**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GENETICS INSTITUTE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 08-290 (SLR) |
| | ) | |
| NOVARTIS VACCINES AND DIAGNOSTICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**GENETIC INSTITUTE'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR IN THE ALTERNATIVE TRANSFER**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (No. 1014)
Karen Jacobs Louden (No. 2881)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
klouden@mnat.com
jparrett@mnat.com
*Attorneys for Plaintiff*

OF COUNSEL:

Barbara C. McCurdy
Steven P. O'Connor
Sanya Sukduang
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001
(202) 408-4000

August 29, 2008

# TABLE OF CONTENTS

INDEX OF EXHIBITS ................................................................................................ iv

I.     INTRODUCTION ................................................................................................ 1

II.    NATURE AND STAGE OF PROCEEDING ...................................................... 2

III.   SUMMARY OF ARGUMENT ........................................................................... 2

IV.   STATEMENT OF FACTS .................................................................................. 4

    A.   The '112 Patent Has Always Been Assigned to GI ......................................... 4

    B.   Wyeth's Stock Purchase of GI Did Not Change Ownership of the '112 Patent ................ 5

    C.   GI Inc. Obtained an Extension of the '112 Patent's Term Under 35 U.S.C. § 156 ........... 5

    D.   GI LLC's Statements in Prior Proceedings Were in Error ................................ 6

V.    ARGUMENT ....................................................................................................... 8

    A.   GI LLC, as the Owner of the '112 Patent, Has Standing to Bring
        the Present § 291 Action .................................................................................. 8

    B.   GI LLC's '112 Patent Is in Force for the Purpose of § 291 ........................... 10

        1.   The rights granted under § 156 to file an infringement action are
            not the only rights GI LLC has in the '112 patent ....................................... 11

        2.   The authority Novartis cites does not support its argument that
            the '112 patent has expired for the purpose of a § 291 action ..................... 13

        3.   The claims of the '112 patent and the Novartis patents interfere ................ 14

    C.   Transfer to the Eastern District of Texas Is Not Warranted ............................ 15

        1.   Novartis's motion to transfer is premised on two contingencies that
            have not occurred and will not occur .......................................................... 15

        2.   Novartis failed to make a showing that transfer is warranted
            under 28 U.S.C. § 1404(a) .......................................................................... 15

VI.   CONCLUSION.................................................................................................... 19

# TABLE OF AUTHORITIES
## FEDERAL CASES

*Abbott Labs. v. Johnson & Johnson, Inc.*,
  524 F. Supp. 2d 553 (D. Del. 2007) ...................................................................17

*ADE Corp. v. KLA-Tencor Corp.*,
  138 F. Supp. 2d 565 (D. Del. 2001) ...................................................................17

*Bergman v. Brainin*,
  512 F. Supp. 972 (D. Del. 1981) ........................................................................16

*Invitrogen Corp. v. Incyte Genomics, Inc.*,
  Civ. A. 01-692, 2002 WL 883963 (D. Del. May 1, 2002) .............................18, 19

*Jumara v. State Farm Ins. Co.*,
  55 F.3d 873 (3d Cir. 1995) ...........................................................................16, 17

*Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*,
  973 F.2d 911 (Fed. Cir. 1992) .......................................................................12, 13

*Liggett Group Inc. v. R.J. Reynolds Tobacco Co.*,
  102 F. Supp. 2d 518 (D.N.J. 2000) .....................................................................19

*Mennen Co. v. Atlantic Mutual Ins. Co.*,
  147 F.3d 287 (3d Cir. 1998) ..............................................................3, 8, 9, 10

*Oracle Corp. v. EpicRealm Licensing, LP*,
  No. Civ. 06-414, 2007 WL 901543 (D. Del. Mar. 26, 2007) ................16, 17, 18

*Regents of the University of California v. Eli Lilly & Co.*,
  777 F. Supp. 779 (N.D. Cal. 1991) .................................................................8, 16

## FEDERAL STATUTES AND REGULATIONS

28 U.S.C. § 1404 .............................................................................................15

35 U.S.C. § 102(g) ..........................................................................................12

35 U.S.C. § 156 ....................................................................................... passim

35 U.S.C. § 271 .............................................................................................11

35 U.S.C. § 282 .........................................................................................12, 13

35 U.S.C. § 291 ....................................................................................... passim

37 C.F.R. § 41.203 ................................................................................................................14

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | U.S. Patent No. 4,686,112 |
| 2 | Assignment of U.S. Application No. 06/725,350, dated July 1, 1985 |
| 3 | Assignment of U.S. Application No. 07/010,085, dated April 10, 1986 |
| 4 | Patent Assignment Abstract of Title for U.S. Patent No. 4,686,112 and accompanying Reel and Frame assignment documents |
| 5 | Pages 1-6 of Genetic Institute Inc.'s Quarterly Report for the Period Ending September 30, 1996 |
| 6 | Pages 1-16 of American Home Products Corporation's Form 10-K for Fiscal Year 1996 |
| 7 | Unanimous Consent of the Board of Directors of Genetics Institute, Inc. |
| 8 | Application for Extension of Patent Term Under 35 U.S.C. § 156 for U.S. Patent No. 4,686,112 |
| 9 | Settlement Agreement dated August 22, 2005 |
| 10 | H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2467 |
| 11 | August 21, 2008 Docket Control Order in *Northeastern Univ. v. Google, Inc.*, C.A. No. 2:07-CV-486 (E.D. Tex.) |
| 12 | Declaration of Bradford A. Lewin |

## I.    INTRODUCTION

Genetics Institute LLC ("GI LLC") filed this action seeking a declaration by this Court under 35 U.S.C. § 291 that GI LLC's '112 patent (U.S. Patent No. 4,868,112) has priority over two patents (U.S. Patent Nos. 6,060,447 and 6,228,620) owned by Novartis Vaccines and Diagnostics, Inc. ("Novartis").  Rather than answer, Novartis moved to dismiss this action for lack of subject matter jurisdiction, or in the alternative to transfer it to the Eastern District of Texas.

The '112 patent represents the culmination of years of research stretching back to 1981 by scientists at GI LLC's predecessor, Genetics Institute, Inc. ("GI Inc.") into Factor VIII, a critical part of the clotting cascade that is missing or reduced in individuals suffering from hemophilia A.  No later than 1984, Dr. John Toole, a scientist at GI Inc., conceived of a version of Factor VIII commonly known as "B-domain deleted Factor VIII."  On April 12, 1985, GI Inc. filed a patent application covering this invention, which the U.S. Patent and Trademark Office ("PTO") issued nearly 19 years ago as the '112 patent.  Novartis now contends that its '447 and '620 patents, which claim priority to an application originally filed at the PTO on January 26, 1986, cover B-domain deleted Factor VIII.  With this cloud hanging over the '112 patent, GI LLC properly filed this interfering patent action against Novartis seeking a declaration on a single issue—that GI LLC was the first to invent B-domain deleted Factor VIII.

Novartis, as the later patent filer, seeks to avoid prompt resolution of GI LLC's sole issue of priority by raising jurisdictional and venue challenges that are not supported by fact or law. Novartis's motion should be seen for what it really is—an attempt to delay the Court's consideration of the priority issue thereby postponing a decision on the merits.  To that end, Novartis promotes a theory that ignores publicly available information, controlling legal

authority, and unequivocal legislative history in seeking to divest this Court of jurisdiction or, alternatively, move this case to an inconvenient forum with no connection to either of the parties. Novartis's fundamental arguments for dismissal are baseless because (1) GI LLC in fact owns the '112 patent, not Wyeth as Novartis alleges; (2) the '112 patent clearly is not "expired" since there is no dispute that the patent is enforceable under 35 U.S.C. § 156 and, furthermore, patents in their extended term are in no way excluded from application of § 291; and (3) the alternative motion to transfer is predicated solely on Novartis's assumptions that either Wyeth transferred ownership of the '112 patent back to GI LLC or GI LLC will add Wyeth as a party, and, because both are incorrect, should be rejected. For these reasons, as more fully set forth below, the Court should deny Novartis's motion and proceed quickly to adjudication of GI LLC's claim that its scientist was the first to invent B-domain deleted Factor VIII.

## II.    NATURE AND STAGE OF PROCEEDING

GI LLC filed this action under § 291 against Novartis seeking adjudication of priority of invention of the '112 patent, assigned to GI LLC, over the '447 and '620 patents, which upon information and belief are assigned to Novartis. Instead of answering the complaint, and in an effort to delay resolution of the § 291 action, Novartis filed a motion to dismiss or in the alternative transfer the action to Texas (*see* D.I. 8). This is GI LLC's opposition to the motion.

## III.    SUMMARY OF ARGUMENT

1.    As a factual matter, Novartis claims that GI LLC lacks standing to bring this action because it does not own the '112 patent. That is simply wrong. GI LLC or its predecessor corporation, GI Inc., has always owned (and continues to own) the '112 patent, as clearly demonstrated by the assignment records recorded in the PTO. Ignoring those publicly available records, Novartis instead claims that Wyeth owns the patent or, in the alternative, that Wyeth recently transferred the patent to GI LLC. At no time has Wyeth held title to the '112 patent.

2

The two statements Novartis relies on to support its motion were incorrect and run contrary to the facts. As such, those statements carry no evidentiary weight in this proceeding. *See Mennen Co. v. Atl. Mut. Ins. Co.*, 147 F.3d 287, 293 (3d Cir. 1998). For this reason, the Court should deny Novartis's motion to dismiss.

2.    Novartis also alleges that the Court lacks subject matter jurisdiction because the '112 patent has expired for purposes of a § 291 action. In making its argument, Novartis asks this Court to adopt an interpretation of 35 U.S.C. § 156 that no court has ever adopted, runs contrary to the plain language of the statute, and is inconsistent with the unambiguous legislative history. Indeed, Novartis's allegation is based on the faulty premise that patents extended under § 156 can be asserted only in patent infringement actions. Novartis's myopic view of § 156 stands in direct conflict with Congress's intent in enacting the statute. As discussed in greater detail below, Congress stated that "*all provisions of the patent law apply to the patent during the period of extension*," qualified only by a more limited right with respect to an infringement action. Consequently, § 291 of the Patent Act applies to the '112 patent.

3.    Novartis alternatively requests that in the event the Court does not dismiss this action, it should transfer this case to the Eastern District of Texas *only if*: (1) Wyeth owned the '112 patent and subsequently transferred ownership back to GI LLC or (2) GI LLC adds Wyeth to this § 291 action. Novartis, a Delaware corporation with a principal place of business in Massachusetts, selects Texas as the forum for transfer because that is where it filed a patent infringement suit against Wyeth and Wyeth Pharmaceuticals Inc., Delaware corporations with principal places of business in New Jersey and Pennsylvania, respectively. According to Novartis, this action "involves the same real parties in interest, both patents at issue in Texas, and many of the same issues as the related case pending there." GI LLC, however, is not a party

to the Texas action, and Wyeth or Wyeth Pharmaceuticals Inc. are not parties here. Nor is the '112 patent at issue there. In any event, Novartis, which bears the burden, provides no evidence in support of transfer nor does it purport to seek transfer other than on the basis of the two identified contingencies, neither of which has or will occur. The Court thus should deny Novartis's motion to transfer.

## IV.    STATEMENT OF FACTS

### A.    The '112 Patent Has Always Been Assigned to GI

The '112 patent, and the applications from which it derives, have at all times been assigned to and owned by GI LLC or its corporate predecessor GI Inc.

The '112 patent issued on September 19, 1989, from U.S. Application No. 07/010,085 ("the '085 application"). The '085 application was filed on April 11, 1986, as a continuation-in-part of U.S. Application No. 06/725,350 ("the '350 application"). (*See* Ex. 1, front cover.) Both the '085 and '350 applications were assigned by John J. Toole, the sole inventor, to GI Inc. (*See* Ex. 2.; Ex. 3.)

In January 2002, GI Inc. converted from a Delaware corporation to a Delaware limited liability company. (*See* Ex. 4 at 17-19.) As a result, GI Inc. changed its name to GI LLC. (*Id*.) GI LLC subsequently recorded the document demonstrating this change in corporate name and status with the PTO in 2002. (*Id*.) GI LLC also recorded a document with the PTO, first in March 2002 and then again in June 2002, indicating that all of the GI Inc.'s patents—including the '112 patent—are now owned by GI LLC. (*Id*. at 4-14[1].) As Novartis acknowledges, the

---

[1] The name change recordation document filed in March 2002 with the PTO did not include GI LLC's address. As a result, the document was resubmitted in June 2002 adding GI LLC's address and reconfirming ownership of the '112 patent in the name of GI LLC.

PTO records indicate that GI LLC is the current assignee of the '112 patent.  (*Id*. at 2-3; D.I. 9 at 3.)  Those records are correct.

**B.    Wyeth's Stock Purchase of GI Did Not Change Ownership of the '112 Patent**

In 1992, American Home Products Corporation ("AHP," now known as Wyeth) obtained a 60% ownership interest in GI Inc. through a stock transaction.  (*See* Ex. 5 at 6.)  Wyeth purchased the remainder of GI Inc.'s stock in 1996.  (*See* Ex. 6 at I-1.)  As a result of those two transactions, GI Inc. (and subsequently GI LLC) became a wholly-owned subsidiary of Wyeth. (*See* D.I. 1 at ¶ 7.)  But at no time did GI Inc. or GI LLC assign or otherwise transfer its interest in the '112 patent to Wyeth.  (*See* Ex. 7; Ex. 12 at ¶¶ 3-4.)  Although GI Inc.'s Board of Directors consented to the transfer of certain GI Inc. assets to AHP, in December 2001 the consent document expressly ***excluded*** "(iii) any intangibles, including, without limitation, all agreements, ***all patents***, patent applications, license, disclosures, trademarks and registration, trade names, logos, copyrights, know-how, new drug applications and abbreviated new drug applications[.]"   (*See* Ex. 7 at 1 (emphasis added).)   At no time did GI Inc.'s (or GI LLC's) Board of Directors consent to transfer any patent, let alone the '112 patent, to AHP or Wyeth. (Ex. 12 at ¶¶ 3-4.)  Consequently, the '112 patent has been at all times owned by GI Inc. and GI LLC.

**C.    GI Inc. Obtained an Extension of the '112 Patent's Term Under 35 U.S.C. § 156**

The duration of the "original" term of the '112 patent was 17 years from issue, or until September 19, 2006.  On March 4, 2000, before the expiration of the '112 patent's original term, GI Inc., as the assignee and owner of the entire right, title, and interest in and to the '112 patent, filed an application with the PTO for a statutory extension of patent term under 35 U.S.C. § 156. (*See* Ex. 8.)  The PTO granted the request for an extension, and on September 14, 2006, issued a

Certificate Extending Patent Term Under 35 U.S.C. § 156, which extended the term of the '112 patent for 1,258 days.  (*See* Ex. 1, last page.)  Accordingly, the '112 patent does not expire until February 28, 2010.

**D.    GI LLC's Statements in Prior Proceedings Were in Error**

The '112 patent was involved in an interference proceeding in the PTO, styled as *Toole v. Vehar*, with a patent application owned by a third-party, Genentech, to determine the first to invent.  During that interference, in May 2002, Toole filed a statement identifying Wyeth as the "real party in interest" for Toole's '112 patent.  According to that statement, GI had transferred its assets to AHP, now known as Wyeth.  (D.I. 10, Ex. 4.)  That statement was incorrect.  Ownership of the '112 patent had not been transferred to either AHP or Wyeth.  (*See* Ex. 7; Ex. 12 at ¶¶ 3-4.)  Indeed, as discussed above (*see* §§ IV A-B, *supra*), in March and again in June 2002, GI LLC recorded with the PTO a document identifying that the assignee and owner of the '112 patent, GI Inc., had changed its name to GI LLC.

After the PTO ruled in the *Toole v. Vehar* interference that Toole was entitled to priority of invention, Genentech "appealed" the decision under 35 U.S.C. § 146 by filing a complaint to this Court seeking to overturn the PTO decision.  (*See* D.I. 10, Ex. 1.)  In its § 146 complaint, Genentech alleged, *inter alia*, that Wyeth, not GI LLC, owned the '112 patent, carrying over the erroneous assumption that there had been an acquisition of all of GI LLC's assets by AHP/Wyeth.  (*Id.*)  The defendants failed to correct the earlier erroneous assumption in their response filed in June 2004.  (*Id.* at Ex. 2.)  In fact, however, at no time during the interference or the § 146 litigation, which ultimately was settled and the action dismissed, was ownership of the '112 patent transferred to Wyeth.  (*See* Ex. 7; Ex. 12 at ¶¶ 3-4.)  On the contrary, the settlement

papers signed by GI LLC, Wyeth, Bayer and Genentech in 2005 specifically identify GI LLC as the sole owner of the '112 patent.  (*See* Ex. 9 at 1 § B.[2])

Thus, as the following timeline indicates, both before and after the two misstatements, the '112 patent has always been owned by GI Inc. or GI LLC, and never by Wyeth.



---

[2] GI LLC submits as Exhibit 9 a redacted version of the Settlement Agreement discussed above.  GI LLC is currently seeking permission from Genentech and Bayer to provide the Court and Novartis with an unredacted version of the Settlement Agreement.

## V.    ARGUMENT

### A.    GI LLC, as the Owner of the '112 Patent, Has Standing to Bring the Present § 291 Action

Novartis acknowledges in its opening brief that the PTO assignment database identifies GI LLC as the assignee of the '112 patent. (D.I. 9 at 3; Ex. 4.) Despite this fact, Novartis alleges that GI LLC lacks standing to file the present § 291 action because it is not the owner of the '112 patent. Novartis's argument, however, is premised on incorrect assumptions.

As discussed above (*see* §§ IV A-B and timeline, *supra*) GI LLC (or its corporate predecessor GI Inc.) has been at all times the assignee and owner of the '112 patent. (*See* Ex. 7; Ex. 12 at ¶¶ 3-4.) Thus, contrary to Novartis's allegation, neither GI LLC nor Wyeth had reason to notify the PTO of any change in ownership of the '112 patent. (*See* D.I. 9 at 3.) There can be no dispute that GI LLC, as the owner of the '112 patent, has standing to bring a § 291 action involving that patent. *See* 35 U.S.C. § 291 ("The owner of an interfering patent may have relief against the owner of another by civil action . . . ."); *Regents of the Univ. of Cal. v. Eli Lilly & Co.*, 777 F. Supp. 779, 783 (N.D. Cal. 1991) (stating that the "title holder" of a patent is the "owner" for purposes of § 291).

Ignoring the chain of assignment documents for the '112 patent recorded at the PTO, and in contradiction to all other documents identifying GI LLC or its predecessor GI Inc. as the owner of the '112 patent, Novartis relies exclusively on two misstatements made in prior pleadings. (*See* D.I. 9 at 1-3.) Novartis does not, and cannot, contend that these two misstatements are binding and irrefutable admissions. Indeed, the Third Circuit has clearly held that misstatements, such as the two Novartis cites, have no evidentiary value when determining subject matter jurisdiction—the issue raised by Novartis here—if they run contrary to the empirical facts. *Mennen*, 147 F.3d at 293.

In *Mennen*, defendant Federal Insurance Co. ("Federal") filed a motion to dismiss for lack of subject matter jurisdiction on the basis that Federal's principal place of business was New Jersey, rather than Indiana, thereby divesting the New Jersey district court of diversity jurisdiction. *Id*. at 289. In response, Mennen relied on pleadings Federal filed in other proceedings where Federal stated that its principal place of business was in Indiana. Mennen argued that the prior pleadings reflected Federal's true understanding of its principal place of business. *Id*. at 293. The Third Circuit disagreed, stating that Federal's prior pleadings have no evidentiary value because they "*run contrary to the empirical facts* with which the jurisdictional inquiry is concerned." *Id*. (emphasis added). The court went on to state that "*pleadings themselves have no intrinsic capacity either to establish or disestablish jurisdiction*; it is axiomatic that a party may not confer or defeat jurisdiction by mere pleading." *Id*. (emphasis added).

Here, the two misstatements in prior pleadings run contrary to the empirical facts that GI LLC is the assignee and owner of the '112 patent, and that at all times the '112 patent has been owned by GI LLC, or its predecessor GI Inc. For instance, although mistakenly stated in a paper submitted to the PTO in *May 2002* that Wyeth owns all right, title, and interest in the '112 patent (*see* D.I. 9 at 2-3), in *March* and *June 2002* GI LLC publicly recorded with the PTO a document indicating that GI LLC owned the '112 patent. (*See* Ex. 4 at pp. 4-5.) In failing to even address GI LLC's public recordation of the change in assignee name for the '112 patent, Novartis implicitly asserts that regardless of the underlying facts, a statement concerning ownership in a prior litigation is irrefutable proof of ownership. As shown by *Mennen*, however, the rule is just the opposite—the underlying facts concerning ownership control, not a contrary statement in a pleading.

The evidence here also demonstrates that GI LLC incorrectly stated in June 2004 that Wyeth owns all right, title, and interest in the '112 patent. (*See* D.I. 9 at 2.) The error of this statement is evidenced not only by documents publicly recorded with the PTO, but also by the subsequent settlement agreement entered into by the parties involved in the § 146 action in 2005. In that agreement, GI LLC and Wyeth make clear that "GI owns" the '112 patent. (*See* Ex. 9 at p. 1 § B.) Further, Genentech and Bayer, which originally stated that Wyeth was the owner of the '112 patent in their complaint, also confirmed in the settlement agreement that GI LLC is the owner of the '112 patent. *Id*. The identification of GI LLC rather than Wyeth as the owner in the settlement agreement as late as 2005, well after the statements on which Novartis relies, is consistent with and supports the fact that GI LLC is the owner of the '112 patent and is properly named as plaintiff in this case.

Because GI LLC's two prior misstatements about ownership of the '112 patent are plainly inconsistent with the underlying empirical facts, they cannot be used to divest this Court of subject matter jurisdiction. *Mennen*, 147 F.3d at 293. GI LLC is the proper party with standing to bring this action. As such, the Court should deny Novartis's motion to dismiss for lack of standing.

### B.    GI LLC's '112 Patent Is in Force for the Purpose of § 291

Novartis contends that, regardless of ownership, there is no subject matter jurisdiction under § 291 because the 17-year term of the '112 patent expired on September 19, 2006. Recognizing that GI Inc. applied for, and was granted, an extension of patent term under 35 U.S.C. § 156, Novartis asserts that in enacting § 156 Congress intended to provide "extensions for the narrow purpose of restoring exclusivity to a patent owner who lost a portion of its patent term during the FDA approval process." (D.I. 9 at 6.) That narrow right to exclude, Novartis argues, "is not intended to support a claim of interfering patents." (*Id*. at 7.) Novartis, however,

cites no authority supporting its position, and § 291, on which the present action is based, applies to *all* patents, without any exception for patents having an extended term. Nor can it, as Novartis's interpretation wholly lacks support. Furthermore, Novartis completely ignores the legislative history evidencing Congress's intent in enacting § 156, which undermines Novartis's theory. Thus, while § 156 may limit the scope of an infringement action under 35 U.S.C. § 271, that limitation is not germane to the jurisdictional challenge Novartis raises because Congress clearly indicated that all other provisions of the patent law apply to a patent during the period of extension. (*See* Ex. 10 at *39.) Accordingly, the Court should deny Novartis's request to dismiss on this ground.

### 1. The rights granted under § 156 to file an infringement action are not the only rights GI LLC has in the '112 patent

In arguing that the '112 patent has expired for the purposes of a § 291 action, Novartis points to the language of § 156 (D.I. 9 at 7), the Federal Circuit's interpretation of § 156 (*id*. at 7-8), and the PTO's Manual of Patent Examining Procedure ("MPEP") (*id*. at 8-9), as support for its contention that the extended rights provided under § 156 are only "for a limited purpose relating to uses approved for the product that underwent FDA review and is not intended to support a claim of interfering patents." (*Id*. at 7.) What these authorities establish, however, is that any limitations to patent term extensions under § 156(b) apply to bringing a *patent infringement action*, not that a patent extended under § 156 is unavailable for a § 291 action. Neither the statute, Federal Circuit case law, nor the MPEP limits an action under § 291 for challenging an interfering patent, and Novartis has pointed to no authority supporting such a position.

Indeed, Congress expressly stated the contrary. Specifically, § 156 was introduced into the patent law with passage of the "Drug Price Competition and Patent Term Restoration Act" in

1984. In the House Report's discussion of the rights to be extended under § 156(b) the Congress stated unambiguously: "Except for the limitations described below with respect to the scope of the patent claims, *all provisions of the patent law apply to the patent during the period of extension*." (Ex. 10 at *39 (emphasis added).) The report then proceeds to explain the limitations on patent infringement actions. (*Id.* at *39-40.) Nowhere in the House Report's discussion of § 156 is there any suggestion that § 291 does not apply during the period of extension. To put it plainly, Novartis's contention that a patent extended under § 156 has expired for the purpose of a § 291 suit is simply wrong.

Moreover, if a § 291 suit could not be brought based on a patent extended by § 156, then GI LLC would be deprived of its right to exclude unencumbered by the cloud of an interfering patent, a right to exclude that even Novartis concedes § 156 grants to GI LLC. All provisions of the patent law apply to the '112 patent, including the presumption of validity provided by 35 U.S.C. § 282. That presumption, however, has been eroded by the issuance of Novartis's patents. As the Federal Circuit explained in *Kimberly-Clark Corp. v. Procter & Gamble Distrib. Co.*, 973 F.2d 911, 914 (Fed. Cir. 1992):

> The rights to which one is entitled by ownership of a patent are principally the right to exclude others from making, using, and selling patented subject matter. . . . The fact that the Patent and Trademark Office issued patents to both K-C and P & G on the same invention is a serious impediment to the enjoyment of this essential right to exclude. Neither patent owner knows if its patent is valid in light of the other's patent, the presumption of validity provided by 35 U.S.C. § 282 having been eroded by the grant of an "interfering" patent. One owner has a patent which it will lose if asserted against third parties, thereby incurring for itself, the accused infringer, and the public unneeded expense. *See* 35 U.S.C. § 102(g). The other has to assert or defend its patent before its presumption of validity, at least regarding priority of invention, is meaningful. Section 291 provides a means for resolving the contested issue of priority of invention solely *between two patent owners,* without involving third parties. (Citation omitted).

With the issuance of the later-filed Novartis patents, GI LLC's rights in the '112 patent have been adversely affected. The law provides a mechanism, via § 291, for GI LLC to remove the impediment of the Novartis patents so it may obtain the full scope of its rights under the law, including the presumption of validity provided by § 282. In addition, § 291 serves the public interest by ensuring that there is only one patent on a given invention.

Contrary to Novartis's statement that "there is no rationale . . . for allowing a § 291 action during the period of extended exclusivity under § 156," (D.I. 9 at 6), the rationale articulated by the *Kimberly-Clark* court aptly applies here to ensure that the extension afforded by § 156 and the rights that exist in the extended term are preserved by avoiding an unjustified restriction on § 291. Moreover, Novartis's assertion that there is also "no authority" for an interfering patent suit during a period of patent term extension is just as meritless in view of the plain language of § 291 and the legislative history of § 156.

> ### 2.     The authority Novartis cites does not support its argument that the '112 patent has expired for the purpose of a § 291 action

Novartis's argues that there is no subject matter jurisdiction for an action brought under § 291 when one of the interfering patents has expired also fails because the '112 patent has not expired. Novartis nowhere challenges the propriety of the PTO granting the extension under § 156, extending the term to 2010. Moreover, Novartis concedes that the '112 patent is in force for at least the purpose of bringing a patent infringement action, for example against a third party's unauthorized sale of the approved product that was the basis for the § 156 extension. (*See* D.I. 9 at 6-8.) In these circumstances, the argument and cases Novartis cites are plainly inapposite—Novartis cites no case that even addresses the question of whether jurisdiction lies in a § 291 action involving a patent that is still in force like the '112 patent, much less a case that holds that there is no jurisdiction.

In short, a major premise of Novartis's argument—that the '112 patent is expired—is wrong and the argument must accordingly fail. GI LLC undisputedly has rights under the '112 patent in view of the § 156 term extension, during which all provisions of the patent law apply as Congress intended. GI LLC should be permitted to invoke one of those provisions, § 291, to remove the impediment to those rights arising from the PTO's issuance of patents to Novartis with claims that interfere with the claims of the '112 patent.

### 3. The claims of the '112 patent and the Novartis patents interfere

According to Novartis, there is no interference-in-fact because the law requires interfering claims. (D.I. 9 at 9-10.) Novartis correctly points out that a suit under § 291 requires two patents that claim the same or substantially the same subject matter, as defined by the test set forth in 37 C.F.R. § 41.203. Notably, Novartis does not challenge the allegations in GI's complaint that the subject matter of the '112 patent and Novartis patents interfere. Instead, Novartis asserts the patents do not claim interfering subject matter solely on the ground that "[b]ecause the extension under § 156 provides exclusivity only for approved uses of a particular product, not for the now-expired *claims* of the '112 patent, no interference can exist between the '112 patent and the Novartis patents." (D.I. 9 at 10 (emphasis in original).)

Novartis's single-minded attack on subject matter jurisdiction based on the scope of rights provided by § 156(b) related to infringement actions must fail. Again, Novartis provides no factual basis or legal authority supporting its arguments that the '112 patent has expired or that § 156(b) somehow limits the right to bring a § 291 action during the extended term. And as explained above, Novartis's position is contradicted by the plain language of § 291, ignores the clear intent of Congress as expressed in the legislative history of § 156(b), and would undermine the enforcement right granted to GI LLC by § 156. If, as Novartis would have the Court believe,

the '112 patent and its claims have expired, there would be no meaning to Congress's statement that all provisions of the patent law apply during the term of extension. Since all provisions of the patent law do apply, the '112 patent and its claims have not expired for the purpose of a § 291 action, and Novartis's sole challenge to interference-in-fact must fail.

### C.    Transfer to the Eastern District of Texas Is Not Warranted

#### 1.    Novartis's motion to transfer is premised on two contingencies that have not occurred and will not occur

Novartis asserts that the present case should be transferred to the Eastern District of Texas if either of two contingencies is met: (1) Wyeth owned the '112 patent and subsequently transferred ownership of it back to GI LLC or (2) GI LLC adds Wyeth to the present § 291 action. (*See* D.I. 9 at 3-4.) Neither of Novartis's two contingencies has or will come to fruition. GI LLC, or its predecessor GI Inc., has at all times been the assignee and owner of the '112 patent; thus Wyeth could not transfer ownership back to GI LLC. (*See* §§ IV A-B, *supra*.) Moreover, because GI LLC is the owner of the '112 patent, it is unnecessary to add Wyeth as a party. Because neither contingency outlined in Novartis's motion has been met, the Court should deny Novartis's motion to transfer.[3]

#### 2.    Novartis failed to make a showing that transfer is warranted under 28 U.S.C. § 1404(a)

That Novartis's pending motion is nothing more than a tactical effort to delay resolution of the first to invent issue before this Court is evidenced by Novartis's failure to even attempt to

---

[3] Novartis contends that it may need discovery to resolve this issue "*[i]f* in response to this motion, GI LLC contends that ownership of the '112 patent was reassigned back to GI . . . ." (D.I. 9 at 4 (emphasis added).) Because GI LLC has established herein that it, or its predecessor GI Inc., has held title to the '112 patent at all times and that ownership of the '112 patent was never transferred to AHP/Wyeth, the contingency for Novartis's alleged need for discovery has not occurred and discovery related to ownership of the '112 patent is not warranted.

meet its burden of establishing that "the balance of convenience of the parties and witnesses strongly favors the defendants" motion to transfer.  *Oracle Corp. v. EpicRealm Licensing, LP*, C.A. No. 06-414, 2007 WL 901543, at *3 (D. Del. Mar. 26, 2007), *quoting Bergman v. Brainin*, 512 F. Supp. 972, 973 (D. Del. 1981).  Indeed, Novartis readily acknowledges its willingness to delay by asserting in a footnote that its alternative motion to transfer could be decided at some later date.  (*See* D.I. 9 at 1, n.1.)  The Court should not countenance Novartis's dilatory tactics.

Novartis's sole case for transfer is a single sentence asserting that "this action involves the same real parties in interest, both patents at issue in Texas, and many of the same issues as the related case pending there."  (D.I. 9 at 4.)  Not only is Novartis's conclusory statement incorrect, it falls far short of any showing that the private and public factors set forth in *Jumara v. State Farm Insurance Co.* favor transfer.  55 F.3d 873, 879-80 (3d Cir. 1995).

First, GI LLC is not a party to the patent infringement action pending in the Eastern District of Texas and neither Wyeth nor Wyeth Pharmaceuticals Inc. is a party to this § 291 action.  Thus, contrary to Novartis's allegation, the § 291 action pending before this Court does not have the same parties as the Texas action.  Second, the patents involved in the Texas action do not overlap with the patents involved here because the '112 patent is not in suit there and the validity of the '112 patent will not be addressed in Texas.  Finally, under § 291, this Court must determine priority of invention as between GI LLC's '112 patent and Novartis's '620 and '447 patents.  This issue is not before the Texas court.  Indeed, because Wyeth is not the owner of the '112 patent, Wyeth cannot assert a § 291 counterclaim in Texas.  *See Regents of the Univ. of Cal.*, 777 F. Supp. at 781-86 (denying exclusive licensee from bringing a § 291 counterclaim because the licensee was not the "owner" of the patent).

16

These same facts also prevent the Texas action from being accorded first-filer status.  In particular, the first-filed rule applies only when "proceedings involving the same parties and issues are pending simultaneously in different federal courts."  *Abbott Labs. v. Johnson & Johnson, Inc.*, 524 F. Supp. 2d 553, 557 (D. Del. 2007).  Here, the parties are not the same and the issue of first to invent between GI LLC's '112 patent and Novartis's '620 and '447 patents is not pending in Texas, so first-filer status does not apply.  *Id*. at 558 ("[I]t would not be appropriate to apply the first-filed rule to the 06-613 action and the first New Jersey action, because those cases involve different patents.").

Although Novartis does not address them, the private and public factors set forth in *Jumara* warrant denial of Novartis's motion to transfer.[4]  With respect to the private interests, GI LLC chose to file this action in Delaware because both GI LLC and Novartis are Delaware corporations.  Novartis, on the other hand, offers no explanation for its decision to file its infringement action against Delaware corporations Wyeth and Wyeth Pharmaceuticals Inc. in the Eastern District of Texas.  As this Court has stated, "[u]nless the balance is strongly in favor of a transfer, the plaintiff's choice of forum should prevail."  *Oracle*, 2007 WL 901543, at *4, *quoting ADE Corp. v. KLA-Tencor Corp.*, 138 F. Supp. 2d 565, 567-68 (D. Del. 2001).  This Court has recognized that filing suit against a Delaware corporation, like Novartis, is a rational and legitimate reason to litigate in Delaware and that a defendant should not be heard to complain about the inconvenience of litigating in its corporate home.  *Oracle*, 2007 WL 901543, at *4 ("[Defendant's] complaints about litigating here are outweighed by the fact that [it] has enjoyed the benefits and protections of Delaware as a limited partnership here and the State has

---

[4] Pursuant to D. Del. L.R. 7.1.3(c)(2) Novartis cannot now address the *Jumara* factors in its reply brief, as those factors "should have been included in [Novartis's] full and fair opening brief."

an interest in litigation regarding companies incorporated within its jurisdiction.")  Further, Novartis has not alleged that litigating in Texas would be more convenient due to the location of witnesses and documents.  Indeed, that is not surprising since both GI LLC and Novartis have principal places of business in *Massachusetts*.  If anything, Delaware is a more convenient forum for these Delaware companies.  (*See* D.I. 1 at ¶¶ 1-2.)

In terms of the public interests, resolution of the single issue of first to invent in Delaware will be less complicated, faster, and likely less expensive than if consolidated with the multiplicity of infringement and invalidity issues pending in Texas.  *See Oracle*, 2007 WL 901543, at *4.  More specifically, patent infringement actions filed in 2007 in Texas are currently being scheduled for trial in the second quarter of 2011.  (*See* Ex. 11 at 1.[5])  Novartis filed its Eastern District of Texas action against Wyeth in February 2008 and a status conference has not yet been set.  Fully aware that the Texas action will likely not be scheduled for trial until late 2011—three years from now—Novartis seeks to transfer this action to a forum where resolution of this limited issue will be a long time coming.  But, because of the very limited scope of a § 291 action, the minimal discovery needed by the parties, and the fact that the single issue of first to invent will be tried to the bench, this Court could quickly adjudicate GI LLC's claim of priority.  Accordingly, GI LLC will seek the earliest possible trial date in Delaware, and certainly a date much earlier than 2011.  Finally, the public interest embodied in § 291 would be served by this Court's prompt decision on GI LLC's claim of priority.  Moreover, Delaware has an interest in resolving legal issues involving companies incorporated within its jurisdiction.  *See Oracle*, 2007 WL 901543, at *3.

---

[5] The attached scheduling order was signed by Magistrate Judge Everingham.  (*See* Ex. 11 at 5.)  Judge Everingham has also been assigned to the Novartis Texas action.

Novartis, as the moving party, must provide sufficient information in the record to support its motion to transfer.  *See Invitrogen Corp. v. Incyte Genomics, Inc.*, C.A. No. 01-692, 2002 WL 883963, at *3 (D. Del. May 1, 2002) citing *Liggett Group Inc. v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 529 (D.N.J. 2000).  Having failed to do so, the Court should deny Novartis's motion to transfer.

## VI.    CONCLUSION

For all the above reasons, GI LLC respectfully requests that this Court deny Novartis's motion to dismiss or in the alternative transfer this action to the Eastern District of Texas.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ James W. Parrett, Jr.*
Jack B. Blumenfeld (#1014)
Karen Jacobs Louden (#2881)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
klouden@mnat.com
jparrett@mnat.com
*Attorney for Plaintiff*

*Of Counsel*:

Barbara C. McCurdy
Steven P. O'Connor
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C.  20001-4413
(202) 408-4000

Willem G. Schuurman
VINSON & ELKINS L.L.P.
The Terrace 7
2801 Via Fortuna, Suite 100
Austin, TX  78746-7568
(512) 542-8400

August 29, 2008

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 29, 2008, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Richard K. Herrmann, Esquire
> Mary B. Matterer, Esquire
> Amy Arnott Quinlan, Esquire
> MORRIS JAMES LLP

I also certify that copies were caused to be served on August 29, 2008 upon the following in the manner indicated:

> **BY ELECTRONIC MAIL**
> <u>**and HAND DELIVERY**</u>
>
> Richard K. Herrmann, Esquire
> Mary B. Batterer, Esquire
> Amy Arnott Quinlan, Esquire
> MORRIS JAMES LLP
> 500 Delaware Avenue, Suite 1500
> Wilmington, DE  19801
>
> <u>**BY ELECTRONIC MAIL**</u>
>
> George A. Riley, Esquire
> John C. Kappos, Esquire
> George C. Yu, Esquire
> O'MELVENY & MYERS LLP
> 275 Battery Street, Suite 2600
> San Francisco, CA  94111-3305

*/s/ James W. Parrett, Jr.*
_____
James W. Parrett, Jr. (#4292)

# EXHIBIT 1

# United States Patent [19]

**Toole, Jr.**

[11] **Patent Number:** **4,868,112**

[45] **Date of Patent:** **Sep. 19, 1989**

[54] **NOVEL PROCOAGULANT PROTEINS**

[75] Inventor: **John J. Toole, Jr.,** Jamaica Plain, Mass.

[73] Assignee: **Genetics Institute, Inc.,** Cambridge, Mass.

[21] Appl. No.: **10,085**

[22] PCT Filed: **Apr. 11, 1986**

[86] PCT No.: **PCT/US86/00774**

§ 371 Date: **Apr. 11, 1986**

§ 102(e) Date: **Apr. 11, 1986**

[87] PCT Pub. No.: **WO86/06101**

PCT Pub. Date: **Oct. 23, 1986**

## Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 725,350, Apr. 12, 1985, abandoned.

[51] **Int. Cl.⁴** ....................... **C12P 21/00; C12P 21/02; C12N 15/00; C07H 15/12**

[52] **U.S. Cl.** ...................................... **435/68;** 435/70; 435/172.3; 435/240.1; 435/240.2; 435/320; 435/948; 435/252.33; 530/383; 536/27; 514/2; 514/8

[58] **Field of Search** ................ 435/68, 70, 172.3, 253, 435/255, 256, 240.1, 240.2, 320; 530/383; 534/27; 935/11, 32, 34, 56, 57, 60, 70; 514/2, 8

[56] **References Cited**

## PUBLICATIONS

Wood et al, *Nature,* vol. 312, 22 Nov. 1984, pp. 330–336, "Expression of Active Human Factor VIII from Recombinant DNA Clones".
Toole et al, *Nature,* vol. 312, 22 Nov. 1984, pp. 342–347, "Molecular Cloning of a cDNA Encoding Human Antihaemophilic Factor".
Vehar et al, *Nature,* vol. 312, 22 Nov. 1984, pp. 337–342, "Structure of Human Factor VIII".
Orr et al, *Thrombos Haemostasis,* vol. 57(1), p. 57, 1985, "Spacer Function Imp for the Heavily Glycosylated Region of Factor VIII".
Toole et al, *Proc. Natl. Acad. Sci.,* vol. 83, pp. 5939–5942, Aug. 1986, "A Large Region ($\approx$95 kDa) of Human Factor VIII is Dispensable for in vitro Procoagulant Activity".
Kaufman et al, *Proteases in Biological Control and Biotechnol.,* J. Gen. Biochem. Supp., 10D 275 (1968).

*Primary Examiner*—Robin Teskin
*Attorney, Agent, or Firm*—David L. Berstein; Bruce M. Eisen; Ellen J. Kapinos

[57] **ABSTRACT**

Novel procoagulant proteins are disclosed which comprise the amino acid sequence:

A-X-B

wherein region A represents the polypeptide sequence Ala-20 through Arg-759 substantially as shown in Table 1; region B represents the polypeptide sequence Ser-1709 through Tyr-2351 substantially as shown in Table 1; and region X represents a polypeptide sequence comprising up to 949 amino acids substantially duplicative of sequences of amino acids within the sequence SER-760 through Arg-1708 of Table 1, wherein the amino terminus of X is covalently bonded through a peptide bond designated "-" to the carboxy terminus of A, and the carboxy terminus of X is likewise bonded to the amino terminus of B. Methods of making such proteins and their use in pharmaceutical preparations is also disclosed.

**12 Claims, No Drawings**

## NOVEL PROCOAGULANT PROTEINS

This application is a continuation in part of U.S. Ser. No. 725,350 (filed Apr. 12, 1985), now abandoned, the contents of which are hereby incorporated by reference.

This invention relates to a novel series of proteins which exhibit procoagulant properties. These proteins have marked structural differences from human factor VIII:C, but have similar procoagulant activity.

Factor VIII:C is the blood plasma protein that is defective or absent in Hemophilia A disease. This disease is a hereditary bleeding disorder affecting approximately one in 20,000 males. The structure of factor VIII:C is described in U.S. Patent Applications Ser. Nos. 546,650 filed Oct. 28, 1983 and 644,036 filed Aug. 24, 1984, which are incorporated herein by reference and in *Nature.* 312:306, 307, 326 and 342.

One of the problems presently encountered with the use of human factor VIII:C for treatment of hemophilia arises from its antigenicity. A significant percentage of hemophiliacs have developed an immune reaction to the factor VIII:C used for their treatment. Non-hemophiliacs can also develop or acquire hemophilia when their immune systems become sensitized to factor VIII:C and produce circulating antibodies or "inhibitors" to factor VIII:C. In either case, the effect is the neutralization of whatever factor VIII:C is present in the patient, making treatment very difficult. Until now, the method of choice for treating hemophiliacs with this problem has been to administer, in cases of severe bleeding episodes, non-human factor VIII:C, such as treated porcine factor VIII:C. See Kernoff et al., *Blood* 63:31 (1984). However, the antibodies which neutralize the clotting ability of human factor VIII:C will react to a varying extent with factor VIII:C of other species, and the porcine protein is itself antigenic, thus both the short-term and long-term effectiveness of such treatment will vary.

Additionally, patients frequently display adverse reactions to infusion with the porcine factor VIII:C. The use of porcine factor VIII:C in spite of the risks has been justified because of the lack of reliably effective alternatives. Kernoff, supra at 38. The present invention provides an alternative to the administration of porcine factor VIII:C.

This invention provides for proteins which have procoagulant activity similar to that of factor VIII:C and also have substantially lower molecular weight. These proteins are schematically depicted by formula (1) as follows:

$$A\text{-}X\text{-}B \tag{1}$$

wherein A represents a polypeptide sequence substantially duplicative of the sequence Ala-20 through Arg-759; B represents a polypeptide sequence substantially duplicative of the sequence Ser-1709 through the C-terminal Tyr-2351; and X represents a polypeptide sequence of up to 949 amino acids substantially duplicative of sequences of amino acids within the sequence Ser-760 through Arg-1708. The amino terminus of region X is covalently bonded through a peptide bond (designated "-" in formula 1) to the carboxy terminus of A. The carboxy terminus of region X is likewise bonded to the amino terminus of B. Numbering of amino acids throughout this disclosure is with reference to the numbering of amino acids in Table 1 in which the first amino acid, Met, of the leader sequence is assigned Number 1. Protein domain X may comprise a continuous but shorter sequence selected from the region Ser-760 through Arg-1708. Alternatively X may comprise two or more amino acid sequences selected from that region which are covalently bonded by a peptide bond (maintaining an ascending numerical order of amino acids).

## TABLE I

5' GAATTCCCCACTGGGTAAGTTCCTTAAAGCTCTGGAAAGAAATTCCGACTTTTCATTAAATCAGAAATT
TTACTTTTTCCCTCTGGGACCTAAAGATATTTTTAGAGAAGAATTAACCTTTTGTTCTTCTTAGCAATAAGTC

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | |
|---|---|---|---|---|---|---|---|---|----|----|----|----|----|----|----|----|----|---|
| MET ATG | Gln CAA | Ile ATA | Glu CAG | Leu CTC | Arg AGA | Glu CAG | Ser TCC | Phe TTC | Cys TGC | Phe TTT | Leu CTG | Arg CCA | Thr ACC | Ser TCC | Tyr TAC | Leu CTG | Phe TTT | 18 |
| Ser ACT | Ala CCC | Thr ACC | Ala GCT | Arg AGA | Gly GGT | Ile ATC | Leu CTG | Ala CCA | Glu GAA | Gly GGT | Leu CTC | Pro CCT | Ser TCA | Pro CCT | Val CTG | Tyr TAC | MET ATC | 36 |
| Gln CAA | Ser AGT | Asp GAT | Pro CCT | Gly GGT | Phe TTC | Leu CTG | Asn AAC | Asp CAC | Arg AGA | Val GTG | Phe TTT | Leu CTT | Thr ACT | Pro CCA | Arg CTG | Asp GAC | Pro CCA | 54 |
| Lys AAA | Ser TCT | Val GTT | Pro CCT | Phe TTC | Leu CTT | Lys AAG | MET ATG | Val GTG | Lys AAA | Gly GGA | Pro CCA | Lys AAG | Pro CCA | Ser TCA | MET ATG | Arg AGA | Glu GAA | 72 |
| Phe TTC | Thr ACG | Pro CCT | His CAC | Pro CCA | Lys AAG | Arg AGA | Thr ACA | Ser TCC | Arg ACC | Gln CAA | Val GTG | MET ATG | Pro CCA | Asn AAT | Val GTT | Val CTG | Leu CTG | 90 |
| Leu CTA | Gly GGT | Pro CCT | His CAT | Tyr TAC | Pro CCA | Ile ATT | Val GTC | Ala CAC | Arg AGG | Gln CAA | Gly GGT | Glu GAA | Val GTA | Glu CAA | Ser TCC | Ile ATA | Lys AAG | 108 |
| Asn AAC | MET ATG | Ala GCT | Pro CCT | Ala GCA | Pro CCA | Ser TCC | Ser ACT | Thr ACA | Thr ACA | Ala CCC | Gln CAA | Leu CTG | Arg AGG | Thr ACA | Lys AAG | Asn AAC | Lys AAA | 126 |
| Ala GCT | Ser TCT | Glu CAG | Val GTC | Thr ACC | Pro CCA | Glu GAA | Val GTT | Ser ACT | Val GTT | Thr ACA | Trp TCC | Gly GGA | Gln CAG | Ser ACT | Leu CTG | His CAC | Asp CAT | 144 |
| Asp GAT | Lys AAA | Val GTC | Pro CCA | Tyr TAT | His CAT | Gly GGA | Ser ACC | Val CTC | Ser TCC | Thr ACA | Tyr TAC | Gln CAA | Gln CAG | Gln CAG | Leu CTG | His CAC | Glu GAG | 162 |
| Asn AAT | Gly GGT | Pro CCA | Gly GGA | Gly GGA | Leu CTG | Asp GAC | Thr ACC | Thr ACC | Leu CTG | Trp TCC | Gly GGA | Tyr TAC | Gly GGA | Tyr TAC | Leu CTT | Val GTC | His CAT | 180 |
| Val GTG | Asp GAC | Leu CTA | Asp GAC | Ser TCT | Leu CTG | Asp CAC | Ile ATT | Ile ATT | Leu CTG | Ile ATT | Ser TCA | Gly CGC | MET ATG | Ser TCT | Leu CTA | Val GTC | Cys TGT | 198 |
| Arg AGA | Glu CAA | Gly GGG | Glu CAA | Asp GAC | Lys AAG | Ala GCC | His CAC | Thr ACC | Leu CTG | Thr ACA | Leu CTG | Leu CTG | Thr ACA | Ala CCT | Leu CTA | Ile ATA | Leu CTA | 216 |
| Leu CTT | Phe TTT | Gly GGG | MET ATG | Arg AGG | Leu CTG | Ala GCC | Ala GCC | Ala GCC | Ile ATT | Ser ACT | Ser TCA | Ser TCA | Phe TTT | Lys AAG | Phe TTT | Asn AAC | Ser TCC | 234 |
| Leu TTG | MET ATG | Ile ATT | Asp GAT | Tyr TAT | Phe TTT | Arg AGG | Ala GCT | Pro CCT | Arg AGG | Ala CCT | Arg TGG | Trp TGG | Lys AAG | MET ATG | Lys AAG | His CAC | Thr ACA | 252 |
| Val GTC | Asn AAT | Gly GGT | Gly CGT | Tyr TAT | Val GTA | Val CTG | Leu CTG | Pro CCA | Gly GGC | Pro CCA | Ile ATT | Ile ATT | Leu CTG | Met ATG | His CAC | Arg ACG | Lys AAA | 270 |
| Ser TCA | Val CTC | Gly GGT | Tyr TAT | His CAT | His CAT | Thr ACC | Leu CTC | Gly GCA | Gly GGC | Gly GCA | Pro CCT | Pro CCT | MET ATG | Gly GCA | His CAC | Ser TCA | Ile ATA | 288 |
| Phe TTC | Luc CTC | His CAC | Glu CAA | His CAC | Thr ACA | His CAT | Asn AAC | leu CTT | Arg AGC | Ala CCG | Arg CCC | Arg AGC | Val GTC | Ser TCC | Ser TCC | Leu TTG | Glu CAA | 306 |

4,868,112

5   6

## TABLE 1-continued

| 324 | 342 | 360 | 378 | 396 | 414 | 432 | 450 | 468 | 486 | 504 | 522 | 540 | 558 | 576 | 594 | 612 | 630 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gln CAG | Tyr TAT | Glu GAA | Arg AGG | Lys AAG | Tyr TAT | Asn AAC | Tyr TAC | Leu TTG | Asn AAT | Pro CCT | Ile ATT | Pro CCA | MET ATG | Glu GAA | Leu CTG | Arg CGC | Ser TCC |
| Gly GGA | Ala GCT | Asn AAT | Val GTC | Lys AAG | Asp GAC | Leu TTG | Ala CCA | Ile ATC | Lys AAG | Arg CGT | Pro CCA | Gly GGG | Asn AAT | Lys AAA | Ile ATG | Gln CAA | Ala GCC |
| Leu CTT | Glu CAA | Asn AAT | Leu CTG | Ala GCC | Trp TGG | Tyr TAT | MET ATG | Gly CCA | Phe TTT | Val GTT | Phe TTT | Gln CAT | Val GTT | Tyr TAC | Val GTC | Ile ATA | Gln CAA |
| Asp CAC | MET ATG | Lys AAA | Asp GAT | Val GTT | Asp GAC | Gln CAA | Phe TTT | Ser TCA | Ile ATA | Asp CAT | Asp GAT | Glu GAA | Phe TTC | Cys TGC | Asn AAT | Asp AAT | Phe TTC |
| MET ATG | Gly GGC | MET ATG | MET ATG | Ser TCA | Glu GAG | Ser AGT | Arg CGA | Glu GAA | Ile ATT | Thr ACT | Lys AAG | Val GTA | Ser ACT | Ile ATC | Arg AGG | Glu CAG | Glu GAG |
| Leu TTG | Asp GAT | Leu TTG | Glu GAA | Arg CCC | Glu GAG | Lys AAA | Val CTC | His CAT | Ile ATC | Thr ACT | Ser TCT | Ser TCT | Leu CTC | Lys AAG | Lys AAG | Thr ACA | Pro CCA |
| Leu CTC | His CAT | Leu CTA | Glu GAA | Ile ATT | Glu GAA | Tyr TAT | Lys AAA | Gln CAG | Gly CGA | His CAT | Val GTG | Tyr TAT | Leu CTC | Asp GAC | Lys AAG | Leu CTC | Asp CAT |
| Thr ACA | Gln CAA | Thr ACA | His CAT | Gln CAA | Ala GCT | Ser AGT | Lys AAA | Ile ATT | Thr ACA | His CAC | Lys AAA | Thr ACA | Tyr TAT | Pro CCT | Ser TCA | Tyr TAC | Glu CAG |
| Gln CAA | His CAC | Pro CCC | Thr ACT | Ile ATC | Aln GCT | Arg AGA | Tyr TAC | Ala CCT | Asp GAC | Pro CCT | Val GTA | Trp TGG | Arg CGC | Gly CGC | MET ATG | Trp TCG | Leu CTT |
| Ala CCT | Ser TCC | Glu GAA | Leu CTT | Phe TTT | Ile ATT | Asp GAC | Lyn AAA | Glu GAA | Tyr TAC | Gly GGT | Lys AAA | Thr ACG | Ile ATT | Ser AGC | Tyr TAT | Pro TCG | Leu CTT |
| Thr ACT | Ser TCT | Glu GAG | Asp GAT | Ser TCC | Tyr TAC | Asp GAC | Glu GAA | Arg AGG | Arg CGT | Arg CGT | Lys AAA | Tyr TAT | Leu CTC | Leu CTC | Gln CAG | Arg CGA | Val GTG |
| Leu CTT | Ile ATC | Pro CCA | Asp GAT | Phe TTT | Ile ATT | Asp GAT | Asn AAC | Pro CCA | Lys AAA | Cys TGC | Gly GGA | Asn AAC | Asn AAC | Gly GGA | Asn AAC | Asn AAT | Gly CGA |
| Phe TTC | His CAT | Cys TGT | Asp GAT | Ser TCT | Val GTA | Ala GCC | Ile ATT | Lys AAG | Gly GGG | Tyr TAT | Leu TTA | Phe TTC | Arg CGG | Ser TCA | Gly GGA | Glu CAG | Ala CCT |
| Thr ACT | Cys TGT | Ser AGC | Tyr TAT | Asn AAC | Trp TGG | Leu CTC | Arg AGA | Thr ACT | Pro CCA | Arg AGA | Pro CCA | Tyr TAT | Pro CCT | Ala GCT | Arg AGA | Asp GAT | Pro CCA |
| Ile ATA | Phe TTT | Asp GAC | Asp GAC | Asp GAC | Thr ACT | Val GTC | Gln CAG | Thr ACC | Leu CTT | Thr ACA | Arg AGG | Glu GAA | Asp GAT | Leu CTA | Gln CAA | Phe CAT | Asn AAT |
| Pro CCA | Leu CTG | Val GTA | Glu GAA | Asp GAT | Lys AAA | Leu TTA | Pro CCT | Glu GAA | Leu TTA | Glu GAA | Ser AGC | Ser TCA | Ser TCA | Asp GAT | Val GTA | Ser TCT | Leu CTC |
| Ser TCG | Leu CTA | Lys AAA | Ala GCG | Asp GAT | Pro CCT | Pro CCC | Asn AAT | Thr ACA | Gly GGA | Gln CAA | Leu TTG | Leu CTG | Thr ACT | Glu GAG | Ser TCT | Phe TTT | Leu CTC |
| Ile ATC | Phe TTT | Val GTC | Glu GAA | Phe TTT | His CAT | Ala GCT | Asn AAT | Thr ACA | Gly GGA | Gln CAA | Leu TTG | Leu CTG | Thr ACT | Glu GAG | Ser TCT | Phe TTT | Phe TTT |

## TABLE 1-continued

| Pos. | Codons (amino acid / codon, reading left → right) |
| --- | --- |
| 648 | Asn AAC, Ile ATC, MET ATG, Ser ACC, His CAC, Ile ATC, Asn AAT, Gly GGC, Tyr TAT, Val CTT, Phe TTT, Asp CAT, Ser ACT, Leu TTG, Gln CAG, Leu TTG, Ser TCA, Val GTT |
| 666 | Cys TGT, Leu TTG, His CAT, Val CTG, Glu CAG, Ala CCA, Tyr TAC, Trp TGG, Tyr TAC, Ile ATT, Leu CTA, Ser ACC, Ile ATT, Gly GGA, Ala GCA, Gln CAG, Thr ACT, Asp CAC |
| 684 | Phe TTC, Thr ACA, Val GTC, Phe TTC, Val GTC, Phe TTC, Ser TCT, Gly GGA, Tyr TAT, Thr ACC, Phe TTC, Lys AAA, His CAC, Lys AAA, MET ATG, Val GTC, Tyr TAT, Glu CAA |
| 702 | Asp GAC, Thr ACA, Leu CTC, Leu CTA, Thr ACC, Phe TTC, Pro CCA, Phe TTC, Ser TCA, Gly GGA, Glu CAA, Thr ACT, Val GTC, Phe TTC, MET ATG, Ser TCG, Tyr TAT, Glu GAA |
| 720 | Asn AAC, Thr ACC, Leu CTA, Trp TGG, Leu TTA, Ile ATT, Val GTT, Gly GGG, Cys TGC, His CAC, Asn AAC, Ser TCA, Asp GAC, Thr ACT, Arg AGG, Asn AAC, MET ATG, Gly GGC |
| 738 | MET ATG, Glu GAG, Ala CCC, Ala CCC, Tyr TAT, Lys AAG, Ile ATT, Ser TCT, Ser AGT, Cys TGT, Asp GAC, Lys AAG, Asn AAC, Lys AAA, Gly CGG, Asp GAT, Arg AGA, Tyr TAC |
| 756 | Glu GAG, Asp GAC, Ser ACT, Tyr TAT, Ser ACC, Asp CAT, Gln CAG, Ser TCA, Ala GCA, Tyr TAC, Leu TTG, Leu CTG, Ser ACT, Thr ACT, Arg AAC, Asn AAT, Tyr TAT, Ile ATT |
| 774 | Glu GAA, Pro CCA, Arg AGA, Glu GAA, Phe TTC, Ser TCC, Pro CCT, Asn AAT, Ser TCA, Arg AGA, His CAC, Pro CCT, Ser AGC, Thr ACT, Arg AGG, Gln CAA, Ala GCC, Gln CAA |
| 792 | Phe TTT, Ala GCA, Ala GCA, Phe TTC, Thr ACA, Ile ATT, Pro CCT, Glu CAA, Asn AAT, Asp GAC, Ile ATA, Glu CAG, Lys AAG, Ser TCT, Ser ACT, Pro CCT, Lys AAG, Phe TTT |
| 810 | Ala GCA, His CAC, Arg AGA, Arg AGA, Thr ACA, MET ATG, Phe TTT, Lys AAA, Ile ATA, Gln CAA, Asn AAT, Val GTC, Ser TCC, Thr ACT, Ser ACT, Asp GAT, Trp TGG, Leu TTG |
| 828 | MET ATG, Leu CTG, Leu TTG, Glu CAG, Glu GAG, Ser ACT, MET ATG, Thr ACT, Pro CCA, His CAT, Gln CAA, Leu CTA, Ser TCC, Leu TTA, Ala GCA, Asp GAT, Leu TTG, Gln CAA |
| 846 | Glu GAA, Asn AAC, Lys AAA, Ser TCT, Tyr TAT, Pro CCT, Glu GAG, Ser TCT, Asp GAT, Asp GAT, His CAT, Ser TCA, Pro CCT, Gly GGA, His CAT, Ile ATA, Asp CAC, Ser ACT |
| 864 | Asn AAT, MET ATG, Ser AGC, Thr ACC, Leu CTG, Pro CCT, Glu GAG, Thr ACA, His CAC, Phe TTC, Phe TTC, Pro CCA, Gln CAG, Leu CTC, His CAT, His CAC, Ser ACT, Gly GGG |
| 882 | Asp GAC, Thr ACA, Val GTA, Phe TTT, Thr ACC, Thr ACA, Glu GAG, Ser TCA, Gly GGC, Leu CTC, Leu CTT, Leu TTA, Arg AGA, Leu TTA, Asn AAT, Glu CAG, Lys AAA, Leu CTG |
| 900 | Gly GGG, Thr ACA, Thr ACT, Ala GCA, Ala GCA, Ser TCA, Thr ACA, Leu TTC, Lys AAG, Lys AAA, Asp GAC, Asp CAT, Phe TTC, Lys AAA, Val CTT, Gly CCT, Ser ACT, Thr ACA |
| 918 | Ser TCA, Asn AAT, Asn AAT, Leu CTG, Ile ATT, Gly GGA, Ile ATT, Pro CCA, Ser TCA, Asn AAT, Asn AAT, Leu TTG, Ala GCA, Ala GCA, Ser TCT, Thr ACT, Asp CAT |
| 936 | Asn AAT, Thr ACA, Ser AGT, Ser TCC, Leu TTA, Gly GGA, Pro CCA, Ser ACT, MET ATG, Pro CCA, Val GTT, His CAT, Tyr TAT, His CAT, Ser ACT, Gln CAA, Leu TTA |
| 954 | Asp, Thr, Thr, Leu, Phe, Leu, Lys, Ser, Ser, Pro, Thr, Glu, Ser, Gly, Gly, Pro |

TABLE 1-continued

| | CAT | ACC | ACT | CTA | TTT | GGC | AAA | AAG | TCA | TCT | CCC | CTT | ACT | GAG | TCT | GGT | GCA | CCT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Leu CTG | Ser AGC | Leu TTG | Glu ACT | Glu CAA | Glu CAA | Asn AAT | Asn AAT | Asp CAT | Ser TCA | Lys AAG | Leu TTG | Leu TTA | Glu CAA | Ser TCA | Gly CCT | Leu TTA | MET ATC | 972 |
| | Asn AAT | Ser ACC | Gln CAA | Glu CAA | Glu ACT | Ser TCA | Trp TGG | Gly CGA | Lys AAA | Asn AAT | Val CTA | Ser TCG | Ser TCA | Thr ACA | Glu CAG | Ser ACT | Gly CGT | Arg ACC | 990 |
| | Leu TTA | Phe TTT | Lys AAA | Gly CGG | Ser ACT | Arg AGA | Ala GCT | His CAT | Gly GCA | Pro CCT | Ala CCT | Leu TTG | Leu TTG | Thr ACT | Lys AAA | Asp CAT | Asn AAT | Ala GCC | 1,008 |
| | Leu TTA | Phe TTC | Lys AAA | Val GTT | Lys AAA | Thr ACT | His CAC | Leu TTG | Leu TTA | Lys AAG | Thr ACA | Asn AAC | Lys AAA | Thr ACT | Ile ATT | Glu AAT | Asn AAT | Ser TCA | 1,026 |
| | Ala CCA | Thr ACT | Asn AAT | Arg ACA | Ser AGC | Asn AAT | Ile ATA | Ile ATT | Asp TCA | Gly CGC | Pro CCA | Ser TCA | Leu TTA | Leu TTA | Lys AAA | Glu GAG | Glu GAG | Ser AGT | 1,044 |
| | Pro CCA | Ser TCA | Val GTC | Trp TGG | Thr ACT | Arg AGA | MET ATG | Leu TTA | Glu GAA | Ser AGT | Asp GAC | Thr ACT | Glu CAG | Phe TTT | Ala CCT | Lys AAA | Val GTG | Thr ACA | 1,062 |
| | Pro CCT | Leu TTG | Ile ATT | His CAT | Ser TCA | Lys AAA | Thr ACT | Thr ACT | Ser AGT | Asp GAC | Lys AAA | Asn AAT | Ala GCT | Thr ACA | MET ATG | Val GTA | Arg AGG | Leu CTA | 1,080 |
| | Asn AAT | His CAT | MET ATG | Ser TCA | Asp GAC | Ile ATT | Pro CCA | Pro CCA | Asp GAC | Ser TCA | Gln CAA | Asn AAT | MET ACC | Glu GAA | MET ATG | Ser TCC | Gln CTC | Gln CAG | 1,098 |
| | Lys AAA | Lys AAA | Glu GAG | Gly GGC | Pro CCC | Pro CCA | Glu GAA | Ser TCA | Pro CCA | Ala CCA | Trp TGG | Ile ATA | Pro CCA | Asp GAT | Thr ACT | His CAT | Leu CAA | Phe TTT | 1,116 |
| | Lys AAG | MET ATG | Leu CTA | Phe TTC | Ser AGC | Gly GGG | Gln CAA | Gly GGC | Asn AAT | Arg AGA | Pro CCA | Lys AAC | Gln CAA | Arg AGG | Val GTA | Ser TCC | Val GTG | Lys AAG | 1,134 |
| | Asn AAC | Ser TCT | Leu CTG | Asn AAC | Val GTT | Glu GAA | Gly GGT | Gln CAG | Asp GAC | Ser ACT | Leu TTG | Ser TCT | Glu GAG | Leu TTA | Asn AAC | Lys AAG | Phe TTT | Gly GCA | 1,152 |
| | Pro CCA | Glu GAA | Lys AAA | Ser TCT | Gly GGC | Phe TTT | Thr ACA | Lys AAG | Asn AAT | Phe TTC | Gly CGA | Leu CTC | Lys AAA | Lys AAA | MET ATG | Val CTT | Asn AAT | Val GTA | 1,170 |
| | Val GTA | Gly GGA | Lys AAG | Gly GGT | Ser TCT | Phe TTT | Leu CTT | Gln CAG | Glu GAG | Val GTA | Asp GAT | Asn AAT | Glu GAG | Glu GAG | Glu GAA | Asn AAT | Leu TTA | Pro CCA | 1,188 |
| | Ser AGC | Ser AGC | Arg ACA | Glu CAA | Phe TTC | Lys AAA | Ile ATT | Gln CAG | Ile ATA | Leu TTG | Ile ATA | Asn AAT | His CAT | His CAT | Glu GAA | Thr ACA | Asn AAT | Thr ACA | 1,206 |
| | His CAC | Asn AAT | Gln CAA | Val GTA | Lys AAA | Leu TTG | Pro CCT | Ser ACC | Glu GAA | Glu GAA | Thr ACA | Glu GAA | Lys AAG | Lys AAG | Thr ACT | Lys AAG | Asn AAT | Ile ATC | 1,224 |
| | Gln CAA | Glu GAG | Asn AAT | Leu CTT | Val GTT | Leu TAA | Leu CTG | | Ile ATA | His CAT | Gln GAA | Val CTG | Thr ACT | Gly GGC | Glu GAA | Lys AAG | Tyr TAT | Phe TTC | 1,242 |
| | MET ATG | Lys AAC | Asn AAC | | Phe TTC | | | | Thr ACT | Arg AGG | | Asn AAT | Val GTA | Glu GAA | Gly GGT | Ser TCA | Glu GAG | Glu GAG | 1,260 |

## TABLE 1-continued

| | | | | | | | | | | | | | | | | | | Pos. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gly GGG | Ala GCA | Tyr TAT | Pro CCA | Ala CCT | Gln CAA | Leu TTA | Phe TTT | Asp CAT | Gln CAA | Leu CTT | Val GTA | Leu TTA | Ser TCA | Asp GAT | Asn AAT | Leu TTA | Asn AAT | 1,278 |
| Arg AGA | Thr ACA | Lys AAG | His CAC | Lys AAA | His CAT | His CAT | Ser TCA | Phe TTC | His CAT | Ala CCT | Thr ACA | Gly GGG | Lys AAA | Glu GAA | Glu GAA | Thr ACA | Leu TTG | 1,296 |
| Glu CAA | Gly GGC | Leu TTG | Asn AAT | Pro CCT | Gln CAA | Gln CAG | Ile ATT | Gln CAA | Gln CAG | Gly GGG | Gln CAA | Lys AAA | Thr ACG | Glu GAA | Cys TGC | Arg AGG | Thr ACA | 1,314 |
| Arg AGC | Ile ATA | Ser AGC | Asn AAT | Gln CAA | Pro CCA | Leu CTA | Asn AAT | Trp TGG | Leu CTT | Leu CTA | Thr ACG | Glu GAA | MET ATG | Thr ACA | Ser TCA | Lys AAA | Arg AGA | 1,332 |
| Ala CCT | Leu TTG | Lys AAA | Phe TTC | Ser TCA | Tyr TAC | Trp TGG | Glu GAA | Arg AGG | Asn AAT | Ile ATT | Glu GAA | MET ATG | Lys AAA | Asn AAC | Lys AAA | Arg AGG | Ile ATA | 1,350 |
| Ile ATT | Val GTG | Asp GAT | Thr ACC | Ser TCT | Thr ACA | Asn AAT | Ser TCC | Ser TCA | Arg AGG | Glu GAA | Ser AGC | Lys AAA | Lys AAA | Ala GCA | Arg AGA | Gly GGG | Pro CCG | 1,368 |
| Ser AGC | Ser AGC | Leu CTC | Gln CAG | Pro CCA | Val GTA | Arg AGG | Ser TCA | Ser ACT | Ser TCT | Leu CTA | Pro CCA | Leu CTT | His CAT | Glu GAC | Glu GAA | Thr ACC | Gln CAG | 1,386 |
| Ser TCT | Thr ACC | Leu TTA | Asp GAT | His CAT | Asp GAC | Ser TCA | Ser TCT | Ser ACT | Phe TTC | Ile ATT | His CAT | Phe TTC | Ser AGC | Gln CAA | Glu GAA | Thr ACC | Arg AGA | 1,404 |
| Ser TCT | Pro CCA | Leu TTA | Ile ATT | His CAT | Gln CAG | Asn AAC | Ser AGC | Arg AGC | Leu CTT | Ile ATT | Pro CCA | Phe TTC | His CAT | Pro CCT | Ala GCA | Asn AAT | Tyr TAT | 1,422 |
| Leu CTG | Thr ACC | Arg AGG | Ser TCT | Glu GAG | Leu CTA | Glu GAA | Thr ACC | Ser ACT | MET ATG | Thr ACT | Leu TTA | Phe TTC | Gly GGG | Gly CGT | Gln CAA | Leu CTT | Tyr TAT | 1,440 |
| Arg ACA | Lys AAG | Lys AAA | Ser TCT | Pro CCA | Ala GCC | Leu CTA | Thr ACC | Asn AAT | Val GTC | Thr ACC | Thr ACA | Ser TCT | Pro CCA | Ala GCA | Gln CAA | Asn AAT | Lys AAA | 1,458 |
| Lys AAA | Asn AAT | Lys AAA | Val GTT | His CAT | Gln CAG | Ile ATT | Thr ACA | Ala ACA | Thr ACA | Ser TCA | His CAT | Leu CTT | Tyr TAC | Ala GCA | Gly CGA | Ile ATA | Arg AGA | 1,476 |
| Glu GAG | Val GTT | Gly GCC | Asp GAT | Glu GAG | Leu CTA | Ser AGC | Lys AAG | Glu GAG | Val GTC | Glu GAG | His CAT | Phe TTC | Gly CGG | Gln CAA | Lys AAC | Val CTT | Val GTT | 1,494 |
| Glu CAG | Asn AAC | Thr ACT | Gln CAG | Ser TCA | Gln CAG | Pro CCC | Val GTG | Glu GAC | Thr ACA | Ser TCA | Leu CTA | Ser AGC | Thr ACG | Thr ACG | Lys AAA | Thr ACT | Glu GAA | 1,512 |
| Leu TTG | Leu CTT | Pro CCA | Leu CTG | Leu CTC | Leu CTC | Leu TTG | Lys AAG | Val GTG | Ser AGC | Gly GGG | Gly GGG | Gly CGA | Thr ACG | Leu CTT | Lys AAA | Asn AAT | Ser AGC | 1,530 |
| Asn AAT | Gly CCG | Ser TCT | Val GTT | Gly GGG | Ala CCA | Asn AAT | Val GTG | Asn AAC | Gly GGA | Pro CCT | Pro CCT | Ser TCT | Leu CTT | Val CTT | Gln CAG | Phe TTT | Pro CCT | 1,548 |
| Glu GAG | Gly GGA | Ala GCG | Lys AAC | Pro CCT | Lys AAG | Val GTT | Asn AAC | Asn AAC | Lys AAC | Pro CCT | Thr ACG | Gly GGA | Leu CTT | Val CTT | Gln CAG | Gly CGA | Thr ACA | 1,566 |
| Arg AGA | Val GTA | Ala GCA | Thr ACA | Ser TCT | Ala GCA | Lys AAG | Thr ACT | Lys AAG | Lys AAC | Ser TCC | Leu TTG | Lys AAC | Leu CTA | Leu CTG | Leu CTT | Pro CCT | Leu CTT | 1,584 |

TABLE 1-continued

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ala GCT | Trp TGG | Asp GAT | His CAC | Asn AAC | Tyr TAT | Gly GGT | Trp TGG | Glu GAG | Glu GAA | Lys AAA | Pro CCA | Ile ATA | Gln CAG | Thr ACT | Lys AAA | Trp TGG | Ser TCC | Gln CAA | 1,602 |
| Glu GAG | Lys AAG | Ser TCA | Glu· GAA | Pro CCA | Ser AGC | Thr ACA | Ala GCT | Ala GCT | Ile ATA | Lys AAG | Thr ACT | Glu GAG | Ser AGC | Thr ACC | Leu TTG | Ser TCC | Ser TCC | Leu CTG | 1,520 |
| Asn AAC | Ala GCT | Cys TGT | Ser AGC | Glu GAA | His CAT | Thr ACA | Ala GCA | Gln CAA | Asn AAT | Ile ATA | Gly GGA | Glu GAG | Arg AGC | Gln CAG | Gln CAA | Asn AAT | Cys TCC | Lys AAG | 1,638 |
| Pro CCC | Glu GAA | Ile ATA | Val GTC | Pro CCA | Trp TGG | Arg AGG | Gln CAA | Asp CAT | Thr ACC | Arg AGG | Glu GAA | Glu GAA | Leu CTG | Thr ACT | Leu CTC | Thr ACT | Thr ACT | Ser TCT | 1,656 |
| Gln CAA | Asn AAC | Pro CCA | Val CTC | Pro CCA | His CAT | Arg AGG | Asp CAT | Glu GAA | Ile ATA | Glu GAA | Arg AGG | Ile ATA | Gly GGA | Thr ACT | Thr ACT | Glu GAA | Thr ACT | Leu CTT | 1,674 |
| Gln CAG | Ser TCA | Asp GAC | Glu GAG | Asp GAC | Glu GAG | Ala GCT | Asp CAT | Ile ATA | Ile ATT | Val GTG | Ser AGC | Ser AGC | Leu CTG | Ile ATA | Glu GAG | MET ATG | Ser AGC | Lys AAG | 1,692 |
| Lys AAG | Glu GAA | Asp GAT | Glu GAG | The TTT | Thr ACA | Asn AAT | Glu GAA | Ala GCA | Gln CAC | Arg AGG | Arg AGC | Arg AGC | Leu CTG | Gln CAC | Ala GCT | Ser AGC | Asp GAT | Phe TTT | 1,710 |
| Gln CAA | Lys AAG | Asp GAT | Arg CCA | Thr ACA | Lys AAA | Thr ACA | Ala GCA | Arg AGA | Glu GAG | Val GTG | Arg AGC | Arg AGC | Asn AAT | Glu GAG | Trp TGG | Asp GAT | Ser ACT | Tyr TAT | 1,728 |
| Gly CCG | MET ATG | Asp GAT | Gly GGA | Ser AGC | Lys AAA | Phe TTT | Asn AAC | Arg AGA | Thr ACC | Arg AGG | Gly CGC | Gly CTG | Ser AGC | Gly CGC | Gly GGC | Thr ACT | Ala GCC | Trp TGG | 1,746 |
| Pro CCT | Gln CAG | Ser TCC | Glu GAG | Tyr TAT | MET ATG | Leu TTG | Phe TTT | Thr ACT | Phe TTT | Gly GGA | Leu CTG | Ser TCC | Leu CTG | Lys AAA | Pro CCA | Tyr TAT | Phe TTT | Trp TGG | 1,764 |
| Pro CCC | Leu TTA | Phe TTC | Glu GAA | Leu CTA | Asn AAT | Leu CTG | Leu TTG | Gly GGA | Pro CCC | Gly GGA | Leu CTG | Gly GGG | Leu CTG | Arg AGA | Glu GAA | Gln CAA | Gln CAA | Gly GGA | 1,782 |
| Arg AGA | Ala GCA | Tyr TAC | Asp GAA | Ser AGC | Ser AGC | Ile ATC | Leu CTT | Gly GGA | Val GTA | Ser TCT | Tyr TAT | Gln CAG | Asn AAT | Leu CTG | Ala GCC | Arg AGG | Phe TTT | Arg CGT | 1,800 |
| Pro CCC | Tyr TAT | Glu GAA | Tyr TAT | Phe TTC | Ser AGC | Glu GAA | Ile ATT | Glu GAA | Ser TCT | Pro CCT | Glu GAA | Gln CAG | Asp GAT | Glu GAA | Arg AGG | Trp TGG | Arg AGG | Gly GGA | 1,818 |
| Ala GCA | Glu GAA | Pro CCT | Thr ACT | Ala GCA | MET ATG | Thr ACC | Leu CTT | Phe TTT | Pro CCT | Thr ACT | Lys AAA | Thr ACT | Lys AAA | Asp GAC | Tyr TAC | Gln CAA | Ala GCC | Trp TGG | 1,836 |
| Lys AAA | Val CTG | Gln CAA | His CAC | Asp GAC | Val GTT | Ala GCA | Leu CTG | Val GTG | His CAT | Asp GAC | Lys AAA | Ser TCA | Asp GAT | Glu GAG | Lys AAA | Leu CTG | Ile ATT | Gly GGG | 1,854 |
| Ala GCT | Tyr TAT | Asp GAT | His CAC | Thr ACT | Val GTT | Asp GAC | Glu GAA | Pro CCT | His CAT | His CAT | Gly GGA | His CAT | His CAT | Ser TCA | Glu GAA | Arg AGA | Gln CAA | Gly GGA | 1,872 |
| Pro CCC | Leu CTT | Cys TGC | Thr ACT | Asn AAC | Leu CTG | Thr ACT | Asn AAC | Pro CCT | Ala GCT | Ala GCT | Gly CCG | His CAT | Ala GCT | Gly CCG | Phe TTT | Arg AGA | Gln CAA | Val CTG | 1,890 |
| Thr | Val | Glu | Leu | Ile | Phe | Leu | Ile | Phe | Asp | Asp | Thr | Glu | Ser | Glu | Lys | Ser | Ser | Trp | 1,908 |

TABLE 1-continued

| ACA | CTA | CAG | GAA | TTT | GCT | CTG | TTT | TTC | ACC | ATC | GAG | CAT | TTT | CAT | GAG | ACC | AAA | AGC | TCG | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Thy TAC | Phe TTC | Thr ACT | Glu CTT | Asn AAT | MET ATG | Glu CAA | Arg AGA | Asn AAC | Cys TGC | Arg ACC | Cys TGC | Pro CCC | Ala CCT | His CAT | Cys TGC | Asn AAT | Ile ATC | Gln CAG | MET ATG | 1,926 |
| Glu CAA | Asp GAT | Pro CCC | Thr ACT | Phe TTT | Lys AAA | Gln CAA | Asn AAT | Thr TAT | Arg CGC | Phe TTC | Ile ATC | Ala GCA | His CAT | Asp GAT | Ile ATC | Asn AAT | Gly CGC | Tyr TAC | Ile ATA | 1,944 |
| MET ATG | Asp CAT | Thr ACA | Leu CTA | Pro CCT | Gly GGC | Leu TTA | Val GTA | MET ATG | Ala GCT | His CAG | Arg AGG | Gln CAA | Asp GAT | His CAT | Ala GCT | Ile ATT | Ser ACT | Trp TCG | Tyr TAT | 1,962 |
| Leu CTC | Leu CTC | Ser AGC | MET ATG | Gly CGC | Ser AGC | Asn AAT | Glu CAA | Asn AAC | Ile ATC | His CAT | His CAT | Ala GCA | Ser TCT | Glu GAG | His CAT | Phe TTC | Asn AAT | Gly CCA | His CAT | 1,980 |
| Val GTG | Phe TTC | Thr ACT | Val GTG | Glu CAA | Lys AAA | Lys AAA | Glu CAG | Glu GAG | Tyr TAT | Lys AAA | Leu CTG | Ala GCA | MET ATG | Leu CTG | Leu CTG | Tyr TAC | Ile ATT | Leu CTC | Tyr TAT | 1,998 |
| Pro CCA | Gly CGT | Val GTT | Phe TTT | Glu GAC | Thr ACA | Val GTG | Glu GAA | MET ATG | Leu TTA | Gly GGA | Ala GCT | Lys AAA | Asp GAT | Ala GCT | Ala GCT | Gly GGA | Ile ATT | Trp TCC | Arg CGG | 2,016 |
| Val GTG | Glu GAA | Cys TGC | Leu CTT | Ile ATT | Gly CCC | Glu GAC | His CAT | Leu CTA | Leu CTG | Ala GCA | Ser AGC | MET ATG | Ser TCC | Ser TCC | Ser AGC | Thr ACA | Leu CTT | Phe TTT | Leu CTG | 2,034 |
| Val GTG | Tyr TAC | Lys AAG | Asn AAT | Lys AAG | Cys TGT | Gln CAG | Thr ACT | Tyr TAT | Tyr TAT | Gly GGA | Ser TCT | Ala GCT | MET ATG | Ile ATT | Ser TCT | Gly GGA | His CAC | Ile ATT | Arg AGA | 2,052 |
| Asp CAT | Phe TTT | Gln CAG | Ile ATT | Thr ACA | Ala GCT | Val GTA | Gly CGA | Gln CAA | MET ATG | Trp TGG | Ala GCC | Trp TGG | Gln CAG | His CAT | Ala GCC | Pro CCA | Lys AAG | Leu CTG | Ala GCC | 2,070 |
| Arg AGA | Leu CTT | His CAT | Tyr TAT | Ser TCC | Gly GGA | Ser TCA | Ile ATC | Asn AAT | Ala GCC | Ile ATT | Lys AAG | Thr ACC | Ser AGC | Ile ATT | Lys AAG | Glu GAG | Pro CCC | Phe TTT | Ser TCT | 2,088 |
| Trp TGC | Ile ATC | Lys AAG | Val GTG | Asp CAT | Leu CTG | Leu TTG | Ala GCA | Pro CCA | Tyr TAC | Ile ATT | Gly GGC | His CAC | Ile ATT | Ala GCA | Gly GGC | Ile ATC | Lys AAG | Thr ACC | Gln CAG | 2,106 |
| Gly GGT | Ala GCC | Arg CGT | Gln CAG | Lys AAG | Phe TTC | Ser TCC | Ser AGC | Leu CTC | Ser TCT | Ile ATC | Phe TTT | Gln CAG | Gly GGA | Ile ATC | Phe TTT | Ile ATC | Ile ATC | MET ATG | Tyr TAT | 2,124 |
| Ser AGT | Leu CTT | Arg CGT | Phe TTT | Lys AAG | Lys AAG | Trp TGG | Gln CAG | Thr ACT | Ser TCC | Arg CGC | Ser TCC | Asn AAT | Gly GGA | Asp GAT | Ser TCC | Thr ACT | Gly CCA | Thr ACC | Leu TTA | 2,142 |
| MET ATG | Val GTC | Asp GAT | Ile ATT | Gly GGC | Asn AAT | Val GTC | Asp CAT | Ser TCA | MET ATG | Gly CCA | His CAC | Lys AAA | Pro CCA | His CAT | His CAC | Asn AAC | Ile ATT | Phe TTT | Asn AAC | 2,160 |
| Pro CCT | Pro CCA | Ile ATT | Ile ATT | Ala GCT | Arg CGA | Tyr TAC | Ile ATC | Arg CGT | Asp CAT | His CAC | His CAT | Thr ACT | Leu TTA | Thr ACT | His CAT | Tyr TAT | Ser AGC | Ile ATT | Arg CCC | 2,178 |
| Ser AGC | Thr ACT | Leu CTT | Arg CGC | MET ATG | Glu GAG | Leu TTG | MET ATG | Gly CCC | Ser TCC | Asp GAT | Ser ACT | Asn AAT | MET ATG | Ser ACT | Ser ACT | Ser TCC | Ser AGC | MET ATG | Pro CCA | 2,196 |
| Leu TTG | Gly GCA | MET ATG | Glu GAG | Ser AGT | Lys AAA | Ala GCA | Ile ATA | Ser TCA | Ala GCT | Ala GCA | Thr ACT | Ile ATT | Ile ATA | Gln CAG | Thr ACT | Ala GCT | Ser TCA | Ser TCC | Tyr TAC | 2,214 |

## TABLE 1-continued

| | | | | | | | | | | | | | | | | | | Pos. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Phe TTT | Thr ACC | Asn AAT | MET ATG | Phe TTT | Ala GCC | Thr ACC | Trp TGG | Ser TCT | Pro CCT | Ser TCA | Lys AAA | Ala GCT | Arg CGA | Leu CTT | His CAC | Leu CTC | Gln CAA | 2,232 |
| Gly GGG | Arg AGG | Ser ACT | Asn AAT | Ala GCC | Trp TGG | Arg AGA | Pro CCT | Gln CAG | Val GTG | Asn AAT | Asn AAT | Pro CCA | Lys AAA | Gln CAG | Trp TGG | Leu CTG | Glu GAA | 2,250 |
| Val GTG | Asp GAC | Phe TTC | Gln CAG | Lys AAG | Thr ACA | MET ATG | Lys AAA | Val CTC | Thr ACA | Gly GGA | Val GTA | Thr ACT | Thr ACT | Gln CAG | Gly GGA | Val CTA | Lys AAA | 2,268 |
| Ser TCT | Leu CTG | Leu CTT | Thr ACC | Ser ACC | MET ATG | Tyr TAT | Val GTG | Lys AAG | Glu GAG | Phe TTC | Ile ATC | Ile ATC | Ser TCC | Ser ACC | Thr ACT | Gln CAA | His CAT | 2,286 |
| Gly GGC | His CAT | Gln CAG | Trp TGG | Thr ACT | Leu CTC | Phe TTT | Phe TTT | Gln CAG | Asn AAT | Pro CCC | Lys AAA | Leu CTA | Asn AAC | Leu CTT | Phe TTT | Gln CAG | Gly CCA | 2,304 |
| Asn AAT | Gln CAA | Asp GAC | Ser TCC | Phe TTC | Thr ACA | Pro CCT | Val GTG | Val GTG | Asn AAC | Ser TCT | Leu CTA | Asp GAC | Pro CCA | Pro CCG | Leu TTA | Leu CTG | Thr ACT | 2,322 |
| Arg CGC | Tyr TAC | Leu CTT | Arg CGA | Ile ATT | His CAC | Pro CCC | Gln CAG | Ser AGT | Trp TGG | Val CTC | His CAC | Gln CAG | Ile ATT | Ala CCC | Leu CTG | Thr ACC | MET ATG | 2,340 |
| Glu GAG | Val GTT | Leu CTG | Leu CTG | Thr ACC | Gln CAG | Ala GCA | Asp GAC | Leu CTC | Tyr TAC | End TGA | | | | | | | | 2,352 |

GGGTGGCCACTGCCATGCCCACCTGCCACTG

CCGTCACCTCCCTCCTCCAGCTCCAGGGCATGTGTCCCTCCGTGCTTGCTTCACCTTGTGCTAAATCCTAGCAGACTCCCTTG
AAGCCTCCTGAATTAACTATCATGATGACTCCTGCATTTCTTTGGTGGGGCCAGGAGGCTCCATCCATTTAACTCTAACCTATT
TTCTCGCAGCTGCTCCCAGA

19                                                    20

By way of example, one compound of this invention contains a region X comprising the amino acid sequence of Ser-760 to Pro-1000 followed by the amino acid sequence of Asp-1582 to Arg-1708. That compound thus comprises the polypeptide sequence of Ala-20 to Pro-1000 covalently linked by a peptide bond to amino acids Asp-1582 to Tyr-2351. Another exemplary compound contains a region X comprising the amino acid sequence Ser-760 to Thr-778 followed by the sequence Pro-1659 to Arg-1708. That compound thus comprises the polypeptide sequence Ala-20 to Thr-778 covalently linked by a peptide bond to the sequence Pro-1659 through Tyr-2351. Still another exemplary compound contains a region X comprising the amino acid sequence Ser-760 to Thr-778 followed by the sequence Glu-1694 to Arg-1708. That compound thus comprises the polypeptide sequence Ala-20 to Thr-778 covalently linked by a peptide bond to amino acids Glu-1694 through Tyr-2351.

These exemplary compounds are depicted schematically in Table 2.

The amino acid sequence represented by X should be selected so that it does not substantially reduce the procoagulant activity of the molecule, which activity can be conveniently assayed by conventional methods. Compound (2) of Table 2 is a presently preferred embodiment.

The procoagulant protein may be produced by appropriate host cells transformed by factor VIII:C DNA which has been specifically altered by use of any of a variety of site-specific mutagenesis techniques which will be familiar to those of ordinary skill in the art of recombinant DNA.

The starting materials may be a DNA sequence which codes for the complete factor VIII:C molecule, e.g., the complete human factor VIII:C as shown in Table 1, a truncated version of that sequence, or it may comprise segments of that DNA sequence, so long as the starting materials contain at least sufficient DNA to code for the amino acid sequences of the desired polypeptide.

the present invention. Moreover, the fact that the procoagulants of the present invention lack many of the sites for non-human glycosylation by the non-human mammalian or other cells used to produce the proteins is also belived to reduce the antigenicity of that protein, and lessen the likelihood of developing antibodies to the procoagulants. This may enable facilitating the treatment of patients in need of procoagulant therapy.

I contemplate that my compounds can be produced by recombinant DNA techniques at a much lower cost than is possible for production of human factor VIII. The host organisms should more efficiently process and express the substantially simpler molecules of this invention.

The compounds of this invention can be formulated into pharmaceutically acceptable preparations with parenterally acceptable vehicles and excipients in accordance with procedures known in the art.

The pharmaceutical preparations of this invention, suitable for parenteral administration, may conveniently comprise a sterile lyophilized preparation of the protein which may be reconstituted by addition of sterile solution to produce solutions preferably isotonic with the blood of the recipient. The preparation may be presented in unit or multi-dose containers, e.g. in sealed ampoules or vials. Their use would be analogous to that of human factor VIII, appropriately adjusted for potency.

One method by which these proteins can be expressed is by use of DNA which is prepared by cutting a full-length factor VIII:C DNA with the appropriate restriction enzymes to remove a portion of the DNA sequence that codes for amino acids 760 to 1708 of human factor VIII:C. The cut DNA is then ligated with an oligonucleotide that resects the cut DNA and maintains the correct translational reading frame.

Preparation of the cDNA has been set forth in detail in U.S. patent applications Ser. Nos. 546,650 and 644,086, supra. A pSP64 recombinant clone containing the nucleotide sequence depicted in Table 1, designated as pSP64-VIII, is on deposit at the American Type

TABLE 2

| Compound | Amino Acid Sequence | EXEMPLARY COMPOUNDS A-X-B | | Deletion |
|---|---|---|---|---|
| | | X | | |
| (human factor VIII:c) | $(Ala_{20} \rightarrow Tyr_{2351})$ | $(Ser_{760} \rightarrow Arg_{1708})$ | | 0 |
| 1 | $(Ala_{20} \rightarrow Pro_{1000}) - (Asp_{1582} \rightarrow Tyr_{2351})$ | $(Ser_{760} \rightarrow Pro_{1000}) - (Asp_{1582} \rightarrow Arg_{1708})$ | | 581 |
| 2 | $(Ala_{20} \rightarrow Thr_{778}) - (Pro_{1659} \rightarrow Tyr_{2351})$ | $(Ser_{760} \rightarrow Thr_{778}) - (Pro_{1659} \rightarrow Arg_{1708})$ | | 880 |
| 3 | $(Ala_{20} \rightarrow Thr_{778}) - (Glu_{1694} \rightarrow Tyr_{2351})$ | $(Ser_{760} \rightarrow Thr_{778}) - (Glu_{1694} \rightarrow Arg_{1708})$ | | 915 |

A and B are defined, supra; "—"represents a peptide bond; "→"indicates a polypeptide sequence inclusive of the specified amino acids; amino acid numbering corresponds to the numbering of the sequence depicted in Table 1; and "deletion"indicates the number of amino acids deleted relative to human factor VII:c.

The procoagulant proteins of the present invention, in addition to lacking a substantial amino acid segment of human factor VIII:C, also have fewer potential N-glycosylation sites than human factor VIII. Preferably, at least one N-glycosylation site has been deleted. More preferably, 18 of the 25 potential N-glycosylation sites are not in the molecule. In still more preferred embodiments, up to 19 of the 25 potential N-glycosylation sites are removed. While not wishing to be bound by theory, it is presently believed that the antibodies to factor VIII:C which are directed to antigenic determinants contained in the protein segment deleted in accordance with this invention, i.e., in the amino acid segment itself or in the carbohydrate portion of the glycosylated protein, will not neutralize the procoagulant proteins of

Culture Collection under Accession Number ATCC 39812.

Restriction endonucleases are used to obtain cleavage of the human factor VIII:C cDNA, hereinafter the DNA source sequence, at appropriate sites in the nucleotide sequence. Unless otherwise noted, restriction endonucleases are utilized under the conditions and in the manner recommended by their commercial suppliers. The restriction endonucleases selected herein are those which will enable one to excise with substantial specificity sequences that code for the portion of the factor VIII:C molecule desired to be excised. BamHI and SacI are particularly useful endonucleases. However, the skilled artisan will be able to utilize other restriction

4,868,112

21

endonucleases chosen by conventional selection methods. The number of nucleotides deleted may vary but care should be taken to insure that the reading frame of the ultimate cDNA sequence will not be affected.

The resulting DNA fragments are then purified using 5 conventional techniques such as those set forth in Maniatis et al., *Molecular Cloning, A Laboratory Manual* (Cold Spring Harbor Laboratory 1982) the disclosure of which is incorporated herein by reference, and *Proc. Natl. Acad. Sci.* 76:615–619 (1979). The purified DNA is 10 then ligated to form the sequence encoding the polypeptide of the preferred invention. When necessary or desirable, the ligation may be within an oligonucleotide that resects the cut DNA and maintains the correct translational reading frame using standard ligation con- 15 ditions. Ligation reactions are carried on as described by Maniatis et al., supra at 2453–6 using the buffer described at page 246 thereof and using a DNA concentration of 1–100 ug/ml, at a temperature of 23° C. for blunt ended DNA and 16° C. for "sticky ended" DNA. The 20 following double-stranded oligonucleotide is useful when there is BamHI/SacI deletion such as described infra,

5'P-CATGGACCG-3'                                          25

3-TCGAGTACCTGGCCTAG 5';

but other oligonucleotides can be selected by the skilled artisan depending upon the deletions made and reaction conditions.

The DNA sequences encoding the novel procoagu-  30 lant polypeptides can, in addition to other methods, be derived from the sequence of human factor VIII:C DNA by application of oligonucleotide-mediated deletion mutagenesis, often referred to as "loopout" muta- 35 genesis, as described for example in Morinaga, Y. et al. *Biotechnology,* 636–639 (1984).

The new DNA sequences containing the various deletions can then be introduced into appropriate vectors for expression in mammalian cells. The procoagu- 40 lant activity produced by the transiently transfected or stably transformed host cells may be measured by using standard assays for blood plasma samples.

The eukaryotic cell expression vectors described herein may be synthesized by techniques well known to 45 those skilled in this art. The components of the vectors such as the bacterial replicons, selection genes, enhancers, promoters, and the like may be obtained from natural sources or synthesized by known procedures. See Kaufman et al., *J. Mol. Biol.,* 159: 51–521 (1982); Kauf- 50 man, *Proc. Natl. Acad. Sci.* 82: 689–693 (1985).

Established cell lines, including transformed cell lines, are suitable as hosts. Normal diploid cells, cell strains derived from in vitro culture of primary tissue, as well as primary explants (including relatively undiffer- 55 entiated cells such as haematopoeitic stem cells) are also suitable. Candidate cells need not be genotypically deficient in the selection gene so long as the selection gene is dominantly acting.

The host cells preferably will be established mamma- 60 lian cell lines. For stable integration of the vector DNA into chromosomal DNA, and for subsequent amplification of the integrated vector DNA, CHO (Chinese hamster ovary) cells are presently preferred. See U.S. Pat. No. 4,399,216. Alternatively, the vector DNA could 65 include all or parts of the bovine papilloma virus genome (Lusky et al., *Cell,* 36: 391–401 (1984) and be carried in cell lines such as C127 mouse cells as a stable

22

episomal element. Other usable mammalian cell lines include HeLa, COS-1 monkey cells, melanoma cell lines such as Bowes cells, mouse L-929 cells, 3T3 lines derived from Swiss, Balb-c or NIH mice, BHK or HaK hamster cells lines and the like.

Stable transformants then are screened for expression of the procoagulant product by standard immunological or enzymatic assays. The presence of the DNA encoding the procoagulant proteins may be detected by standard procedures such as Southern blotting. Transient expression of the procoagulant genes during the several days after introduction of the expression vector DNA into suitable host cells such as COS-1 monkey cells is measured without selection by enzymatic or immunologic assay of the proteins in the culture medium.

The invention will be further understood with reference to the following illustrative embodiments, which are purely exemplary, and should not be taken as limiting the true scope of the present invention, as described in the claims.

### EXAMPLE 1

10 μg. of the plasmid pACE, a pSP64 (Promega Biotec, Madison, Wis.) derivative, containing nucleotides 562-7269 of human factor VIII:C cDNA (nucleotide 1 is the A of the ATG initiator methionine codon) was subjected to partial BamHI digestion in 100 ul containing 50 mM Tris.HCl ph 8.0, 50 mM MgCl₂, and 2.4 units BamHI (New England Biolabs) for 30 minutes at 37° C. The reaction was terminated by the addition of EDTA to 20 mM and then extracted once with phenol, once with chloroform , ethanol precipitated and pelleted by centrifugation. DNA was redissolved, cleaved to completion in 50 ul using 40 units SacI for 1.5 hours at 37° C. DNA was then electrophoresed through a buffered 0.6% agarose gel. An 8.1 kb fragment corresponding to the partial BamHI-SacI fragment of pACE lacking only the sequence corresponding to nucleotides 2992-4774 of the factor VIII:C sequence was purified from the gel using the glass powder technique described in *Proc. Nat. Acad. Sci.* 76: 615–619 (1979). Purified DNA was ligated with 100 pmoles of the following double-stranded oligonucleotide

5'P-CATGGACCG-3'

3'-TCGAGTACCTGGCCTAG 5'

using standard ligation conditions. The DNA sequence removed represents the deletion of 584 amino acid sequence beginning with amino acid 998 and continuing through 1581. The oligonucleotide inserted, however, encodes amino acids corresponding to 998–1000. Therefore, the polypeptide encoded contains deletion of 581 amino acids.

DNA was then used to transform competent *E. coli* bacteria, and DNA from several ampicillin resistant transformants was analyzed by restriction mapping to identify a plasmid harboring the desired SacI-BamHI deletion mutant. DNA from this plasmid was digested to completion with KpnI, which cleaves the plasmid uniquely at nucleotide 1816 of the factor VIII:C coding sequence. This DNA was ligated with a KpnI DNA fragment containing nucleotides 1-1815 of factor VIII:C DNA and a synthetic SalI site at nucleotides −11 to −5 and then used to transform competent *E. coli* bacteria.

4,868,112

23

Plasmid DNA was isolated and oriented by restriction mapping to identify a plasmid, pBSdK, containing the correct 5' to 3' orientation of the KpnI insert. SalI digestion, which excises the entire polypeptide coding region from the plasmid, was performed and the DNA electrophoresed through a buffered 0.6% agarose gel. The 5.3 Kb SalI fragment was purified from the gel as described above. This DNA fragment was ligated with XhoI cut pXMT2 DNA to give rise to plasmid pDGR-2. pXMT2 is a plasmid capable of expressing heterologous genes when introduced into mammalian cells such as the COS-1 African Green Monkey kidney cell line, and is a derivative of the expression vectors described in Kaufman, supra at 689–93. The expression elements are the same as described for plasmid pQ2 except that it contains a deletion of the adenovirus major late promoter extending from −45 to +156 with respect to the transcription start site of the adenovirus major late promoter. mRNA expression in pXMT is driven by the SV40 late promoter. The bacterial replicon, however, has been substituted to render bacteria containing the vector resistant to ampicillin rather than tetracycline. pXMT2 contains a unique Xho I site at a position which allows for expression of inserted cDNA from the SV40 late promoter. This Xho I site is convenient for inserting factor VIII:C cDNA constructs since these are flanked by SalI sites.

Restriction mapping of transformants identified a plasmid, pDGR-2, containing the correct 5' to 3' orientation of the polypeptide coding sequence relative to the direction of transcription from the SV40 late promoter. pDGR-2 is on deposit at the American Type Culture Collection under Accession number 53100.

### EXAMPLE 2

Other novel procoagulant proteins may be obtained from constructs produced by oligonucleotide mediated deletion mutagenesis, using for example the "loopout" mutagenesis techniques as described in Morinaga et al., supra. The deletion mutagenesis is performed using expression plasmid pDGR-2 or any other appropriate plasmid or bacteriophage vector. Other methods for oligonucleotide mediated mutagenesis employing single stranded DNA produced with M13 vectors and the like are also suitable. See Zoller et al., *Nucl. Acids Res.* 10: 648–6500 (1982). For example, these deletions can be produced using the oligonucleotides

(A) 5'
AAAAGCAATTTAATGCCACCCCAC-
CAGTCTTGAAACGCCA

(B) 5'
AAAAGCAATTTAATGCCACC-
GAAGATTTTGACATTTATGA

to cause deletions in factor VIII:C cDNA from nucleotides (A) 2334 to 4974 or (B) 2334 to 5079. The proteins encoded by these constructs contain deletions of (A) 880 and (B) 915 amino acids relative to Factor VIII:C.

The deleted constructs are tested directly, or after subcloning into appropriate expression vectors, in order to determine if the novel proteins possess procoagulant activity. Procoagulant activity was assayed as described in Examples 3 and 4.

### EXAMPLE 3

Expression of Procoagulant Molecules in COS Monkey Cells The expression plasmids containing the modified cDNA's prepared as in Examples 1 or 2 and the

24

full-length cDNA, pXMT-VIII, were introduced into COS-1 cells via the DEAE-dextran transfection protocol. Sompayrac and Dana 1981, *Proc. Natl. Acad. Sci.* 78: 7575–7578. Conditioned media was harvested 48 hours post-transfection and assayed for factor VIII-type activity as described in Toole et. al., 1984, *Nature* 312:342–347. The results of the experiment are summarized in Table 3. Both plasmids containing the modified cDNAs yielded procoagulant activity and, moreover, the activity was greater than that obtained using wild type cDNA. From these data it was concluded that removal of up to 880 amino acids (95,000 daltons) in a defined domain of human factor VIII does not destroy cofactor activity. Furthermore, these abridged procoagulant proteins retain their ability to be activated by thrombin.

TABLE 3

| EXPRESSION OF ABRIDGED FACTOR VIII MOLECULES | | | | |
|---|---|---|---|---|
| | # amino acids | chromogenic activity | Clotek activity | |
| plasmid | deleted | (mUml⁻¹) | −IIa | +IIa (fold) |
| No DNA | — | 0 | | |
| pXMT-VIII | — | 15:1 | — | 450 |
| pDGR-2 | 581 | 114 | 250 | 5750 (23X) |
| pLA-2 | 880 | 162 | 330 | 9240 (28X) |

The plasmids indicated were transfected into COS cells and 48 hr. post-transfection the conditioned media taken for assay by the Kabi Coatest factor VIII:C method (chromogenic activity) and by the one-stage activated partial thromboplastin time (APTT) coagulation assay (Clotek activity) using factor VIII:C deficient plasma as described (Toole, *Nature* 1984). For thrombin (IIa) activation, samples were pretreated 1–10 min, with 0.2 units/ml thrombin (IIa) at room temperature. Activation coefficients are provided in parentheses. Activity from media from the wild-type (pXMT-VIII) transfection was too low to directly measure Clotek activity before thrombin activation. From other experiments where the wild type factor VIII activity was concentrated, it was demonstrated to be approximately 30-fold activatable.

### EXAMPLE 4

Expression of Procoagulant Molecules in CHO Cells

(A) Expression of pDGR-2

The procoagulant expression vector containing a deletion (relative to the Factor VIII:C cDNA) of 581 amino acids (pDGR-2) was transfected with plasmid pAdD26SV(A)#3 (10 ug pDGR-2:1 ug pAdD26SV-(A)#3) by CaPO₄ coprecipitatio CHO DHFR deficient cells (DUKX-B11) and transformants isolated and grown in increasing concentrations of MTX as described by Kaufman et. al., (1985). One transformant designated J1 exhibited the following activities as a function of resistance to increasing concentrations of MTX.

| uM MTX | mUnits/ml/day/10⁶ cells* |
|---|---|
| 0 | 1.46 |
| 0.02 | 322 |
| 0.1 | 499 |

(B) Expression of pLA-2

4,868,112

**25**

The procoagulant expression vector containing a deletion of 880 amino acids (pLA-2) was introduced into CHO DHFR deficient cells (DUKX-B11, Chasin and Urlaub, PNAS 77: 4216–4220, 1980 by protoplast fusion as described (Sandri-Goldin et al. Mol. Cell. Biol. 1: 743–752). After fusion, fresh medium containing 100 ug/ml of kanamycin, and 10 ug/ml of each of thymidine, adenosine, deoxyadenosine, penicillin, and streptomycin and 10% dialyzed fetal calf serum was added to each plate. The kanamycin was included to prevent the growth of any bacteria which had escaped conversion to protoplasts. Four days later the cells were subcultured 1:15 into alpha-media with 10% dialyzed fetal calf serum, penicillin, and streptomycin, but lacking the nucleosides. Colonies appeared after 10–12 days after subculturing cells into selective media. A group of 8 transformants were pooled and grown in sequentially increasing concentrations of MTX starting at 0.02 uM with steps to 0.1, 0.2, and 1.0 uM MTX (LA 3–5 cells; ATCC No. CRL 10/01). Results of factor VIII-type activity in cells resistant to increasing concentrations of MTX is shown below.

| uM MTX | mUnits/ml/day/$10^6$ cells* |
|--------|------------------------------|
| 0 | 16 |
| 0.02 | 530 |
| 0.2 | 1170 |
| 1.0 | 1890 |

*Factor VIII activity was determined by the Kabi Coatest factor VIII:C method (chromogenic activity).

What is claimed is:

1. A recombinant DNA which upon expression results in a truncated Factor VIII protein which is an active procoagulant wherein the recombinant DNA encodes for a protein having the amino acid sequence of a human Factor VIII:C except for having a deletion corresponding to at least 581 amino acids within the region between Arg-759 and Ser.-1709, wherein the

**26**

amino acid numbering is with reference to Met-1 of the human Factor VIII:C leader sequence.

2. The recombinant DNA of claim 1 wherein the deletion corresponds to the region between Pro-1000 and Asp-1582.

3. The recombinant DNA of claim 1 wherein the deletion corresponds to the region between Thr-778 and Pro-1659.

4. The recombinant DNA of claim 1 wherein the deletion corresponds to the region between Thr-778 and Glu-1694.

5. A genetically engineered mammalian host cell containing, and capable of expressing, DNA of claim 1.

6. A genetically engineered mammalian host cell containing, and capable of expressing, DNA of claim 2.

7. A genetically engineered mammalian host cell containing, and capable of expressing, DNA of claim 3.

8. A genetically engineered mammalian host cell containing, and capable of expressing, DNA of claim 4.

9. A method for producing a truncated Factor VIII:C protein which is an active procoagulant having the amino acid sequence of a human Factor VIII:C but lacking at least 581 amino acids of the region between Arg-759 and Ser-1709 which comprises producing a genetically engineered mammalian host cell of claim 5 and culturing said host cell under condition permitting expression of the protein.

10. A truncated human Factor VIII:C protein which is an active procoagulant protein having a peptide sequence of human Factor VIII:C but lacking a peptide region selected from the group consisting of:

(a) the region between Pro-1000 and Asp-1582;

(b) the region between Thr-778 and Pro-1659; and,

(c) the region between Thr-778 and Glu-1694.

11. A pharmaceutical preparation for the treatment of Hemphilia A comprising a sterile preparation containing an effective amount of a protein of claim 9, in admixture with a pharmaceutically accepted carrier.

12. A method for treating Hemophilia A comprising administering to a patient a pharmaceutical preparation of claim 11.

* * * * *

45

50

55

60

65

# UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.  :  4,868,112

DATED       :  Sep. 19, 1989

INVENTOR(S) :  John J. Toole, Jr.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In column 1, between lines 7 and 8 (before the second paragraph), insert

the following:

--   This invention was made with Government support under DHHS grant
     S R44 HL35946-03 awarded by the NIH.  The Government has certain
     rights under the invention. --.

Signed and Sealed this

Third Day of November, 1992

Attest:

DOUGLAS B. COMER

Attesting Officer                    Acting Commissioner of Patents and Trademarks

# UNITED STATES PATENT AND TRADEMARK OFFICE

(12)        CERTIFICATE EXTENDING PATENT TERM
                  UNDER 35 U.S.C. § 156

| | | | |
|---|---|---|---|
| (68) | PATENT NO. | : | 4,868,112 |
| (45) | ISSUED | : | September 19, 1989 |
| (75) | INVENTOR | : | John J. Toole, Jr. |
| (73) | PATENT OWNER | : | Genetics Institute LLC |
| (95) | PRODUCT | : | ReFacto® (novel procoagulant proteins) |

This is to certify that an application under 35 U.S.C. § 156 has been filed in the United States Patent and Trademark Office, requesting extension of the term of U.S. Patent No. 4,868,112 based upon the regulatory review of the product ReFacto® (novel procoagulant proteins) by the Food and Drug Administration. Since it appears that the requirements of the law have been met, this certificate extends the term of the patent for the period of

(94)                          1,258 days

from September 19, 2006, the original expiration date of the patent, subject to the payment of maintenance fees as provided by law, with all rights pertaining thereto as provided by 35 U.S.C. § 156(b).



I have caused the seal of the United States Patent and Trademark Office to be affixed this 14th day of September 2006.

Jon W. Dudas
Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office

EXHIBIT 2

Docket: 35877

# ASSIGNMENT

I, John J. Toole, Jr.,

of Jamaica Plain, Massachusetts

in consideration of One Dollar and other valuable consideration paid to          by

GENETICS INSTITUTE

a corporation of Delaware, having its principal place

of business at Boston, Massachusetts, the receipt of

which is hereby acknowledged, do hereby sell, assign and transfer unto said

GENETICS INSTITUTE

its successors and assigns, the entire interest for the United States of America and all foreign

countries in a certain invention or improvement in

NOVEL PROCOAGULANT PROTEINS

described in an application { executed by          of even date herewith and about to be filed

{ Serial Number 725,350, filed on April 12, 1985

and the inventions and any of them therein set forth and described, and any and all

Letters Patent of the United States and of countries foreign thereto which may be granted

thereon or therefor;

And for the above consideration I agree promptly upon request of the Assignee,

its successors or assigns, to execute and deliver without further compensation any power

of attorney, assignment, application, whether original, divisional, continuation or reissue, or

other papers which may be necessary or desirable fully to secure to the Assignee, its

successors and assigns, the inventions and any of them described in said application and

all patent rights therein, in the United States and in any country foreign thereto.

IN WITNESS WHEREOF, I hereunto set my hand and seal this     1st

day of     July     , 19 85

RECORDED
PATENT & TRADEMARK OFFICE
JUL 17 1985
[Inventor's Signature:]     John J. Toole

STATE OF Massachusetts     :
COUNTY OF Suffolk     : ss.

ACTING COMMISSIONER OF
PATENTS & TRADEMARKS

Before me this     1st     day of     July     , 19 85 , personally

appeared John J. Toole, Jr. who is to me personally known, and

acknowledged the foregoing instrument of assignment to be his free act and deed.

Eleanor M. Oberbeck
Notary Public.

Eleanor M. Oberbeck, Notary Public
My Commission Expires Feb. 2, 1990

[Notary's
seal here]

REEL 4426 FRAME 849

EXHIBIT 3

# Assignment

In consideration of good and valuable considerations, the receipt of which is hereby acknowledged, ⊤ , the undersigned,

John J. Toole, Jr., residing at
27 Lakeville Road, Jamaica Plain, Massachusetts 02140

Hereby sell, assign and transfer to Genetics Institute, Inc.

a corporation of the State of Delaware having a place of business at 87 CambridgePark Drive, Cambridge in the County of Middlesex and State of Massachusetts its successors, assigns and legal representatives, the entire right, title and interest for all countries, in and to any and all inventions which are disclosed and claimed, and any and all inventions which are disclosed but not claimed, in the application for United States Patent, which has been executed by the undersigned on 10 April 1986 and is entitled

NOVEL PROCOAGULANT PROTEINS
( a continuation-in-part of U.S. Serial No. 725,350 filed April 12, 1985)

and in and to said application and all divisional, continuing, substitute, renewal, reissue, and all other applications for U.S. Letters Patent or other related property rights in any and all foreign countries which have been or shall be filed on any of said inventions disclosed in said application; and in and to all original and reissued patents or related foreign documents which have been or shall be issued on said inventions;

Authorize and request the Commissioner of Patents of the United States to issue to said Assignee, the corporation above named, its successors, assigns and legal representatives, in accordance with this assignment, any and all United States Letters Patent on said inventions or any of them disclosed in said application;

*Agree that said Assignee may apply for and receive foreign Letters Patent or rights of any other kind for said inventions, or any of them; and may claim, in applications for said foreign Letters Patent or other rights, the priority of the aforesaid United States patent application under the provisions of the International Convention of 1883 and later modifications thereof, under the Patent Cooperation Treaty, under the European Patent Convention or under any other available international agreement; and that, when requested, without charge to, but at the expense of, said Assignee, its successors, assigns and legal representatives, to carry out in good faith the intent and purpose of this assignment, the undersigned or the undersigned's executors or administrators will, for the United States and all foreign countries, execute all divisional, continuing, substitute, renewal, reissue, and all other patent applications or other documents on any and all said inventions; execute all rightful oaths, assignments, powers of attorney and other papers; communicate to said Assignee, its successors, assigns and representatives, all facts known and documents available to the undersigned relating to said inventions and the history thereof; testify in all legal proceedings; and generally do everything possible which said Assignee, its successors, assigns or representatives shall consider desirable for aiding in securing, maintaining and enforcing proper patent protection for said inventions and for vesting title to said inventions and all applications for patents or related foreign rights and all patents on said inventions, in said Assignee, its successors, assigns and legal representatives; and*

*Covenant with said Assignee, its successors, assigns and legal representatives that no assignment, grant, mortgage, license or other agreement affecting the rights and property herein conveyed has been made to others by the undersigned, and that full right to convey the same as herein expressed is possessed by the undersigned.*



[L.S.]

John J. Toole, Jr.

Before me this 10th day of April, 1986
personally appeared John J. Toole, Jr.
who is known to me personally, and
acknowledged the foregoing instrument
of assignment to be his free act and deed.

TEREZA WEIL
NOTARY PUBLIC
MY COMMISSION EXPIRES
NOV. 14 1991

# EXHIBIT 4

# United States Patent [19]

## Toole, Jr.

[11] Patent Number: 4,868,112

[45] Date of Patent: Sep. 19, 1989

[54] **NOVEL PROCOAGULANT PROTEINS**

[75] Inventor: John J. Toole, Jr., Jamaica Plain, Mass.

[73] Assignee: Genetics Institute, Inc., Cambridge, Mass.

[21] Appl. No.: 10,085

[22] PCT Filed: Apr. 11, 1986

[86] PCT No.: PCT/US86/00774

§ 371 Date: Apr. 11, 1986

§ 102(e) Date: Apr. 11, 1986

[87] PCT Pub. No.: WO86/06101

PCT Pub. Date: Oct. 23, 1986

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 725,350, Apr. 12, 1985, abandoned.

[51] Int. Cl.$^4$ ........................ C12P 21/00; C12P 21/02; C12N 15/00; C07H 15/12

[52] U.S. Cl. ...................................... 435/68; 435/70; 435/172.3; 435/240.1; 435/240.2; 435/320; 435/948; 435/252.33; 530/383; 536/27; 514/2; 514/8

[58] Field of Search ............... 435/68, 70, 172.3, 253, 435/255, 256, 240.1, 240.2, 320; 530/383; 534/27; 935/11, 32, 34, 56, 57, 60, 70; 514/2, 8

[56] **References Cited**

### PUBLICATIONS

Wood et al, *Nature*, vol. 312, 22 Nov. 1984, pp. 330–336, "Expression of Active Human Factor VIII from Recombinant DNA Clones".

Toole et al, *Nature*, vol. 312, 22 Nov. 1984, pp. 342–347, "Molecular Cloning of a cDNA Encoding Human Antihaemophilic Factor".

Vehar et al, *Nature*, vol. 312, 22 Nov. 1984, pp. 337–342, "Structure of Human Factor VIII".

Orr et al, *Thrombos Haemostasis*, vol. 57(1), p. 57, 1985, "Spacer Function Imp for the Heavily Glycosylated Region of Factor VIII".

Toole et al, *Proc. Natl. Acad. Sci.*, vol. 83, pp. 5939–5942, Aug. 1986, "A Large Region (≈95 kDa) of Human Factor VIII is Dispensable for in vitro Procoagulant Activity".

Kaufman et al, *Proteases in Biological Control and Biotechnol.*, J. Gen. Biochem. Supp., 10D 275 (1968).

*Primary Examiner*—Robin Teskin
*Attorney, Agent, or Firm*—David L. Berstein; Bruce M. Eisen; Ellen J. Kapinos

[57] **ABSTRACT**

Novel procoagulant proteins are disclosed which comprise the amino acid sequence:

A-X-B

wherein region A represents the polypeptide sequence Ala-20 through Arg-759 substantially as shown in Table 1; region B represents the polypeptide sequence Ser-1709 through Tyr-2351 substantially as shown in Table 1; and region X represents a polypeptide sequence comprising up to 949 amino acids substantially duplicative of sequences of amino acids within the sequence SER-760 through Arg-1708 of Table 1, wherein the amino terminus of X is covalently bonded through a peptide bond designated "-" to the carboxy terminus of A, and the carboxy terminus of X is likewise bonded to the amino terminus of B. Methods of making such proteins and their use in pharmaceutical preparations is also disclosed.

**12 Claims, No Drawings**

# Patent Assignment Abstract of Title
## *NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff.*

**Total Assignments:** 2

**Patent #:** 4868112    **Issue Dt:** 09/19/1989    **Application #:** 07010085    **Filing Dt:** 04/11/1986

**Inventor:** JOHN J. TOOLE JR.

**Title:** NOVEL PROCOAGULANT PROTEINS

**Assignment:** 1

**Reel/Frame:** 004670 / 0383    **Recorded:** 12/09/1986    **Pages:** 2

**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.

**Assignor:** TOOLE, JOHN J. JR.    **Exec Dt:** 04/10/1986

**Assignee:** GENETICS INSTITUTE, INC., 87 CAMBRIDGE PARK DRIVE, MASSACHUSETTS A CORP. OF DE.

**Correspondent:** DAVID L. BERSTEIN
C/O GENETICS INSTITUTE, INC.
87 CAMBRIDGE PARK DRIVE
CAMBRIDGE, MA 02140-2387

**Assignment:** 2

**Reel/Frame:** 012937 / 0815    **Recorded:** 03/13/2002    **Pages:** 16

**Conveyance:** CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).

**Assignor:** GENETICS INSTITUTE, INC.    **Exec Dt:** 01/01/2002

**Assignee:** GENETICS INSTITUTE, LLC
87 CAMBRIDGE PARK DRIVE
CAMBRIDGE, MASSACHUSETTS 02140

**Correspondent:** WYETH
KAY E. BRADY
PATENT LAW DEPARTMENT
FIVE GIRALDA FARMS
MADISON, NJ 07940-0874

Search Results as of: 06/16/2008 01:03 PM

---

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: February 22, 2007 v.2.0

2

# Patent Assignment Abstract of Title

**Total Assignments: 1**
**Application #:** 06725350   **Filing Dt:** 04/12/1985      **Patent #:** NONE      **Issue Dt:**
**PCT #:** NONE                                   **Publication #:** NONE      **Pub Dt:**
**Inventor:** JOHN J TOOLE JR
**Title:** PROCOAGULANT PROTEINS
**Assignment: 1**
**Reel/Frame:** 004426 / 0849   **Received:**   **Recorded:** 07/11/1985      **Mailed:** NONE   **Pages:** 1
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.
**Assignor:** TOOLE, JOHN J JR                                      **Exec Dt:** 07/01/1985
**Assignee:** GENETICS INSTITUTE, BOSTON, MASSACHUSETTS, A CORP OF DE.
**Correspondent:** DAVID G. CONLIN
DIKE, BRONSTEIN, ROBERTS,
CUSHMAN & PFUND
130 WATER ST.
BOSTON, MASSACHUSETTS 02109

Search Results as of: 06/16/2008 01:08 PM

---

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at 571-272-3350.
Web interface last modified: February 22, 2007 v.2.0

3

P.E
6/7/02

06-13-2002

Docket No:  GENETICS
Patent

Recordation Form Cover Sheet
Patents

||||||||||||||||||||||||||
102121088

ENT OF COMMERCE
RADEMARK OFFICE

To the Commissioner for Patents:  Please record the attached original document:

**Certificate of the Secretary of State of Delaware showing the conversion of Genetics Institute, Inc. from a Delaware Corporation to a Delaware Limited Liability Company and changing its name to Genetics Institute, LLC.**

1.  Submission Type
    ☐ New
    ☒ Resubmission (Non-Recordation)
       Document ID # 102050878
    ☐ Correction of PTO Error
       Reel #        Frame #
    ☐ Corrective Document
       Reel #        Frame #

2.  Conveyance Type:
    ☐ Assignment           ☐ License            ☐ Security Agreement
    ☐ Other                ☒ Change of Name     ☐ Merger

3.  Conveying party(ies):

    **Genetics Institute, Inc.**

    Additional name(s) of conveying party(ies) attached:
    ☐ Yes
    ☒ No
    Execution Date:  January 1, 2002

4.  Receiving party(ies):

    **GENETICS INSTITUTE, LLC**
    **87 Cambridge Park Drive**
    **Cambridge, MA  02140**

    Additional name(s) and address(es) attached:
    ☐ Yes
    ☒ No

5.  Correspondent address:

    Kay E. Brady
    Wyeth
    Patent Law Department
    Five Giralda Farms
    Madison, NJ 07940-0874
    Tel. No. (973) 683-2130

AssignmentRecordationCover.dot – Rev 9/01          Page 1 of 2          Recordation Form Cover Sheet

**PATENT**
**REEL: 012937 FRAME: 0815**

4

Docket No:  GENETICS
Patent

6. Application number(s) or patent number(s):
   If this document is being filed together with a new application, the execution date of the application is:
   A. Patent Application Number(s):
   B. Patent Number(s): **See Attached Schedule**
   C. Patent Cooperation Treaty (PCT) Application Number(s) (only if a U.S. Application Number has not been assigned):
   Additional numbers attached:
   ☒ Yes
   ☐ No

7. Pages:  Enter the total number of pages of the attached conveyance document including any attachments:  12

8. Total number of properties involved:  220

9. Total Fee (37 CFR 3.41):  $8,800.00
   ☐ Enclosed
   ☒ Authorized to be charged to deposit account.

10. Deposit Account Number: 07-1060
    Authorization is given to charge any additional fees to deposit account.
    (Attach duplicate copy of this page if paying by deposit account).

11. Statement and Signature:
    To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.  Charges to deposit account are authorized, as indicated herein.

    6-7-02
    _____            _____
    Date                            Egon E. Berg
                                    Assistant Secretary
                                    Reg. No. 21,117

                                    Customer No. 25291

**Certificate of Mailing 37 CFR §1.10**

   I hereby certify that this paper and the documents referred to as enclosed therein are being deposited with the United States Postal Service on the date written below in an envelope as "Express Mail Post Office to Addressee" Mailing Label Number EV100596798US  addressed to the Commissioner for Patents, Box Assignments, Washington, DC 20231.

   6-7-02
   _____            _____
   **Date:**                       **Annette D. Cromer**

L:\PATENTS\Brady\Genetics\Genetics Name Change U.S. Recordal.doc

AssignmentRecordationCover.dot – Rev 9/01            Page 2 of 2            Recordation Form Cover Sheet

MASTER FILE REPORT

PCMASTER REPORTER

GI ACTIVE PATENTS

13MR2002  10 42  PAGE: 1

| Pat No. | Grant Dt | App No | Confirmation No | App Date | Docket No. | Ctry | Types | Curr Owner Desc |
|---|---|---|---|---|---|---|---|---|
| 4518692 | 21MY1985 | 06/528730 | | 01SE1983 | GI005006 | USA | | Genetics Institute Inc. |
| 4525454 | 25JE1985 | 06/643654 | | 23AU1984 | GI005015 | USA | P 01 | Genetics Institute Inc. |
| 4638032 | 20JA1987 | 06/640027 | | 10AU1984 | GI005000A | USA | P 01 | Genetics Institute Inc. |
| 4675285 | 23JE1987 | 06/652316 | | 19SE1984 | GI005018 | USA | | Genetics Institute Inc. |
| 4677195 | 30JE1987 | 06/690853 | | 11JA1985 | GI005024 | USA | | Genetics Institute Inc. |
| 4740461 | 26AP1988 | 06/566057 | | 27DE1983 | GI005006 | USA | | Genetics Institute Inc. |
| 4752566 | 21JN1988 | 06/809992 | | 17DE1985 | GI005052 | USA | | Genetics Institute Inc. |
| 4757006 | 12JL1988 | 06/546650 | | 28OC1983 | GI005002 | USA | | Genetics Institute Inc. |
| 4761375 | 02AU1988 | 06/849234 | | 07AP1986 | GI005035A | USA | C 01 | Genetics Institute Inc. |
| ~~4770999~~ | ~~13SE1988~~ | ~~INPF 103463~~ | | ~~04NR1986~~ | ~~GI005006~~ | ~~USA~~ | ~~01 01~~ | ~~Genetics Institute Inc.~~ |
| 4770999 | 13SE1988 | 06/929294 | | 05MY1986 | GI005026 | USA | P 01 | Genetics Institute Inc. |
| 4801536 | 31JA1989 | 07/057881 | | 02JL1987 | GI005045 | USA | P 01 | Genetics Institute Inc. |
| 4826766 | 02MY1989 | 06/779157 | | 23SE1985 | GI005041 | USA | | Genetics Institute Inc. |
| 4833239 | 23MY1989 | 07/008500 | | 29JA1987 | GI005065A | USA | | Genetics Institute Inc. |
| 4843012 | 27JE1989 | 06/908413 | | 17SE1986 | GI005065 | USA | | Genetics Institute Inc. |
| 4868112 | 19SE1989 | 07/010085 | | 11AP1986 | GI005031A | USA | J 01 | Genetics Institute Inc. |
| 4868319 | 19SE1989 | 06/940362 | | 11DE1986 | GI005069A | USA | P 01 | Genetics Institute Inc. |
| 4877729 | 31OC1989 | 06/916335 | | 07OC1986 | GI005080B | USA | P 01 | Genetics Institute Inc. |
| 4877864 | 31OC1989 | 07/031346 | | 26MR1987 | GI005071B | USA | | Genetics Institute Inc. |
| 4879227 | 07NO1989 | 06/860377 | | 06MY1986 | GI005069 | USA | | Genetics Institute Inc. |
| 4880738 | 14NO1989 | 06/873920 | | 13JL1986 | GI005072 | USA | | Genetics Institute Inc. |
| 4882422 | 21NO1989 | 07/100372 | | 24SE1987 | GI005043B | USA | P 02 | Genetics Institute Inc. |
| 4904584 | 27FE1990 | 07/137043 | | 23DE1987 | GI005110A | USA | | Genetics Institute Inc. |
| 4912040 | 27MR1990 | 07/010351 | | 03FE1987 | GI005088A | USA | P 01 | Genetics Institute Inc. |
| 4918161 | 17AP1990 | 07/190287 | | 04MY1988 | GI005043C | USA | P 03 | Genetics Institute Inc. |

MASTER FILE REPORT

GI ACTIVE PCMASTER REPORTER
PATENTS

13MR2002   10 42   PAGE: 2

| Pat No. | Grant Dt | App No | Confirmation No | App Date | Docket No. | Ctry | Types | Curr Owner Desc |
|---|---|---|---|---|---|---|---|---|
| 4921837 | 01MY1990 | 07/081489 | | 24JL1987 | GX005049A | USA | P 01 | Genetics Institute Inc. |
| 4959455 | 25SE1990 | 07/021865 | | 04MR1987 | GX005080C | USA | P 01 | Genetics Institute Inc. |
| 4963481 | 16OC1990 | 06/929969 | | 12NO1986 | GX005048A | USA | P 01 | Genetics Institute Inc. |
| 4980165 | 25DE1990 | 07/302846 | | 27JA1989 | GX005143 | USA | | Genetics Institute Inc. |
| 5002874 | 26MR1991 | 07/561217 | | 30JL1990 | GX005107 | USA | C 01 | Genetics Institute Inc. |
| 5002887 | 26MR1991 | 06/882051 | | 03JL1986 | GX005078 | USA | P | Genetics Institute Inc. |
| 5004803 | 02AP1991 | 07/270082 | | 14NO1988 | GX005138 | USA | | Genetics Institute Inc. |
| 5013649 | 07MY1991 | 07/179100 | | 08AP1988 | GX005071H | USA | P 03 | Genetics Institute Inc. |
| 5019509 | 28MY1991 | 07/183860 | | 20AP1988 | GX005128 | USA | | Genetics Institute Inc. |
| 5032395 | 16JL1991 | 07/370680 | | 23JE1989 | GX005157A | USA | P 01 | Genetics Institute Inc. |
| 5055553 | 08OC1991 | 07/507331 | | 09AP1990 | GX005043D | USA | D 01 | Genetics Institute Inc. |
| 5071748 | 10DE1991 | 07/353181 | | 15MY1989 | GX005073B | USA | C 01 | Genetics Institute Inc. |
| 5071972 | 10DE1991 | 07/382678 | | 30JA1987 | GX005078B | USA | PP01 | Genetics Institute Inc. |
| 5079159 | 07JA1992 | 07/185649 | | 25AP1988 | GX005004C | USA | C 01 | Genetics Institute Inc. |
| 5084556 | 28JA1992 | 07/545678 | | 28JE1990 | GX005108B | USA | C 01 | Genetics Institute Inc. |
| 5106748 | 21AP1992 | 07/370547 | | 23JE1989 | GX005151A | USA | P 01 | Genetics Institute Inc. |
| 5108922 | 28AP1992 | 07/561496 | | 31JL1990 | GX005071G | USA | C 02 | Genetics Institute Inc. |
| 5116738 | 26MY1992 | 07/692827 | | 26AP1991 | GX005071F | USA | C 01 | Genetics Institute Inc. |
| 5141905 | 25AU1992 | 07/438919 | | 17NO1989 | GX005159A | USA | P 01 | Genetics Institute Inc. |
| 5166058 | 24NO1992 | 07/378537 | | 11JL1989 | GX005160 | USA | P 01 | Genetics Institute Inc. |
| 5166322 | 24NO1992 | 07/341990 | | 21AP1989 | GX005153 | USA | | Genetics Institute Inc. |
| 5171579 | 15DE1992 | 07/776514 | | 11OC1991 | GX005194 | USA | | Genetics Institute Inc. |
| 5187076 | 16FE1993 | 07/490033 | | 07MR1990 | GX005156B | USA | P 01 | Genetics Institute Inc. |
| 5198349 | 30MR1993 | 07/707211 | | 23MY1991 | GX005047A | USA | P 01 | Genetics Institute Inc. |
| 5198617 | 30MR1993 | 07/433054 | | 07NO1989 | GX005049C | USA | D 01 | Genetics Institute Inc. |

PATENT
REEL: 012937 FRAME: 0818

MASTER FILM REPORT

GI ACTIVE REPORTER PCMASTER PATENTS

13MR2002   10 42   PAGE: 3

| Pat No. | Grant Dt | App No | Confirmation No | App Date | Docket No. | Ctry | Types | Curr Owner Desc |
|---|---|---|---|---|---|---|---|---|
| 5215895 | 01JL1993 | 07/526474 | | 21MY1990 | GI005174A | USA | P 01 | Genetics Institute Inc. |
| 5238820 | 24AU1993 | 07/421228 | | 13OC1989 | GI005042B | USA | P 02 | Genetics Institute Inc. |
| 5250421 | 05OC1993 | 07/824765 | | 17JA1992 | GI005175 | USA | F 01 | Genetics Institute Inc. |
| 5258298 | 02NO1993 | 07/805415 | | 10DE1991 | GI005078D | USA | C 01 | Genetics Institute Inc. |
| 5270181 | 14DE1993 | 07/745382 | | 14AU1991 | GI005188A | USA | P 01 | Genetics Institute Inc. |
| 5292646 | 08MR1994 | 07/921848 | | 28JL1992 | GI005188C | USA | P 02 | Genetics Institute Inc. |
| 5322776 | 21JE1994 | 08/004156 | | 13JA1993 | GI005170 | USA | D 01 | Genetics Institute Inc. |
| 5322837 | 21JE1994 | 07/903220 | | 31JL1992 | GI005024D | USA | C 04 | Genetics Institute Inc. |
| 5340573 | 23AU1994 | 08/027918 | | 08MR1993 | GI005121C | USA | C 01 | Genetics Institute Inc. |
| 5354677 | 11OC1994 | 08/002447 | | 13JA1993 | GI005170 | USA | D 05 | Genetics Institute Inc. |
| 5364839 | 15NO1994 | 07/539756 | | 18JE1990 | GI005172 | USA | | Genetics Institute Inc. |
| 5366875 | 22NO1994 | 07/764731 | | 24SE1991 | GI005155B | USA | C 01 | Genetics Institute Inc. |
| 5371193 | 06DE1994 | 08/017522 | | 12FE1993 | GI005174A | USA | D 01 | Genetics Institute Inc. |
| 5378612 | 03JA1995 | 07/997670 | | 28DE1992 | AM100499 | USA | C 01 | Genetics Institute Inc. |
| 5385887 | 31JA1995 | 08/119772 | | 10SE1993 | GI005198 | USA | | Genetics Institute Inc. |
| 5393657 | 28FE1995 | 07/990300 | | 30NO1992 | GI005214 | USA | | Genetics Institute Inc. |
| 5399677 | 21MR1995 | 08/163877 | | 07DE1993 | GI005219 | USA | | Genetics Institute Inc. |
| 5418158 | 23MY1995 | 08/103938 | | 06AU1993 | GI005078E | USA | C 01 | Genetics Institute Inc. |
| 5422060 | 06JE1995 | 07/883936 | | 15MY1992 | GI005077E | USA | F 01 | Genetics Institute Inc. |
| 5437863 | 01AU1995 | 08/115680 | | 01SE1993 | GI005211A | USA | P 01 | Genetics Institute Inc. |
| 5451521 | 19SE1995 | 06/939658 | | 09DE1986 | GI005077B | USA | P 02 | Genetics Institute Inc. |
| 5459047 | 17OC1995 | 08/251069 | | 27MY1994 | GI005156B | USA | D 01 | Genetics Institute Inc. |
| 5460810 | 24OC1995 | 07/941372 | | 02SE1992 | GI005211 | USA | | Genetics Institute Inc. |
| 5466595 | 14NO1995 | 08/281193 | | 27JL1994 | GI005224 | USA | | Genetics Institute Inc. |
| 5520923 | 28MY1996 | 08/308787 | | 19SE1994 | GI005240 | USA | | Genetics Institute Inc. |

MASTER FILE REPORT

GI ACTIVE PCMASTER REPORTER
PATENTS

13MAR2002   10 42   PAGE: 4

| Pat. No. | Grant Dt | App No | Confirmation No | App Date | Docket No. | Ctry | Types | Curr Owner Desc |
|---|---|---|---|---|---|---|---|---|
| 5527698 | 18JE1996 | 08/263861 | | 22JL1994 | GI005170 | USA | D 03 | Genetics Institute Inc. |
| 5536637 | 16JL1996 | 08/328962 | | 24OC1994 | GI005200 | USA | C 01 | Genetics Institute Inc. |
| 5543394 | 06AU1996 | 08/116425 | | 07SE1993 | GI005151E | USA | C 01 | Genetics Institute Inc. |
| 5554511 | 10SE1996 | 08/422420 | | 14AP1995 | GI005224 | USA | D 01 | Genetics Institute Inc. |
| 5563045 | 08OC1996 | 08/121202 | | 14SE1993 | GI005195A | USA | P 01 | Genetics Institute Inc. |
| 5573763 | 12NO1996 | 07/393435 | | 14AU1989 | GI005069C | USA | D 01 | Genetics Institute Inc. |
| 5582821 | 10DE1996 | 08/278765 | | 22JL1994 | GI005237 | USA | | Genetics Institute Inc. |
| 5589170 | 31DE1996 | 08/422106 | | 14AP1995 | GI005224 | USA | D 02 | Genetics Institute Inc. |
| 5593878 | 14JA1997 | 08/263590 | | 22JN1994 | GI005170 | USA | D 02 | Genetics Institute Inc. |
| 5597897 | 28JA1997 | 08/081378 | | 22JN1992 | GI005189 | USA | P | Genetics Institute Inc. |
| 5597897 | 28JA1997 | 08/081378 | | 29JN1993 | GI005189A | USA | P | Genetics Institute Inc. |
| 5618924 | 08AP1997 | 07/655579 | | 18MR1991 | GI005071H | USA | D 01 | Genetics Institute Inc. |
| 5622832 | 22AP1997 | 07/486628 | | 28FE1990 | GI005170 | USA | | Genetics Institute Inc. |
| 5631142 | 20MY1997 | 08/118363 | | 07SE1993 | GI005160 | USA | C 01 | Genetics Institute Inc. |
| 5635182 | 03JE1997 | 08/260582 | | 16JN1994 | GI005236 | USA | | Genetics Institute Inc. |
| 5635373 | 03JE1997 | 08/469935 | | 06JN1995 | GI005151E | USA | D 01 | Genetics Institute Inc. |
| 5637480 | 10JE1997 | 08/247908 | | 20MY1994 | GI005206 | USA | P 01 | Genetics Institute Inc. |
| 5639453 | 17JE1997 | 08/370277 | | 10JA1995 | GI005080G | USA | C 01 | Genetics Institute Inc. |
| 5639638 | 17JE1997 | 08/247907 | | 20MY1994 | GI005205 | USA | P 01 | Genetics Institute Inc. |
| 5646016 | 08JL1997 | 08/165301 | | 10DE1993 | GI005188D | USA | P 03 | Genetics Institute Inc. |
| 5654173 | 05AU1997 | 08/702080 | | 23AU1996 | GI006010 | USA | | Genetics Institute Inc. |
| 5658736 | 19AU1997 | 08/586329 | | 16JA1996 | GI005266 | USA | | Genetics Institute Inc. |
| 5661007 | 26AU1997 | 08/050132 | | 22AP1993 | GI005186A | USA | P 01 | Genetics Institute Inc. |
| 5665566 | 09SE1997 | 08/200900 | | 23FE1994 | GI005201 | USA | C 01 | Genetics Institute Inc. |
| 5679339 | 21OC1997 | 08/495724 | | 27JN1995 | GI005238 | USA | | Genetics Institute Inc. |

PATENT
REEL: 012937 FRAME: 0820

9

MASTER FILE REPORT

GI ACTIVE PCMASTER REPORTER PATENTS

13MR2002   10 42   PAGE: 5

| Pat No. | Grant Dt | App No | Confirmation No | App Date | Docket No. | Ctry | Types | Curr Owner Desc |
|---|---|---|---|---|---|---|---|---|
| 5688678 | 18NO1997 | 07/800364 | | 26NO1991 | GX005182A | USA | P 01 | Genetics Institute Inc. |
| 5700664 | 23DE1997 | 07/949516 | | 19NO1992 | GX005174B | USA | P 01 | Genetics Institute Inc. |
| 5700774 | 23DE1997 | 08/622101 | | 26MR1996 | GX005269 | USA | | Genetics Institute Inc. |
| 5700911 | 23DE1997 | 08/452772 | | 30MY1995 | GX005205A | USA | D 01 | Genetics Institute Inc. |
| 5703043 | 30DE1997 | 08/453942 | | 30MY1995 | GX005206A | USA | D 01 | Genetics Institute Inc. |
| 5707829 | 13JA1998 | 08/514014 | | 11AU1995 | GX006000 | USA | | Genetics Institute Inc. |
| 5708157 | 13JA1998 | 08/686878 | | 26JL1995 | GX006006 | USA | | Genetics Institute Inc. |
| 5710023 | 20JA1998 | 08/609572 | | 01MR1996 | GX005268 | USA | | Genetics Institute Inc. |
| 5712216 | 27JA1998 | 08/639052 | | 24AP1996 | GX005200PWC | USA | C 02 | Genetics Institute Inc. |
| 5712381 | 27JA1998 | 08/698551 | | 15AU1996 | GX005232D | USA | P 01 | Genetics Institute Inc. |
| 5714583 | 03FE1998 | 08/472823 | | 07JN1995 | GX005246 | USA | | Genetics Institute Inc. |
| 5723315 | 03MR1998 | 08/702344 | | 23AU1996 | GX006009 | USA | | Genetics Institute Inc. |
| 5728548 | 17MR1998 | 08/496631 | | 29JN1995 | GX005248 | USA | | Genetics Institute Inc. |
| 5728568 | 17MR1998 | 08/753233 | | 22NO1996 | GX005285 | USA | | Genetics Institute Inc. |
| 5728819 | 17MR1998 | 08/691641 | | 02AU1996 | GX006007 | USA | | Genetics Institute Inc. |
| 5733873 | 31MR1998 | 08/244266 | | 01OC1993 | AML00542 | USA | P | Genetics Institute Inc. |
| 5744132 | 28AP1998 | 08/783523 | | 14JA1997 | GX005249 | USA | C 01 | Genetics Institute Inc. |
| 5756308 | 26MY1998 | 08/360914 | | 21DE1994 | GX005219B | USA | P 01 | Genetics Institute Inc. |
| 5760189 | 02JN1998 | 08/464176 | | 02JN1995 | GX005235 | USA | | Genetics Institute Inc. |
| 5770700 | 23JN1998 | 08/591332 | | 25JA1996 | GX005263 | USA | | Genetics Institute Inc. |
| 5786465 | 28JL1998 | 08/721489 | | 27SE1996 | GX006006.AJ172 | USA | P 02 | Genetics Institute Inc. |
| 5789181 | 04AU1998 | 08/726525 | | 07OC1996 | GX005258 | USA | D 02 | Genetics Institute Inc. |
| 5792628 | 11AU1998 | 08/818163 | | 14MR1997 | GX005295 | USA | | Genetics Institute Inc. |
| 5804416 | 08SE1998 | 08/741589 | | 31OC1996 | GX005219B | USA | D 01 | Genetics Institute Inc. |
| 5807703 | 15SE1998 | 08/664596 | | 17JN1996 | GX006004 | USA | | Genetics Institute Inc. |

MASTER FILE REPORT

13MR2002  10 42  PAGE: 6

GI ACTIVE PATENTS PCMASTER REPORTER

| Pat No. | Grant Dt | App No | Confirmation No | App Date | Docket No. | Ctry | Types | | Curr Owner Desc |
|---|---|---|---|---|---|---|---|---|---|
| 5807709 | 15SE1998 | 08/721798 | | 27SE1996 | GI006004.0276 | USA | P 01 | | Genetics Institute Inc. |
| 5817476 | 06OC1998 | 08/487942 | | 07JN1995 | GI005258 | USA | | | Genetics Institute Inc. |
| 5827688 | 27OC1998 | 08/738367 | | 25OC1996 | GI006004.C195A | USA | P 01 | | Genetics Institute Inc. |
| 5827817 | 27OC1998 | 08/477254 | | 07JN1995 | GI005213X | USA | D 02 | | Genetics Institute Inc. |
| 5830761 | 03NO1998 | 08/481774 | | 07JN1995 | GI005233 | USA | | | Genetics Institute Inc. |
| 5833026 | 03NO1998 | 08/809756 | | 14NO1995 | AM100543 | USA | P | | Genetics Institute Inc. |
| 5831056 | 03NO1998 | 08/721746 | | 27SE1996 | GI006003.075 | USA | P 01 | | Genetics Institute Inc. |
| 5837490 | 17NO1998 | 08/739775 | | 30OC1996 | GI006004.AS152 | USA | P 01 | | Genetics Institute Inc. |
| 5837518 | 17NO1998 | 08/891245 | | 10JL1997 | GI005078F | USA | C 01 | | Genetics Institute Inc. |
| 5840511 | 24NO1998 | 08/735716 | | 23OC1996 | GI005224DIV | USA | C 01 | | Genetics Institute Inc. |
| 5840679 | 24NO1998 | 08/472576 | | 07JN1995 | GI005213X | USA | D 01 | | Genetics Institute Inc. |
| 5843675 | 01DE1998 | 08/602228 | | 15FE1996 | GI005232C | USA | P 01 | | Genetics Institute Inc. |
| 5843707 | 01DE1998 | 08/428734 | | 25AP1995 | GI005213X | USA | P 01 | | Genetics Institute Inc. |
| 5846931 | 08DE1998 | 08/926942 | | 10SE1997 | GI005269 | USA | C 01 | | Genetics Institute Inc. |
| 5847099 | 08DE1998 | 08/649341 | | 17MY1996 | GI005232 | USA | C 01 | | Genetics Institute Inc. |
| 5849501 | 15DE1998 | 08/494440 | | 19JN1995 | GI005232A | USA | P 01 | | Genetics Institute Inc. |
| 5849880 | 15DE1998 | 08/469936 | | 06JN1995 | GI005156B | USA | C 02 | | Genetics Institute Inc. |
| 5852173 | 22DE1998 | 08/533901 | | 26SE1995 | GI005232B | USA | P 01 | | Genetics Institute Inc. |
| 5853714 | 29DE1998 | 08/411028 | | 27MR1995 | GI005250 | USA | | | Genetics Institute Inc. |
| 5854028 | 29DE1998 | 08/814459 | | 10MR1997 | GI005174B | USA | D 01 | | Genetics Institute Inc. |
| 5861278 | 19JA1999 | 08/742753 | | 01NO1996 | GI005277 | USA | | | Genetics Institute Inc. |
| 5865164 | 02FE1999 | 07/989847 | | 27NO1992 | GI005192B | USA | P 02 | | Genetics Institute Inc. |
| 5869307 | 09FE1999 | 08/984246 | | 03DE1997 | GI005285 | USA | D 01 | | Genetics Institute Inc. |
| 5883230 | 16MR1999 | 08/658762 | | 05JN1996 | GI005144A | USA | C 02 | | Genetics Institute Inc. |
| 5888495 | 30MR1999 | 07/931551 | | 18AU1992 | GI005122A | USA | C 01 | | Genetics Institute Inc. |

**PATENT**
**REEL: 012937 FRAME: 0822**

MASTER FILE REPORT                                              13MR2002   10 42   PAGE:   7

GI ACTIVE PATENTS   PCMASTER REPORTER

| Pat No. | Grant Dt | App No | Confirmation No | App Date | Docket No. | Ctry | Types | Curr Owner Desc |
|---|---|---|---|---|---|---|---|---|
| 5891675 | 06AP1999 | 08/839032 | | 23AP1997 | GI005232D | USA | D 01 | Genetics Institute Inc. |
| 5902785 | 11MY1999 | 08/646193 | | 07MY1996 | GI005261A | USA | P 01 | Genetics Institute Inc. |
| 5932216 | 03AU1999 | 08/926885 | | 10SE1997 | GI005206A | USA | C 01 | Genetics Institute Inc. |
| 5935852 | 10AU1999 | 08/887997 | | 03JL1997 | GI005290 | USA | | Genetics Institute Inc. |
| 5936067 | 10AU1999 | 08/535116 | | 19AP1994 | GI005215 | USA | P | Genetics Institute Inc. |
| 5939388 | 17AU1999 | 08/788729 | | 23JA1997 | GI005151F | USA | P 01 | Genetics Institute Inc. |
| 5942228 | 24AU1999 | 09/149574 | | 09SE1998 | GI005285 | USA | D 02 | Genetics Institute Inc. |
| 5945302 | 31AU1999 | 08/783395 | | 13JA1997 | GI006001.D157 | USA | P 01 | Genetics Institute Inc. |
| 5948144 | 07SE1999 | 08/946178 | | 07OC1997 | GI005308 | USA | | Genetics Institute Inc. |
| 5948402 | 07SE1999 | 08/892407 | | 15JL1997 | GI005238 | USA | D 01 | Genetics Institute Inc. |
| 5948638 | 07SE1999 | 08/839031 | | 23AP1997 | GI005232RD1V | USA | D 01 | Genetics Institute Inc. |
| 5958401 | 28SE1999 | 08/973830 | | 30MY1996 | GI005238 | USA | P 02 | Genetics Institute Inc. |
| 5958726 | 28SE1999 | 08/867680 | | 02JE1997 | GI006002.H849 | USA | P 01 | Genetics Institute Inc. |
| 5965386 | 12OC1999 | 08/721488 | | 27SE1996 | GI006005A | USA | P 01 | Genetics Institute Inc. |
| 5965397 | 12OC1999 | 09/014969 | | 28JA1998 | GI006025A | USA | P 01 | Genetics Institute Inc. |
| 5965403 | 12OC1999 | 08/715202 | | 18SE1996 | GI005275 | USA | | Genetics Institute Inc. |
| 5965693 | 12OC1999 | 08/858830 | | 19MY1997 | GI006010.MD372 | USA | D 01 | Genetics Institute Inc. |
| 5969093 | 19OC1999 | 08/833823 | | 10AP1997 | GI006000 | USA | D 01 | Genetics Institute Inc. |
| 5969125 | 19OC1999 | 08/721924 | | 27SE1996 | GI006006.AP224 | USA | P 03 | Genetics Institute Inc. |
| 5972652 | 26OC1999 | 08/924838 | | 05SE1997 | GI006001.B196 | USA | D 01 | Genetics Institute Inc. |
| 5976837 | 02NO1999 | 08/960022 | | 29OC1997 | GI006030A | USA | P 01 | Genetics Institute Inc. |
| 5976838 | 02NO1999 | 08/993228 | | 18DE1997 | GI006018B | USA | P 02 | Genetics Institute Inc. |
| 5976854 | 02NO1999 | 08/555558 | | 08NO1995 | GI005224A | USA | P 01 | Genetics Institute Inc. |
| 5981222 | 09NO1999 | 08/858834 | | 19MY1997 | GI006010.BR533 | USA | D 01 | Genetics Institute Inc. |
| 5981482 | 09NO1999 | 08/726036 | | 07OC1996 | GI005258 | USA | D 01 | Genetics Institute Inc. |

PATENT
REEL: 012937 FRAME: 0823

12

MASTER FILE REPORT

GI ACTIVE PCMASTER REPORTER PATENTS

13MR2002  10 42  PAGE: 8

| Pat No. | Grant Dt | App No | Confirmation No | App Date | Docket No. | Ctry | Types | Curr Owner Desc |
|---|---|---|---|---|---|---|---|---|
| 5985602 | 16NO1999 | 08/721925 | | 27SE1996 | GI006008.EL205 | USA | | Genetics Institute Inc. |
| 6004937 | 21DE1999 | 09/037118 | | 09MR1998 | GI005327 | USA | | Genetics Institute Inc. |
| 6005082 | 21DE1999 | 08/809698 | | 14NO1995 | AM100544 | USA | P | Genetics Institute Inc. |
| 6022714 | 08FE2000 | 08/574860 | | 19DE1995 | GI005038A | USA | C 01 | Genetics Institute Inc. |
| 6027917 | 22FE2000 | 08/987904 | | 10DE1997 | GI005307 | USA | | Genetics Institute Inc. |
| 6034061 | 07MR2000 | 08/750222 | | 04DE1996 | GI005186B | USA | | Genetics Institute Inc. |
| 5034062 | 07MR2000 | 08/815652 | | 13MR1997 | GI005186C | USA | P 01 | Genetics Institute Inc. |
| 6043344 | 28MR2000 | 09/034810 | | 04MR1998 | GI005262B | USA | D 01 | Genetics Institute Inc. |
| 6057128 | 02MY2000 | 09/040005 | | 17MR1998 | GI005320 | USA | | Genetics Institute Inc. |
| 6066317 | 23MY2000 | 09/122525 | | 24JL1998 | GI005174B | USA | C 02 | Genetics Institute Inc. |
| 6074849 | 13JN2000 | 08/685239 | | 18JL1996 | GI005262A | USA | P 01 | Genetics Institute Inc. |
| 6084071 | 04JL2000 | 09/094287 | | 09JN1998 | GI005299A | USA | P 01 | Genetics Institute Inc. |
| 6100387 | 08AU2000 | 08/808720 | | 28FE1997 | GI005291 | USA | | Genetics Institute Inc. |
| 6121031 | 19SE2000 | 08/890615 | | 09JL1997 | GI005300 | USA | | Genetics Institute Inc. |
| 6126933 | 03OC2000 | 09/179026 | 7193 | 26OC1998 | GI005238B | USA | P 01 | Genetics Institute Inc. |
| 6136536 | 24OC2000 | 09/175690 | | 20OC1998 | GI005310 | USA | | Genetics Institute Inc. |
| 6143524 | 07NO2000 | 08/810436 | | 04MR1997 | GI005188D | USA | D 01 | Genetics Institute Inc. |
| 6150328 | 21NO2000 | 07/721847 | | 14JN1991 | GI005160C | USA | P 01 | Genetics Institute Inc. |
| 6177406 | 23JA2001 | 08/927124 | | 05SE1997 | GI005071F | USA | C 02 | Genetics Institute Inc. |
| 6187742 | 13FE2001 | 09/274575 | | 23MR1999 | GI005243 | USA | C 01 | Genetics Institute Inc. |
| 6190880 | 20FE2001 | 08/469411 | | 06JN1995 | GI005192B | USA | C 01 | Genetics Institute Inc. |
| 6207813 | 27MR2001 | 09/189157 | | 09NO1998 | GI005156 | USA | C 01 | Genetics Institute Inc. |
| 6214559 | 10AP2001 | 08/841751 | | 30AP1997 | GI005268 | USA | D 01 | Genetics Institute Inc. |
| 6245889 | 12JN2001 | 08/925779 | | 09SE1997 | GI005160C | USA | C 01 | Genetics Institute Inc. |
| 6248714 | 19JN2001 | 08/846340 | | 30AP1997 | GI005268-DIV3 | USA | D 02 | Genetics Institute Inc. |

PATENT
REEL: 012937 FRAME: 0824

13

MASTER FILE REPORT

PCMASTER REPORTER

GI ACTIVE PATENTS

13MR2002  10 42  PAGE: 9

| Pat No. | Grant Dt | App No | Confirmation No | App Date | Docket No. | Ctry | Types | Curr Owner Desc |
|---|---|---|---|---|---|---|---|---|
| 5268980 | 31JL2001 | 08/846344 | | 30AP1997 | GI005268 | USA | D 03 | Genetics Institute Inc. |
| 6270757 | 07AU2001 | 08/230982 | 6502 | 21AP1994 | GI005218 | USA | | Genetics Institute Inc. |
| 6270759 | 07AU2001 | 09/337965 | 9762 | 22JN1999 | GI005238 | USA | D 02 | Genetics Institute Inc. |
| 6274135 | 14AU2001 | 09/337968 | 9765 | 22JN1999 | GI005238 | USA | D 03 | Genetics Institute Inc. |
| 6274140 | 14AU2001 | 09/519223 | 7953 | 06MR2000 | GI005224 | USA | C 01 | Genetics Institute Inc. |
| 6274547 | 14AU2001 | 09/151102 | 7297 | 10SE1998 | GI005252A | USA | D 02 | Genetics Institute Inc. |
| 6277975 | 21AU2001 | 08/713556 | | 30AU1996 | GI005213F | USA | P 05 | Genetics Institute Inc. |
| 6280739 | 28AU2001 | 08/885469 | 7378 | 27JN1997 | GI006500.AM931A | USA | X 04 | Genetics Institute Inc. |
| 6284237 | 04SE2001 | 08/224985 | 8756 | 06AP1994 | GI005070F | USA | C 01 | Genetics Institute Inc. |
| 6287816 | 11SE2001 | 08/254353 | 5870 | 06JN1994 | GI005186S | USA | C 01 | Genetics Institute Inc. |
| 6287838 | 11SE2001 | 09/460145 | | 13DE1999 | GI005289 | USA | C 01 | Genetics Institute Inc. |
| 6291206 | 18SE2001 | 08/123934 | 5853 | 17SE1993 | GI005203 | USA | | Genetics Institute Inc. |
| 6300086 | 09OC2001 | 09/083516 | | 22MY1998 | GI005258 | USA | D 03 | Genetics Institute Inc. |
| 6312921 | 06NO2001 | 09/175928 | | 20OC1998 | GI006006B.AJ72 | USA | P 01 | Genetics Institute Inc. |
| 6321163 | 20NO2001 | 09/389092 | | 02SE1999 | GI005374 | USA | | Genetics Institute Inc. |
| 6322972 | 27NO2001 | 09/185258 | | 02NO1998 | GI005232D-DIV | USA | D 03 | Genetics Institute Inc. |
| 6331612 | 18DE2001 | 09/328775 | | 09JL1999 | GI005275 | USA | D 01 | Genetics Institute Inc. |
| 6338848 | 15JA2002 | 09/513380 | 7931 | 25FE2000 | GI005229FWC | USA | C 02 | Genetics Institute Inc. |
| 6340668 | 22JA2002 | 09/414234 | 3003 | 07OC1999 | GI005205 | USA | C 01 | Genetics Institute Inc. |
| 6348191 | 19FE2002 | 07/704578 | 9344 | 17JN1991 | GI005070E | USA | D 01 | Genetics Institute Inc. |
| 6350855 | 26FE2002 | 08/929846 | 2318 | 15SE1997 | GI005252A | USA | D 01 | Genetics Institute Inc. |

PATENT
REEL: 012937 FRAME: 0825

14

Docket No: GENETICS
Patent

OFFICE OF PUBLIC RECORDS

2002 MAR 13 AM 11: 31

04-08-2002

Recordation Form Cover Sheet
Patents                    FINANCE SECTION

||||||||||||||||||||||||||||||||||||

102050878

COMMERCE
ARK OFFICE

To the Commissioner for Patents:   Please record the attached original document.

**Certificate of the Secretary of State of Delaware showing the conversion of Genetics Institute, Inc. from a Delaware Corporation to a Delaware Limited Liability Company and changing its name to Genetics Institute, LLC.**

*3·13·02*

1. Submission Type
   ☒ New
   ☐ Resubmission (Non-Recordation)
      Document ID #
   ☐ Correction of PTO Error
      Reel #          Frame #
   ☐ Corrective Document
      Reel #          Frame #

2. Conveyance Type:
   ☐ Assignment          ☐ License              ☐ Security Agreement
   ☐ Other               ☒ Change of Name       ☐ Merger

3. Conveying party(ies):

   **Genetics Institute, Inc.**

   Additional name(s) of conveying party(ies) attached:
   ☐ Yes
   ☒ No

   Execution Date: January 1, 2002

4. Receiving party(ies):

   **GENETICS INSTITUTE, LLC**

   Additional name(s) and address(es) attached:
   ☐ Yes
   ☒ No

5. Correspondent address:

   Kay E. Brady
   Wyeth
   Patent Law Department
   Five Giralda Farms
   Madison, NJ 07940-0874
   Tel. No. (973) 683-2130

04/05/2002 DBYRNE    00000156 071060    06528730
01 FC:581            8800.00 CH
AssignmentRecordationCover.dot – Rev 9/01

Page 1 of 2

Recordation Form Cover Sheet

**PATENT
REEL: 012937 FRAME: 0826**

15

Docket No:  GENETICS
Patent

6.  Application number(s) or patent number(s):
    If this document is being filed together with a new application, the execution date of the
    application is
    A.  Patent Application Number(s):
    B.  Patent Number(s):  **See Attached Schedule**
    C.  Patent Cooperation Treaty (PCT) Application Number(s) (only if a U.S. Application
        Number has not been assigned):
    Additional numbers attached:
    ☒ Yes
    ☐ No

7.  Pages:  Enter the total number of pages of the attached conveyance document including any
    attachments:  12

8.  Total number of properties involved:  220

9.  Total Fee (37 CFR 3.41): $8,800.00
    ☐ Enclosed
    ☒ Authorized to be charged to deposit account.

10. Deposit Account Number: 07-1060
    Authorization is given to charge any additional fees to deposit account.
    (Attach duplicate copy of this page if paying by deposit account).

11. Statement and Signature:
    To the best of my knowledge and belief, the foregoing information is true and correct and
    any attached copy is a true copy of the original document.  Charges to deposit account are
    authorized, as indicated herein.

    3-13-02                              Egon E Berg
    _____                     _____
    Date                                Egon E Berg
                                        Assistant Secretary
                                        Reg. No. 21,117

                                        Customer No. 25291

## Certificate of Mailing 37 CFR §1.10

I hereby certify that this paper and the documents referred to as enclosed therein are being deposited
with the United States Postal Service on the date written below in an envelope as "Express Mail Post Office to
Addressee" Mailing Label Number EI 2036923045 addressed to the Commissioner for Patents, Box
Assignments, Washington, DC 20231.

3-13-02                              Annette D. Cromer
_____                     _____
Date                                Annette D. Cromer

L:\PATENTS\Brady\Genetics\Genetics Name Change U.S. Recordal.doc

AssignmentRecordationCover.dot – Rev 9/01        Page 2 of 2        Recordation Form Cover Sheet

**PATENT
REEL: 012937 FRAME: 0827**

16



# Delaware

PAGE 1

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE DO HEREBY CERTIFY THAT THE ATTACHED IS A TRUE AND
CORRECT COPY OF THE CERTIFICATE OF CONVERSION OF A DELAWARE
CORPORATION UNDER THE NAME OF "GENETICS INSTITUTE, INC.".TO A
DELAWARE LIMITED LIABILITY COMPANY, CHANGING ITS NAME FROM
"GENETICS INSTITUTE, INC." TO "GENETICS INSTITUTE, LLC", FILED
IN THIS OFFICE ON THE TWENTY-EIGHTH DAY OF DECEMBER, A.D. 2001,
AT 9 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF
THE AFORESAID CERTIFICATE OF CONVERSION IS THE FIRST DAY OF
JANUARY, A.D. 2002, AT 12:01 O'CLOCK A.M.



Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 1546198

0904549   8100V

020012004

DATE: 01-08-02

**PATENT
REEL: 012937 FRAME: 0828**

17

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 12/28/2001
010675965 – 0904549

## CERTIFICATE OF CONVERSION

### CONVERTING

### GENETICS INSTITUTE, INC.
(A Delaware Corporation)

### TO

### GENETICS INSTITUTE, LLC
(A Delaware Limited Liability Company)

This Certificate of Conversion is being filed for the purpose of converting Genetics Institute, Inc., a Delaware corporation (the "Converting Corporation"), to a Delaware limited liability company to be named "Genetics Institute, LLC" (the "Company") pursuant to Section 266 of the Delaware General Corporation Law, 8 Del. C. §§ 101 et seq. (the "DGCL"), and Section 18-214 of the Delaware Limited Liability Company Act, 6 Del. C. §§ 18-101 et seq. (the "Delaware LLC Act").

The undersigned, as an authorized person of the Converting Corporation and the Company, does hereby certify as follows:

1.  Name of Converting Corporation.  The name of the Converting Corporation immediately prior to the filing of this Certificate of Conversion, was "Genetics Institute, Inc." The name of the Converting Corporation under which it was originally incorporated was "Genetics Institute."

2.  Date and Jurisdiction of Incorporation of Converting Corporation.  The date on which, and the jurisdiction where, the Converting Corporation was incorporated, which jurisdiction has not changed, are as follows:

| Date | Jurisdiction |
|------|--------------|
| December 12, 1980 | Delaware |

3.  Name of Continuing Limited Liability Company.  The name of the Delaware limited liability company to which the Converting Corporation is being converted and the name set forth in the Certificate of Formation of the Company filed in accordance with Section 18-214(b) of the Delaware LLC Act is "Genetics Institute, LLC."

4.  Approval of Conversion.  The conversion of the Converting Corporation to the Company has been approved in accordance with the provisions of Section 266 of the DGCL and Section 18-214 of the Delaware LLC Act.

5.  Effective Time.  This Certificate shall be effective on January 1, 2002 at 12:01 a.m.

6.  Continuation.    The conversion shall constitute a continuation of the existence of the Converting Corporation, Genetics Institute, Inc., in the form of and as a Delaware limited liability company, Genetics Institute, LLC.

IN WITNESS WHEREOF, the undersigned have executed this Certificate of Conversion as of the 26th day of December, 2001.

GENETICS INSTITUTE, INC.

By: _____

Jack M. O'Connor
Treasurer

PATENT
REEL: 012937 FRAME: 0830

# Assignment

In consideration of good and valuable considerations, the receipt of which is hereby acknowledged, ᵀ , the undersigned,

John J. Toole, Jr., residing at
27 Lakeville Road, Jamaica Plain, Massachusetts 02140

Hereby sell, assign and transfer to Genetics Institute, Inc.

a corporation of the State of Delaware    having a place of business at 87 CambridgePark Drive, Cambridge   in the County of Middlesex      and State of Massachusetts its successors, assigns and legal representatives, the entire right, title and interest for all countries, in and to any and all inventions which are disclosed and claimed, and any and all inventions which are disclosed but not claimed, in the application for United States Patent, which has been executed by the undersigned on   10 April 1986 and is entitled

NOVEL PROCOAGULANT PROTEINS
( a continuation-in-part of U.S. Serial No. 725,350 filed April 12, 1985)

and in and to said application and all divisional, continuing, substitute, renewal, reissue, and all other applications for U.S. Letters Patent or other related property rights in any and all foreign countries which have been or shall be filed on any of said inventions disclosed in said application; and in and to all original and reissued patents or related foreign documents which have been or shall be issued on said inventions;

Authorize and request the Commissioner of Patents of the United States to issue to said Assignee, the corporation above named, its successors, assigns and legal representatives, in accordance with this assignment, any and all United States Letters Patent on said inventions or any of them disclosed in said application;

REEL 4 6 7 0 FRAME 1 8 3

20

*Agree* that said Assignee may apply for and receive foreign Letters Patent or rights of any other kind for said inventions, or any of them; and may claim, in applications for said foreign Letters Patent or other rights, the priority of the aforesaid United States patent application under the provisions of the International Convention of 1883 and later modifications thereof, under the Patent Cooperation Treaty, under the European Patent Convention or under any other available international agreement; and that, when requested, without charge to, but at the expense of, said Assignee, its successors, assigns and legal representatives, to carry out in good faith the intent and purpose of this assignment, the undersigned or the undersigned's executors or administrators will, for the United States and all foreign countries, execute all divisional, continuing, substitute, renewal, reissue, and all other patent applications or other documents on any and all said inventions; execute all rightful oaths, assignments, powers of attorney and other papers; communicate to said Assignee, its successors, assigns and representatives, all facts known and documents available to the undersigned relating to said inventions and the history thereof; testify in all legal proceedings; and generally do everything possible which said Assignee, its successors, assigns or representatives shall consider desirable for aiding in securing, maintaining and enforcing proper patent protection for said inventions and for vesting title to said inventions and all applications for patents or related foreign rights and all patents on said inventions, in said Assignee, its successors, assigns and legal representatives; and

*Covenant* with said Assignee, its successors, assigns and legal representatives that no assignment, grant, mortgage, license or other agreement affecting the rights and property herein conveyed has been made to others by the undersigned, and that full right to convey the same as herein expressed is possessed by the undersigned.

[L.S.]

John J. Toole, Jr.

Before me this 10ᵗʰ day of April, 1986 personally appeared John J. Toole, Jr. who is known to me personally, and acknowledged the foregoing instrument of assignment to be his free act and deed.



TERESA WEIL
NOTARY PUBLIC
MY COMMISSION EXPIRES
NOV. 14 1991

REEL 4670 FRAME 384

PATENT & TRADEMARK OFFICE
RECORDED
DEC -9 1986

21

Docket:  35877

# ASSIGNMENT

I, John J. Toole, Jr.,

of Jamaica Plain, Massachusetts

in consideration of One Dollar and other valuable consideration paid to            by

GENETICS INSTITUTE

a corporation of............Delaware............................., having its principal place

of business at...........Boston, Massachusetts........................, the receipt of

which is hereby acknowledged, do hereby sell, assign and transfer unto said

GENETICS INSTITUTE

its successors and assigns, the entire interest for the United States of America and all foreign

countries in a certain invention or improvement in

NOVEL PROCOAGULANT PROTEINS

described in an application { executed by          of even date herewith and about to be filed

{ Serial Number...725,350..., filed on......April 12, 1985...........

and the inventions and any of them therein set forth and described, and any and all

Letters Patent of the United States and of countries foreign thereto which may be granted

thereon or therefor;

And for the above consideration I agree promptly upon request of the Assignee,

its successors or assigns, to execute and deliver without further compensation any power

of attorney, assignment, application, whether original, divisional, continuation or reissue, or

other papers which may be necessary or desirable fully to secure to the Assignee, its

successors and assigns, the inventions and any of them described in said application and

all patent rights therein, in the United States and in any country foreign thereto.

IN WITNESS WHEREOF, I hereunto set my hand and seal this .....1st.....

day of .................July................, 19..85..

RECORDED
PATENT & TRADEMARK OFFICE

JUL 17 1985

[Inventor's Signature ].............          John J. Toole

ACTING COMMISSIONER OF
PATENTS & TRADEMARKS

STATE OF ....Massachusetts..............  :
COUNTY OF ....Suffolk..............  :  ss.

Before me this  1st  day of  July  , 19..85.., personally

appeared  John J. Toole, Jr.  who is to me personally known, and

acknowledged the foregoing instrument of assignment to be his free act and deed.

................Eleanor M. Oberbeck................
Notary Public.

Eleanor M. Oberbeck, Notary Public
My Commission Expires Feb. 2, 1990

[Notary's
seal here]

REEL 4426 FRAME 849

22

# EXHIBIT 5

1

SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

----------

FORM 10-Q

Quarterly Report Under Section 13 or 15(d)
of the Securities Exchange Act of 1934

For Quarter Ended September 30, 1996          Commission File Number 0-14587
            ------------------                                      -------

GENETICS INSTITUTE, INC.
-----------------------------------------------------------------------------
(Exact name of registrant as specified in its charter)


        Delaware                              04-2718435
-------------------------------     --------------------------------------
(State or other jurisdiction of     (I.R.S. Employer Identification No.)
incorporation or organization)


87 CambridgePark Drive, Cambridge, MA                      02140
-----------------------------------------------------------------------------
(Address of principal executive offices)                (zip code)


Registrant's telephone number, including area code    (617) 876-1170
                                                    ----------------------------


                                None
-----------------------------------------------------------------------------
(Former name, former address and former fiscal year if changed since last
report)



Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days.      Yes   X    No
                                            -----      -----

29,589,784 shares of Common Stock, par value $.01 (including 12,752,894 shares
represented by Depositary Shares) were outstanding on November 1, 1996.

2

GENETICS INSTITUTE, INC.

INDEX
-----

|  |  | Page<br>Number |
| --- | --- | --- |
| PART I - FINANCIAL INFORMATION<br>------------------------------ |  | ------ |
|  |  |  |
| Item 1 - Financial Statements |  |  |
|  |  |  |
| Consolidated Condensed Balance Sheets at<br>September 30, 1996 and December 31, 1995............................. | | 3 |
| Consolidated Condensed Statements of Operations<br>for the Three and Nine Months Ended September 30, 1996 and 1995 ...... | | 4 |
| Consolidated Condensed Statements of Cash Flows<br>for the Nine Months Ended September 30, 1996 and 1995................. | | 5 |
| Notes to Consolidated Condensed Financial Statements.................... | | 6 |
|  |  |  |
| Item 2 - Management's Discussion and Analysis of<br>Financial Condition and Results of Operations........................... | | 10 |
|  |  |  |
| PART II - OTHER INFORMATION<br>--------------------------- |  |  |
|  |  |  |
| Item 1 - Legal Proceedings................................................ | | 14 |
|  |  |  |
| Item 6 - Exhibits and Reports on Form 8-K................................ | | 14 |
|  |  |  |
| Signatures................................................................ | | 15 |

3

GENETICS INSTITUTE, INC. AND SUBSIDIARIES

CONSOLIDATED CONDENSED BALANCE SHEETS
(Unaudited - in thousands except share amounts)

|  | September 30, 1996 | December 31, 1995 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $106,025 | $ 33,164 |
| Marketable securities | 232,178 | 217,670 |
| Accounts receivable | 61,636 | 40,876 |
| Inventories: | | |
|     Materials and supplies | 6,840 | 5,769 |
|     Work in progress | 2,292 | 915 |
|     Finished goods | 16,872 | 14,325 |
| | 26,004 | 21,009 |
| Other current assets | 6,060 | 5,844 |
|     Total current assets | 431,903 | 318,563 |
| Property, plant and equipment | 192,617 | 174,826 |
|     Less accumulated depreciation | (77,526) | (65,710) |
| | 115,091 | 109,116 |
| Other assets | 5,720 | 6,132 |
| | $552,714 | $433,811 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Accounts payable | $ 6,022 | $ 8,936 |
| Accrued merger consideration | -- | 7,615 |
| Other accrued expenses | 33,629 | 27,145 |
|     Total current liabilities | 39,651 | 43,696 |
| Shareholders' Equity: | | |
|     Common stock, par value $.01; | | |
|       authorized 50,000,000 shares | 296 | 268 |
|     Additional paid-in capital | 693,454 | 604,013 |
|     Accumulated deficit | (180,687) | (214,166) |
|     Total shareholders' equity | 513,063 | 390,115 |
| | $552,714 | $433,811 |

The accompanying notes are an integral part of these financial statements.

-3-

4

GENETICS INSTITUTE, INC. AND SUBSIDIARIES

CONSOLIDATED CONDENSED STATEMENTS OF OPERATIONS
(Unaudited - in thousands except per share data)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 1996 | 1995 | 1996 | 1995 |
| **REVENUE** | | | | |
| Product sales | $35,978 | $14,841 | $ 98,317 | $ 61,350 |
| Royalties | 17,044 | 14,733 | 60,572 | 38,692 |
| Collaborative research and development | 13,440 | 2,920 | 43,935 | 30,133 |
| Total revenue | 66,462 | 32,494 | 202,824 | 130,175 |
| **OPERATING EXPENSES** | | | | |
| Cost of sales | 13,395 | 4,260 | 37,795 | 31,140 |
| Research and development | 37,659 | 31,903 | 107,316 | 90,448 |
| General and administrative | 9,096 | 5,318 | 23,380 | 14,786 |
| Total operating expenses | 60,150 | 41,481 | 168,491 | 136,374 |
| INCOME (LOSS) FROM OPERATIONS | 6,312 | (8,987) | 34,333 | (6,199) |
| **OTHER INCOME, NET** | | | | |
| Investment income | 4,951 | 3,950 | 12,629 | 12,633 |
| (Loss) income of affiliates, net | (3,133) | (2,054) | (7,426) | 117 |
| Other, net | (298) | 785 | (1,382) | (1,718) |
| Total other income, net | 1,520 | 2,681 | 3,821 | 11,032 |
| INCOME (LOSS) BEFORE INCOME TAXES | 7,832 | (6,306) | 38,154 | 4,833 |
| Provision for taxes on income | -- | (877) | (910) | (1,147) |
| NET INCOME (LOSS) | $ 7,832 | $(7,183) | $ 37,244 | $ 3,686 |
| NET INCOME (LOSS) PER COMMON SHARE | $  .25 | $  (.27) | $  1.22 | $   .14 |
| Weighted average common and common equivalent shares outstanding | 31,727 | 26,745 | 30,551 | 27,225 |

The accompanying notes are an integral part of these financial statements.

-4-

5

GENETICS INSTITUTE, INC. AND SUBSIDIARIES

CONSOLIDATED CONDENSED STATEMENTS OF CASH FLOWS
(Unaudited - in thousands)

| | Nine Months Ended September 30, | |
|---|---|---|
| | 1996 | 1995 |
| **OPERATING ACTIVITIES** | | |
| Net income | $  37,244 | $   3,686 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities - | | |
| Depreciation and amortization | 12,414 | 13,386 |
| Equity in loss (income) of affiliates | 7,426 | (117) |
| Compensation related to incentive plans | 1,231 | 535 |
| Changes in assets and liabilities | (22,401) | (22,510) |
| Net cash provided by (used in) operating activities | 35,914 | (5,020) |
| **INVESTING ACTIVITIES** | | |
| Purchase of marketable securities | (164,536) | (168,619) |
| Proceeds from sale/maturity of marketable securities | 146,263 | 215,054 |
| Payment of merger consideration | (7,614) | -- |
| Additions to property, plant and equipment | (23,306) | (18,183) |
| Investments in affiliates | (7,426) | (1,720) |
| Other investing activities | 293 | 993 |
| Net cash provided by (used in) investing activities | (56,326) | 27,525 |
| **FINANCING ACTIVITIES** | | |
| Proceeds from stock issuances | 13,149 | 4,349 |
| Proceeds from sale-leaseback transaction | 5,035 | -- |
| Proceeds from exercise of warrants | 75,089 | -- |
| Net cash provided by financing activities | 93,273 | 4,349 |
| Net increase in cash and cash equivalents | 72,861 | 26,854 |
| Cash and cash equivalents, beginning of period | 33,164 | 21,793 |
| Cash and cash equivalents, end of period | $ 106,025 | $  48,647 |

The accompanying notes are an integral part of these financial statements.

6

GENETICS INSTITUTE, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED CONDENSED FINANCIAL STATEMENTS
(unaudited)

1. Significant Accounting Policies

Basis of Presentation: The accompanying consolidated condensed financial statements are unaudited. In the opinion of management, all adjustments necessary for a fair presentation of these financial statements have been included. Such adjustments consisted only of normal recurring items. Interim results are not necessarily indicative of results for a full year. Certain amounts in the prior period financial statements have been reclassified to conform to the current period presentation. The consolidated condensed financial statements should be read in conjunction with the Company's audited consolidated financial statements and related footnotes for the year ended December 31, 1995.

The consolidated condensed financial statements include all accounts of Genetics Institute, Inc. and its wholly owned subsidiaries. Investments in 50% owned joint ventures are accounted for on the equity method. Under the equity method, investments in such affiliated joint ventures are recorded at cost and adjusted by the Company's share of the income and losses of and the investments in and distributions from such affiliates. All significant intercompany balances and transactions have been eliminated in consolidation.

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

2. Transactions with American Home Products Corporation

On September 19, 1991, the Company and American Home Products Corporation ("AHP") entered into an Agreement and Plan of Merger (the "AHP Transaction") that was consummated on January 16, 1992 through which AHP acquired a 60% interest in the Company. In connection with the AHP Transaction, the Company issued 9,466,709 new shares of Common Stock to AHP for an aggregate purchase price of approximately $300.0 million and, for shares of Common Stock owned, the Company's shareholders received a combination of cash and Depositary Shares subject to a call option. Under the terms of the call option, AHP has the right but not the obligation, to purchase the outstanding Depositary Shares that it does not own, in whole but not in part, at any time until December 31, 1996, at a call price of $85.00 per share.

Independent of its right to call the Depositary Shares, AHP is permitted to acquire additional Depositary Shares through open market purchases or privately negotiated purchases, provided that during the term of the call option its aggregate holdings do not exceed 75% of the Company's outstanding equity, subject to certain exceptions. As of September 30, 1996, AHP's total ownership position in the Company approximated 60%.

The Company is engaged in collaborations with AHP in the development and commercialization of recombinant human interleukin-twelve (rhIL-12), an immune system modulatory protein, and the commercialization of Neumega[Registered Trademark] recombinant human interleukin-eleven (rhIL-11), a blood cell growth factor. A collaboration with AHP in the area of cellular adhesion discovery research ended as scheduled during the second quarter of 1995. Collaborative research and development revenue includes $1.1 million and $6.8 million, respectively, for the three and nine month periods ended September 30, 1996 and $0.9 million and $8.7 million, respectively, for the three and nine month periods ended September 30, 1995, relating to these collaborations with AHP. (Loss) income of affiliates, net, includes losses of $(1.4) million and $(3.1) million for the three and nine month periods ended September 30, 1996, and losses of $(0.1) million and $(1.6) million for the three and nine month periods ended September 30, 1995, relating to these collaborations with AHP.

-6-

EXHIBIT 6

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-K

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE
SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended                        Commission file number
December 31, 1996                                            1-1225

AMERICAN HOME PRODUCTS CORPORATION
(Exact name of registrant as specified in its charter)

Delaware                                          13-2526821

(State or other jurisdiction of        (I.R.S. Employer Identification
incorporation or organization)                    Number)

Five Giralda Farms, Madison, NJ                   07940-0874

(Address of Principal Executive Offices)          (Zip Code)

Registrant's telephone number, including area code    (201) 660-5000
Securities registered pursuant to Section 12(b) of the Act:

                                                  Name of Each Exchange On
           Title of Each Class                       Which Registered

$2 Convertible Preferred Stock, $2.50 par value   New York Stock Exchange

Common Stock, $.33 - 1/3 par value                New York Stock Exchange

6 - 7/8% Notes due April 15, 1997                 New York Stock Exchange

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days.

                                         YES    X           No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to this
Form 10-K. ___

State the aggregate market value of the voting stock held by nonaffiliates of
the registrant. (The aggregate market value shall be computed by reference to
the price at which the stock was sold, or the average bid and asked prices of
such stock, as of a specified date within 60 days prior to the date of filing).

Aggregate market value at March 3, 1997           $41,679,526,717

Indicate the number of shares outstanding of each of the registrant's classes of
common stock, as of the latest practicable date (applicable only to corporate
registrants).

                                                  Outstanding at
                                                  March 3, 1997

Common Stock, $.33 - 1/3 par value                642,458,986

Documents incorporated by reference: list hereunder the following documents if
incorporated by reference and the part of the Form 10-K into which the document
is incorporated: (1) any annual report to security holders; (2) any proxy or
information statements; and (3) any prospectus filed pursuant to Rule 424(b) or
(c) under the Securities Act of 1933 (the listed documents should be clearly
described for identification purposes).

(1) 1996 Annual Report to Shareholders - In Parts I, II and IV
(2) Proxy Statement filed March 24, 1997 - In Part III

PART I

ITEM 1.    BUSINESS

General

American Home Products Corporation (the "Company"), a Delaware
corporation organized in 1926, is currently engaged in the discovery,
development, manufacture, distribution and sale of a diversified line
of products in two primary business segments:  health care products
and agricultural products.  Health care products include branded and
generic ethical pharmaceuticals, biologicals, nutritionals, consumer
health care products, medical devices and animal biologicals and
pharmaceuticals.  Agricultural products include crop protection and
pest control products such as herbicides, insecticides, fungicides and
plant growth regulators.  The Company holds a majority interest in
Immunex Corporation, a biopharmaceutical company whose stock is
publicly traded.

In December 1996, the Company acquired the remaining equity interest
in the biopharmaceutical company, Genetics Institute, Inc. ("G.I.")
that it did not already own for approximately $1.3 billion.

In November 1996, the Company sold a majority interest in the American
Home Foods business for approximately $1.2 billion.  The Company
retained a 20% equity interest in International Home Foods, the
successor to American Home Foods.

In late 1994, the Company acquired the outstanding common stock of
American Cyanamid Company ("Cyanamid").  The aggregate purchase price
to acquire all of Cyanamid including acquisition-related fees and
expenses was approximately $9.6 billion.

Additional information relating to the G.I. and Cyanamid acquisitions,
the American Home Foods disposition, and certain other acquisitions
and divestitures is set forth in Notes 2 and 3 of the Notes to
Consolidated Financial Statements in the Company's 1996 Annual Report
to Shareholders and is incorporated herein by reference.

In February 1997, the Company acquired the worldwide animal health
business of Solvay S.A. for approximately $460 million.

Unless stated to the contrary, or unless the context otherwise
requires, references to the Company in this report include American
Home Products Corporation and its wholly-owned or majority-owned
subsidiaries.

I-1

Industry Segments

Financial information, by industry segment, for the three years ended December 31, 1996 is set forth on page 34 of the Company's 1996 Annual Report to Shareholders and is incorporated herein by reference.

The Company is not dependent on any single or major group of customers for its sales.  The Company currently manufactures, distributes and sells a diversified line of products in two primary industry segments. The product designations appearing in differentiated type herein are trademarks.

HEALTH CARE PRODUCTS -

Pharmaceuticals - This sector includes a wide variety of ethical pharmaceutical and biological products for human and veterinary use which are promoted and sold worldwide primarily to wholesalers, pharmacies, hospitals, managed care organizations and physicians. Some of these sales are made to large buying groups representing certain of these customers.  Principal product categories for human use and their respective products are:  women's health care including PREMARIN, PREMPRO/PREMPHASE, LO/OVRAL (marketed as MIN-OVRAL internationally), NORDETTE and TRIPHASIL (marketed as TRINORDIOL internationally);  infant nutritionals (international markets only); cardiovascular including CORDARONE and ZIAC; antiobesity including PONDIMIN and REDUX; mental health including ATIVAN and EFFEXOR; anti-inflammatories including LODINE and ORUVAIL; anti-infectives including MINOCIN, SUPRAX and ZOSYN (marketed as TAZOCIN internationally); vaccines including ORIMUNE and TETRAMUNE; biopharmaceuticals including recombinant Factor VIII; and oncology therapies.  In addition, the Company markets generic pharmaceutical products.  Principal animal health product categories include vaccines, pharmaceuticals including anthelmintics, endectocides and growth implants.  The Company manufactures these products in the United States and Puerto Rico and in 22 foreign countries.

Sales of women's health care products in the aggregate accounted for more than 10% of consolidated net sales in 1996, 1995 and 1994. Except for sales of women's health care products, no single pharmaceutical product or other category of products accounted for more than 10% of consolidated net sales in 1996, 1995 or 1994. The operating income before taxes from the women's health care products in the aggregate, and the PREMARIN line of products individually, accounted for more than 10% of consolidated operating income before taxes in 1996, 1995 and 1994.

Consumer health care - Principle over-the-counter health care product categories and their respective products are analgesics including ADVIL; cough/cold/allergy remedies including ROBITUSSIN and DIMETAPP; vitamins and mineral supplements including CENTRUM; hemorrhoidal; antacids; and asthma relief items. These products are generally sold to wholesalers, retailers and managed care organizations, and are

I-2

primarily promoted to consumers worldwide through advertising. These products are manufactured in the United States and Puerto Rico and in 17 foreign countries.

No single consumer health care product or category of products accounted for more than 10% of consolidated net sales or operating income before taxes in 1996, 1995 or 1994.

Medical Devices - Principal products in this sector include MONOJECT needles and syringes, ARGYLE tubes, catheters and chest drainage devices, DAVIS & GECK wound closure products, tympanic and predictive thermometers, ophthalmic surgical equipment and vision care products, exercise equipment, cardiopulmonary instrumentation and devices, enteral feeding systems and access devices, microsurgical equipment and other hospital products which are promoted and sold worldwide, principally to physicians, hospitals, other health care institutions and wholesalers. Buying groups also represent certain of these customers. In addition to the United States and Puerto Rico, these products are manufactured in 11 foreign countries.

No single medical device product or category of products accounted for more than 10% of consolidated net sales or operating income before taxes in 1996, 1995 or 1994.

AGRICULTURAL PRODUCTS -

Principal agricultural product categories and their respective products are herbicides including PURSUIT (marketed as PIVOT internationally) and PROWL (marketed as STOMP internationally); insecticides including COUNTER; and fungicides which are promoted to consumers worldwide and generally sold directly to wholesalers and retailers. In addition to the United States and Puerto Rico, these products are manufactured in eight foreign countries.

No single agricultural product or category of products exceeded 10% of consolidated net sales or operating income before taxes in 1996, 1995 or 1994.

FOOD PRODUCTS -

On November 1, 1996, the Company sold a majority interest in the American Home Foods business. Products in this segment included prepared pastas and other entrees, regional specialty foods, condiments, snack products, spreadable fruit products and other food products which were promoted to consumers through advertising and generally sold directly to wholesalers and retailers. The Company retained a 20% equity interest in International Home Foods, the successor to American Home Foods.

No single food product or category of products exceeded 10% of consolidated net sales or operating income before taxes in 1996, 1995 or 1994.

I-3

Sources and Availability of Raw Materials

Generally, raw materials and packaging supplies are purchased in the open market from various outside vendors.  The loss of any one source of supply would not have a material adverse effect on the Company's consolidated financial position or results of operations.

Patents and Trademarks

The Company owns, has applications pending for, and is licensed under many patents relating to a wide variety of products.  The Company believes that its patents and licenses are important to its business, but no one patent or license (or group of related patents or licenses) currently is of material importance in relation to its business as a whole.

In the pharmaceuticals business, most of the Company's major products are not protected by patents.  The non-steroidal anti-inflammatory ("NSAID") LODINE ceased to be under patent protection in the United States in February 1997.  The product extensions LODINE XL and LODINE 500 mg. have market exclusivity until 1999.  Other prescription products, such as the cardiovasculars INDERAL LA and INDERIDE LA, remain patent protected until late 1997.  The anti-depressant EFFEXOR will have patent protection into 2007.  TETRAMUNE, a combination vaccine, will have patent protection until 2007.  SUPRAX, a third-generation cephalosporin antibiotic, remains under patent protection until 2002.  VERELAN, a calcium channel blocker, will have patent protection until 2006.  PREMPRO, a combination estrogen and progestin product, will have patent protection until 2006.

Sales in the consumer health care and medical devices businesses are largely supported by the Company's trademarks and brand names.  These trademarks and brand names are a significant part of the Company's business and have a perpetual life as long as they remain in use.  See "Competition" below, for a discussion of generic and store brands competition.

In the Agricultural Products segment, the imidazolinone herbicide products SCEPTER and PURSUIT will have patent protection until at least 2006.

Seasonality

Sales and results of operations of the U.S. agricultural products business are seasonal and tend to be heavily concentrated in the first six months of each year.  Sales of consumer health care products are affected by seasonal demand for cold/flu products and, as a result, second quarter results for consumer health care products tend to be lower than results in other quarters.

Competition

HEALTH CARE PRODUCTS -

The Company operates in the highly competitive health care industry which includes the ethical pharmaceutical, animal health, consumer health care and medical devices businesses. Within the ethical pharmaceutical and animal health businesses, the Company has many major multi-national competitors and numerous other smaller domestic and foreign competitors. Based on net sales, the Company believes it ranks within the top 10 major competitors within the ethical pharmaceutical business category and, with the acquisition of the Solvay S.A. animal health business in the first quarter of 1997, the Company believes it ranks within the top 5 major competitors within the animal health business category. The consumer health care business also has many competitors. Based on net sales, the Company believes it ranks within the top 10 major competitors within this business category.

The Company's competitive position in the Health Care Products segment is affected by several factors including resources available to develop, enhance and promote products, customer acceptance, product quality, patent protection, development of alternative therapies by competitors, scientific and technological advances and governmental reforms on pricing and generic substitutes. For prescription products, the growth of managed care organizations, such as health maintenance organizations ("HMOs") and pharmaceutical benefit management companies, has resulted in increased competitive pressures. The continued growth of generic substitutes is further promoted by legislation, regulation and various incentives enacted and promulgated in both the public and private sectors.

PREMARIN, the Company's conjugated estrogens product, which has not had patent protection for many years, does contribute significantly to sales and results of operations. PREMARIN is not currently subject to generic competition in the United States. A U.S. Food and Drug Administration ("FDA") advisory committee meeting was held in July 1995 to discuss relative differences in safety and efficacy among estrogen products and to advise the FDA on the activity of various estrogenic components in PREMARIN relative to the FDA's review of applications for generic conjugated estrogens. The FDA advisory committee concluded that there is insufficient data to assess whether or not any individual component or combination of components of PREMARIN, other than estrone and equilin, must be present to achieve clinical efficacy and safety. In November 1996, the FDA published and sought comment on scientific data on the composition of conjugated estrogens. The Company cannot predict the timing or outcome of the FDA's action on currently pending applications for generic conjugated estrogen products. While the introduction of generic competition ordinarily is expected to significantly impact the market for a brand name product, the extent of such impact on PREMARIN and related products cannot be predicted with certainty due to a number of factors, including the nature of the product and the introduction of new combination estrogen and progestin products in the PREMARIN family.

I-5

Health care costs will continue to be the subject of attention in both the public and private sectors in the U.S. Similarly, in international markets, health care spending is subject to increasing governmental review, much of which is focused on pharmaceutical prices. While the Company cannot predict the impact that any future health care initiatives may have on the Company's worldwide results of operations, the Company believes that the pharmaceutical industry will continue to play a very positive role in helping to contain global health care costs through the development of innovative products.

The growth of generic and store brands continued to impact some of the Company's consumer health care branded product line categories in 1996 and is expected to continue during 1997. The medical devices business, particularly in the needle and syringe, and suture product lines, is also impacted by competitive market conditions which continue to place significant pressure on prices.

AGRICULTURAL PRODUCTS -

The Agricultural Products segment has over 40 competitors worldwide and ranks in the top 10 based on net sales. Among these companies, the top 10 competitors are multi-national, representing over 70% of the sales in the agrochemical market. Competitive factors include product efficacy, distribution channels and resource availability for development of new products and improvement of existing ones. There can also be generic competition when products are no longer patent protected.

GENERAL -

In all business segments, advertising and promotional expenditures are significant costs to the Company and are necessary to effectively communicate information concerning the Company's products to health professionals, to the trade and to consumers.

Research and Development

Worldwide research and development activities are focused on developing and bringing to market new products to treat and/or prevent some of the most serious health care and agricultural problems. Research and development expenditures totaled $1,429,056,000 in 1996, $1,354,963,000 in 1995 and $817,090,000 in 1994, with approximately 78% of these expenditures in the ethical pharmaceutical area in 1996.

The Company currently has 14 New Drug Applications and 23 Supplemental Drug Applications filed with the FDA for review, and 86 active Investigational New Drug Applications and one Biologics License Application pending. During 1996, several major collaborative research and development arrangements continued with other pharmaceutical and biotechnology companies. It is not anticipated, however, that the products developed as a result of these activities will contribute significantly to consolidated revenues or operating profits in the near future. The extent of subsequent contributions from these potential products, if any, cannot presently be predicted. Additionally, the Agricultural Products segment has four products awaiting approval by the United States Environmental Protection Agency ("EPA").

In December 1996, the Company acquired the remaining equity interest in G.I. for approximately $1.3 billion. The completion of this acquisition will facilitate research and development coordination with Wyeth-Ayerst Research.

During 1996, the Company received FDA approval for the arthritis product NAPRELAN, the antiobesity drug REDUX, the non-steroidal anti-inflammatory drugs LODINE XL and LODINE 500 mg., the new rheumatoid arthritis indication for LODINE and the OTC products AXID AR, Children's ADVIL and Junior Strength ADVIL tablets (100 mg.).

Regulation

The Company's various health care and agricultural products are subject to regulation by government agencies throughout the world. The primary emphasis of these requirements is to assure the safety and effectiveness of the Company's products. In the United States, the FDA, under the Federal Food, Drug and Cosmetic Act and the Public Health Service Act, regulates many of the Company's health care products, including human and animal pharmaceuticals, vaccines, consumer health care products and medical devices. The U.S. Department of Agriculture ("USDA") regulates the Company's domestic animal vaccine products. The FDA's powers include the imposition of criminal and civil sanctions against companies, including seizures of regulated products and criminal sanctions against individuals. The FDA's enforcement powers also include its inspection of the numerous facilities operated by the Company. To facilitate compliance, the Company from time to time may institute voluntary compliance actions such as product recalls when it believes it is appropriate to do so. In addition, many states have similar regulatory requirements. Most of the Company's pharmaceutical products, and an increasing number of its consumer health care products, are regulated under the FDA's new drug approval processes, which mandate pre-market approval of all new drugs. Such processes require extensive time, testing and documentation for approval, resulting in significant costs for new product introductions. The Company's pharmaceutical business is also affected by the Controlled Substances Act, administered by the Drug Enforcement Administration, which regulates strictly all narcotic and habit-forming drug substances. The Company devotes significant resources to dealing with the extensive federal and state regulatory requirements applicable to its products.

Federal law also requires drug manufacturers to pay rebates to state Medicaid programs in order for their products to be eligible for federal matching funds under the Social Security Act. Additionally, a number of states are, or may be, pursuing similar initiatives for rebates and other strategies to contain the cost of pharmaceutical products. The federal Vaccines for Children entitlement program enables states to purchase vaccines at federal vaccine prices and limits federal vaccine price increases to the increase in the consumer price index. Federal and state rebate programs are expected to continue.

The manufacture and sale of pesticides are regulated by the EPA. No new pesticide and no existing pesticide for a new use may be manufactured, processed or used in the United States without prior notice to the EPA. Outside the United States, agricultural chemicals are regulated by various agencies, often by standards which differ from those in the United States.

Environmental

Certain of the Company's operations are affected by a variety of
federal, state and local environmental protection laws and regulations
and the Company has, in a number of instances, been notified of its
potential responsibility relating to the generation, storage,
treatment and disposal of hazardous waste.  In addition, the Company
has been advised that it may be a responsible party in several sites
on the National Priority List created by the Comprehensive
Environmental Response, Compensation, and Liability Act ("CERCLA"),
commonly known as Superfund.  (See Item 3. Legal Proceedings.) In
connection with the spin-off in 1993 by Cyanamid of Cytec Industries
Inc. ("Cytec"), Cyanamid's former chemicals business, Cytec assumed
the environmental liabilities relating to the chemicals businesses,
except for the former chemical business site at Bound Brook, New
Jersey.  This assumption is not binding on third parties, and if Cytec
were unable to satisfy these liabilities, they would, in the absence
of other circumstances, be enforceable against Cyanamid.

It is the Company's policy to accrue environmental cleanup costs if it
is probable that a liability has been incurred and an amount is
reasonably estimable.  For further information on environmental
matters, see Notes 3, 5 and 11 of the Notes to Consolidated Financial
Statements in the Company's 1996 Annual Report to Shareholders, which
are incorporated herein by reference.

Employees

At the end of 1996, the Company had 59,747 employees worldwide, with
31,447 employed in the United States including Puerto Rico.
Approximately 27% of worldwide employees are represented by various
collective bargaining groups.  Relations with most organized labor
groups remain relatively stable.

Financial Information about the Company's Foreign and Domestic
Operations

Financial information about foreign and domestic operations for the
three years ended December 31, 1996, as set forth on page 34 of the
Company's 1996 Annual Report to Shareholders, is incorporated herein
by reference.

The Company's operations outside the United States are conducted
primarily through subsidiaries.  International sales in 1996 amounted
to 41% of the Company's total worldwide sales.

I-8

The Company's international businesses are subject to risks of currency fluctuations, governmental actions and other governmental proceedings which are inherent in conducting business outside of the United States. The Company does not regard these factors as deterrents to maintaining or expanding its non-U.S. operations.

ITEM 2.    PROPERTIES

The Company's corporate headquarters and the headquarters of its domestic consumer health care business are located in Madison, New Jersey. The Company's domestic and international ethical pharmaceutical operations and its international consumer health care business are headquartered in three executive/administrative buildings in Radnor and St. Davids, Pennsylvania. The Company's animal health business is headquartered in Overland Park, Kansas. The Company's principal medical devices business maintains its headquarters in St. Louis, Missouri. The Agricultural Products segment maintains its headquarters in Parsippany, New Jersey. The Company's foreign subsidiaries and affiliates, which generally own their properties, have manufacturing facilities in 26 countries outside the United States. The following are the principal manufacturing plants (M) and research laboratories (R) of the Company as of December 31, 1996:

INDUSTRY SEGMENT

Health Care Products:
  Alpirsbach, Germany (M)
  Andover, Massachusetts (M, R)
  Askeaton, Ireland (M)
  Balleymoney, N. Ireland (M)
  Baulkham Hills, Australia (M)
  Buenos Aires, Argentina (M)
  Cabuyao, Philippines (M)
  Carolina, Puerto Rico (M)
  Catania, Italy (M)
  Chazy, New York (R)
  Cherry Hill, New Jersey (M, R)
  Commerce, Texas (M)
  Deland, Florida (M)
  Fort Dodge, Iowa (M, R)
  Fukuroi City, Japan (M, R)
  Georgia, Vermont (M)
  Gosport, Great Britain (M, R)
  Guayama, Puerto Rico (M)
  Havant, Great Britain (M, R)
  Hsin-Chu Hsien, Taiwan (M, R)
  Maracay, Venezuela (M)
  Marietta, Pennsylvania (M, R)
  Montreal, Canada (M, R)
  Muenster, Germany (M)

I-9

```
                  Newbridge, Ireland (M)
                  Norfolk, Nebraska (M)
                  Pearl River, New York (M, R)
                  Princeton, New Jersey (R)
                  Radnor, Pennsylvania (R)
                  Richmond, Virginia (M, R)
                  Rouses Point, New York (M, R)
                  Sanford, North Carolina (M)
                  Smithfield, Australia (M)
                  Suzhou, China (M)
                  West Chester, Pennsylvania (M)

              Agricultural Products:
                  Catania, Italy (M)
                  Genay, France (M)
                  Gravelines, France (M)
                  Hannibal, Missouri (M)
                  Hsin-Chu Hsien, Taiwan (M, R)
                  Iracemapolis, Brazil (R)
                  Paulina, Brazil (M)
                  Princeton, New Jersey (R)
                  Resende, Brazil (M)
                  Schwabenheim, Germany (R)
```

All of the above properties are owned except certain facilities in Cherry Hill, New Jersey, Guayama, Puerto Rico and Suzhou, China which are under lease.  The Company also owns or leases a number of other smaller properties worldwide which are used for manufacturing, research, warehousing and office space.

ITEM 3.   LEGAL PROCEEDINGS

The Company and its subsidiaries are parties to numerous lawsuits and claims arising out of the conduct of its business, including product liability and other tort claims.

There are approximately 250 cases pending, predominantly in Scotland, based upon alleged injuries arising out of the use of the tranquilizer ATIVAN.  Substantially all of the cases in Scotland have been supported by governmental legal aid funding, as had other related litigation in the United Kingdom.  In 1994, the Legal Aid Board in England, where more than 1,100 cases had been pending, discontinued funding for the English litigation and all of the English ATIVAN cases have now been dismissed.  The Northern Ireland Legal Aid Board has also discontinued the funding of the litigation in that jurisdiction. The Scottish Legal Aid Board is currently considering submissions by the Company that public funding for the Scottish litigation should also be discontinued.  The Scottish cases have been stayed pending the Legal Aid Board's determination.

There are currently more than 2,700 lawsuits pending against the Company in federal and state courts on behalf of approximately 42,000 plaintiffs alleging injuries as a result of use of the NORPLANT SYSTEM, the Company's implantable contraceptive containing levonorgestrel. Approximately 70 of the cases have been filed as class actions and the remainder are proceeding as individual suits. In December 1994, the Judicial Panel on Multi-District Litigation ("MDL") ordered that all NORPLANT SYSTEM lawsuits filed in federal courts be consolidated for pretrial proceedings in the U.S. District Court in Beaumont, Texas. In August 1996, the MDL court denied a motion by the federal plaintiffs to certify the cases as a class action. Class certification was also denied during 1996 in state courts in New Jersey, Pennsylvania and Illinois and a class relating to claims involving removal difficulties which had been certified by the Circuit Court of Illinois in June 1994 ( Doe v. Wyeth-Ayerst Laboratories (Cir. Ct. Ill., Cook Cty. 1993)) was decertified. The only jurisdiction where the certification issue remains pending is Louisiana, where the issue will not be fully briefed and decided until 1998. Following the denial of class certification, the MDL court scheduled three "bellwether" trials, each involving the claims of five Texas plaintiffs. Rather than proceeding with the first of these trials as scheduled on February 24, 1997, the court entered summary judgment in favor of the Company on all of plaintiffs' claims. It is not known at this point whether the plaintiffs will appeal. The Company will continue to contest these and all other NORPLANT SYSTEM claims. A number of state court "bellwether" trials, primarily in Texas and Indiana, are scheduled to take place during 1997.

On March 7, 1994, an action was brought against the Company by Johnson & Johnson ("J&J") and Ortho Pharmaceutical Corporation ("Ortho") currently seeking approximately $270 million in damages alleged to have arisen from a preliminary injunction which was granted in a patent infringement lawsuit brought by the Company and which had prevented J&J and Ortho from marketing an oral contraceptive containing norgestimate for approximately 10 months until it was overturned by the Court of Appeals for the Federal Circuit in a two-to-one decision. Thereafter, in the underlying action in the district court, the jury found against the Company on its claim of infringement and the trial of the damages action is expected to commence in 1997.

In an action for patent infringement pending in U.S. District Court (Eastern District of Pennsylvania), McNeilab Inc. has recently alleged that it is entitled to approximately $60 million in compensatory damages against Scandipharm Inc., which would be entitled to seek indemnification from a subsidiary of the Company, Eurand Microencapsulation, S.A. In this action, McNeilab is alleging that pancreatic tablets used to treat cystic fibrosis, which Eurand exclusively supplies to Scandipharm, infringe U.S. patents licensed to McNeilab. Treble damages are also sought for alleged willful infringement. Although the trial court had previously dismissed this action for lack of standing, the appeals court reinstated the lawsuit and it is expected to proceed to trial in 1997.

On October 14, 1993, Rite Aid Corporation, Revco D.S. Inc. and other retail drug chains and retail pharmacies filed an action in U.S. District Court (Middle District of Pennsylvania) against the Company,

other pharmaceutical manufacturers and a pharmacy benefit management company alleging that the Company and other defendants provided discriminatory price and promotional allowances to managed care organizations and others in violation of the Robinson-Patman Act. The complaint further alleges collusive conduct among the defendants related to the alleged discriminatory pricing in violation of the Sherman Antitrust Act as well as certain other violations of common law principles of unfair competition. Subsequently, numerous other cases, many of which are purported class actions brought on behalf of retail pharmacies and retail drug and grocery chains, were filed in various federal courts against the Company as well as other pharmaceutical manufacturers and wholesalers. These cases make one or more similar allegations of violations of federal or state antitrust or unfair competition laws. In addition, a mail order pharmacy plaintiff alleges that it was forced out of business and certain plaintiffs also allege that the defendants' patents covering brand name prescription drugs give the defendants power to enter into exclusionary arrangements with certain managed care customers and seek compulsory patent licenses. The various class actions were consolidated as a single class action (the "Consolidated Class Action") which alleges violations of Section 1 of the Sherman Act. All of the federal actions have been coordinated and consolidated for pretrial purposes under the caption In re Brand Name Prescription Drug Antitrust Litigation (MDL 997 N.D.Ill.). These federal actions seek treble damages in unspecified amounts and injunctive and other relief. The court in the federal actions approved an amended settlement among certain defendants, including the Company, and the Consolidated Class Action plaintiffs. The settlement provides, among other things, for certain payments to be made by the settling defendants, over a period of three years, to the Consolidated Class Action plaintiffs. The Company's settlement payments (including payments to be made on behalf of Cyanamid) would total $42.5 million. Notices of appeal of the settlement have been filed by certain class members. The amendment to the settlement, which would be in effect for three years, would prohibit the settling manufacturers from refusing to grant discounts to retailers solely because of their status as retailers and would require that retailers be given the opportunity to demonstrate their ability to move market share and to negotiate and earn discounts similar to the discounts offered to managed care organizations. The settlement also provides that it shall not be deemed or construed to be an admission or evidence of any violation of any statute or law or of any liability or wrongdoing by the Company or of the truth of any of the claims or allegations alleged in the Consolidated Class Action. Also, the Court of Appeals for the Seventh Circuit has agreed to hear the appeal of the denial of the manufacturer defendants' motion for summary judgment that indirect purchasers lack standing to bring federal price fixing claims. The individual federal actions, including those brought by Rite Aid Corporation, Revco D.S. Inc. and other retail drug chains, remain pending against the Company. In addition to the federal actions, similar litigation on behalf of consumers or retail pharmacies has been brought in various state courts, including purported class actions in Alabama, Arizona, California, Colorado, District of Columbia, Florida, Kansas, Maine, Michigan, Minnesota, New York, Tennessee, Washington and Wisconsin. These actions are all in various pre-trial stages. The actions in Colorado, Washington and New York have been dismissed on pre-trial motions. Plaintiffs have appealed the dismissal of the Washington and New York actions.

The FTC is also investigating allegations of concerted action in the pricing of pharmaceutical products and the Company has provided information in response to a subpoena.

The Company has been involved in various antitrust suits and government investigations relating to its marketing and sale of infant formula. The antitrust lawsuits, which were commenced in various federal and state courts, alleged in general that the Company conspired with one or more of its competitors to fix prices of infant formula and to monopolize the market for infant formula products. As previously disclosed, most of the cases as well as a Federal Trade Commission ("FTC") proceeding have been settled and other cases have been terminated without liability to the Company, including an action brought in federal court by the State of Louisiana, which has been dismissed. In Alabama, class certification has been denied in a state court action on behalf of indirect purchasers. The Company is also a defendant in a purported class action brought in federal court under Massachusetts state law on behalf of indirect purchasers of infant formula in Massachusetts. The government agencies that have been conducting investigations of pricing and marketing practices in the infant formula industry include three state attorneys general. The Company has been advised that two other state attorneys general have terminated their investigations of the Company without any action.

The Company has entered into settlements with the FTC and state attorneys general concerning pricing practices relating to a marketing program for certain crop protection products. These settlements, which do not admit any liability by the Company, prohibit resale price maintenance in the sale of such crop protection products. The state settlement also provides for a payment of $7.3 million by the Company. A purported class action was filed in state court in Tennessee and alleges similar violations of state antitrust and consumer protection laws by Cyanamid in the sale of crop protection products. The complaint purports to be on behalf of indirect purchasers of Cyanamid's crop protection products in the states of Tennessee, Alabama, California, Florida, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, North Carolina, North Dakota, South Dakota, West Virginia, Wisconsin and the District of Columbia.

In response to a subpoena from the New York State Attorney General, the Company has provided information relating to the Company's copromotion of Merck's osteoporosis drug FOSAMAX and disease management activities.

Pursuant to a consent order entered into by the Company in connection with the acquisition from Solvay S.A. of its animal health business, the Company has divested certain canine and feline vaccines to Schering-Plough Corporation. If Schering-Plough does not obtain USDA approval to manufacture these vaccines itself, the consent order may require certain additional asset divestitures by the Company.

I-13

As discussed in Item I, the Company is a party to, or otherwise involved in, legal proceedings under CERCLA and similar state laws directed at the cleanup of various sites including 62 Superfund sites, including the Cyanamid-owned Bound Brook, N.J. site. The Company's potential liability varies greatly from site to site. For some sites, the potential liability is de minimis and, for others, the final costs of cleanup have not yet been determined. As assessments and cleanups proceed, these liabilities are reviewed periodically and are adjusted as additional information becomes available. Environmental liabilities are inherently unpredictable. The liabilities can change substantially due to such factors as additional information on the nature or extent of contamination, methods of remediation required, and other actions by governmental agencies or private parties. The 62 Superfund sites exclude sites for which Cytec assumed full liability and agreed to indemnify Cyanamid but include certain sites for which there is shared responsibility between Cyanamid and Cytec. The Company has no reason to believe that it has any practical exposure to any of the liabilities against which Cytec has agreed to assume and indemnify Cyanamid.

The Company has agreed to enter into a settlement with the EPA with respect to a civil administrative action pending against Cyanamid for alleged violation of a provision of the Emergency Planning & Community Right-to-Know Act of 1986. Under the proposed settlement, the Company would pay a civil penalty of $129,000 plus the donation to the local county of certain emergency response equipment.

For information concerning certain litigation involving Immunex Corporation, see Part I, Item 3 of the Immunex Corporation Annual Report on Form 10-K for the fiscal year ended December 31, 1996, which Item is incorporated herein by reference.

In the opinion of the Company, although the outcome of any litigation cannot be predicted with certainty, the ultimate liability of the Company in connection with pending litigation and other matters described above will not have a material adverse effect on the Company's consolidated financial position but could be material to the results of operation in any one accounting period.

ITEM 4.    SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

None.

I-14

EXECUTIVE OFFICERS OF THE REGISTRANT AS OF MARCH 27, 1997

Each officer is elected to hold office until a successor is chosen or until earlier removal or resignation.  None of the executive officers is related to another:

| Name | Age | Offices and Positions | Elected to Office |
|------|-----|----------------------|-------------------|
| John R. Stafford | 59 | Chairman of the Board, President and Chief Executive Officer, Chairman of Executive, Finance, Operations and Nominating Committees | December 1986 |
| Business Experience: | | 1991 to date, Chairman of the Board, President and Chief Executive Officer (President to May 1990 and from February 1994) | |
| Robert G. Blount | 58 | Senior Executive Vice President, Director, Member of Executive, Finance and Operations Committees | October 1995 |
| Business Experience: | | 1991 to October 1995, Executive Vice President<br>October 1995 to date, Senior Executive Vice President | |
| Fred Hassan | 51 | Executive Vice President, Director, Member of Finance and Operations Committees | October 1995 |
| Business Experience: | | To March 1993, President, Wyeth-Ayerst Laboratories Division<br>March 1993 to May 1993, Group Vice President<br>May 1993 to October 1995 Senior Vice President<br>October 1995 to date, Executive Vice President | |

I-15

| Name | Age | Offices and Positions | Elected to Office |
|------|-----|----------------------|-------------------|
| Joseph J. Carr | 54 | Senior Vice President<br>Member of Finance and<br>Operations Committees | May 1993 |
| Business Experience: | | To April 1991, Vice President<br>April 1991 to May 1993, Group<br>Vice President<br>May 1993 to date, Senior Vice<br>President | |
| Louis L. Hoynes, Jr. | 61 | Senior Vice President and<br>General Counsel<br>Member of Finance and<br>Operations Committees | November 1990 |
| Business Experience: | | 1991 to date, Senior Vice<br>President and General<br>Counsel | |
| William J. Murray | 51 | Senior Vice President<br>Member of Finance and<br>Operations Committees | October 1995 |
| Business Experience: | | To September 1992, President,<br>Agricultural Division,<br>American Cyanamid Company<br>September 1992 to January 1995,<br>Group Vice President, American<br>Cyanamid Company<br>January 1995 to October 1995,<br>Vice President<br>October 1995 to date, Senior Vice<br>President | |

I-16

| Name | Age | Offices and Positions | Elected to Office |
|------|-----|----------------------|-------------------|
| David M. Olivier | 53 | Senior Vice President<br>Member of Finance and<br>Operations Committees | January 1996 |
| Business Experience: | | To January 1996, President,<br>Wyeth-Ayerst International,Inc.<br>January 1996 to date, Senior Vice<br>President | |
| John R. Considine | 46 | Vice President - Finance<br>Member of Finance and<br>Operations Committees | February 1992 |
| Business Experience: | | To February 1992,<br>Vice President and Treasurer<br>February 1992 to date, Vice<br>President- Finance | |
| Paul J. Jones | 51 | Vice President and Comptroller<br>Member of Finance Committee | May 1995 |
| Business Experience: | | To April 1995, Senior Vice<br>President - Finance and<br>Administration, Wyeth-Ayerst<br>Laboratories Division<br>May 1995 to date, Vice President<br>and Comptroller | |
| Rene R. Lewin | 50 | Vice President - Human<br>Resources, Member of Finance<br>Committee | May 1994 |
| Business Experience: | | To May 1994, Executive Director<br>Human Resources - Worldwide<br>Pharmaceutical Division,<br>Eli Lilly and Company<br>May 1994 to date, Vice President -<br>Human Resources | |

I-17

|              |     |                           | Elected to Office |
|--------------|-----|---------------------------|-------------------|
| Name         | Age | Offices and Positions     |                   |
| Thomas M. Nee | 57  | Vice President - Taxes<br>Member of Finance Committee | May 1986 |

Business Experience:      1991 to date, Vice President-Taxes

I-18

EXHIBIT 7

# UNANIMOUS CONSENT OF THE BOARD OF DIRECTORS

## OF

## GENETICS INSTITUTE, INC.

Pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, and in lieu of a meeting of the Board of Directors, the undersigned, being all of the Directors of Genetics Institute, Inc. (the "Corporation"), a Delaware corporation, do hereby consent in writing to the following actions, with the same force and effect as if taken by unanimous vote at a duly constituted meeting of the Board of Directors of the Corporation:

RESOLVED, that the proposed transfer and distribution by the Corporation to American Home Products Corporation ("AHP") of all assets and properties owned by the Corporation, except for the assets set forth below, be, and it hereby is approved and adopted in all respects, effective as of 11:59 pm on December 31, 2001; provided, however, that that the assets and properties to be distributed to AHP shall not include (i) all cash, cash equivalents and marketable securities; (ii) all land and buildings; and (iii) any intangibles, including, without limitation, all agreements, all patents, patent applications, license, disclosures, trademarks and registration, trade names, logos, copyrights, know-how, new drug applications and abbreviated new drug applications; and it was

FURTHER RESOLVED, that the President, any Vice President, the Treasurer and the Secretary of the Company (collectively, the "Proper Officers") be, and each of them hereby is, authorized and empowered to execute and deliver an Asset Transfer Agreement between the Corporation and AHP (the "Transfer Agreement") providing for such distribution, and to execute and deliver such further instruments, agreements, certificates or documents and to do such acts as may be necessary or desirable to implement the transactions contemplated by, and the terms, provisions, purposes and intents, whether express or implied, of said Transfer Agreement in the name and on behalf of the Corporation with such changes thereto as the officer executing the same may approve, his execution thereof to be conclusive evidence of such approval; and it was

FURTHER RESOLVED, that the execution by the Proper Officers, or any of them, of any document or instrument authorized by these resolutions, or any document or instrument executed in the accomplishment of any action or actions so authorized, is and shall become upon delivery the enforceable and binding act and obligation of the Corporation, without the necessity of the signature of attestation of any other officer of the Corporation or the affixing of any corporate seal; and it was

FURTHER RESOLVED, that all actions taken by the Proper Officers of the Company prior to the date of these resolutions (i) necessary or desirable to implement the transactions contemplated by, and the terms, provisions, purposes and intents, whether express or implied, of the Purchase Agreement and (ii) within and in furtherance of

these resolutions be, and hereby are, ratified and approved as the actions of the Corporation; and it was

FURTHER RESOLVED, that the transfer and distribution of assets set forth herein, together with the conversion of the Corporation to a Delaware limited liability company pursuant to Section 266 of the Delaware General Corporation Law, effective as of 12:01 on January 1, 2002, is intended to constitute a complete liquidation of the Corporation under Section 332 of the Internal Revenue Code of 1986, as amended, on December 31, 2001 for federal and state income tax purposes.

IN WITNESS WHEREOF, all of the Directors of Genetics Institute, Inc. have signed this consent as of the 27th day of December, 2001.


_____          _____
John R. Stafford                                    Kenneth J. Martin


_____          _____
Robert Essner                                       Louis L. Hoynes, Jr.

# EXHIBIT 8

PN 4,868,112  Fee Code III  Amount $1,120.00  INTERFERENCE
$

PATENT
Atty. Docket No.: 01142.0130

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re U.S. Patent No. 4,868,112          )

Issued:  September 19, 1989              )

To:  John J. Toole, Jr.                  )

Assignee:  Genetics Institute, Inc.      )

For:  NOVEL PROCOAGULANT                 )
      PROTEINS                           )

RECEIVED

JAN 2 6 2001

OFFICE OF PETITIONS

#16
5-24-00

BOARD OF PATENT APPEALS
AND INTERFERENCES

2001 MAY 10 AM 10: 17

BOX PATENT EXT.
**Assistant Commissioner for Patents**
**Washington, D.C. 20231**

Sir:

### APPLICATION FOR EXTENSION OF PATENT
### TERM UNDER 35 U.S.C. § 156

     Your Applicant, Genetics Institute, Inc., represents that it is the Assignee of the

entire interest in and to Letters Patent of the United States No. 4,868,112 granted to

John J. Toole, Jr. on the 19th day of September, 1989, for NOVEL PROCOAGULANT

PROTEINS, by virtue of an assignment in favor of Genetics Institute, Inc.  This

assignment was recorded at the U.S. Patent and Trademark Office on Reel 4670, at

frame 383, on December 9, 1986 (Attachment A).

     By the Power of Attorney enclosed herein (Attachment B), Applicant appoints

attorneys of Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., including Steven

P. O'Connor, as attorney for Genetics Institute with regard to this application for

LAW OFFICES
FINNEGAN, HENDERSON,
FARABOW, GARRETT,
& DUNNER, L.L.P.
1300 I STREET, N. W.
WASHINGTON, D. C. 20005
202-408-4000

extension of the term of U.S. Patent No. 4,868,112 and to transact all business in the U.S. Patent and Trademark Office in connection therewith.

Applicant hereby submits this application for extension of the patent term under 35 U.S.C. § 156 by providing the following information required by the rules promulgated by the U.S. Patent and Trademark Office (37 C.F.R. § 1.740). For the convenience of the Patent and Trademark Office, the information contained in this application is presented in a format that follows the requirements of Section 1.740 of Title 37 of the Code of Federal Regulations.

(1) The approved product, ReFacto®, is an antihemophilic factor for use in therapy for factor VIII deficiency comprising a purified protein produced by recombinant DNA technology. The formulation including ReFacto® is a sterile, nonpyrogenic, lyophilized preparation that contains a glycoprotein with an approximate molecular mass of 170 kDa consisting of 1438 amino acids comparable to the 90 + 80 kDa form of factor VIII.

(2) The approved product was subject to regulatory review under the Federal Food, Drug, and Cosmetic Act Section 505.

(3) The approved product ReFacto® received permission for commercial marketing or use under Section 505 of the Federal Food, Drug, and Cosmetic Act on March 6, 2000.

(4) The active ingredient in ReFacto® is a recombinant glycoprotein with an approximate molecular mass of 170 kDa consisting of 1438 amino acids comparable to the 90 + 80 kDa form of factor VIII, which, on information and belief, has not been

LAW OFFICES
FINNEGAN, HENDERSON,
FARABOW, GARRETT,
& DUNNER, L.L.P.
1300 I STREET, N. W.
WASHINGTON, D. C. 20005
202-408-4000

- 2 -



approved for commercial marketing or use under Section 505 of the Federal Food,

Drug, and Cosmetic Act before the approval of BLA 98-0137 for ReFacto® by the Food

and Drug Administration on March 6, 2000. A copy of the insert describing the

approved product is attached (Attachment C).

(5) This application for extension of patent term under 35 U.S.C. § 156 is being

submitted within the 60-day period pursuant to 37 C.F.R. § 1.720(f), said period will

expire on May 4, 2000.

(6) The complete identification of the patent for which a term extension is being

sought is as follows:

> Inventor:     John J. Toole, Jr.
>
> Patent No.:   4,868,112
>
> Issue Date:   September 19, 1989
>
> Expiration Date:     September 19, 2006.

(7) A true copy of the patent is attached (Attachment D).

(8) No terminal disclaimer or reexamination certificate has been issued on this

patent. A certificate of correction dated November 3, 1992, is attached (Attachment E).

In addition, a copy of the maintenance fee statement indicating payment of

maintenance fees on March 15, 1993, and March 19, 1997, is attached (Attachment F).

(9) U.S. Patent No. 4,868,112 claims a method of making the active ingredient

in the approved product in claim 9, and the active ingredient in the approved product in

claim 10. Claims 9 and 10 claim the active ingredient in ReFacto® as follows:

> 9. A method for producing a truncated Factor VIII:C protein which
> is an active procoagulant having the amino acid sequence of human
> Factor VIII:C but lacking at least 581 amino acids of the region between

LAW OFFICES
FINNEGAN, HENDERSON,
FARABOW, GARRETT,
& DUNNER, L.L.P.
1300 I STREET, N. W.
WASHINGTON, DC 20005
202-408-4000

- 3 -



Arg-759 and Ser-1709 which comprises producing a genetically engineered mammalian host cell of claim 5 and culturing said host cell under condition permitting expression of the protein.

Claim 9 reads on the method of making the active ingredient in ReFacto® since it reads on a method of producing an active procoagulant having the amino acid sequence of human Factor VIII:C, but lacking amino acids 760-1667, by genetically engineering a Chinese hamster ovary (CHO) cell line and culturing that cell line such that it secretes B-domain deleted recombinant Factor VIII into the culture medium.

10.  A truncated human Factor VIII:C protein which is an active procoagulant protein having a peptide sequence of human Factor VIII:C but lacking a peptide region selected from the group consisting of:

(a)  the region between Pro-1000 and Asp-1582;
(b)  the region between Thr-778 and Pro-1659; and
(c)  the region between Thr-778 and Glu-1694.

Claim 10 reads on the active ingredient in ReFacto® since it reads on an active procoagulant having the amino acid sequence of human Factor VIII:C, but lacking amino acids 760-1667.

LAW OFFICES
FINNEGAN, HENDERSON,
FARABOW, GARRETT,
& DUNNER, L.L.P.
1300 I STREET, N. W.
WASHINGTON, D. C. 20005
202-408-4000



(10)  The relevant dates and information pursuant to 35 U.S.C. § 156(g) to enable the Secretary of Health and Human Services to determine the applicable regulatory review period are as follows:

Investigational New Drug Application (BB-IND 5348) for ReFacto® was filed November 30, 1993, and became effective on March 14, 1994, following removal of a clinical hold.

Biological License Application for ReFacto® (98-0137) was submitted on February 2, 1998.

Biological License Application for ReFacto® was approved on March 6, 2000.

LAW OFFICES
FINNEGAN, HENDERSON,
FARABOW, GARRETT,
& DUNNER, L.L.P.
1300 I STREET, N. W.
WASHINGTON, D. C. 20005
202-408-4000

- 5 -

(11)  A brief description of the significant activities undertaken by the marketing applicant and its collaborative partner during the applicable regulatory review period with respect to ReFacto® and the dates applicable to these significant activities are set forth in a chronology of events in Attachment G.

LAW OFFICES
FINNEGAN, HENDERSON,
FARABOW, GARRETT,
& DUNNER, L.L.P.
1300 I STREET, N. W.
WASHINGTON, D. C. 20005
202-408-4000

- 6 -



(12)(I)  Applicant is of the opinion that U.S. Patent 4,868,112 is eligible for extension of the patent term under 35 U.S.C. § 156 because it satisfies all requirements for such extension as follows:

(a)    35 U.S.C. § 156(a) - U.S. Patent 4,868,112 claims the product ReFacto®.

(b)    35 U.S.C. § 156(a)(1) - U.S. Patent 4,868,112 has not expired before submission of this application.

(c)    35 U.S.C. § 156(a)(2) - The term of U.S. Patent 4,868,112 has never been extended under 35 U.S.C. § 156(e)(1).

(d)    35 U.S.C. § 156(a)(3) - The application for extension is submitted by the owner of record of the patent in accordance with the requirements of paragraphs (1) through (4) of 35 U.S.C. § 156(d) and the rules of the Patent and Trademark Office.

(e)    35 U.S.C. § 156(a)(4) - The product ReFacto® has been subjected to a regulatory review period before its commercial marketing or use.

(f)    35 U.S.C. § 156(a)(5)(A) - The commercial marketing or use of the product ReFacto® after the regulatory review period is the first permitted commercial marketing or use under the provision of the Federal Food, Drug and Cosmetic Act (that is, Section 505) under which such regulatory review period occurred.

(g)    35 U.S.C. § 156(c)(4) - No other patent has been extended for the same regulatory review period for the product ReFacto®.

(12)(ii)  The length of the extension of patent term of U.S. Patent 4,868,112 claimed by Applicant is that period authorized by 35 U.S.C. § 156(c) which has been

LAW OFFICES
FINNEGAN, HENDERSON,
FARABOW, GARRETT,
& DUNNER, L.L.P.
1300 I STREET, N. W.
WASHINGTON, D. C. 20005
202-408-4000

- 7 -



calculated to be 1475 days.  The length of the extension was determined pursuant to 37 C.F.R. § 1.775 as follows:

(a)    The regulatory review period under 35 U.S.C. § 156(g)(1)(B) began on March 14, 1994, and ended March 6, 2000, which is a total of 2186 days, which is the sum of (1) and (2) below:

(1)    The period of review under 35 U.S.C. § 156(g)(1)(B)(l), the "Testing Period", began on March 14, 1994, and ended on February 2, 1998, which is 1422 days; and

(2)    The period of review under 35 U.S.C. § 156(g)(1)(B)(ii), the "Approval Period", began on February 2, 1998, and ended on March 6, 2000, which is a total of 764 days.

(b)    The regulatory review period upon which the period of extension is calculated is the entire regulatory review period as determined in subparagraph 12(ii)(a) above (2186 days) less:

(1)    The number of days in the regulatory review period which were on or before the date on which the patent issued (September 19, 1989) which is zero (0) days; and

(2)    The number of days during which applicant did not act with due diligence, which is zero (0) days; and

(3)    One-half the number of days determined in sub-paragraph (12)(ii)(a)(1) above after the patent issued (one-half of 1422 days) which is 711 days;

LAW OFFICES
FINNEGAN, HENDERSON,
FARABOW, GARRETT,
& DUNNER, L.L.P.
1300 I STREET, N. W.
WASHINGTON, D. C. 20005
202-408-4000

- 8 -



(c)    The number of days as determined in sub-paragraph (12)(ii)(b) (1475 days) when added to the expiration date of the original term of the patent (September 19, 2006) would result in the date of October 3, 2010.

(d)    Fourteen (14) years when added to the date of the BLA approval (March 6, 2000) would result in the date of March 6, 2014;

(e)    The earlier date as determined in sub-paragraphs (12)(ii)(c) and (12)(ii)(d) is October 3, 2010;

(f)    Since U.S. Patent 4,868,112 issued after September 24, 1984, the period of extension may not exceed five years from the original expiration date of September 19, 2006.  Five years when added to the original expiration date of the patent would result in the date of September 19, 2011.

(g)    The earlier date as determined by sub-paragraphs (12)(ii)(e) and (12)(ii)(f) is October, 3, 2010.

(13)  Applicant acknowledges a duty to disclose to the Commissioner of Patents and Trademarks and the Secretary of Health and Human Services any information which is material to the determination of entitlement to the extension sought.

While Applicant does not consider the information to be material to the determination of entitlement to the extension sought, it points out that U.S. Patent No. 4,868,112 is currently the subject of interference no. 103,215.  Claim 9 is designated as corresponding to count 1 of this interference, while claim 10 is designated as corresponding to count 2.

LAW OFFICES
FINNEGAN, HENDERSON,
FARABOW, GARRETT,
& DUNNER, L.L.P.
1300 I STREET, N. W.
WASHINGTON, DC 20005
202-408-4000

- 9 -

(14) The prescribed fee for receiving and acting upon this application is attached as a check in the amount of $1,120.00. The Commissioner is authorized to charge any additional fees required by this application to Deposit Account No. 06-0916.

(15) All correspondence and inquiries may be direct to the undersigned, whose address, telephone number, and fax number are as follows:

> Steven P. O'Connor
> Finnegan, Henderson, Farabow,
>   Garrett & Dunner, L.L.P.
> 1300 I Street, N.W.
> Washington, D.C. 20005-3315
>
> Phone: 202-408-4079
> Fax: 202-408-4400

(16) Enclosed is a certification that the application for extension of patent term under 35 U.S.C. § 156 including its attachments and supporting papers is being submitted as one original and four (4) copies thereof (Attachment H).

(17)    The requisite declaration pursuant to 37 C.F.R. § 1.740(b) is attached (Attachment I).

> Respectfully submitted,
>
> FINNEGAN, HENDERSON, FARABOW,
>   GARRETT & DUNNER, L.L.P.
>
>
> By: _Stn. P. O'Conn_/ _____
>      Steven P. O'Connor
>      Reg. No. 41,225

Date: May 4, 2000

LAW OFFICES
FINNEGAN, HENDERSON,
FARABOW, GARRETT,
& DUNNER, L.L.P.
1300 I STREET, N. W.
WASHINGTON, D. C. 20005
202-408-4000

- 10 -

Attachments:
Assignment (Attachment A)
Power of Attorney (Attachment B)
Package Insert for ReFacto® (Attachment C)
U.S. Patent No. 4,868,112 (Attachment D)
Copy of Certificate of Correction (Attachment E)
Copy of Maintenance Fee Statement (Attachment F)
Chronology of Regulatory Review Period (Attachment G)
Certification of Copies of Application Papers (Attachment H)
Declaration Pursuant to 37 C.F.R. § 1.740(b) (Attachment I)

LAW OFFICES
FINNEGAN, HENDERSON,
FARABOW, GARRETT,
& DUNNER, L.L.P.
1300 I STREET, N.W.
WASHINGTON, DC 20005
202-408-4000

- 11 -

# EXHIBIT 9

09/07/05  16:13 FAX 6109891879          WLV                                    🖉002

# SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT, effective as of August 22, 2005 (the "Effective Date"), is made by and among Wyeth, having offices at 5 Giralda Farms, Madison, New Jersey 07940 ("Wyeth"), Genetics Institute, LLC, a subsidiary of Wyeth ("GI"), Genentech Inc., having offices at 1 DNA Way, South San Francisco, CA 94080 ("Genentech"), and Bayer Healthcare LLC, having offices at 800 Dwight Way, Berkeley, California 94701 ("Bayer").

A.    Genentech owns U.S. Patent Application No. 07/584,076 to Vehar ("the '076 Application").

B.    GI owns U.S. Patent No. 4,868,112 to Toole, Jr. ("the '112 Patent").

C.    Genentech and GI were parties to *Vehar v. Toole, Jr.*, Interference No. 103,215 ("the Interference"), in the United States Patent and Trademark Office ("USPTO").

D.    The USPTO granted priority to GI in the Interference.

E.    Genentech and Bayer, as plaintiffs; and Wyeth and GI, as defendants; are parties to Genentech, Inc., et al. v. Wyeth et al. in the U.S. District Court - District of Delaware (D. Del. Civil Action No. 03-1160-GMS), an action under 35 U.S.C §146 (the "Civil Action").

REDACTED

REDACTED

4.    This Settlement Agreement will be construed in accordance with the laws of the State of Delaware (excluding conflicts of laws provisions) and the patent laws of the United States.

IN WITNESS WHEREOF, the parties hereto have caused this settlement Agreement to be executed in duplicate.

WYETH                                          GENENTECH INC.

By _____                   By _____
Name _____                   Name ____ REDACTED ____
Title _____                  Title _____

GENETICS INSTITUTE, LLC                         BAYER HEALTHCARE LLC
(a subsidiary of Wyeth)

By _Ronald W._____                              By _____
Name _Ronald W. Alice_         REDACTED         Name ____ REDACTED ____
Title _Vice President_                          Title _____

09/07/05  16:14 FAX 6109891879          WLV                                    004
AUG-18-2005 . 04:01        WYETH                      973 660 7155   P.03/03

REDACTED

4.    This Settlement Agreement will be construed in accordance with the laws of the State of
      Delaware (excluding conflicts of laws provisions) and the patent laws of the United
      States.

IN WITNESS WHEREOF, the parties hereto have caused this settlement Agreement to be
executed in duplicate.

WYETH                                    GENENTECH INC.

By _____             By _____
Name _William M. Hostel____              Name _____
Title _VP_____               Title _____

GENETICS INSTITUTE, LLC                  BAYER HEALTHCARE LLC
(a subsidiary of Wyeth)

By _____             By _____
Name _____             Name _____
Title _____             Title _____

TOTAL P.03

EXHIBIT 10

Westlaw.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

**\*\*2647** P.L. 98-417, DRUG PRICE COMPETITION AND PATENT TERM
RESTORATION ACT
SEE PAGE 98 STAT. 1585
SENATE REPORT (JUDICIARY COMMITTEE) NO. 98-547, JUNE 26,
1984 (TO ACCOMPANY S. 1538)
HOUSE REPORT (ENERGY AND COMMERCE COMMITTEE) NO. 98-857(I),
JUNE 21, 1984 (TO ACCOMPANY H.R. 3605)
HOUSE REPORT (JUDICIARY COMMITTEE) NO. 98-857(II), AUG. 1,
1984 (TO ACCOMPANY H.R. 3605)
CONG. RECORD VOL. 130 (1984)
DATES OF CONSIDERATION AND PASSAGE
SENATE JUNE 29, AUGUST 10, SEPTEMBER 12, 1984
HOUSE SEPTEMBER 6, 1984
S. 1538 WAS PASSED IN LIEU OF THE HOUSE BILL AFTER AMENDING
ITS LANGUAGE TO CONTAIN THE TEXT OF THE HOUSE BILL.  THE
HOUSE REPORT (PART I, THIS PAGE, AND PART II, PAGE 2686)
AND A RELATED REPORT (PAGE 2721) ARE SET OUT.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL.  EACH
COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

HOUSE REPORT NO. 98-857(I)
JUNE 21, 1984
**\*1** THE COMMITTEE ON ENERGY AND COMMERCE, TO WHOM WAS REFERRED THE BILL  (H.R.
3605) TO AMEND THE FEDERAL FOOD, DRUG, AND COSMETIC ACT TO AUTHORIZE AN ABBREVI-
ATED NEW DRUG APPLICATION UNDER SECTION 505 OF THAT ACT FOR GENERIC NEW DRUGS
EQUIVALENT TO APPROVED NEW DRUGS, HAVING CONSIDERED THE SAME, REPORT FAVORABLY
THEREON WITH AMENDMENTS AND RECOMMEND THAT THE BILL AS AMENDED DO PASS.

*          *          *          *

**\*14** PURPOSE AND SUMMARY

TITLE I

THE PURPOSE OF TITLE I OF THE BILL IS TO MAKE AVAILABLE MORE LOW COST GENERIC
DRUGS BY ESTABLISHING A GENERIC DRUG APPROVAL PROCEDURE FOR PIONEER DRUGS FIRST
APPROVED AFTER 1962.  UNDER CURRENT LAW, THERE IS A GENERIC DRUG APPROVAL PROCED-
URE FOR PIONEER DRUGS APPROVED BEFORE 1962, BUT NOT FOR PIONEER DRUGS APPROVED
AFTER 1962.
TITLE I OF THE BILL GENERALLY EXTENDS THE PROCEDURES USED TO APPROVE GENERIC
COPIES OF PRE-62 DRUGS TO POST-62 DRUGS.  GENERIC COPIES **\*15 \*\*2648** OF ANY DRUGS
MAY BE APPROVED IF THE GENERIC IS THE SAME AS THE ORIGINAL DRUG OR SO SIMILAR THAT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)

FDA HAS DETERMINED THE DIFFERENCES DO NOT REQUIRE SAFETY AND EFFECTIVENESS TEST-
ING.

TITLE I ALSO REQUIRES PATENT OWNERS TO SUBMIT INFORMATION TO FDA REGARDING PRO-
DUCE AND USE PATENTS THAT COVER APPROVED DRUGS.  GENERIC COPIES OF THESE DRUGS MAY
BE APPROVED WHEN THE PATENTS EXPIRE UNLESS THE GENERIC COMPANY CERTIFIES THAT THE
PATENT IS INVALID OR WILL NOT BE INFRINGED.  IN SUCH CASES, THE GENERIC COMPANY
MUST NOTIFY THE PATENT OWNER ABOUT ITS CERTIFICATION AND APPROVAL OF THE GENERIC
DRUG MAY NOT BE MADE EFFECTIVE UNTIL THE COURT DECIDES THE SUIT FOR PATENT IN-
FRINGEMENT OR A PERIOD OF 18 MONTHS, WHICHEVER OCCURS FIRST. NOTIFICATION MUST BE
GIVEN WHEN THE GENERIC HAS SUBMITTED AN ANDA WITH BIOEQUIVALENCE DATA.

IN ADDITION, TITLE I AFFORDS FOUR YEARS OF EXCLUSIVE MARKET LIFE TO DRUGS WHICH
MAY NOT BE PATENTED AND WHICH ARE APPROVED FOR THE FIRST TIME AFTER ENACTMENT OF
THE BILL.  FURTHER, DRUGS WHICH WERE APPROVED FOR THE FIRST TIME BETWEEN 1982 AND
THE DATE OF ENACTMENT RECEIVED TEN YEARS OF EXCLUSIVE MARKET LIFE.

TITLE II

THE PURPOSE OF TITLE II OF THE BILL IS TO CREATE A NEW INCENTIVE FOR INCREASED
EXPENDITURES FOR RESEARCH AND DEVELOPMENT OF CERTAIN PRODUCTS WHICH ARE SUBJECT TO
PREMARKET GOVERNMENT APPROVAL.  THE INCENTIVE IS THE RESTORATION OF SOME OF THE
TIME LOST ON PATENT LIFE WHILE THE PRODUCT IS AWAITING PRE-MARKET APPROVAL.  UNDER
CURRENT LAW, A PATENT CONTINUES TO RUN WHILE THE MAKER OF THE PRODUCT IS TESTING
AND AWAITING APPROVAL TO MARKET IT.

TITLE II OF H.R. 3605 PROVIDES FOR ONE EXTENSION OF THE EARLIEST PATENT ON CER-
TAIN PRODUCTS SUBJECT TO PRE-MARKET APPROVAL.  THE EXTENSION WOULD BE FOR A PERIOD
EQUAL TO:  (1) HALF OF THE TIME REQUIRED TO TEST THE PRODUCT FOR SAFETY (AND EF-
FECTIVENESS IN SOME CASES); AND (2) ALL OF THE TIME REQUIRED FOR THE AGENCY TO AP-
PROVE MARKETING OF THE PRODUCT.  THESE PRODUCTS INCLUDE: HUMAN DRUGS, ANIMAL
DRUGS, MEDICAL DEVICES, AND FOOD AND COLOR ADDITIVES.

TITLE II PLACES SEVERAL LIMITS ON THE PERIOD OF PATENT EXTENSION. FIRST, THE
PERIOD OF EXTENSION MAY NOT EXCEED TWO YEARS FOR PRODUCTS EITHER CURRENTLY BEING
TESTED OR AWAITING APPROVAL.  FOR ALL OTHER PRODUCTS, THE PERIOD OF EXTENSION MAY
NOT EXCEED FIVE YEARS.  SECOND, THE PERIOD OF PATENT EXTENSION WHEN ADDED TO THE
PATENT TIME LEFT AFTER APPROVAL OF THE PRODUCT MAY NOT EXCEED FOURTEEN YEARS.
THIRD, ANY TIME THAT THE PRODUCT'S MANUFACTURER DID NOT ACT WITH DUE DILIGENCE
DURING THE REGULATORY REVIEW PERIOD WOULD BE SUBTRACTED.

FINALLY, TITLE II PROVIDES THAT IT IS NOT AN ACT OF PATENT INFRINGEMENT FOR A
GENERIC DRUG MAKER TO IMPORT OR TO TEST A PATENTED DRUG IN PREPARATION FOR SEEKING
FDA APPROVAL IF MARKETING OF THE DRUG WOULD OCCUR AFTER EXPIRATION OF THE PATENT.

HEARINGS

THE COMMITTEE'S SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT HELD ONE DAY OF HEAR-
INGS ON H.R. 3605, THE DRUG PRICE COMPETITION ACT, ON JULY 15, 1983. TESTIMONY WAS
RECEIVED FROM 15 WITNESSES, **16 **2649 REPRESENTING NINE ORGANIZATIONS, WITH ADDI-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:08-cv-00290-SLR    Document 11-3    Filed 08/29/2008    Page 50 of 98

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH CONG., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


TIONAL MATERIAL SUBMITTED BY TWO INDIVIDUALS AND ORGANIZATIONS.

COMMITTEE CONSIDERATION

ON AUGUST 2, 1983, THE COMMITTEE'S SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT
MET IN OPEN SESSION AND ORDERED FAVORABLY REPORTED H.R. 3605 WITHOUT AMENDMENT BY
VOICE VOTE.  ON JUNE 12, 1984, THE COMMITTEE MET IN OPEN SESSION ON H.R. 3605,
AMENDED THE BILL, AND ORDERED IT FAVORABLY REPORTED BY A VOICE VOTE. THE TITLE OF
THE BILL, AS AMENDED, IS THE 'DRUG PRICE COMPETITION AND PATENT TERM RESTORATION
ACT OF 1984.'

BACKGROUND AND NEED FOR THE LEGISLATION

TITLE I-- ABBREVIATED NEW DRUG APPLICATIONS

PRIOR TO 1962, THE FEDERAL FOOD, DRUG AND COSMETIC ACT (FFDCA) REQUIRED THAT ALL
DRUGS BE APPROVED AS SAFE BEFORE THEY COULD BE MARKETED.  THE 1962 AMENDMENTS RE-
QUIRED THAT ALL NEW DRUGS, GENERIC AND PIONEER, MUST BE APPROVED AS SAFE AND EF-
FECTIVE PRIOR TO MARKETING.
AS A RESULT OF THE 1962 AMENDMENTS, FDA DID TWO THINGS REGARDING PRE-1962 DRUGS.
FIRST, THE AGENCY CREATED THE DRUG EFFICACY STUDY (DESI) TO DETERMINE IF ALL PRE-
1962 DRUGS WERE EFFECTIVE.  SECOND, FDA ESTABLISHED A POLICY PERMITTING THE AP-
PROVAL OF A GENERIC DRUG EQUIVALENT TO A SAFE AND EFFECTIVE PRE-1962 PIONEER DRUG.
AS A RESULT OF THE 1962 AMENDMENTS, THE MANUFACTURER OF A PIONEER DRUG MUST CON-
DUCT TESTS ON HUMANS THAT SHOW THE PRODUCT TO BE SAFE AND EFFECTIVE AND SUBMIT THE
RESULTS IN A NEW DRUG APPLICATION (NDA).  A MANUFACTURER OF A GENERIC DRUG MUST
CONDUCT TESTS THAT SHOW THE GENERIC DRUG IS THE SAME AS THE PIONEER DRUG AND THAT
IT WILL BE PROPERLY MANUFACTURED AND LABELED.  THIS INFORMATION IS SUBMITTED IN AN
ABBREVIATED NEW DRUG APPLICATION (ANDA).
THE ONLY DIFFERENCE BETWEEN A NDA AND AN ANDA IS THAT THE GENERIC MANUFACTURER
IS NOT REQUIRED TO CONDUCT HUMAN CLINICAL TRIALS.  FDA CONSIDERS SUCH RETESTING TO
BE UNNECESSARY AND WASTEFUL BECAUSE THE DRUG HAS ALREADY BEEN DETERMINED TO BE
SAFE AND EFFECTIVE.  MOREOVER, SUCH RETESTING IS UNETHICAL BECAUSE IT REQUIRES
THAT SOME SICK PATIENTS TAKE PLACEBOS AND BE DENIED TREATMENT KNOWN TO BE EFFECT-
IVE.
THE FDA ALLOWS THIS ANDA PROCEDURE ONLY FOR PIONEER DRUGS APPROVED BEFORE 1962.
THERE IS NO ANDA PROCEDURE FOR APPROVING GENERIC EQUIVALENTS OF PIONEER DRUGS AP-
PROVED AFTER 1962.  WHILE THE FDA HAS BEEN CONSIDERING SINCE 1978 AN EXTENSION OF
THE PRE-1962 ANDA POLICY TO POST-1962 DRUGS, IT HAS NOT EXTENDED THE REGULATION.
BECAUSE OF THE AGENCY'S FAILURE TO ACT, TITLE I OF H.R. 3605 IS NECESSARY TO ES-
TABLISH A POST-1962 ANDA POLICY.
SOME HAVE SUGGESTED THAT 'PAPER NDAS' BE USED TO APPROVE GENERIC EQUIVALENTS OF
PIONEER DRUGS APPROVED AFTER 1962.  UNDER THE PAPER NDA PROCEDURE, THE GENERIC
MANUFACTURER MAY SUBMIT SCIENTIFIC REPORTS, INSTEAD OF CLINICAL TRIALS, TO SUPPORT
FINDINGS OF SAFETY AND EFFICACY.  THIS PROCEDURE IS INADEQUATE, HOWEVER, BECAUSE

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

FDA ESTIMATES THAT SATISFACTORY REPORTS ARE NOT AVAILABLE FOR 85 PERCENT OF ALL POST-1962 DRUGS.

**\*17 \*\*2650** CURRENTLY, THERE ARE APPROXIMATELY 150 DRUGS APPROVED AFTER 1962 THAT ARE OFF PATENT AND FOR WHICH THERE IS NO GENERIC EQUIVALENT. ALL OF THESE DRUGS COULD BE APPROVED IN GENERIC FORM IF THERE WAS A PROCEDURE. EACH YEAR, MORE PIONEER DRUGS GO OFF PATENT AND BECOME AVAILABLE FOR APPROVAL AS GENERICS.

AMONG THE DRUGS AVAILABLE OR SOON TO BE AVAILABLE FOR GENERIC APPROVAL ARE FIVE BEST SELLERS: VALIUM, MOTRIN, INDERAL, DYAZIDE, AND LASIX. DYAZIDE, FOR EXAMPLE, IS THE MOST WIDELY USED DIURETIC FOR THE TREATMENT OF HIGH BLOOD PRESSURE. ITS PATENT EXPIRED IN 1981. VALIUM IS A POPULAR TRANQUILIZER WHOSE PATENT EXPIRES IN 1985. ANOTHER DRUG WHOSE PATENT HAS EXPIRED IS INDOCIN, AN ANTI-INFLAMMATORY DRUG USED IN THE TREATMENT OF ARTHRITIS THAT IS THE TENTH HIGHEST SELLING DRUG IN THE UNITED STATES.

THE AVAILABILITY OF GENERIC VERSIONS OF PIONEER DRUGS APPROVED AFTER 1962 WOULD SAVE AMERICAN CONSUMERS $920 MILLION OVER THE NEXT 12 YEARS. OLDER AMERICANS, IN PARTICULAR, WOULD BENEFIT BECAUSE THEY USE ALMOST 25 PERCENT OF ALL PRESCRIPTION DRUGS.

MOREOVER, THE LACK OF GENERICS FOR POST-1962 PIONEER DRUGS WILL COST FEDERAL AND STATE GOVERNMENTS MILLIONS OF DOLLARS. FOR THE DRUG METRONIDAZOLE, PURCHASED BY THE DEPARTMENT OF DEFENSE, THE TAXPAYERS SAVED APPROXIMATELY $1.2 MILLION IN ONE YEAR AS A RESULT OF THE AVAILABILITY OF A LOWER PRICED GENERIC VERSION. FEDERAL AND STATE GOVERNMENTS WILL BE DENIED COMPARABLE SAVINGS ON DRUGS APPROVED AFTER 1962 BECAUSE OF THE LACK OF AN APPROVAL PROCEDURE.

## TITLE II-- PATENT TERM RESTORATION

PATENTS ARE DESIGNED TO PROMOTE INNOVATION BY PROVIDING THE RIGHT TO EXCLUDE OTHERS FROM MAKING, USING, OR SELLING AN INVENTION. THEY ENABLE INNOVATORS TO OBTAIN GREATER PROFITS THAN COULD HAVE BEEN OBTAINED IF DIRECT COMPETITION EXISTED. THESE PROFITS ACT AS INCENTIVES FOR INNOVATIVE ACTIVITIES.

ALTHOUGH THE PATENT TERM IN THE UNITED STATES IS 17 YEARS, THE PERIOD DURING THE PATENT TERM IN WHICH PRODUCTS ARE MARKETED (THE EFFECTIVE PATENT TERM) IS USUALLY LESS THAN 17 YEARS BECAUSE PATENTS OFTEN ARE OBTAINED BEFORE PRODUCTS ARE READY TO BE MARKETED.

EFFECTIVE PATENT TERMS ARE INFLUENCED BY MANY FACTORS, INCLUDING FEDERAL PREMARKETING AND PREMANUFACTURING REGULATIONS. THE PRODUCTS COVERED BY THESE REGULATIONS INCLUDE PHARMACEUTICALS, MEDICAL DEVICES, FOOD ADDITIVES, AND COLOR ADDITIVES. PHARMACEUTICALS FOR INSTANCE CANNOT BE MARKETED IN THE UNITED STATES UNTIL THEY HAVE BEEN APPROVED BY THE FOOD AND DRUG ADMINISTRATION (FDA). TO OBTAIN SUCH APPROVAL, DRUGS MUST UNDERGO EXTENSIVE TESTING TO PROVE THEY ARE BOTH SAFE AND EFFECTIVE. ALL THESE PRODUCTS ARE SUBJECT TO DIFFERENT REGULATIONS THAT HAVE HAD VARYING IMPACTS ON EFFECTIVE PATENT TERMS.

IN TESTIMONY BEFORE SEVERAL CONGRESSIONAL COMMITTEES, REPRESENTATIVES FROM THE PHARMACEUTICAL FIRMS THAT ARE HEAVILY INVOLVED IN BASIC RESEARCH AND RELY UPON PATENTS, CLAIMED THAT THE AVERAGE EFFECTIVE PATENT TERM OF DRUGS HAS DECLINED.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

THEY ARGUED THAT A CONTINUATION OF THE DECLINE WOULD RESULT IN DECREASED EXPENDIT-
URES FOR RESEARCH AND DEVELOPMENT AND, EVENTUALLY, IN A DECLINE IN THE INTRODUC-
TION OF NEW DRUGS.

**\*18 \*\*2651** AS COMPENSATION FOR THE LOSS OF PATENT TERM DUE TO GOVERNMENT REVIEW,
THE RESEARCH INTENSIVE FIRMS ARGUED FOR PATENT TERM EXTENSION LEGISLATION.  THEY
STATED THAT THE LEGISLATION WOULD CREATE A SIGNIFICANT, NEW INCENTIVE WHICH WOULD
RESULT IN INCREASED EXPENDITURES FOR RESEARCH AND DEVELOPMENT, AND ULTIMATELY IN
MORE INNOVATIVE DRUGS.

### COMMITTEE OVERSIGHT FINDINGS

    PURSUANT TO CLAUSE 2(1)(3)(A) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENT-
ATIVES, THE COMMITTEE REPORTS THAT OVERSIGHT OF THE FOOD AND DRUG ADMINISTRATION
AND THE FEDERAL FOOD, DRUG, AND COSMETIC ACT WAS CONDUCTED BY THE SUBCOMMITTEE ON
HEALTH AND THE ENVIRONMENT.  A HEARING WAS HELD ON JULY 15, 1983.  THE FINDINGS OF
THE COMMITTEE'S OVERSIGHT ACTIVITIES HAVE BEEN INCORPORATED INTO THE LEGISLATION
AND ARE DISCUSSED IN THOSE PORTIONS OF THIS REPORT ENTITLED 'BACKGROUND AND NEED
FOR THE LEGISLATION' AND 'SECTION-BY-SECTION ANALYSIS.'

### COMMITTEE ON GOVERNMENT OPERATIONS

    PURSUANT TO CLAUSE 2(1)(3)(D) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENT-
ATIVES, NO OVERSIGHT FINDINGS HAVE BEEN SUBMITTED TO THE COMMITTEE BY THE COMMIT-
TEE ON GOVERNMENT OPERATIONS.

### COMMITTEE COST ESTIMATE

    IN COMPLIANCE WITH CLAUSE 7(A) OF RULE XIII OF THE RULES OF THE HOUSE OF REPRES-
ENTATIVES, THE COMMITTEE BELIEVES THAT THE COSTS, IF ANY, INCURRED IN CARRYING OUT
H.R. 3605 WILL BE OFFSET BY SAVINGS TO THE FEDERAL GOVERNMENT. IN TESTIFYING BE-
FORE THE COMMITTEE'S SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT, OFFICIALS FROM
THE FOOD AND DRUG ADMINISTRATION ESTIMATED THAT ANY GREATER WORKLOAD RESULTING
FROM THE APPROVAL OF GENERIC DRUGS UNDER TITLE I WOULD BE ABSORBED INITIALLY.
LATER, THE OFFICIALS ESTIMATED, SOME ADDITIONAL STAFF MIGHT BE REQUIRED TO PROCESS
GENERIC DRUG APPLICATIONS.  THIS ADDITIONAL STAFF COULD COST UP TO $1.1 MILLION.
THE ACTUAL COST TO THE FEDERAL GOVERNMENT CANNOT BE ESTIMATED BECAUSE IT IS UN-
KNOWN HOW MUCH ADDITIONAL STAFF, IF ANY, MIGHT BE HIRED.
    ENACTMENT OF THE LEGISLATION, HOWEVER, WILL RESULT IN SIGNIFICANT COST SAVINGS
TO THE FEDERAL GOVERNMENT.  UNLIKE THE COSTS OF H.R. 3605, THESE SAVINGS ARE CER-
TAIN.  THE FEDERAL GOVERNMENT SPENT ABOUT $2.4 BILLION FOR DRUGS IN 1983.  MANY OF
THESE DRUGS WILL BE AVAILABLE AS LOW COST GENERIC AFTER ENACTMENT OF H.R. 3605.
FOR EXAMPLE, THE DEPARTMENT OF DEFENSE SAVED APPROXIMATELY $1.2 MILLION IN ONE
YEAR WHEN A LOWER PRICED GENERIC VERSION OF METRONIDAZOLE BECAME AVAILABLE.

### CONGRESSIONAL BUDGET OFFICE ESTIMATE

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

PURSUANT TO CLAUSES 2(1)(3)(B) AND (C) OF RULE XI OF THE RULES OF THE HOUSE OF
REPRESENTATIVES, THE COMMITTEE SETS FORTH THE FOLLOWING LETTER AND COST ESTIMATE
PREPARED BY THE CONGRESSIONAL BUDGET OFFICE WITH RESPECT TO THE REPORTED BILL:

**\*19 \*\*2652** U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
WASHINGTON, DC, JUNE 19, 1984
HON. JOHN D. DINGELL,
CHAIRMAN, COMMITTEE ON ENERGY AND COMMERCE,
HOUSE OF REPRESENTATIVES, WASHINGTON, DC.

DEAR MR. CHAIRMAN:  THE CONGRESSIONAL BUDGET OFFICE HAS REVIEWED H.R. 3605, THE
DRUG PRICE COMPETITION AND PATENT TERM RESTORATION ACT OF 1984, AS ORDERED REPOR-
TED BY THE HOUSE COMMITTEE ON ENERGY AND COMMERCE ON JUNE 12, 1984.

TITLE I OF THIS BILL WOULD ALLOW DRUG MANUFACTURERS TO USE AN ABBREVIATED NEW
DRUG APPLICATION (ANDA) WHEN SEEKING APPROVAL TO MAKE GENERIC COPIES OF DRUGS THAT
WERE APPROVED BY THE FOOD AND DRUG ADMINISTRATION (FDA) AFTER 1962.  AN ESTIMATED
150 DRUG PRODUCTS APPROVED AFTER 1962 ARE CURRENTLY OFF PATENT AND WOULD BECOME
AVAILABLE FOR GENERIC COPY USING THE ANDA PROCEDURE PROPOSED IN THIS BILL.

THE FDA ESTIMATES THAT THE ENACTMENT OF H.R. 3605 WOULD AT LEAST TRIPLE THE
WORKLOAD OF THE DIVISION RESPONSIBLE FOR APPROVING ANDAS. CURRENTLY, THIS DIVISION
REVIEWS ANDAS FOR GENERIC COPIES OF PRE-1962 APPROVED DRUG PRODUCTS. THE WORKLOAD
WOULD INCREASE AS SEVERAL MANUFACTURERS FILE AN ANDA FOR EACH DRUG PRODUCT THAT
BECOMES AVAILABLE FOR GENERIC COPY.  BECAUSE THEY WOULD BE REVIEWING INFORMATION
ON NEW DRUGS, THE FDA BELIEVES IT WOULD TAKE THEM A YEAR TO PROCESS EACH OF THE
NEW APPLICATIONS.  THIS IS ABOUT THREE MONTHS LONGER ON AVERAGE THAN IT CURRENTLY
TAKES TO PROCESS A PRE-1962 ANDA.  DR. MARVIN SEIFE, DIRECTOR OF FDA'S DIVISION OF
GENERIC DRUG MONOGRAPHS, TESTIFIED BEFORE THE SUBCOMMITTEE ON HEALTH AND THE EN-
VIRONMENT THAT A GREATER WORKLOAD COULD AT FIRST BE ABSORBED, BUT MAY LATER RE-
QUIRE ADDITIONAL OFFICE SPACE AND 15 NEW FDA EMPLOYEES.  ASSUMING AN AVERAGE FULL-
TIME EQUIVALENT POSITION PLUS OVERHEAD AND FRINGE BENEFITS IS $70,000, THE POTEN-
TIAL COST TO THE FDA OF IMPLEMENTING THIS LEGISLATION COULD BE ABOUT $1.1 MILLION.
THE ACTUAL COST TO THE FEDERAL GOVERNMENT WOULD DEPEND ON THE EXTENT TO WHICH THE
FDA WOULD EXPAND TO ACCOMMODATE THE INCREASED WORKLOAD.

ENACTMENT OF THIS LEGISLATION COULD ALSO RESULT IN SAVINGS TO BOTH THE FEDERAL
AND STATE AND LOCAL GOVERNMENTS.  IN FISCAL YEAR 1983, THE FEDERAL GOVERNMENT
SPENT APPROXIMATELY $2.4 BILLION FOR DRUGS IN THE MEDICAID PROGRAM, AND IN VETERAN
AND MILITARY HOSPITALS.  DATA ON DRUG COSTS IN THE MEDICARE PROGRAM ARE UNAVAIL-
ABLE.  IF THE FEDERAL GOVERNMENT IS CURRENTLY PURCHASING THESE 150 COPIABLE DRUG
PRODUCTS AT HIGHER, BRAND NAME PRICES, SAVINGS MAY RESULT IF LOWER PRICED, GENERIC
COPIES OF THESE DRUGS ARE SUBSTITUTED.

IT IS DIFFICULT TO KNOW IN ADVANCE WHICH OF THE AVAILABLE 150 DRUG PRODUCTS MAN-
UFACTURERS WOULD CHOOSE TO COPY.  IT IS ALSO DIFFICULT TO ESTIMATE THE PRICE AT
WHICH THESE GENERIC COPIES WOULD BE SOLD. GENERIC VERSIONS OF TEN POPULAR DRUG
PRODUCTS SHOW THEIR PRICE TO BE ON AVERAGE 50 PERCENT LESS THAN THEIR BRAND NAME
EQUIVALENT.  THE DOLLAR AMOUNT OF THE FEDERAL GOVERNMENT CURRENTLY SPENT ON THESE
150 BRAND NAME DRUG PRODUCTS IS UNKNOWN.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


TITLE II OF THIS BILL WOULD EXTEND THE AMOUNT OF TIME FOR WHICH CERTAIN PATENTS ARE ISSUED TO INCLUDE SOME OR ALL OF THE TIME REQUIRED**2653 *20 FOR A MANUFAC- TURER TO TEST A PRODUCT FOR SAFETY AND EFFICACY AND TO RECEIVE MARKETING APPROVAL. PRODUCTS AFFECTED BY THIS LEGISLATION WOULD BE DRUGS, MEDICAL DEVICES, AND FOOD AND COLOR ADDITIVES.  MANUFACTURERS MUST SHOW DUE DILIGENCE IN THEIR PRODUCT TEST- ING OR THIS AMOUNT OF TIME WILL BE SUBTRACTED FROM THE TOTAL LIFE OF THE PATENT. THIS PROVISION WOULD PLACE AN ADDITIONAL BURDEN ON THE FDA.  THEY WOULD BE RE- SPONSIBLE FOR KEEPING TRACK OF A MANUFACTURER'S PRODUCT TESTING TIME AND FOR DE- TERMINING THEIR DILIGENCE IN COMPLETING THE TESTING.  THESE COSTS, HOWEVER, WOULD BE NEGLIGIBLE.

ENACTMENT OF THIS BILL COULD RESULT IN INCREASED PERSONNEL COSTS TO THE FEDERAL GOVERNMENT OF APPROXIMATELY $1.1 MILLION.  THE BILL, HOWEVER, DOES NOT SPECIFIC- ALLY AUTHORIZE ADDITIONAL APPROPRIATIONS FOR THE FDA.  THIS BILL MAY ALSO RESULT IN SAVINGS IF CHEAPER, GENERIC DRUGS ARE MADE AVAILABLE FOR PURCHASE BY THE FEDER- AL GOVERNMENT.  THESE SAVINGS WOULD OCCUR IN VARIOUS PROGRAMS THROUGHOUT THE BUDGET SUCH AS MEDICARE, MEDICAID, AND THE VETERANS ADMINISTRATION.  HOWEVER, THE MAGNITUDE OF THESE SAVINGS IS UNKNOWN.

PLEASE CALL ME IF I CAN BE OF ADDITIONAL ASSISTANCE, OR YOUR STAFF MAY WISH TO CONTACT CARMELA PENA (226-2820) OF OUR BUDGET ANALYSIS DIVISION FOR FURTHER DE- TAILS ON THIS ESTIMATE.

SINCERELY,

ERIC HANUSHEK

(FOR RUDOLPH G. PENNER, DIRECTOR).


INFLATIONARY IMPACT STATEMENT


PURSUANT TO CLAUSE 2(1)(4) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTAT- IVES, THE COMMITTEE MAKES THE FOLLOWING STATEMENT WITH REGARD TO THE INFLATIONARY IMPACT OF THE REPORTED BILL:

THE COMMITTEE BELIEVES THAT ENACTMENT OF H.R. 3605 WILL NOT HAVE AN INFLATIONARY IMPACT UPON THE ECONOMY.  IN FACT, TITLE I OF THE BILL WILL HAVE A DEFLATIONARY EFFECT BECAUSE IT MAKES AVAILABLE LOWER PRICED GENERIC VERSIONS OF DRUGS.  SUCH GENERIC DRUGS ARE THREE TO FIFTEEN TIMES LESS COSTLY THAN THEIR BRAND NAME COUNTER-PARTS.  THE ESTIMATED $1 BILLION COST SAVINGS TO CONSUMERS AS A RESULT OF TITLE I'S GENERIC DRUG APPROVAL PROCEDURE WILL HAVE A DEFLATIONARY EFFECT UPON THE NATIONAL ECONOMY.  WHILE TITLE II OF THE BILL PROVIDES FOR A LIMITED EXTENSION OF THE PATENTS ON CERTAIN PRODUCTS, THE COMMITTEE BELIEVES THAT THE ADDITIONAL PATENT TERM WILL ACT AS A SPUR TO DEVELOP INNOVATIVE AND, ULTIMATELY, LESS COSTLY TREAT- MENTS FOR DISEASES.


SECTION-BY-SECTION ANALYSIS


TITLE I-- DRUG PRICE COMPETITION ACT


SECTION 101


© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

SECTION 101 AMENDS SECTION 505 OF THE FEDERAL FOOD, DRUG AND COSMETIC ACT
(FFDCA) [FN1]  TO ESTABLISH A NEW SUBSECTION (J) PROVIDING FOR THE APPROVAL OF AB-
BREVIATED NEW DRUG APPLICATIONS (ANDA).  PAR GRAPH (1) OF SECTION (J) SETS FORTH
THE INFORMATION WHICH MUST BE INCLUDED IN AN ANDA.

### *21 **2654 ANDA'S FOR DRUGS WHICH ARE THE SAME

IN THE CASE OF DRUGS WHICH ARE THE SAME AS THE LISTED DRUG, THE FOCUS OF THE
BILL IS TO PROVIDE THE FOOD AND DRUG ADMINISTRATION (FDA) WITH SUFFICIENT INFORMA-
TION TO ASSURE THAT THE GENERIC DRUG IS THE SAME AS THE LISTED DRUG [FN2] THAT HAS
PREVIOUSLY BEEN DETERMINED TO BE SAFE AND EFFECTIVE.  SOME HAVE SUGGESTED THAT A
GENERIC DRUG MUST BE IDENTICAL IN ALL RESPECTS TO THE LISTED DRUG INSTEAD OF THE
SAME.  THE REGULATIONS THAT PERMIT ANDA'S FOR PRE-1962 PIONEER DRUGS MAKE NO SUCH
DISTINCTION.  [FN3]  IN REJECTING THE USE OF THE TERM IDENTICAL, THE FDA REGULA-
TION COMMENTS THAT 'IDENTICAL MEANS A PRODUCT THAT IS THE SAME IN DOSAGE FORM,
STRENGTH, AND ROUTE OF ADMINISTRATION, CONTAINS THE SAME ACTIVE INGREDIENT, AND IS
RECOMMENDED FOR USE UNDER THE SAME CONDITIONS OF USE.'  [FN4]  THE COMMITTEE HAS
ADOPTED THE FDA'S POLICY OF UTILIZING THE TERM 'SAME' EXCEPT THAT THE BILL PERMITS
AN ANDA TO BE APPROVED FOR LESS THAN ALL OF THE INDICATIONS FOR WHICH THE LISTED
DRUG HAS BEEN APPROVED AS EXPLAINED BELOW.

FIRST, AN ANDA MUST INCLUDE SUFFICIENT INFORMATION TO SHOW THAT THE CONDITIONS
OF USE FOR WHICH THE APPLICANT IS SEEKING APPROVAL ARE THE SAME AS THOSE THAT HAVE
BEEN PREVIOUSLY APPROVED FOR THE LISTED DRUG. THE APPLICANT NEED NOT SEEK APPROVAL
FOR ALL OF THE INDICATIONS FOR WHICH THE LISTED DRUG HAS BEEN APPROVED.  FOR EX-
AMPLE, IF THE LISTED DRUG HAS BEEN APPROVED FOR HYPERTENSION AND ANGINA PECTORIS,
AND IF THE INDICATION FOR HYPERTENSION IS PROTECTED BY PATENT, THEN THE APPLICANT
COULD SEEK APPROVAL FOR ONLY THE ANGINA PECTORIS INDICATION.

WHILE THE FDA'S CURRENT REGULATIONS FOR CONSIDERING ANDA'S FOR PIONEER DRUGS AP-
PROVED BEFORE 1962 PERMIT AN APPLICANT TO PETITION FOR APPROVAL FOR AN INDICATION
OTHER THAN THAT WHICH HAS BEEN APPROVED FOR THE PIONEER DRUG, SECTION 101 OF THE
BILL OVERTURNS THAT POLICY.  [FN5]  THUS, AN ANDA MAY NOT BE CONSIDERED FOR A CON-
DITION OF USE THAT HAS NOT BEEN PREVIOUSLY APPROVED FOR THE LISTED DRUG.

AN ANDA MUST ALSO CONTAIN SUFFICIENT INFORMATION TO SHOW THAT THE ACTIVE IN-
GREDIENTS OF THE GENERIC DRUG ARE THE SAME AS THOSE OF THE LISTED DRUG.  IF THE
LISTED DRUG HAS ONE ACTIVE INGREDIENT, THEN THE ACTIVE INGREDIENT OF THE GENERIC
MUST BE THE SAME.  IF THE LISTED DRUG HAS MORE THAN ONE ACTIVE INGREDIENT, THEN
SUFFICIENT INFORMATION MUST BE INCLUDED TO SHOW THAT ALL OF THE ACTIVE INGREDIENTS
IN THE GENERIC DRUG ARE THE SAME.

IN ADDITION, AN ANDA MUST CONTAIN SUFFICIENT INFORMATION TO SHOW THAT THE ROUTE
OF ADMINISTRATION, THE DOSAGE FORM AND THE STRENGTH OF THE GENERIC DRUG ARE THE
SAME AS THOSE OF THE LISTED DRUG.

FURTHER, AN ANDA MUST INCLUDE SUFFICIENT INFORMATION TO SHOW THAT THE GENERIC
DRUG IS BIOEQUIVALENT TO THE LISTED DRUG.

*22 **2655 FIFTH, AN ANDA MUST CONTAIN ADEQUATE INFORMATION TO SHOW THAT THE

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

PROPOSED LABELING FOR THE GENERIC DRUG IS THE SAME AS THAT OF THE LISTED DRUG.
THE COMMITTEE RECOGNIZES THAT THE PROPOSED LABELING FOR THE GENERIC DRUG MAY NOT
BE EXACTLY THE SAME.  FOR EXAMPLE, THE NAME AND ADDRESS OF THE MANUFACTURERS WOULD
VARY AS MIGHT THE EXPIRATION DATES FOR THE TWO PRODUCTS.  ANOTHER EXAMPLE IS THAT
ONE COLOR IS USED IN THE COATING OF THE LISTED DRUG AND ANOTHER COLOR IS USED IN
THAT OF THE GENERIC DRUG.  THE FDA MIGHT REQUIRE THE LISTED DRUG MAKER TO SPECIFY
THE COLOR IN ITS LABEL.  THE GENERIC MANUFACTURER, WHICH HAS USED A DIFFERENT COL-
OR, WOULD HAVE TO SPECIFY A DIFFERENT COLOR IN ITS LABEL.

SIXTH, AN ANDA MUST INCLUDE A LIST OF ALL THE COMPONENTS OF THE GENERIC DRUG, A
DESCRIPTION OF THE COMPOSITION OF THE GENERIC DRUG, A DESCRIPTION OF THE METHODS
AND CONTROLS USED IN THE MANUFACTURE, PROCESSING AND PACKING OF THE GENERIC DRUG,
SAMPLES OF THE GENERIC DRUG AND ITS COMPONENTS, AND SPECIMENS OF THE PROPOSED LA-
BELING.

SEVENTH, AN ANDA MUST INCLUDE A CERTIFICATION BY THE APPLICANT REGARDING THE
STATUS OF CERTAIN PATENTS APPLICABLE TO THE LISTED DRUG IF THE PATENT INFORMATION
HAS BEEN SUBMITTED UNDER SECTION 505(B) OR (C).  WITH RESPECT TO ALL PRODUCT PAT-
ENTS WHICH CLAIM THE LISTED DRUG AND ALL USE PATENTS WHICH CLAIM AN INDICATION FOR
THE DRUG FOR WHICH THE APPLICANT IS SEEKING APPROVAL (HEREAFTER DESCRIBED AS A
CONTROLLING USE PATENT), THE APPLICANT MUST CERTIFY, IN HIS OPINION AND TO THE
BEST OF HIS KNOWLEDGE, AS TO ONE OF FOUR CIRCUMSTANCES.

THE APPLICANT MAY CERTIFY THAT THE PATENT INFORMATION REQUIRED UNDER  SECTIONS
505(B) AND (C) HAS NOT BEEN SUBMITTED IF THAT IS THE CASE.  IF APPROPRIATE, THE
APPLICANT MAY CERTIFY THAT ONE OR MORE OF THE PRODUCT OR CONTROLLING USE PATENTS
PROVIDED HAVE EXPIRED.  THIRD, THE APPLICANT MAY CERTIFY WHEN APPROPRIATE THAT ONE
OR MORE OF THE PRODUCT OR CONTROLLING USE PATENTS WILL EXPIRE AT SOME SPECIFIED
DATE IN THE FUTURE.  WHEN THE APPLICANT MAKES THESE CERTIFICATIONS, IT MUST RELY
UPON THE PATENT INFORMATION SUPPLIED TO THE FDA.  LAST, AN APPLICANT MAY CERTIFY
IF APPLICABLE THAT ONE OR MORE OF THE PRODUCT OR CONTROLLING USE PATENTS ARE IN-
VALID OR WILL NOT BE INFRINGED.

THE COMMITTEE RECOGNIZES THAT IN SOME INSTANCES AN APPLICANT WILL HAVE TO MAKE
MULTIPLE CERTIFICATIONS WITH RESPECT TO PRODUCT OR CONTROLLING USE PATENTS.  FOR
EXAMPLE, IF THE PRODUCT PATENT HAS EXPIRED AND A VALID CONTROLLING USE PATENT WILL
NOT EXPIRE FOR THREE YEARS, THEN THE APPLICANT MUST CERTIFY THAT ONE PATENT HAS
EXPIRED AND THE OTHER WILL EXPIRE IN THREE YEARS. THE COMMITTEE INTENDS THAT THE
APPLICANT MAKE THE APPROPRIATE CERTIFICATION FOR EACH PRODUCT AND CONTROLLING USE
PATENT.

EIGHTH, IF THERE ARE INDICATIONS WHICH ARE CLAIMED BY ANY USE PATENT AND FOR
WHICH THE APPLICANT IS NOT SEEKING APPROVAL, THEN AN ANDA MUST STATE THAT THE AP-
PLICANT IS NOT SEEKING APPROVAL FOR THOSE INDICATIONS WHICH ARE CLAIMED BY SUCH
USE PATENT.  FOR EXAMPLE, THE LISTED DRUG MAY BE APPROVED FOR TWO INDICATIONS.  IF
THE APPLICANT IS SEEKING APPROVAL ONLY FOR INDICATION NO. 1, AND NOT INDICATION
NO. 2 BECAUSE IT IS PROTECTED BY A USE PATENT, THEN THE APPLICANT MUST MAKE THE
APPROPRIATE CERTIFICATION AND A STATEMENT EXPLAINING THAT IT IS NOT SEEKING AP-
PROVAL FOR INDICATION NO. 2.

FINALLY, THE COMMITTEE INTENDS THAT AN ANDA CONTAIN ANY INFORMATION AVAILABLE TO

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)


THE APPLICANT REGARDING REPORTS OF ADVERSE EFFECTS **2656 *23 NOT REFLECTED IN THE
LABELING, AN ENVIRONMENTAL IMPACT ANALYSIS PURSUANT TO FDA REGULATIONS, STATEMENTS
REGARDING THE PROTECTION OF HUMAN SUBJECTS IN CLINICAL INVESTIGATIONS AS REQUIRED
BY FDA REGULATIONS, AND A STATEMENT REGARDING COMPLIANCE WITH GOOD LABORATORY
PRACTICES IN NON-CLINICAL INVESTIGATIONS AS REQUIRED BY FDA REGULATIONS.  [FN6]

                    ANDA'S FOR DRUGS WHICH ARE DIFFERENT

   PARAGRAPH (2)(C) PROHIBITS ANY PERSON FROM SUBMITTING AN ANDA FOR A GENERIC DRUG
WHICH DIFFERS FROM THE LISTED DRUG UNLESS THE CHANGE IS PERMITTED BY THE STATUTE
AND THE FDA HAS GRANTED A PETITION REQUESTING THE CHANGE.
   IF AN APPLICANT WISHES TO VARY THE ROUTE OF ADMINISTRATION, DOSAGE FORM OR
STRENGTH OF THE GENERIC DRUG FROM THE LISTED DRUG, IT MUST FIRST PETITION THE FDA
FOR PERMISSION TO FILE AN ANDA FOR THE DIFFERING GENERIC DRUG.  IN ADDITION, AN
APPLICANT MAY REQUEST TO VARY ONE OF THE ACTIVE INGREDIENTS IN THE GENERIC DRUG
FROM THE LISTED DRUG WHEN THE LISTED DRUG IS A COMBINATION PRODUCT.  THE REMAINING
ACTIVE INGREDIENTS OF THE GENERIC DRUG MUST BE THE SAME AS THE OTHER ACTIVE IN-
GREDIENTS OF THE LISTED DRUG.
   THESE ARE THE ONLY CHANGES FROM THE LISTED DRUG FOR WHICH AN APPLICANT MAY PETI-
TION.  AS IS EXPLAINED IN THE ANDA REGULATIONS FOR PRE-1962 DRUGS, THE COMMITTEE
GENERALLY EXPECTS THAT APPROVAL OF PETITIONS WILL 'ORDINARILY BE LIMITED TO DOSAGE
FORMS FOR THE SAME ROUTE OF ADMINISTRATION OR TO CLOSELY RELATED INGREDIENTS.'
[FN7]  IF THE FDA GRANTS A PETITION FOR A CHANGE FROM THE LISTED DRUG, THE FDA MAY
REQUIRE SUCH ADDITIONAL INFORMATION IN THE ANDA REGARDING THE CHANGE AS IT DEEMS
NECESSARY.
   THE FDA MUST APPROVE A PETITION TO SUBMIT AN ANDA FOR A DIFFERING GENERIC DRUG
UNLESS CLINICAL STUDIES ARE NEEDED TO SHOW THE SAFETY AND EFFECTIVENESS OF THE
CHANGE.  IN REVIEWING A PETITION TO CHANGE ONE OF THE ACTIVE INGREDIENTS IN A COM-
BINATION PRODUCT, THE COMMITTEE DOES NOT INTEND TO CHANGE THE FDA'S CURRENT POLICY
REGARDING THE EVALUATION OF THE SAFETY AND EFFECTIVENESS OF COMBINATION PRODUCTS.
IF THE FDA FINDS THAT SAFETY AND EFFECTIVENESS TESTING OF THE ACTIVE INGREDIENTS
OF THE DRUG, INDIVIDUALLY OR IN COMBINATION, IS REQUIRED, THEN THE FDA MUST DENY
THE PETITION.
   THE FDA MUST EITHER APPROVE OR DISAPPROVE A PETITION WITHIN 90 DAYS OF ITS SUB-
MISSION.  AS IS THE CASE UNDER THE CURRENT REGULATIONS, 'THERE IS NO LEGAL RE-
QUIREMENT THAT THE HEARING OPPORTUNITY PROVIDED BY SECTION 505(C) BE MADE AVAIL-
ABLE TO ANDA APPLICANTS WHO DISAGREE WITH AN ADVERSE AGENCY DECISION' ON WHETHER
CLINICAL STUDIES ARE NEEDED TO SHOW THE SAFETY AND EFFECTIVENESS OF THE DIFFERING
GENERIC DRUG.  [FN8]  'APPROPRIATE REVIEW OF SUCH DECISIONS MAY BE HAD . . . UNDER
THE APPLICABLE STANDARD-- THAT APPLICABLE TO ADMINISTRATIVE DECISIONMAKING GENER-
ALLY-- WHICH IS WHETHER THE AGENCY'S DECISION IS ARBITRARY, CAPRICIOUS, AN ABUSE
OF DISCRETION, OR OTHERWISE NOT IN ACCORDANCE WITH LAW (5 U.S.C. 706(2)(A)).'
[FN9]  IF THE FDA *24 **2657 DOES NOT APPROVE A PETITION, THEN AN ANDA MAY NOT BE
FILED FOR A GENERIC DRUG THAT VARIES FROM THE LISTED DRUG.
   AN ANDA FOR A DRUG WHICH DIFFERS FROM THE LISTED DRUG AND FOR WHICH A PETITION

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

HAS BEEN APPROVED BY THE FDA MUST CONTAIN SUCH ADDITIONAL INFORMATION REGARDING
THE DIFFERENCE AS THE FDA MAY REQUIRE WHEN IT GRANTED THE PETITION. FOR EXAMPLE,
IF THE ROUTE OF ADMINISTRATION OF THE GENERIC DRUG DIFFERS FROM THAT OF THE LISTED
DRUG, THEN THE FDA MAY REQUIRE SUCH ADDITIONAL INFORMATION ON THAT CHANGE AS IT
DEEMS NECESSARY.

IF THE FDA APPROVES A PETITION PERMITTING AN APPLICANT TO VARY ONE OF THE ACTIVE
INGREDIENTS OF A GENERIC DRUG FROM THOSE OF THE LISTED COMBINATION DRUG, THE ANDA
MUST CONTAIN SUFFICIENT INFORMATION TO SHOW THAT THE ACTIVE INGREDIENTS OF THE
GENERIC DRUG (INCLUDING THE VARYING ACTIVE INGREDIENT) ARE OF THE SAME PHARMACOLO-
GICAL OR THERAPEUTIC CLASS AS THOSE OF THE LISTED DRUG. IN ADDITION, THE DIFFERING
GENERIC DRUG MUST BE EXPECTED TO HAVE THE SAME THERAPEUTIC EFFECT WHEN ADMIN-
ISTERED TO PATIENTS FOR AN APPROVED CONDITION OF USE.

AN EXAMPLE OF SUCH A CHANGE IN ONE OF THE ACTIVE INGREDIENTS THAT THE FDA MIGHT
FIND ACCEPTABLE IS THE SUBSTITUTION OF ACETAMINOPHEN FOR ASPIRIN IN A COMBINATION
PRODUCT.  ANOTHER EXAMPLE MIGHT BE THE SUBSTITUTION OF ONE ANTIHISTAMINE FOR AN-
OTHER.  THE ACTIVE INGREDIENT, WHICH THE APPLICANT WISHES TO VARY AND WHICH THE
FDA HAS GRANTED A PETITION, MUST HAVE BEEN APPROVED FOR SAFETY AND EFFECTIVENESS
OR MUST NOT BE WITHIN THE REQUIREMENTS OF SECTION 201(P) OF FFDCA.  [FN10]

CERTIFICATION OF INVALIDITY OF NONINFRINGEMENT OF A PATENT

WHEN AN APPLICANT CERTIFIES THAT ANY PRODUCT OR CONTROLLING USE PATENT IS INVAL-
ID OR WILL NOT BE INFRINGED, PARAGRAPH (2)(B) REQUIRES THAT IT MUST GIVE NOTICE OF
SUCH CERTIFICATION TO EITHER THE OWNER OF THE PATENT OR THE REPRESENTATIVE OF THE
PATENT OWNER THAT WAS DESIGNATED WHEN THE PATENT INFORMATION WAS SUBMITTED UNDER
SECTION 505(B) OR (C) OF THE FFDCA.  THE FDA MAY, BY REGULATION, ESTABLISH A PRO-
CEDURE FOR DESIGNATING IN THE NDA THE REPRESENTATIVE OF THE PATENT OWNER.  IN AD-
DITION, NOTICE OF THE CERTIFICATION MUST BE GIVEN TO THE HOLDER OF THE APPROVED
NEW DRUG APPLICATION (NDA) FOR THE DRUG WHICH IS CLAIMED BY A PRODUCT PATENT OR
THE USE OF WHICH IS CLAIMED BY A USE PATENT.

THIS NOTICE MUST BE GIVEN SIMULTANEOUSLY WITH THE SUBMISSION OF AN ANDA.  THE
COMMITTEE DOES NOT INTEND THAT APPLICANTS BE PERMITTED TO CIRCUMVENT THIS NOTICE
REQUIREMENT BY FILING SHAM ANDA'S OR ANDA'S WHICH ARE SUBSTANTIALLY INCOMPLETE.
THE COMMITTEE INTENDS THAT THE APPLICANT MUST HAVE MADE A GOOD FAITH EFFORT TO
MEET THE REQUIREMENTS SET FORTH IN PARAGRAPH (2)(A) REGARDING THE CONTENTS OF AN
ANDA.

WHILE THE COMMITTEE DOES NOT INTEND THAT FAILURE TO INCLUDE A MINOR PIECE OF IN-
FORMATION IN AN ANDA VITIATES THE EFFECTIVENESS OF THE NOTICE REQUIRED UNDER PARA-
GRAPH (2)(B), AN ANDA MUST INCLUDE **25 **2658 THE RESULTS OF ANY REQUIRED
BIOAVAILABILITY OR BIOEQUIVALENCE TESTS.  FAILURE TO INCLUDE THE RESULTS OF SUCH
TESTS WHEN REQUIRED WILL VOID THE EFFECTIVENESS OF ANY NOTICE UNDER PARAGRAPH
(2)(B).  NOTICE MUST THEN BE GIVEN AGAIN WHEN AN ANDA WITH ANY REQUIRED BIOAVAIL-
ABILITY OR BIOEQUIVALENCE DATA IS SUBMITTED TO THE FDA.

WHEN THE APPLICANT GIVES NOTICE OF THE CERTIFICATION OF PATENT INVALIDITY OR
NON-INFRINGEMENT, THE NOTICE MUST STATE THAT AN ANDA HAS BEEN SUBMITTED TO OBTAIN

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)    Case 1:08-cv-00290-SLR    Document 11-3    Filed 08/29/2008    Page 59 of 98

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

APPROVAL OF THE DRUG TO ENGAGE IN THE COMMERCIAL MANUFACTURE, USE OR SALE OF THE
GENERIC DRUG BEFORE THE EXPIRATION OF THE PATENT WHICH HAS BEEN CERTIFIED AS IN-
VALID OR NON-INFRINGED.

IF AN ANDA IS AMENDED AFTER SUBMISSION TO INCLUDE A CERTIFICATION THAT A PRODUCT
PATENT OR CONTROLLING USE PATENT IS INVALID OR NOT INFRINGED, THEN THE NOTICE OF
SUCH CERTIFICATION MUST BE GIVEN TO THE APPROPRIATE PARTIES WHEN THE AMENDED AP-
PLICATION IS SUBMITTED.

GROUNDS FOR DISAPPROVAL OF AN ANDA

PARAGRAPH (3) PROVIDES THAT THE FDA SHALL APPROVE AN ANDA EXCEPT IN ONE OF THE
FOLLOWING CIRCUMSTANCES.

FIRST, THE FDA SHALL NOT APPROVE AN ANDA IF THE METHODS USED IN, OR THE FACILIT-
IES AND CONTROLS USED FOR, THE MANUFACTURE, PROCESSING AND PACKING OF THE GENERIC
DRUG ARE INADEQUATE TO ASSURE AND PRESERVE ITS IDENTITY, STRENGTH, QUALITY AND
PURITY.

SECOND, AN ANDA SHALL NOT BE APPROVED IF IT DOES NOT CONTAIN ADEQUATE INFORMA-
TION TO SHOW THAT EACH OF THE CONDITIONS FOR USE FOR THE GENERIC DRUG HAVE BEEN
PREVIOUSLY APPROVED FOR THE LISTED DRUG.  IF AN ANDA INCLUDES A CONDITION FOR USE
FOR WHICH THE LISTED DRUG HAS NOT BEEN APPROVED, THEN THE GENERIC DRUG MAY NOT BE
APPROVED.

THIRD, AN ANDA MUST BE DISAPPROVED IF THE ACTIVE INGREDIENT OF THE GENERIC DRUG
IS NOT THE SAME AS THAT OF THE LISTED DRUG AND THE LISTED DRUG HAS ONLY ONE ACTIVE
INGREDIENT.  AN ANDA MUST ALSO BE DISAPPROVED IF ANY OF THE ACTIVE INGREDIENTS IN
THE GENERIC DRUG ARE NOT THE SAME AS THOSE OF THE LISTED DRUG UNLESS A PETITION
REGARDING A CHANGE IN ONE OF THE ACTIVE INGREDIENTS HAS BEEN GRANTED.  IF THE LIS-
TED DRUG IS A COMBINATION PRODUCT AND A PETITION PERMITTING A CHANGE IN ONE OF THE
ACTIVE INGREDIENTS IN THE GENERIC DRUG HAS BEEN GRANTED, THEN THE ANDA MUST BE
DISAPPROVED IF THE OTHER ACTIVE INGREDIENTS OF THE GENERIC DRUG ARE NOT THE SAME
AS THOSE OF THE LISTED DRUG.  FURTHER, ANDA MUST BE DISAPPROVED IN SUCH A CIRCUM-
STANCE IF THE DIFFERENT ACTIVE INGREDIENT IN THE GENERIC DRUG IS NOT A LISTED DRUG
OR IF THE DIFFERENT ACTIVE INGREDIENT IS A DRUG WITHIN THE REQUIREMENTS OF SECTION
201(P) OF THE FFDCA.

FOURTH, AN ANDA FOR A DRUG WHICH IS THE SAME MUST BE DISAPPROVED IF IT DOES NOT
SHOW THAT THE ROUTE OF ADMINISTRATION, DOSAGE FORM, OR STRENGTH OF THE GENERIC
DRUG ARE ALL THE SAME AS THOSE OF THE LISTED DRUG.  IF THE ROUTE OF ADMINISTRA-
TION, DOSAGE FORM, OR STRENGTH OF THE GENERIC DRUG DIFFERS FROM THAT OF THE LISTED
DRUG, AN ANDA MUST BE DISAPPROVED IF NO PETITION REGARDING THE CHANGE WAS GRANTED.

FIFTH, AN ANDA MUST BE DISAPPROVED IF THE GENERIC DRUG DIFFERS FROM THE LISTED
DRUG AND A PETITION REGARDING THE CHANGE HAS BEEN **26 **2659 GRANTED, BUT THE ANDA
DOES NOT CONTAIN ALL OF THE ADDITIONAL INFORMATION THAT THE FDA REQUIRED IN GRANT-
ING THE PETITION.

A SIXTH GROUND REQUIRING DISAPPROVAL OF AN ANDA FOR A GENERIC DRUG WHOSE ACTIVE
INGREDIENTS ARE THE SAME AS THOSE OF THE LISTED DRUG IS THAT THERE IS UNSUFFICIENT
INFORMATION TO SHOW THAT THE GENERIC DRUG IS BIOEQUIVALENT TO THE LISTED DRUG.  IF

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)                                                              Page 13
H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

A PETITION REGARDING A CHANGE IN ONE OF THE ACTIVE INGREDIENTS IN A COMBINATION
GENERIC DRUG HAS BEEN GRANTED, THEN THE ANDA MUST BE DISAPPROVED IF THE APPLICA-
TION FAILS TO SHOW THAT THE ACTIVE INGREDIENTS OF THE GENERIC DRUG ARE OF THE SAME
PHARMACOLOGICAL OR THERAPEUTIC CLASS AS THOSE OF THE LISTED DRUG.  IN ADDITION,
SUCH AN ANDA MUST BE DISAPPROVED IF IT FAILS TO SHOW THAT THE DIFFERING GENERIC
COMBINATION DRUG CAN BE EXPECTED TO HAVE THE SAME THERAPEUTIC EFFECT AS THE LISTED
COMBINATION PRODUCT WHEN ADMINISTERED TO PATIENTS FOR AN APPROVED CONDITION OF
USE.

   SEVENTH, AN ANDA MUST ALSO BE DISAPPROVED IF IT FAILS TO SHOW THAT THE PROPOSED
LABELING FOR THE GENERIC DRUG IS THE SAME AS THAT OF THE LISTED DRUG. CHANGES IN
THE PROPOSED LABELING DUE TO THE FACT THAT THE GENERIC DRUG IS PRODUCED OR DIS-
TRIBUTED BY A DIFFERENT MANUFACTURER ARE NOT A GROUNDS FOR DISAPPROVAL.  SIMIL-
ARLY, CHANGES IN THE PROPOSED LABELING OF THE GENERIC DRUG BECAUSE A PETITION RE-
GARDING A CHANGE HAS BEEN GRANTED IS NOT A GROUNDS FOR DISAPPROVAL.

   EIGHTH, AN ANDA MUST BE DISAPPROVED IF IT OR ANY OTHER INFORMATION BEFORE THE
FDA SHOWS THAT THE INACTIVE INGREDIENTS OF THE GENERIC DRUG ARE UNSAFE FOR USE UN-
DER THE CONDITIONS PRESCRIBED, RECOMMENDED, OR SUGGESTED IN THE PROPOSED LABELING
FOR THE GENERIC DRUG.  AN ANDA MUST ALSO BE DISAPPROVED IF THE COMPOSITION OF THE
GENERIC DRUG IS UNSAFE UNDER APPROVED CONDITIONS OF USE. FOR EXAMPLE, THE COMPOSI-
TION OF THE GENERIC DRUG MIGHT BE UNSAFE BECAUSE OF THE TYPE OR QUANTITY OF THE
INACTIVE INGREDIENT INCLUDED OR BECAUSE OF THE MANNER IN WHICH THE INACTIVE IN-
GREDIENT WAS INCLUDED.

   NINTH, AN ANDA MAY NOT BE APPROVED IF THE APPROVAL OF THE LISTED DRUG HAS BEEN
WITHDRAWN OR SUSPENDED FOR REASONS OF SAFETY OR EFFECTIVENESS UNDER SECTION
505(E)(1)-(4) OF THE FFDCA.  [FN11]  THE ANDA MAY ALSO NOT BE APPROVED IF THE FDA
DETERMINES THAT THE LISTED DRUG HAS BEEN VOLUNTARILY WITHDRAWN FROM THE MARKET FOR
SAFETY OR EFFECTIVENESS REASONS.  THE COMMITTEE RECOGNIZES THAT THE MAKER OF A
LISTED DRUG MIGHT WITHDRAW IT FROM THE MARKET WITHOUT SPECIFYING THE REASON OR
WITHOUT ARTICULATING SAFETY OR EFFECTIVENESS CONCERNS.  FOR THIS REASON, THE COM-
MITTEE AUTHORIZED THE FDA TO EXAMINE WHETHER SAFETY OR EFFECTIVENESS CONCERNS WERE
ONE OF THE REASONS FOR THE VOLUNTARY WITHDRAWAL OF THE DRUG FROM THE MARKET.  IF
THE FDA SO FINDS, THEN AN ANDA FOR A GENERIC VERSION OF THAT DRUG MAY NOT BE AP-
PROVED.

   TENTH, AN ANDA MAY NOT BE APPROVED IF IT DOES NOT MEET ANY OF THE REQUIREMENTS
SET FORTH IN PARAGRAPH (2)(A).  FOR EXAMPLE, AN ANDA THAT DOES NOT CONTAIN THE
CERTIFICATIONS REGARDING PATENTS REQUIRED IN PARAGRAPH (A)(A)(VII) CANNOT BE AP-
PROVED.

   LAST, AN ANDA MAY NOT BE APPROVED IF IT CONTAINS ANY UNTRUE STATEMENT OF MATERI-
AL FACT.  [FN12]

### *27 **2660 APPROVAL OF AN ANDA

   PARAGRAPH (4)(A) REQUIRES THE FDA TO APPROVE OR DISAPPROVE AN ANDA WITHIN 180
DAYS OF INITIAL RECEIPT OF THE APPLICATION.  THE COMMITTEE RECOGNIZES THAT EXTEN-
SIONS MAY BE NECESSARY SO THE BILL PERMITS EXTENSIONS OF THIS PERIOD FOR SO LONG

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

AS THE APPLICANT AND THE FDA MAY AGREE UPON.

                    EFFECTIVENESS OF AN ANDA APPROVAL

   THE COMMITTEE RECOGNIZES THAT SOME ANDA'S WILL BE SUBMITTED AND READY FOR AP-
PROVAL BEFORE THE PATENT ON THE LISTED DRUG HAS EXPIRED. TO DEAL WITH THIS SITU-
ATION AND TO ASSURE THAT THE FDA CONCERNS ITSELF SOLELY WITH THE SAFETY AND EF-
FECTIVENESS OF THE GENERIC DRUG, PARAGRAPH (4)(B) PERMITS THE FDA TO APPROVE AN
ANDA BUT MAKE THE APPROVAL EFFECTIVE AT SOME LATER DATE WHEN APPROPRIATE.

   IF THE APPLICANT CERTIFIED IN AN ANDA THAT NO PATENT INFORMATION WAS SUPPLIED OR
THAT THE RELEVANT PATENTS HAVE EXPIRED, THEN THE APPROVAL OF THE ANDA MAY BE MADE
EFFECTIVE IMMEDIATELY.  IF THE APPLICANT CERTIFIED BASED UPON THE SUBMITTED PATENT
INFORMATION THAT THE PATENT OR PATENTS WOULD EXPIRE IN ONE YEAR, THEN AN ANDA MAY
BE APPROVED AND THE APPROVAL MADE EFFECTIVE IN ONE YEAR.

   IF THE APPLICANT CERTIFIED THAT ONE OR MORE OF THE PRODUCT OR CONTROLLING USE
PATENTS WERE INVALID OR NOT INFRINGED, THEN APPROVAL OF THE ANDA MAY BE MADE EF-
FECTIVE IMMEDIATELY EXCEPT IN THE FOLLOWING SITUATION.  IF WITHIN 45 DAYS AFTER
NOTICE OF THE CERTIFICATION OF INVALIDITY OR NON-INFRINGEMENT IS RECEIVED, AN AC-
TION FOR PATENT INFRINGEMENT REGARDING ONE OR MORE OF THE PATENTS SUBJECT TO THE
CERTIFICATION IS BROUGHT, [FN13]  THEN APPROVAL OF THE ANDA MAY NOT BE MADE EF-
FECTIVE IMMEDIATELY.  INSTEAD, APPROVAL OF THE ANDA MAY NOT BE MADE EFFECTIVE UN-
TIL 18 MONTHS AFTER THE NOTICE OF THE CERTIFICATION WAS PROVIDED UNLESS A DISTRICT
COURT HAS DECIDED A CASE FOR PATENT INFRINGEMENT EARLIER.  ONCE EITHER OF THESE
EVENTS OCCURS AND THE APPROVAL OF THE ANDA BECOMES EFFECTIVE, THEN THE FDA HAS
DISCHARGED ITS STATUTORY RESPONSIBILITY WITH RESPECT TO MAKING THE APPROVAL OF THE
GENERIC DRUG EFFECTIVE.

   EACH PARTY TO THE ACTION HAS AN AFFIRMATIVE DUTY TO REASONABLY COOPERATE IN EX-
PEDITING THE ACTION.  IF THE PLAINTIFF BREACHES THAT DUTY, THE COURT MAY SHORTEN
THE 18 MONTH PERIOD AS IT DEEMS APPROPRIATE.  IF THE DEFENDANT BREACHES THAT DUTY,
THE COURT MAY EXTEND THE 18 MONTH PERIOD AS IT DEEMS APPROPRIATE.

   IF THE COURT DECIDES THAT THE PATENT IS INVALID OR NOT INFRINGED BEFORE THE EX-
PIRATION OF THE 18 MONTH PERIOD (OR SUCH SHORTER OR LONGER PERIOD AS THE COURT DE-
CIDES), THEN THE APPROVAL MAY BE MADE EFFECTIVE ON THE DATE OF THE COURT DECISION.
IF THE COURT DECIDES THAT THE PATENT IS VALID OR INFRINGED BEFORE THE EXPIRATION
OF THE 18 MONTH PERIOD, THEN THE APPROVAL MAY BE MADE EFFECTIVE ON SUCH DATA AS
THE COURT ORDERS.  THE COMMITTEE WISHES TO EMPHASIZE THAT THE COURT MAY NOT ORDER
AN ANDA APPROVED UNDER THIS PROVISION. **28 **2661 THESE ARE TIMES WHEN APPROVAL OF
AN ANDA MAY BE MADE EFFECTIVE IF THE FDA HAS APPROVED THE ANDA.

   THIS ADDITIONAL REMEDY PERMITS THE COMMENCEMENT OF A LEGAL ACTION FOR PATENT IN-
FRINGEMENT BEFORE THE GENERIC DRUG MAKER HAS BEGUN MARKETING.  THE COMMITTEE BE-
LIEVES THIS PROCEDURE FAIRLY BALANCES THE RIGHTS OF A PATENT OWNER TO PREVENT OTH-
ERS FROM MAKING, USING, OR SELLING ITS PATENTED PRODUCT AND THE RIGHTS OF THIRD
PARTIES TO CONTEST THE VALIDITY OF A PATENT OR TO MARKET A PRODUCT WHICH THEY BE-
LIEVE IS NOT CLAIMED BY THE PATENT.

   THE PROVISIONS OF THIS BILL RELATING TO THE LITIGATION OF DISPUTES INVOLVING

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

PATENT VALIDITY AND INFRINGEMENT ARE NOT INTENDED TO MODIFY EXISTING PATENT LAW
WITH RESPECT TO THE BURDEN OF PROOF AND THE NATURE OF THE PROOF TO BE CONSIDERED
BY THE COURTS IN DETERMINING WHETHER A PATENT IS VALID OR INFRINGED.

CONCERN HAS BEEN EXPRESSED THAT PERMITTING AN APPLICANT TO MARKET ITS DRUG AT
THE CONCLUSION OF THE 18 MONTH PERIOD AND POSSIBLY BEFORE THE RESOLUTION OF THE
PATENT INFRINGEMENT SUIT OVERTURNS THE STATUTORY PRESUMPTION OF A PATENT'S VALID-
ITY. ON THE CONTRARY, THE COMMITTEE INTENDS THAT A PATENT WOULD HAVE THE SAME
STATUTORY PRESUMPTION OF VALIDITY AS IS AFFORDED UNDER CURRENT LAW.

IN MOST INSTANCES, AN ANDA WILL CONTAIN MULTIPLE CERTIFICATIONS. THE FDA SHOULD
MAKE APPROVAL OF THE ANDA EFFECTIVE UPON THE LAST CERTIFICATION. FOR EXAMPLE, IF
AN ANDA CONTAINS A CERTIFICATION THAT A PRODUCT PATENT IS EXPIRED AND A CON-
TROLLING USE PATENT WILL EXPIRE IN THREE YEARS, THEN THE FDA MUST MAKE APPROVAL OF
THE ANDA EFFECTIVE IN THREE YEARS. IN THE CASE WHERE THE PATENT CERTIFICATION IS
AMENDED IN AN ANDA TO ALLEGE INVALIDITY OR NON-INFRINGEMENT OF A PATENT, THE FDA
MAY NOT MAKE THE APPROVAL EFFECTIVE WITHIN THE 45 DAY PERIOD THAT AN ACTION FOR
PATENT INFRINGEMENT MAY BE BROUGHT.

NO ACTION FOR A DECLARATORY JUDGMENT REGARDING THE PATENT AT ISSUE MAY BE
BROUGHT BEFORE THE EXPIRATION OF THE 45 DAY PERIOD COMMENCING WITH THE PROVISION
OF NOTICE OF THE CERTIFICATION OF PATENT INVALIDITY OR NON-INFRINGEMENT. ANY SUIT
FOR DECLARATORY JUDGMENT AFTER THE 45 DAY PERIOD MUST BE BROUGHT IN THE JUDICIAL
DISTRICT WHERE THE DEFENDANT HAS ITS PRINCIPAL OF BUSINESS OR A REGULAR AND ESTAB-
LISHED PLACE OF BUSINESS.

SUBSEQUENT ANDA'S CERTIFYING PATENT INVALIDITY OR NONINFRINGEMENT

IF AN ANDA CERTIFYING PATENT INVALIDITY OR NON-INFRINGEMENT IS FILED SUBSEQUENT
TO AN ANDA FOR THE SAME LISTED DRUG THAT HAS MADE THE SAME CERTIFICATION OF IN-
VALIDITY OR NON-INFRINGEMENT, PARAGRAPH (4)(B)(IV) PROVIDES THAT THE APPROVAL OF
THE SUBSEQUENT ANDA MAY NOT BE MADE EFFECTIVE SOONER THAN 180 DAYS AFTER THE PRE-
VIOUS APPLICANT HAS BEGUN COMMERCIAL MARKETING, OR THE DATE ON WHICH THE COURT
HOLDS THE PATENT INVALID OR NOT INFRINGED, WHICHEVER OCCURS FIRST. IN THE EVENT
OF MULTIPLE ANDA'S CERTIFYING PATENT INVALIDITY OR NON-INFRINGEMENT, THE COURTS
SHOULD EMPLOY THE EXISTING RULES FOR MULTIDISTRICT LITIGATION, WHEN APPROPRIATE,
TO AVOID HARDSHIP ON THE PARTIES AND WITNESSES AND TO PROMOTE THE JUST AND EFFI-
CIENT CONDUCT OF THE PATENT INFRINGEMENT ACTIONS. [FN14]

**\*29 \*\*2662** DISAPPROVAL OF AN ANDA

IF THE FDA DECIDES TO DISAPPROVE AN ANDA, PARAGRAPH (4)(C) PROVIDES THAT THE FDA
MUST GIVE THE APPLICANT NOTICE OF THE OPPORTUNITY FOR A HEARING ON THE ISSUE OF
THE APPROVABILITY OF THE ANDA. TO AVAIL ITSELF OF THIS HEARING, THE APPLICANT
MUST SUBMIT A WRITTEN REQUEST WITHIN 30 DAYS OF THE NOTICE. IF A HEARING IS RE-
QUESTED, IT MUST BEGIN NOT LATER THAN 120 DAYS AFTER THE NOTICE. HOWEVER, THE
HEARING MAY BE HELD LATER IF BOTH THE APPLICANT AND THE FDA AGREE. THE HEARING
SHALL BE CONDUCTED ON AN EXPEDITED BASIS. THE FDA'S ORDER REGARDING THE HEARING

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


SHALL BE ISSUED WITHIN 90 DAYS AFTER THE DATE FOR FILING FINAL BRIEFS.

                         TRANSITION RULE

   PARAGRAPH (4)(D)(I) PROVIDES THAT THE FDA MAY NOT MAKE EFFECTIVE THE APPROVAL OF
AN ANDA FOR A DRUG INCLUDING AN ACTIVE INGREDIENT (INCLUDING ANY ESTER OR SALT OF
THE ACTIVE INGREDIENT) WHICH WAS APPROVED FOR THE FIRST TIME IN AN NDA BETWEEN
JANUARY 1, 1982 AND THE DATE OF ENACTMENT OF THIS BILL UNTIL 10 YEARS AFTER THE
DATE OF APPROVAL OF THE NDA.  FOR EXAMPLE, IF ACTIVE INGREDIENT X WAS APPROVED IN
A DRUG FOR THE FIRST TIME IN 1983, WHEN THE APPROVAL OF AN ANDA FOR A DRUG CON-
TAINING ACTIVE INGREDIENT X COULD NOT BE MADE EFFECTIVE UNTIL 1993.

                        UNPATENTABLE DRUGS

   IF THE ACTIVE INGREDIENT (INCLUDING ANY ESTER OR SALT OF THE ACTIVE INGREDIENT)
OF A DRUG IS APPROVED FOR THE FIRST TIME IN AN NDA AFTER THE ENACTMENT OF THIS
BILL, THEN PARAGRAPH (4)(D)(II) PROVIDES THAT THE FDA MAY NOT MAKE THE APPROVAL OF
AN ANDA FOR A DRUG WHICH CONTAINS THE SAME ACTIVE INGREDIENT EFFECTIVE UNTIL FOUR
YEARS AFTER THE APPROVAL OF THE NDA IF THE FOLLOWING CONDITIONS ARE MET.
   FIRST, THE HOLDER OF THE NDA MUST CERTIFY THAT NO PATENT HAS EVER BEEN ISSUED TO
ANY PERSON FOR SUCH DRUG, OR FOR A METHOD OF USING SUCH DRUG.  SECOND, THE HOLDER
MUST CERTIFY THAT IT CANNOT RECEIVE A PATENT FOR SUCH DRUG OR FOR A METHOD USING
SUCH DRUG FOR ANY KNOWN THERAPEUTIC PURPOSE.  IN DETERMINING WHETHER A DRUG MEETS
THESE TWO PATENT STIPULATIONS, THE FDA MAY RELY UPON THE CERTIFICATIONS OF THE NDA
HOLDER.
   IF THE FDA DETERMINES AT ANY TIME DURING THE FOUR YEAR PERIOD THAT AN ADEQUATE
SUPPLY OF THE DRUG WILL NOT BE AVAILABLE, IT MAY MAKE THE APPROVAL OF AN ANDA EF-
FECTIVE BEFORE THE EXPIRATION OF THE FOUR YEAR PERIOD.  THE FDA MAY ALSO MAKE THE
APPROVAL OF AN ANDA FOR SUCH DRUG EFFECTIVE BEFORE THE FOUR YEAR PERIOD IF THE
HOLDER OF THE NDA CONSENTS.

               WITHDRAWAL OR SUSPENSION OF LISTED DRUG'S APPROVAL

   PARAGRAPH (5) PROVIDES THAT THE APPROVAL OF AN ANDA IS WITHDRAWN OR SUSPENDED IF
APPROVAL OF THE LISTED VERSION OF THE GENERIC DRUG HAS BEEN WITHDRAWN OR SUSPENDED
FOR SAFETY OR EFFECTIVENESS REASONS AS SET FORTH IN SECTION 505(E)(1)-(4) OF THE
FFDCA.  THE APPROVAL OF AN ANDA IS ALSO WITHDRAWN OR SUSPENDED IF IT REFERS TO A
DRUG WHOSE APPROVAL IS WITHDRAWN OR SUSPENDED UNDER SECTION 505(J)(5) OF THE FFD-
CA.  IN ADDITION, THE APPROVAL OF AN ANDA IS WITHDRAWN OR SUSPENDED IF THE FDA DE-
TERMINES THAT THE LISTED **30 **2663 DRUG HAS BEEN VOLUNTARILY WITHDRAWN FROM SALE
DUE TO SAFETY OR EFFECTIVENESS CONCERNS.
   THE COMMITTEE RECOGNIZES THAT THE MAKER OF A LISTED DRUG MIGHT WITHDRAW IT FROM
THE MARKET WITHOUT SPECIFYING THE REASON OR WITHOUT ARTICULATING SAFETY OR EFFECT-
IVENESS CONCERNS.  FOR THIS REASON, THE COMMITTEE AUTHORIZED THE FDA TO EXAMINE
WHETHER SAFETY OR EFFECTIVENESS CONCERNS WERE ONE OF THE REASONS FOR THE VOLUNTARY
WITHDRAWAL OF THE DRUGS FROM THE MARKET.  IF THE FDA SO FINDS, THEN THE APPROVAL

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

OF AN ANDA FOR A GENERIC VERSION OF THAT DRUG MUST BE WITHDRAWN OR SUSPENDED.

THE ANDA MUST BE WITHDRAWN OR SUSPENDED FROM SALE FOR THE SAME PERIOD AS THE AP-
PROVAL OF THE DRUG TO WHICH IT REFERS HAS BEEN WITHDRAWN OR SUSPENDED.  WHEN THE
LISTED DRUG HAS BEEN VOLUNTARILY WITHDRAWN FROM THE MARKET AND THE FDA HAS DETERM-
INED THAT THE LISTED DRUG WAS WITHDRAWN DUE TO SAFETY OR EFFECTIVENESS REASONS,
THEN THE APPROVAL OF THE ANDA MUST BE WITHDRAWN UNTIL SUCH TIME AS THE FDA DETERM-
INES THAT THE LISTED DRUG WAS NOT WITHDRAWN FROM SALE FOR SAFETY OR EFFECTIVENESS
REASONS.

LISTINGS OF DRUGS

WITHIN 60 DAYS AFTER ENACTMENT OF THIS BILL, PARAGRAPH (6) REQUIRES THE FDA TO
PUBLISH AND TO MAKE AVAILABLE A LIST OF DRUGS ELIGIBLE FOR CONSIDERATION IN AN AN-
DA.  THE LIST MUST INCLUDE THE OFFICIAL AND PROPRIETARY NAME OF EACH DRUG THAT HAS
BEEN APPROVED FOR SAFETY AND EFFECTIVENESS PRIOR TO THE DATE OF ENACTMENT OF THE
BILL.  THE LIST MUST BE IN ALPHABETICAL ORDER.  IF THE DRUG WAS APPROVED AFTER
1981, THE LIST MUST INCLUDE THE DATE OF APPROVAL OF THE DRUG AND THE NDA NUMBER.
THIRD, THE LIST MUST SPECIFY WHETHER IN VITRO OR IN VIVO BIOEQUIVALENCE STUDIES,
OR BOTH, ARE REQUIRED FOR ANDA'S.

AT 30-DAY INTERVALS, THE FDA MUST UPDATE THE LIST TO INCLUDE DRUGS THAT HAVE
BEEN APPROVED FOR SAFETY AND EFFECTIVENESS AFTER ENACTMENT OF H.R. 3605 AND DRUGS
APPROVED IN ANDA'S UNDER THIS SUBSECTION.  IN ADDITION, THE FDA MUST INTEGRATE IN-
TO THE LIST PATENT INFORMATION SUBMITTED UNDER SECTIONS 505(B) AND (C) OF THE FFD-
CA AS IT BECOMES AVAILABLE.

A DRUG APPROVED FOR SAFETY AND EFFECTIVENESS UNDER SECTION 505(C) OR UNDER SUB-
SECTION (J) SHALL BE CONSIDERED AS PUBLISHED AND THUS ELIGIBLE FOR APPROVAL IN AN
ANDA ON THE DATE OF ITS APPROVAL OR THE DATE OF ENACTMENT, WHICHEVER IS LATER.

PARAGRAPH (6)(C) PROVIDES A DRUG MAY NOT BE LISTED AS ELIGIBLE FOR CONSIDERATION
IN AN ANDA IF THE APPROVAL OF THE PIONEER DRUG IS WITHDRAWN OR SUSPENDED FOR
SAFETY OR EFFECTIVENESS REASONS AS SET FORTH IN SECTION 505(E)(1)-(4) OF THE FFDCA
OR IF APPROVAL OF THE GENERIC DRUG WAS WITHDRAWN OR SUSPENDED UNDER SECTION
505(J)(5) OF THE FFDCA. IN ADDITION, A DRUG MAY NOT BE LISTED IF THE FDA DETERM-
INES THAT THE DRUG HAS BEEN VOLUNTARILY WITHDRAWN FROM SALE DUE TO SAFETY OR EF-
FECTIVENESS CONCERNS.  IF SUCH A DRUG HAS ALREADY BEEN LISTED, THEN IT MUST BE IM-
MEDIATELY REMOVED FROM THE LIST.

THE COMMITTEE RECOGNIZES THAT THE MAKER OF A LISTED DRUG MIGHT WITHDRAW IT FROM
THE MARKET WITHOUT SPECIFYING THE REASON OF WITHOUT ARTICULATING SAFETY OR EFFECT-
IVENESS CONCERNS.  FOR THIS REASON, THE COMMITTEE AUTHORIZED THE FDA TO EXAMINE
WHETHER SAFETY OR EFFECTIVENESS CONCERNS WERE ONE OF THE REASONS FOR THE VOLUNTARY
WITHDRAWAL OF THE DRUGS FROM THE MARKET.  IF THE FDA SO FINDS, THEN **31 **2664 THE
DRUG MAY NOT BE LISTED.  PERSONS ADVERSELY AFFECTED BY THIS DECISION MAY SEEK JU-
DICIAL REVIEW UNDER TITLE 5 OF THE UNITED STATES CODE.

A DRUG MAY NOT BE LISTED AS LONG AS ITS APPROVAL IS WITHDRAWN OR SUSPENDED.  IF
THE DRUG HAS BEEN VOLUNTARILY WITHDRAWN FROM THE MARKET, THEN THE DRUG MAY NOT BE
LISTED UNTIL THE FDA DETERMINES THAT THE DRUG WAS NOT WITHDRAWN FROM SALE FOR

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

SAFETY OR EFFECTIVENESS REASONS.  A NOTICE REGARDING THE REMOVAL OF ANY DRUG FROM
THE LIST MUST BE PUBLISHED IN THE FEDERAL REGISTER.

### BIOAVAILABILITY AND BIOEQUIVALENCE STUDIES

   AS USED IN THIS BILL, THE TERM 'BIOAVAILABILITY' MEANS THE RATE AND EXTENT TO
WHICH THE ACTIVE INGREDIENT OR THERAPEUTIC INGREDIENT IS ABSORBED FROM A DRUG AND
BECOMES AVAILABLE AT THE SITE OF DRUG ACTION. [FN15]
   A DRUG SHALL BE CONSIDERED BIOEQUIVALENT TO A LISTED DRUG IF THE RATE AND EXTENT
OF ABSORPTION OF THE GENERIC DRUG DO NOT SHOW A SIGNIFICANT DIFFERENCE FROM THE
RATE AND EXTENT OF ABSORPTION OF THE LISTED DRUG WHEN ADMINISTERED AT THE SAME
MOLAR DOSE OF THE THERAPEUTIC INGREDIENT UNDER SIMILAR EXPERIMENTAL CONDITIONS IN
EITHER A SINGLE DOSE OR MULTIPLE DOSES.  A GENERIC DRUG SHALL ALSO BE CONSIDERED
TO BE BIOEQUIVALENT TO A LISTED DRUG IF THE EXTENT OF ABSORPTION OF THE GENERIC
DRUG DOES NOT SHOW A SIGNIFICANT DIFFERENCE FROM THE EXTENT OF ABSORPTION OF THE
LISTED DRUG WHEN ADMINISTERED AT THE SAME MOLAR DOSE OF THE THERAPEUTIC INGREDIENT
UNDER SIMILAR EXPERIMENTAL CONDITIONS IN EITHER A SINGLE DOSE OR MULTIPLE DOSES
AND THE DIFFERENCE FROM THE LISTED DRUG IN THE RATE OF ABSORPTION OF THE GENERIC
DRUG IS INTENTIONAL, IS REFLECTED IN THE PROPOSED LABELING, IS NOT ESSENTIAL TO
THE ATTAINMENT OF EFFECTIVE BODY DRUG CONCENTRATIONS ON CHRONIC USE, AND IS CON-
SIDERED MEDICALLY INSIGNIFICANT FOR THE DRUG.  [FN16]

### SECTION 102

   SECTION 102 OF THE BILL REQUIRES THAT CERTAIN PATENT INFORMATION BE FILED WITH
ALL NEW NDA'S AND WITH ALL NDA'S PREVIOUSLY FILED BUT NOT YET APPROVED.  PENDING
AND FUTURE NDA'S MAY NOT BE APPROVED UNLESS THEY CONTAIN THE APPROPRIATE PATENT
INFORMATION.  THE FDA SHALL PUBLISH THE PATENT INFORMATION UPON APPROVAL OF THE
NDA.
   THIS SECTION ALSO REQUIRES THAT ANY PREVIOUSLY APPROVED NDA BE AMENDED WITHIN 30
DAYS OF ENACTMENT OF THIS BILL TO INCLUDE CERTAIN PATENT INFORMATION.  THE FDA
SHALL PUBLISH THE PATENT INFORMATION UPON ITS SUBMISSION.  AN NDA MAY BE REVOKED
IF THE PATENT INFORMATION AVAILABLE IS ADVISABLE AND IS NOT FILED WITHIN 30 DAYS
AFTER RECEIPT OF A WRITTEN NOTICE FROM THE FDA SPECIFYING THE FAILURE TO PROVIDE
THE PATENT INFORMATION.
   THE PATENT INFORMATION TO BE FILED INCLUDES THE PATENT NUMBER AND THE EXPIRATION
DATE OF ANY PATENT WHICH CLAIMS THE DRUG IN THE NDA OR WHICH CLAIMS A METHOD OF
USING SUCH DRUG WITH RESPECT TO WHICH A CLAIM OF PATENT INFRINGEMENT COULD REASON-
ABLY BE ASSERTED **32 **2665 IF A PERSON NOT LICENSED BY THE OWNER ENGAGED IN THE
MANUFACTURE, SALE OR USE OF THE DRUG. PATENTS WHICH CLAIM A METHOD OF MANUFACTUR-
ING SUCH DRUG ARE NOT REQUIRED TO BE SUBMITTED.
   FINALLY, SECTION 102 MAKES A NUMBER OF TECHNICAL CHANGES.

### SECTION 103

   SECTION 103 AMENDS SECTION 505(B) OF THE FFDCA TO REQUIRE AN APPLICANT FILING A

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)
H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

PAPER NDA'S FOR A LISTED DRUG UNDER SECTION 505(J)(6) TO MAKE THE SAME CERTIFICA-
TIONS REGARDING PATENTS AS MANDATED IN THE FILING OF ANDA'S UNDER NEW SUBSECTION
(J) OF THE FFDCA.  IN ADDITION, THE FDA MUST MAKE APPROVALS FOR SUCH PAPER NDA'S
EFFECTIVE UNDER THE SAME CONDITIONS THAT APPLY TO ANDA'S SUBMITTED UNDER SUBSEC-
TION (J).  FINALLY, SECTION 103 APPLIES THE 10 YEAR TRANSITION RULE AND THE 4 YEAR
UNPATENTABLE SUBSTANCES RULE TO PAPER NDA'S.

                               PAPER NDA'S

  PAPER NDA'S ARE DEFINED AS ANY APPLICATION SUBMITTED UNDER SECTION 505(B) OF THE
FFDCA IN WHICH THE INVESTIGATIONS RELIED UPON BY THE APPLICANT TO SHOW SAFETY AND
EFFECTIVENESS WERE NOT CONDUCTED BY OR FOR THE APPLICANT AND THE APPLICANT HAS NOT
OBTAINED A RIGHT OF REFERENCE OR USE FROM THE PERSON WHO CONDUCTED THE STUDIES OR
FOR WHOM THE STUDIES WERE CONDUCTED.

             PATENT CERTIFICATIONS IN PAPER NDA'S FOR LISTED DRUGS

  WHEN A PAPER NDA'S IS SUBMITTED FOR A LISTED DRUG UNDER SECTION 505(J)(6), IT
MUST INCLUDE A CERTIFICATION BY THE APPLICANT REGARDING THE STATUS OF CERTAIN PAT-
ENTS APPLICABLE TO THE LISTED DRUG IF SUCH INFORMATION HAS BEEN PROVIDED TO THE
FDA.  WITH RESPECT TO ALL PRODUCT PATENTS WHICH CLAIM THE LISTED DRUG AND ALL USE
PATENTS WHICH CLAIM AN INDICATION FOR THE DRUG FOR WHICH THE APPLICANT IS SEEKING
APPROVAL (HEREAFTER DESCRIBED AS A CONTROLLING USE PATENT), THE APPLICANT MUST
CERTIFY, IN HIS OPINION AND TO THE BEST OF HIS KNOWLEDGE, AS TO ONE OF FOUR CIR-
CUMSTANCES.
  FIRST, THE APPLICANT MAY CERTIFY THAT THE PATENT INFORMATION REQUIRED UNDER
SECTIONS 505(B) AND (C) HAS NOT BEEN SUBMITTED IF THAT IS THE CASE.  SECOND, IF
APPROPRIATE, THE APPLICANT MAY CERTIFY THAT ONE OR MORE OF THE PRODUCT OR CON-
TROLLING USE PATENTS WILL EXPIRE AT SOME SPECIFIED DATE IN THE FUTURE.  WHEN THE
APPLICANT MAKES THESE CERTIFICATIONS, IT MUST RELY UPON THE PATENT INFORMATION
SUPPLIED TO THE FDA.  LAST, AN APPLICANT MAY CERTIFY IF APPLICABLE THAT ONE OR
MORE OF THE PRODUCT OR CONTROLLING USE PATENTS ARE INVALID OR WILL NOT BE IN-
FRINGED.
  THE COMMITTEE RECOGNIZES THAT IN SOME INSTANCES AN APPLICANT WILL HAVE TO MAKE
MULTIPLE CERTIFICATIONS WITH RESPECT TO PRODUCT AND CONTROLLING USE PATENTS.  FOR
EXAMPLE, IF THE PRODUCT PATENT HAS EXPIRED AND VALID CONTROLLING USE PATENT WILL
NOT EXPIRE FOR THREE YEARS, THEN THE APPLICANT MUST CERTIFY THAT ONE PATENT HAS
EXPIRED AND THE OTHER WILL EXPIRE IN THREE YEARS.  THE COMMITTEE INTENDS THAT THE
APPLICANT MAKE THE APPROPRIATE CERTIFICATION FOR EACH PRODUCT AND CONTROLLING USE
PATENT.
  **\*33 \*\*2666** EVERY PAPER NDA FOR A LISTED DRUG MUST ALSO STATE, WHEN APPLICABLE,
THAT THE APPLICANT IS NOT SEEKING APPROVAL FOR AN INDICATION WHICH IS CLAIMED BY
ANY USE PATENT FOR WHICH IT HAS NOT MADE A CERTIFICATION.  FOR EXAMPLE, THE LISTED
DRUG MAY BE APPROVED FOR TWO INDICATIONS.  IF THE APPLICANT IS SEEKING APPROVAL
ONLY FOR INDICATION NO. 1, AND NOT INDICATION NO. 2 BECAUSE IT IS PROTECTED BY A

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


USE PATENT, THEN THE APPLICANT MUST MAKE THE APPROPRIATE CERTIFICATIONS AND A
STATEMENT EXPLAINING THAT IT IS NOT SEEKING APPROVAL FOR INDICATION NO. 2.

          CERTIFICATION OF INVALIDITY OR NONINFRINGEMENT OF A PATENT

  WHEN AN APPLICANT CERTIFIES THAT ANY PRODUCT OR CONTROLLING USE PATENT IS INVAL-
ID OR WILL NOT BE INFRINGED, SECTION 505(B)(3) REQUIRES THAT IT MUST GIVE NOTICE
OF SUCH CERTIFICATION TO EITHER THE OWNER OF THE PATENT OR THE REPRESENTATIVE OF
THE PATENT OWNER THAT WAS SO DESIGNATED WHEN THE PATENT INFORMATION WAS SUBMITTED
UNDER SECTION 505(B) OR (C) OF THE FFDCA.  THE FDA MAY, BY REGULATION, ESTABLISH A
PROCEDURE FOR DESIGNATING IN THE NDA THE REPRESENTATIVE OF THE PATENT OWNER.  IN
ADDITION, NOTICE OF THE CERTIFICATION MUST BE GIVEN TO THE HOLDER OF THE APPROVED
NEW DRUG APPLICATION (NDA) FOR THE DRUG WHICH IS CLAIMED BY THE PRODUCT PATENT OR
THE USE OF WHICH IS CLAIMED BY THE USE PATENT.
  THIS NOTICE MUST BE GIVEN SIMULTANEOUSLY WITH THE SUBMISSION OF A PAPER NDA.
THE COMMITTEE DOES NOT INTEND THAT APPLICANTS BE PERMITTED TO CIRCUMVENT THIS NO-
TICE REQUIREMENT BY FILING SHAM PAPER NDA'S OR PAPER NDA'S WHICH ARE SUBSTANTIALLY
INCOMPLETE.  THE COMMITTEE INTENDS THAT THE APPLICANT MUST HAVE MADE A GOOD FAITH
EFFORT TO MEET THE REQUIREMENTS REGARDING THE CONTENTS OF A PAPER NDA AS SET FORTH
IN SECTION 505(B) OF FFDCA.
  WHEN THE APPLICANT GIVES NOTICE OF THE CERTIFICATION OF INVALIDITY OR NON-
INFRINGEMENT, THE NOTICE MUST STATE THAT A PAPER NDA HAS BEEN SUBMITTED TO OBTAIN
APPROVAL OF THE DRUG TO ENGAGE IN THE COMMERCIAL MANUFACTURE, USE OF SALE OF THE
GENERIC DRUG BEFORE THE EXPIRATION OF THE PATENT WHICH HAS BEEN CERTIFIED AS IN-
VALID OR NON-INFRINGED.
  IF A PAPER NDA IS AMENDED AFTER SUBMISSION TO INCLUDE A CERTIFICATION THAT A
PRODUCT PATENT OR CONTROLLING USE PATENT IS INVALID, THEN THE NOTICE OF SUCH CER-
TIFICATION MUST BE GIVEN TO THE APPROPRIATE PARTIES WHEN THE AMENDED APPLICATION
IS SUBMITTED.

          EFFECTIVENESS OF APPROVAL OF A PAPER NDA FOR A LISTED DRUG

  THE COMMITTEE RECOGNIZES THAT SOME PAPER NDA'S FOR LISTED DRUGS WILL BE SUBMIT-
TED AND READY FOR APPROVAL BEFORE THE PATENT ON THE LISTED DRUG HAS EXPIRED.  TO
DEAL WITH THIS SITUATION AND TO ASSURE THAT THE FDA CONCERNS ITSELF SOLELY WITH
THE SAFETY AND EFFECTIVENESS OF THE GENERIC DRUG, SECTION 505(C)(3) REQUIRES THE
FDA TO APPROVE A PAPER NDA BUT MAKE THE APPROVAL EFFECTIVE AT SOME LATER DATE WHEN
APPROPRIATE.
  IF THE APPLICANT CERTIFIED IN THE PAPER NDA THAT NO PATENT INFORMATION WAS SUP-
PLIED OR THAT THE RELEVANT PATENTS HAVE EXPIRED, THEN THE APPROVAL OF THE PAPER
NDA MAY BE MADE EFFECTIVE IMMEDIATELY. IF THE APPLICANT CERTIFIED BASED UPON THE
SUBMITTED PATENT INFORMATION THAT THE PATENT WOULD EXPIRE IN ONE YEAR, THEN THE
**\*34 \*\*2667** PAPER NDA MAY BE APPROVED AND THE APPROVAL MADE EFFECTIVE IN ONE YEAR.
  IF THE APPLICANT CERTIFIED THAT ONE OR MORE OF THE PRODUCT OF CONTROLLING USE
PATENTS WERE INVALID OR NOT INFRINGED, THEN APPROVAL OF THE PAPER NDA MAY BE MADE

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

EFFECTIVE IMMEDIATELY EXCEPT IN THE FOLLOWING SITUATION.  IF WITHIN 45 DAYS AFTER
NOTICE OF THE CERTIFICATION OF INVALIDITY OR NON-INFRINGEMENT IS RECEIVED, AN AC-
TION FOR PATENT INFRINGEMENT REGARDING ONE OR MORE OF THE PATENT SUBJECT TO THE
CERTIFICATION IS BROUGHT, [FN17]  THEN APPROVAL OF THE PAPER NDA MAY NOT BE MADE
EFFECTIVE IMMEDIATELY.  INSTEAD, APPROVAL OF THE PAPER NDA MAY NOT BE MADE EFFECT-
IVE UNTIL 18 MONTHS AFTER THE NOTICE OF THE CERTIFICATION WAS PROVIDED.

   EACH PARTY TO THE ACTION HAS AN AFFIRMATIVE DUTY TO REASONABLY COOPERATE IN EX-
PEDITING THE ACTION.  IF THE PLAINTIFF BREACHES THAT DUTY, THE COURT MAY SHORTEN
THE 18 MONTH PERIOD AS IT DEEMS APPROPRIATE.  IF THE DEFENDANT BREACHES THAT DUTY,
THE COURT MAY EXTEND THE 18-MONTH PERIOD AS IT DEEMS APPROPRIATE.

   IF THE COURT DECIDES THAT THE PATENT IS INVALID OR NOT INFRINGED BEFORE THE EX-
PIRATION OF THE 18-MONTH PERIOD (OR SUCH SHORTER OR LONGER PERIOD AS THE COURT DE-
CIDES), THEN THE APPROVAL MAY BE MADE EFFECTIVE ON THE DATE OF THE COURT DECISION.
IF THE COURT DECIDES THAT THE PATENT INVALID OR INFRINGED BEFORE THE EXPIRATION OF
THE 18 MONTH PERIOD, THEN THE APPROVAL MAY BE MADE EFFECTIVE ON SUCH DATE AS THE
COURT ORDERS.  THE COMMITTEE WANTS TO EMPHASIZE THAT THE COURT MAY NOT ORDER THE
PAPER NDA APPROVED.  THESE ARE TIMES WHEN THE APPROVAL OF A PAPER NDA MAY BE MADE
EFFECTIVE IF THE FDA HAS COMPLETED ITS REVIEW OF THE PAPER NDA.

   NO ACTION FOR A DECLARATORY JUDGMENT REGARDING THE PATENT AT ISSUE MAY BE
BROUGHT BEFORE THE EXPIRATION OF THE 45 DAY PERIOD COMMENCING WITH THE PROVISION
OF NOTICE OF THE CERTIFICATION OF PATENT INVALIDITY OR NON-INFRINGEMENT.  AFTER
THE 45 DAY PERIOD, ANY SUIT FOR DECLARATORY JUDGMENT REGARDING THE PATENT AT ISSUE
MUST BE BROUGHT IN THE JUDICIAL DISTRICT WHERE THE DEFENDANT HAS ITS PRINCIPAL
PLACE OF BUSINESS OR A REGULAR AND ESTABLISHED PLACE OF BUSINESS.

                                 TRANSITION RULE

   SECTION 505(C)(3)(D)(I) PROVIDES THAT THE FDA MAY NOT MAKE EFFECTIVE THE APPROV-
AL OF A PAPER NDA FOR A DRUG WHICH CONTAINS AN ACTIVE INGREDIENT (INCLUDING ANY
ESTER OR SALT OF THE ACTIVE INGREDIENT) WHICH WAS APPROVED FOR THE FIRST TIME IN
AN NDA BETWEEN JANUARY 1, 1982 AND THE DATE OF ENACTMENT OF THIS BILL UNTIL 10
YEARS AFTER THE DATE OF APPROVAL OF THE NDA.  FOR EXAMPLE, IF ACTIVE INGREDIENT X
WAS APPROVED IN A DRUG FOR THE FIRST TIME IN 1983, THEN THE APPROVAL OF A PAPER
NDA FOR A DRUG CONTAINING ACTIVE INGREDIENT X COULD NOT BE MADE EFFECTIVE UNTIL
1993.

                                UNPATENTABLE DRUGS

   IF THE ACTIVE INGREDIENT (INCLUDING ANY ESTER OR SALT OF THE ACTIVE INGREDIENT)
OF A DRUG IS APPROVED FOR THE FIRST TIME IN AN NDA AFTER **35 **2668 THE ENACTMENT
OF THIS BILL, THEN SECTION 505(C)(3)(D)(II) PROVIDES THAT THE FDA MAY NOT MAKE THE
APPROVAL OF A PAPER NDA FOR A DRUG WHICH CONTAINS THAT ACTIVE INGREDIENT EFFECTIVE
UNTIL FOUR YEARS AFTER THE APPROVAL OF THE NDA IF THE FOLLOWING CONDITIONS ARE
MET.

   THE HOLDER OF THE NDA MUST CERTIFY THAT NO PATENT HAS EVER BEEN ISSUED TO ANY

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

PERSON FOR SUCH DRUG OR FOR A METHOD OF USING SUCH DRUG. FURTHER, THE HOLDER MUST
CERTIFY THAT HE CANNOT RECEIVE A PATENT FOR SUCH DRUG OR FOR A METHOD USING SUCH
DRUG FOR ANY KNOWN THERAPEUTIC PURPOSE.

IF THE FDA DETERMINES AT ANY TIME DURING THE FOUR YEAR PERIOD THAT AN ADEQUATE
SUPPLY OF THE DRUG WILL NOT BE AVAILABLE, IT MAY MAKE THE APPROVAL OF A PAPER NDA
EFFECTIVE BEFORE THE EXPIRATION OF THE FOUR YEAR PERIOD.  THE FDA MAY ALSO MAKE
THE APPROVAL OF A PAPER NDA FOR THE DRUG EFFECTIVE BEFORE THE FOUR YEAR PERIOD IF
THE HOLDER OF THE NDA CONSENTS.

SECTION 104

SECTION 104 AMENDS SECTION 505 OF THE FFDCA TO ADD A NEW SUBSECTION (1).  THIS
NEW SUBSECTION PROVIDES THAT SAFETY AND EFFECTIVENESS INFORMATION THAT HAS BEEN
SUBMITTED IN AN NDA AND WHICH HAS NOT BEEN PREVIOUSLY DISCLOSED TO THE PUBLIC
SHALL BE MADE AVAILABLE TO THE PUBLIC UPON REQUEST UNDER THE FOLLOWING CIRCUM-
STANCES UNLESS EXTRAORDINARY CIRCUMSTANCES ARE SHOWN.

FIRST, THE SAFETY AND EFFECTIVENESS INFORMATION AND DATA SHALL BE DISCLOSED UPON
REQUEST IF THE NDA HAS BEEN ABANDONED.  SECOND, SUCH INFORMATION AND DATA SHALL BE
MADE AVAILABLE UPON REQUEST IF THE FDA HAS DETERMINED THAT THE NDA IF NOT APPROV-
ABLE AND ALL LEGAL APPEALS HAVE BEEN EXHAUSTED.  THIRD, THE DATA AND INFORMATION
SHALL BE RELEASED UPON REQUEST IF THE APPROVAL OF THE NDA UNDER SECTION 505(C) OF
THE FFDCA HAS BEEN WITHDRAWN AND ALL LEGAL APPEALS HAVE BEEN EXHAUSTED. FOURTH,
SUCH INFORMATION AND DATA SHALL BE RELEASED UPON REQUEST IF THE FDA HAS DETERMINED
THAT THE DRUG WHICH IS THE SUBJECT OF THE NDA IS NOT A NEW DRUG.

THESE CONDITIONS UNDER WHICH SUCH SAFETY AND EFFECTIVENESS DATA SHALL BE RE-
LEASED UPON REQUEST, UNLESS EXTRAORDINARY CIRCUMSTANCES ARE SHOWN, ARE MERELY A
RESTATEMENT OF THE CURRENT REGULATION.  THE COMMITTEE INTENDS THAT ALL TERMS IN
NEW SECTION 505(1) BE GIVEN THE SAME MEANING THAT THEY HAVE IN THE REGULATION.
[FN18]  IT IS NOT THE INTENT OF THE COMMITTEE TO ALTER THE RIGHTS OF THE PUBLIC
UNDER THE FREEDOM OF INFORMATION ACT.

THE COMMITTEE DOES INTEND, HOWEVER, TO CLARIFY THE INTERPRETATION OF 21 C.F.R.
314.14(F)(5).  [FN19]  IN THIS CIRCUMSTANCE, SAFETY AND EFFECTIVENESSDATA
**\*36 \*\*2669** AND INFORMATION MAY BE RELEASED UPON THE EFFECTIVE DATE OF THE FIRST
APPROVAL OF AN ANDA FOR SUCH DRUG UNDER NEW SUBSECTION (J) OF SECTION 505 OF THE
FFDCA.  FURTHER, THE INFORMATION AND DATA MAY BE RELEASED ON THE DATE UPON WHICH
AN APPROVAL OF AN ANDA COULD BE MADE EFFECTIVE IF AN ANDA HAD BEEN SUBMITTED.  THE
COMMITTEE RECOGNIZES THAT AN ANDA MAY NOT BE SUBMITTED FOR ALL DRUGS THAT ARE ELI-
GIBLE FOR APPROVAL AS GENERICS.  TO DEAL WITH THAT POSSIBILITY, THE COMMITTEE IN-
TENDS TO MAKE AVAILABLE THIS DATA WHEN THE APPROVAL OF AN ANDA WOULD HAVE BECOME
EFFECTIVE.

THE COMMITTEE DOES NOT INTEND THAT ANY SAFETY AND EFFECTIVENESS DATA AND INFORM-
ATION BE RELEASED PURSUANT TO THIS SECTION DURING THE 30 DAY PERIOD AFTER ENACT-
MENT OF THIS BILL WHEN PATENT INFORMATION MUST BE SUBMITTED UNDER SECTION 505(B)
OR (C).  OTHERWISE, ANDA'S FILED DURING THAT PERIOD COULD BE APPROVED EFFECTIVE
IMMEDIATELY, THUS ALLOWING FOR THE DISCLOSURE OF SAFETY AND EFFECTIVENESS INFORMA-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

TION AND DATA FOR THOSE DRUGS.

THE COMMITTEE ALSO DOES NOT INTEND THAT SAFETY AND EFFECTIVENESS DATA AND IN-FORMATION BE RELEASED UNDER THIS SECTION IF AN ANDA CHALLENGING THE VALIDITY OF A PATENT IS APPROVED BEFORE THERE HAS BEEN A COURT DECISION HOLDING THE PATENT IN-VALID AND IF THE NDA HOLDER BRINGS AN ACTION TO RESTRAIN THE DISCLOSURE.

FINALLY, EXCEPT AS PROVIDED IN THIS SECTION, THE COMMITTEE DOES NOT INTEND TO CHANGE OTHER REGULATIONS REGARDING FREEDOM OF INFORMATION ACT REQUESTS, TRADE SECRETS, AND CONFIDENTIALITY OF IND, NDA AND MASTER FILE SAFETY AND EFFECTIVENESS INFORMATION AND DATA.

SECTION 104 ALSO ADDS A NEW SUBSECTION (M) TO SECTION 505 OF THE FFDCA. THIS PROVISION CLARIFIES THAT ANY REFERENCE TO PATENT INFORMATION IN SECTION 505 AP-PLIES ONLY TO PATENTS ISSUED BY THE PATENT AND TRADEMARK OFFICE OF THE DEPARTMENT OF COMMERCE. IT DOES NOT INCLUDE ANY PATENTS ISSUED BY FOREIGN GOVERNMENTS.

### SECTION 105

SECTION 105(A) OF THE BILL REQUIRES THE FDA TO PROMULGATE SUCH REGULATIONS AS ARE NECESSARY TO IMPLEMENT NEW SUBSECTION (J). THESE REGULATIONS MUST BE PROMUL-GATED IN ACCORDANCE WITH THE INFORMAL RULEMAKING REQUIREMENTS OF TITLE 5 OF THE U.S.C. AND NOT LATER THAN ONE YEAR AFTER ENACTMENT OF THIS BILL.

SECTION 105(B) OF THE BILL ESTABLISHES AN INTERIM PROCEDURE FOR APPROVING ANDA'S FOR POST-1962 DRUGS UNTIL THE FINAL IMPLEMENTING REGULATIONS ARE PROMULGATED. DURING THE PERIOD AFTER ENACTMENT OF THIS BILL AND UNTIL THE PROMULGATION OF REGU-LATIONS BY THE FDA, ANDA'S FOR LISTED POST-1962 DRUGS MAY BE SUBMITTED IN ACCORD-ANCE WITH THE CURRENT REGULATIONS APPLICABLE TO PRE-1962 PIONEER DRUGS.

TO THE EXTENT THAT THERE ARE INCONSISTENCIES BETWEEN THE CURRENT REGULATIONS AND THIS ACT, THE FDA SHALL FOLLOW THIS ACT. UNDER NO CIRCUMSTANCES MAY THE FDA AP-PROVE AN ANDA OR PAPER NDA UNDER THIS INTERIM PROCEDURE FOR A DRUG THAT IS ELI-GIBLE FOR FOUR OR TEN YEARS OF MARKET EXCLUSIVITY EXCEPT IN ACCORDANCE WITH THOSE PROVISIONS.

**\*37 \*\*2670** SECTION 106

SECTION 106 OF THE BILL AMENDS SECTION 2201 OF TITLE 28 TO INSERT A CROSS REFER-ENCE TO EXPLAIN THAT A SUIT FOR DECLARATORY JUDGMENT REGARDING A PATENT MAY NOT BE BROUGHT UNDER CERTAIN CIRCUMSTANCES SET FORTH IN SECTION 505 OF THE FFDCA.

### TITLE II-- PATENT TERM RESTORATION ACT

### SECTION 201 OF THE BILL

SECTION 201 ADDS A NEW SECTION 156 TO TITLE 35 OF THE U.S.C. THE PATENT LAW. IT IS ENTITLED 'EXTENSION OF PATENT TERM.' THE NEW SECTION PROVIDES FOR THE EX-TENSION OF THE NORMAL 17 YEAR TERM OF A PRODUCT, USE, OR PROCESS PATENT IF A PRODUCT WHICH IS THE SUBJECT OF THE PATENT IS REQUIRED BY FEDERAL LAW TO BE AP-PROVED BEFORE IT IS COMMERCIALLY MARKETED.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

SECTION 156(A)

CONDITIONS FOR EXTENSION APPLICABLE TO ALL PATENTS

THE TERM OF A PATENT WHICH CLAIMS A PRODUCT, A METHOD OF USING A PRODUCT, OR A METHOD OF MANUFACTURING A PRODUCT SHALL BE EXTENDED ONE TIME FROM ITS ORIGINAL EX-PIRATION DATE IF THE CONDITIONS DESCRIBED IN SECTION 156(A) ARE MET. THE TERM 'CLAIMS' WAS SELECTED BECAUSE IT IS THE TERM USED IN THE PATENT LAW TO DESCRIBE THE INVENTION WHICH THE PATENT OWNER OR ITS ASSIGNEE MAY PREVENT OTHERS FROM MAK-ING, USING OR SELLING DURING THE SEVENTEEN YEAR TERM OF THE PATENT. FOR INSTANCE, IN THE CASE OF A PRODUCT PATENT WHICH 'CLAIMS' A BROAD GENUS OF COMPOUNDS, THE PATENT OWNER COULD PREVENT OTHERS FROM MAKING, USING OR SELLING ANY COMPOUND WHICH IS A SPECIES OF THAT GENUS.

SIX OF THE EIGHT CONDITIONS DESCRIBED IN THE NUMBERED PARAGRAPHS UNDER SECTION 156(A) ARE APPLICABLE TO ALL PATENTS TO BE EXTENDED. THEY ARE FOUND IN PARAGRAPHS (1)-(3) AND (6)-(8).

PARAGRAPH (1) REQUIRES THE PATENT TO BE IN FORCE AT THE TIME AN APPLICATION FOR ITS EXTENSION IS SUBMITTED TO THE COMMISSIONER OF PATENTS AND TRADEMARKS. PARA-GRAPH (2) ALLOWS EXTENSION ONLY IF THE TERM OF THE PATENT HAS NOT BEEN EXTENDED PREVIOUSLY. AND PARAGRAPH (3) REQUIRES THE APPLICATION FOR EXTENSION TO BE SUB-MITTED BY THE OWNER OF RECORD OF THE PATENT, OR ITS AGENT, IN ACCORDANCE WITH THE REQUIREMENTS OF SECTION 156(D).

PARAGRAPHS (6) AND (7) DESCRIBE TWO CONDITIONS WHICH MUST BE MET BY THE PRODUCT WHICH IS CLAIMED IN THE PRODUCT PATENT TO BE EXTENDED, OR THE USE OR MANUFACTURE OF WHICH IS CLAIMED IN THE USE OR PROCESS PATENT TO BE EXTENDED. FIRST, THE PRODUCT MUST HAVE BEEN SUBJECTED TO A REGULATORY REVIEW PERIOD UNDER AN APPLICABLE FEDERAL LAW, AND APPROVED, BEFORE THE PRODUCT WAS ALLOWED TO BE COMMERCIALLY MAR-KETED. (THE PRODUCT WHICH CAN BE THE SUBJECT OF A PATENT EXTENSION IS HEREAFTER REFERRED TO AS THE 'APPROVED PRODUCT.') SECOND, WITH ONE EXCEPTION, THE APPROVED PRODUCT MUST HAVE BEEN APPROVED FOR COMMERCIAL MARKETING FOR THE FIRST TIME. THE EXCEPTION INVOLVES AN APPROVED PRODUCT MADE UNDER A PATENTED PROCESS WHICH PRIMAR-ILY USES RECOMBINANT DNA TECHNOLOGY. SUCH AN APPROVED PRODUCT COULD HAVE RECEIVED ITS SECOND APPROVAL FOR COMMERCIAL **38 **2671 MARKETING, BUT IT MUST BE THE FIRST TIME A PRODUCT MADE BY THE CLAIMED PROCESS HAS BEEN APPROVED.

THE COMMITTEE'S BILL REQUIRES EXTENSIONS TO BE BASED ON THE FIRST APPROVAL OF A PRODUCT BECAUSE THE ONLY EVIDENCE AVAILABLE TO CONGRESS SHOWING THAT PATENT TIME HAS BEEN LOST IS DATA ON SO-CALLED CLASS I, NEW CHEMICAL ENTITY DRUGS. THESE DRUGS HAD BEEN APPROVED BY THE FOOD AND DRUG ADMINISTRATION (FDA) FOR THE FIRST TIME. AN EXCEPTION WAS ALLOWED FOR PRODUCTS MADE THROUGH RECOMBINANT DNA BECAUSE THIS INNOVATIVE, NEW TECHNIQUE IS BEING EMPLOYED TO IMPROVE ALREADY APPROVED DRUGS.

PARAGRAPH (8) ADDRESSES THE CIRCUMSTANCES WHERE TWO DIFFERENT APPROVED PRODUCTS ARE THE SUBJECT OF THE SAME PATENT. AN EXTENSION WOULD BE GRANTED ONLY FOR THE FIRST APPROVED PRODUCT WHICH HAS BEEN THE SUBJECT OF A REGULATORY REVIEW PERIOD.

CONDITIONS OF EXTENSION APPLICABLE TO PRODUCT AND USE PATENTS

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

PARAGRAPH (4) OF SECTION 156(A) DESCRIBES CONDITIONS WHICH ARE APPLICABLE TO PRODUCT AND USE PATENTS ONLY.

PARAGRAPH (4)(A) PERMITS SUCH A PATENT TO BE EXTENDED IF TWO REQUIREMENTS ARE MET. THE FIRST IS THAT THE APPROVED PRODUCT IS NOT CLAIMED IN ANOTHER PRODUCT PATENT WHICH HAS BEEN EXTENDED OR WHICH AS AN EARLIER ISSUANCE DATE. THE SECOND IS THAT THE APPROVED PRODUCT AND THE USE FOR WHICH THE PRODUCT IS APPROVED ARE NOT IDENTICALLY DISCLOSED OR DESCRIBED IN ANOTHER PRODUCT OR USE PATENT WHICH HAS BEEN EXTENDED OR WHICH HAS AN EARLIER ISSUANCE DATE. THE PHRASE 'IDENTICALLY DISCLOSED OR DESCRIBED' IS INTENDED TO HAVE THE SAME MEANING WHICH IT HAS UNDER CURRENT PATENT LAW. [FN20]

THE POLICY WHICH THE COMMITTEE SEEKS TO IMPLEMENT IN PARAGRAPH (4)(A) IS, IN BRIEF, THAT THE FIRST PATENT (1) WHICH CLAIMS THE APPROVED PRODUCT, IN THE SENSE THAT THE APPROVED PRODUCT WOULD INFRINGE A CLAIM OF THAT PATENT, OR (2) WHICH FULLY DISCLOSES THAT PRODUCT AND ITS APPROVED USE, IS THE PATENT WHICH SHOULD BE REWARDED WITH AN EXTENSION. FOR EXAMPLE, IF THE APPROVED PRODUCT IS THE SUBJECT OF SEVERAL PATENTS AS A RESULT OF FILING CONTINUATION, CONTINUATION-IN-PART, DIVISIONAL OR OTHERWISE RELATED PATENT APPLICATIONS, EACH OF WHICH DISCLOSES THE APPROVED PRODUCT AND ITS APPROVED USE, THEN ONLY THE EARLIEST ISSUED PATENT IS ELIGIBLE FOR AN EXTENSION.

PARAGRAPH (4)(B) IS AN EXCEPTION TO THE RULE IN PARAGRAPH (4)(A) FOR CERTAIN PRODUCT PATENTS. IF TWO CONDITIONS ARE MET, A PRODUCT PATENT CAN BE EXTENDED EVEN THOUGH THE APPROVED PRODUCT IS ALSO CLAIMED IN ANOTHER PRODUCT PATENT WHICH HAS BEEN EXTENDED OR WHICH HAS AN EARLIER ISSUANCE DATE. FIRST, THE PRODUCT PATENT WHICH WAS ISSUED EARLIER OR PREVIOUSLY EXTENDED CANNOT IDENTICALLY DISCLOSE OR DESCRIBE THE APPROVED PRODUCT. SECOND, THE HOLDER OF EACH OF THE TWO PRODUCT PATENTS MUST NEVER HAVE BEEN AND MUST NEVER BECOME THE HOLDER OF THE OTHER PATENT. IN THIS PARAGRAPH, THE TERM 'HOLDER' IS ANY PERSON WHO OWNS THE PATENT OR IS AN EXCLUSIVE LICENSEE OF THE OWNER. THIS EXCEPTION WAS INCLUDED TO PREVENT AN EARLIER ISSUED PATENT WHICH CLAIMS A BROAD GENUS OF COMPOUNDS FROM BLOCKING THE POSSIBLE EXTENSION OF A LATER ISSUED PATENT CLAIMING A **39 **2672 SPECIFIC MEMBER OF THAT GENUS WHERE NEITHER PATENT HOLDER HAD A CHOICE AS TO WHICH PATENT TO EXTEND.

CONDITIONS OF EXTENSION APPLICABLE TO PROCESS PATENTS

PARAGRAPH (5) OF SECTION 156(A) DESCRIBES CONDITIONS WHICH ARE APPLICABLE TO PROCESS PATENTS ONLY.

PARAGRAPH (5)(A) PERMITS A PROCESS PATENT, WHICH DOES NOT PRIMARILY UTILIZE RECOMBINANT DNA IN THE MANUFACTURE OF THE APPROVED PRODUCT, TO BE EXTENDED IF TWO CONDITIONS ARE MET. FIRST, THERE CAN NOT BE ANY ISSUED PRODUCT PATENT WHICH CLAIMS THE APPROVED PRODUCT OR ANY ISSUED USE PATENT WHICH CLAIMS A METHOD OF USING THE APPROVED PRODUCT FOR ANY KNOWN THERAPEUTIC USE. AND, SECOND, THERE CAN NOT BE AN EARLIER ISSUED PROCESS PATENT, WHICH DOES NOT PRIMARILY UTILIZE RECOMBINANT DNA AND WHICH CLAIMS A METHOD OF MANUFACTURING THE APPROVED PRODUCT.

PARAGRAPH (5)(B) PERMITS A PROCESS PATENT, WHICH PRIMARILY UTILIZES RECOMBINANT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

DNA IN THE MANUFACTURE OF THE APPROVED PRODUCT, TO BE EXTENDED IF SEVERAL CONDI-
TIONS ARE MET.  FIRST, THE HOLDER OF THE PROCESS PATENT CAN NOT HOLD A PRODUCT
PATENT CLAIMING THE APPROVED PRODUCT OR A USE PATENT CLAIMING A METHOD OF USING
THE APPROVED PRODUCT.  SECOND, THERE CAN NOT BE AN OWNERSHIP OR CONTROL INTEREST,
EITHER DIRECTLY OR INDIRECTLY, BETWEEN THE HOLDER OF THE PROCESS PATENT AND THE
HOLDER OF ANY PRODUCT PATENT CLAIMING THE APPROVED PRODUCT OR THE HOLDER OF ANY
USE PATENT CLAIMING A METHOD OF USING THE APPROVED PRODUCT.  THIRD, THERE CAN NOT
BE ANY EARLIER ISSUED PROCESS PATENT WHICH CLAIMS A METHOD OF MANUFACTURING THE
APPROVED PRODUCT BY PRIMARILY UTILIZING RECOMBINANT DNA.

 THE COMMITTEE'S BILL ESTABLISHES SEPARATE RULES FOR PROCESS PATENTS WHICH DO NOT
USE RECOMBINANT DNA BECAUSE THE DISCOVERY OF SUCH A NEW PROCESS FOR MAKING AN EX-
ISTING PRODUCT DOES NOT WARRANT THE SAME REWARD OF PATENT EXTENSION AS DOES THE
DISCOVERY OF A NEW PRODUCT.  AN EXTENSION FOR THE PROCESS PATENT IS APPROPRIATE
ONLY WHEN THERE ARE NO PRODUCT OR USE PATENTS.  ON THE OTHER HAND, WHEN RECOMBIN-
ANT DNA TECHNOLOGY IS THE ESSENTIAL AND PREDOMINANT TECHNIQUE USED IN MAKING AN
IMPROVED VERSION OF AN EXISTING PRODUCT, THE COMMITTEE BELIEVES THAT THIS NEW AND
IMPORTANT INNOVATION SHOULD BE REWARDED.

SECTION 156(B)


RIGHTS TO BE EXTENDED


 EXCEPT FOR THE LIMITATIONS DESCRIBED BELOW WITH RESPECT TO THE SCOPE OF THE PAT-
ENT CLAIMS, ALL PROVISIONS OF THE PATENT LAW APPLY TO THE PATENT DURING THE PERIOD
OF EXTENSION.  THE LIMITATIONS ARE AS FOLLOWS:  (1) WHEN A PRODUCT PATENT CLAIMING
THE APPROVED PRODUCT IS EXTENDED, THE HOLDER'S RIGHTS ARE LIMITED TO ANY USE OF
THE APPROVED PRODUCT WHICH WAS APPROVED BEFORE THE EXPIRATION OF THE EXTENDED TERM
OF THE PATENT UNDER THE PROVISION OF LAW UNDER WHICH THE APPLICABLE REGULATORY RE-
VIEW PERIOD OCCURRED.

 (2) WHEN A USE PATENT CLAIMING A METHOD OF USING THE APPROVED PRODUCT IS EXTEN-
DED, THE HOLDER'S RIGHTS ARE LIMITED TO ANY USE OF THE APPROVED PRODUCT WHICH:
(1) IS CLAIMED IN THE USE PATENT, AND (B) WAS APPROVED BEFORE THE EXPIRATION OF
THE EXTENDED TERM OF THE **40 **2673 PATENT UNDER THE PROVISION OF LAW UNDER WHICH
THE APPLICABLE REGULATORY REVIEW PERIOD OCCURRED.

 (3) WHEN A PROCESS PATENT CLAIMING A METHOD OF MANUFACTURING THE APPROVED
PRODUCT IS EXTENDED, THE HOLDER'S RIGHTS ARE LIMITED TO THE METHOD OF MANUFACTUR-
ING WHICH:  (A) IS CLAIMED IN THE PROCESS PATENT, AND (B) IS USED TO MAKE THE AP-
PROVED PRODUCT.

SECTION 156(C)


PERIOD OF EXTENSION


SECTION 156(C) SPECIFIES THE RULES BY WHICH THE LENGTH OF THE PERIOD OF EXTEN-
SION IS DETERMINED.  THE CALCULATION MADE UNDER THESE RULES IS FURTHER LIMITED BY

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

THE REQUIREMENTS OF SECTION 156(G)(4).

   UNDER SECTION 156(C), THE LENGTH OF THE EXTENSION IS BASED ON THE LENGTH OF THE
REGULATORY REVIEW PERIOD IN WHICH THE APPROVED PRODUCT WAS APPROVED. THE DEFINI-
TION OF THE VARIOUS REGULATORY REVIEW PERIODS IS IN SECTIONS 156(G) (1)-(3). ALL
REGULATORY REVIEW PERIODS ARE DIVIDED INTO A TESTING PHASE AND AN AGENCY APPROVAL
PHASE.

   THE REGULATORY REVIEW PERIOD WHICH OCCURS AFTER THE PATENT TO BE EXTENDED WAS
ISSUED IS ELIGIBLE TO BE COUNTED TOWARDS EXTENSION IN ACCORDANCE WITH THE FOLLOW-
ING CALCULATION. FIRST, EACH PHASE OF THE REGULATORY REVIEW PERIOD IS REDUCED BY
ANY TIME THAT THE APPLICANT FOR EXTENSION DID NOT ACT WITH DUE DILIGENCE DURING
THAT PHASE. (THE DETERMINATION OF LACK OF DUE DILIGENCE IS MADE UNDER SECTION
156(D).) SECOND, AFTER ANY SUCH REDUCTION, ONE-HALF OF THE TIME REMAINING IN THE
TESTING PHASE WOULD BE ADDED TO THE TIME REMAINING IN THE APPROVAL PHASE TO COM-
PRISE THE TOTAL PERIOD ELIGIBLE FOR EXTENSION. THIRD, ALL OF THE ELIGIBLE PERIOD
CAN BE COUNTED UNLESS TO DO SO WOULD RESULT IN A TOTAL REMAINING PATENT TERM OF
MORE THAN FOURTEEN YEARS. FOR EXAMPLE, IF AN APPROVED DRUG PRODUCT WHICH IS ELI-
GIBLE FOR FIVE YEARS OF EXTENSION HAD TEN YEARS OF ORIGINAL PATENT TERM LEFT AT
THE END OF ITS REGULATORY REVIEW PERIOD, THEN ONLY FOUR OF THE FIVE YEARS COULD BE
COUNTED TOWARDS EXTENSION.

   THE ADDITIONAL LIMITATION ON THE PERIOD OF EXTENSION IS FOUND IN SECTION
156(G)(4). THAT SECTION PROVIDES DIFFERENT MAXIMUM PERIODS OF EXTENSION DEPENDING
ON WHETHER THE APPROVED PRODUCT WAS DEVELOPED BEFORE OR AFTER THE DATE OF ENACT-
MENT.

   UNDER THAT SECTION, THE TOTAL PERIOD OF REGULATORY REVIEW WHICH CAN BE COUNTED
TOWARDS EXTENSION WOULD NOT EXCEED FIVE YEARS WHEN: (1) THE PATENT TO BE EXTENDED
WAS ISSUED AFTER THE DATE OF ENACTMENT OF THIS BILL; OR (2) THE PATENT WAS ISSUED
BEFORE THE DATE OF ENACTMENT, BUT THE APPROVED PRODUCT'S REGULATORY REVIEW PERIOD
HAD NOT BEGUN ON THE DATE OF ENACTMENT. THE TOTAL PERIOD OF ELIGIBLE REGULATORY
REVIEW WOULD NOT EXCEED TWO YEARS WHEN: (1) THE PATENT TO BE EXTENDED WAS ISSUED
BEFORE THE DATE OF ENACTMENT; AND (2) THE APPROVED PRODUCT'S REGULATORY REVIEW
PERIOD HAD BEGUN BEFORE THE DATE OF ENACTMENT BUT THE PRODUCT HAD NOT BEEN AP-
PROVED BY THAT DATE. IF ANY ACTION WAS TAKEN BEFORE THE DATE OF ENACTMENT WHICH
INITIATED THE TESTING PHASE OF THE REGULATORY REVIEW PERIOD, THEN THE APPLICANT
WOULD NOT BE ELIGIBLE FOR THE FIVE YEAR RULE BY DISCONTINUING ACTIVITY AND THEN
INITIATING A NEW REGULATORY REVIEW PERIOD AFTER THE DATE OF ENACTMENT.

   **\*41 \*\*2674** THE COMMITTEE ESTABLISHED DIFFERENT MAXIMUM PERIODS OF EXTENSION TO
PROVIDE GREATER INCENTIVE FOR FUTURE INNOVATIONS. BY EXTENDING PATENTS FOR UP TO
FIVE YEARS FOR PRODUCTS DEVELOPED IN THE FUTURE, AND BY PROVIDING FOR UP TO FOUR-
TEEN YEARS OF MARKET EXCLUSIVITY, THE COMMITTEE EXPECTS THAT RESEARCH INTENSIVE
COMPANIES WILL HAVE THE NECESSARY INCENTIVE TO INCREASE THEIR RESEARCH AND DEVEL-
OPMENT ACTIVITIES.


SECTION 156(D)


APPLICATION FOR EXTENSION


© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)
(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)

TO OBTAIN AN EXTENSION, THE PATENT OWNER OR ITS AGENT WOULD SUBMIT AN APPLICA-
TION TO THE COMMISSIONER OF PATENTS AND TRADEMARKS WITHIN 60 DAYS OF APPROVAL OF
THE APPROVED PRODUCT.  THE APPLICATION WOULD CONTAIN THE INFORMATION DESCRIBED IN
SUBPARAGRAPHS (A)-(G) OF SECTION 156(D)(1).  THE APPLICANT WOULD BE SUBJECT TO ANY
DISCLOSURE REQUIREMENTS PRESCRIBED BY THE COMMISSIONER.  THE COMMITTEE EXPECTS
THAT THOSE REQUIREMENTS WOULD SUBJECT THE APPLICANT TO AT LEAST THE SAME DUTY OF
DISCLOSURE, AND THE PENALTIES AND LOSS OF RIGHTS FOR VIOLATION OF THE DUTY OF DIS-
CLOSURE, WHICH GOVERNS ALL PATENT APPLICATION PROCEEDINGS BEFORE THE PATENTS AND
TRADEMARKS OFFICE.
   WITHIN 60 DAYS OF THE SUBMISSION OF AN APPLICATION, THE COMMISSIONER WOULD NOTI-
FY THE SECRETARY OF HEALTH AND HUMAN SERVICES, OR THE SECRETARY OF AGRICULTURE, AS
APPROPRIATE, TO REVIEW THE DATES CONTAINED IN THE APPLICATION FOR THE REGULATORY
REVIEW PERIOD.  WITHIN 30 DAYS, THE APPROPRIATE SECRETARY WOULD MAKE A DETERMINA-
TION AS TO THOSE DATES, NOTIFY THE COMMISSIONER OF THEM, AND PUBLISH THEM IN THE
FEDERAL REGISTER.

          DETERMINATION OF DUE DILIGENCE (SECTION 156(D)(2)(B))

   THE COMMITTEE'S BILL PROVIDES A DEFINITION OF DUE DILIGENCE AT SECTION
156(D)(3).  IT IS 'THAT DEGREE OF ATTENTION, CONTINUOUS DIRECTED EFFORT, AND
TIMELINESS AS MAY REASONABLY BE EXPECTED FROM, AND ARE ORDINARILY EXERCISED BY, A
PERSON DURING A REGULATORY REVIEW PERIOD.'
   A PETITION MAY BE SUBMITTED BY ANY INTERESTED PERSON TO THE APPROPRIATE SECRET-
ARY REQUESTING A DETERMINATION OF WHETHER THE APPLICANT FOR EXTENSION ACTED WITH
DUE DILIGENCE DURING THE REGULATORY REVIEW PERIOD OF THE APPROVED PRODUCT.  THE
PETITION MUST BE SUBMITTED WITHIN 180 DAYS OF THE PUBLICATION BY THE SECRETARY OF
A DETERMINATION OF THE REGULATORY REVIEW PERIOD AND MUST STATE CLAIM THAT THE AP-
PLICANT DID NOT ACT WITH DUE DILIGENCE DURING SOME PART OF THE REGULATORY REVIEW
PERIOD.  IF THE SECRETARY CONCLUDES FROM THE INFORMATION IN THE PETITION THAT
THERE IS REASON TO BELIEVE THAT THE APPLICANT FAILED TO ACT WITH DUE DILIGENCE AT
SOME POINT IN THE REGULATORY REVIEW PERIOD, THEN THE SECRETARY WOULD MAKE, WITHIN
90 DAYS OF THE RECEIPT OF THE PETITION AND IN ACCORDANCE WITH REGULATIONS, A DE-
TERMINATION OF WHETHER THE APPLICANT ACTED WITH DUE DILIGENCE.  THE SECRETARY OF
HHS IS PROHIBITED FROM DELEGATING THE AUTHORITY TO MAKE THE DETERMINATION TO ANY
OFFICE BELOW THAT OF THE COMMISSIONER OF FDA.
   WHILE THE BILL PLACES THE BURDEN ON THE PETITIONER TO MAKE THE NECESSARY SHOW-
ING, THE COMMITTEE RECOGNIZES THAT THE INFORMATION **42 **2675 NEEDED TO MAKE A FI-
NAL DETERMINATION OF DUE DILIGENCE IS NOT AVAILABLE TO THE PETITIONER.  TO MEET
THIS BURDEN OF PROOF, THE PETITIONER NEED NOT SHOW CONCLUSIVELY THAT THERE WAS A
LACK OF DUE DILIGENCE.  INSTEAD, THE PETITIONER NEED ONLY ALLEGE SUFFICIENT FACTS
TO MERIT AN INVESTIGATION BY THE SECRETARY. FOR EXAMPLE, IT WOULD BE SUFFICIENT
FOR THE PETITIONER TO DEMONSTRATE THAT HUMAN CLINICAL TRIALS DID NOT BEGIN FOR AN
UNREASONABLY LONG PERIOD OF TIME AFTER THE FDA GRANTED PERMISSION TO BEGIN THOSE
TRIALS OR THAT THE TRIALS TOOK AN UNREASONABLY LONG PERIOD OF TIME.  IN THOSE

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

EVENTS, THE SECRETARY WOULD DETERMINE WHETHER THE DELAY WAS CAUSED BY A LACK OF DUE DILIGENCE ON THE PART OF THE APPLICANT.

AFTER MAKING THE DETERMINATION, THE SECRETARY WOULD NOTIFY THE COMMISSIONER OF PATENTS AND TRADEMARKS AND PUBLISH IT IN THE FEDERAL REGISTER. ANY INTERESTED PERSON COULD REQUEST AN INFORMAL HEARING WITHIN 60 DAYS OF PUBLICATION OF THE DETERMINATION. IF A TIMELY REQUEST IS MADE, THE SECRETARY MUST HOLD SUCH A HEARING WITHIN 30 DAYS, GIVE NOTICE OF THE HEARING TO THE PATENT OWNER AND ANY INTERESTED PERSON, AND PROVIDE SUCH PERSONS WITH AN OPPORTUNITY TO PARTICIPATE. WITHIN 30 DAYS OF THE HEARING, THE SECRETARY MUST AFFIRM OR REVISE THE DETERMINATION, NOTIFY THE COMMISSIONER OF PATENTS, AND PUBLISH IT IN THE FEDERAL REGISTER.

THE COMMITTEE ESTABLISHED A SYSTEM FOR REVIEW OF DUE DILIGENCE THAT REQUIRES THE MINIMAL AMOUNT OF FEDERAL AGENCY PERSONNEL TIME. THE GOAL OF THE SYSTEM IS TO ASSURE THAT OBVIOUS DELAYS DURING REGULATORY REVIEW, SUCH AS A PROLONGED PERIOD WHEN HUMAN CLINICAL TRIALS ON A DRUG PRODUCT ARE NOT BEING CONDUCTED, ARE NOT COUNTED TOWARDS PATENT EXTENSION. THE SYSTEM IS NOT INTENDED TO CAUSE A REVIEW OF EVERY ACTION, BUT TO IDENTIFY SIGNIFICANT PERIODS OF TIME WHEN THE LOSS OF PATENT TERM RESULTED SOLELY FROM THE APPLICANT'S FAILURE TO PURSUE APPROVAL. DELAYS CAUSED BY THE TEMPORARY UNAVAILABILITY OF NECESSARY TESTING FACILITIES, OR A SCIENTIFIC DISPUTE INVOLVING TESTS REQUIRED FOR APPROVAL OR THE INTERPRETATION OF THOSE TESTS, ARE EXAMPLES OF DELAYS WHICH CAN REASONABLY BE EXPECTED TO OCCUR AND WOULD NOT BE A BASIS FOR FINDING A LACK OF DUE DILIGENCE.

SECTION 156(E)

DETERMINATION ON PATENT EXTENSION OF THE COMMISSIONER OF PATENTS AND TRADEMARKS

THE COMMISSIONER WOULD MAKE THE FINAL DETERMINATION THAT A PATENT IS ELIGIBLE FOR EXTENSION UNDER SECTION 156(A), THAT THE REQUIREMENTS OF SECTION 156(D) HAVE BEEN MET, AND THAT THE PERIOD OF EXTENSION WILL BE THE PERIOD PRESCRIBED IN SECTION 156(C). ONCE THESE FINDINGS ARE MADE, THE COMMISSIONER WOULD BE REQUIRED TO ISSUE A CERTIFICATE OF EXTENSION TO THE APPLICANT. THE CERTIFICATE WOULD BE RECORDED IN THE OFFICIAL FILE OF THE PATENT AND BE CONSIDERED A PART OF THE ORIGINAL PATENT.

THE COMMISSIONER'S DECISION REGARDING A PATENT'S ELIGIBILITY FOR EXTENSION UNDER THE RULES OF SECTION 156(A) MAY BE BASED SOLELY ON THE INFORMATION CONTAINED IN THE APPLICATION. THE BURDEN IS ON THE APPLICANT TO SHOW THAT ALL PATENTS WHICH ARE RELEVANT TO THE ELIGIBILITY DETERMINATION HAVE BEEN CONSIDERED AND DO NOT PREVENT THE REQUESTED EXTENSION.

**\*43 \*\*2676** WHILE THE COMMISSIONER WOULD BE RESPONSIBLE FOR EVALUATING THE APPLICANT'S DETERMINATION REGARDING THE PATENTS LISTED IN THE APPLICATION, THE COMMITTEE EXPECTS THAT MOST REVIEWS WOULD BE MINISTERIAL IN NATURE. SINCE THE APPLICANT IS UNDER A DUTY TO DISCLOSE ALL RELEVANT INFORMATION (SEE SECTION 156(D)(4)), THE APPLICATION SHOULD BE SO WELL DOCUMENTED THAT A SUBSTANTIVE REVIEW BY THE COMMISSIONER WOULD USUALLY NOT BE NECESSARY.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

EXPIRATION OF A PATENT PENDING EXTENSION (SECTION 156(E)(2))

   IT IS POSSIBLE THAT THE ORIGINAL TERM OF THE PATENT FOR WHICH EXTENSION IS
SOUGHT COULD EXPIRE BEFORE A FINAL DECISION BY THE COMMISSIONER TO ISSUE A CERTI-
FICATE OF EXTENSION.  THIS MIGHT OCCUR, FOR INSTANCE, BECAUSE THE DETERMINATION OF
DUE DILIGENCE BY THE SECRETARY OF HHS OR AGRICULTURE HAS NOT BEEN COMPLETED.
   IN SUCH CIRCUMSTANCES, THE COMMISSIONER IS REQUIRED TO DETERMINE WHETHER THE
PATENT IS ELIGIBLE FOR EXTENSION UNDER SECTION 156(A), AND IF IT IS, TO ISSUE A
CERTIFICATE OF EXTENSION FOR A PERIOD OF UP TO ONE YEAR.  THE LENGTH OF THIS IN-
TERIM EXTENSION IS DISCRETIONARY WITH THE COMMISSIONER, BUT IS INTENDED TO PROVIDE
TIME FOR THE COMPLETION OF ANY OUTSTANDING REQUIREMENTS.  IF THE COMMISSIONER DE-
TERMINED THAT SUBSEQUENT INTERIM EXTENSIONS WERE NECESSARY, AND CONSISTENT WITH
THE OBJECTIVES OF SECTION 156(E)(2), THEY COULD BE GRANTED AS WELL.  IN NO EVENT
COULD THESE INTERIM EXTENSIONS BE LONGER THAN THE MAXIMUM PERIOD OF EXTENSION TO
WHICH THE APPLICANT IS THOUGHT TO BE ELIGIBLE.

SECTION 156(F)

DEFINITIONS

   THE TERM 'PRODUCT' IS DEFINED IN SUBSECTION (F)(1) TO INCLUDE DRUG PRODUCTS AND
MEDICAL DEVICES, FOOD ADDITIVES AND COLOR ADDITIVES SUBJECT TO REGULATION UNDER
THE FEDERAL FOOD, DRUG, AND COSMETIC ACT.
   THE TERM 'DRUG PRODUCT' IS DEFINED IN SUBSECTION (F)(2) TO MEAN THE ACTIVE IN-
GREDIENT OF A NEW DRUG, ANTIBIOTIC DRUG, NEW ANIMAL DRUG, OR HUMAN OR VETERINARY
BIOLOGICAL PRODUCT (AS THOSE TERMS ARE USED IN THE FEDERAL FOOD, DRUG, AND COSMET-
IC ACT, THE PUBLIC HEALTH SERVICE ACT AND THE VIRUS-SERUM-TOXIN ACT), INCLUDING
ANY SALT OR ESTER OF THE ACTIVE INGREDIENT, AS A SINGLE ENTITY OR IN COMBINATION
WITH ANOTHER ACTIVE INGREDIENT.  THE HUMAN DRUGS INCLUDED IN THIS DEFINITION ARE
BOTH PRESCRIPTION AND OVER-THE-COUNTER DRUGS.
   THE TERM 'MAJOR HEALTH OR ENVIRONMENTAL EFFECTS TEST' IS DEFINED IN SUBSECTION
(F)(3) TO MEAN A TEST WHICH IS REASONABLY RELATED TO THE EVALUATION OF THE HEALTH
OR ENVIRONMENTAL EFFECTS OF A PRODUCT, WHICH REQUIRES AT LEAST SIX MONTHS TO CON-
DUCT, AND THE DATA FROM WHICH IS SUBMITTED TO RECEIVE PERMISSION FOR COMMERCIAL
MARKETING OR USE. PERIODS OF ANALYSIS OR EVALUATION OF TEST RESULTS ARE NOT TO BE
INCLUDED IN DETERMINING IF THE CONDUCT OF A TEST REQUIRED AT LEAST SIX MONTHS.
   THE TERM 'INFORMAL HEARING' IS DEFINED IN SUBSECTION (F)(5) TO HAVE THE SAME
MEANING AS 'PRESCRIBED FOR SUCH TERM BY SECTION 201(Y) OF THE FEDERAL FOOD, DRUG,
AND COSMETIC ACT.'
   THE TERM 'PATENT' IS DEFINED IN SUBSECTION (F)(6) TO MEAN 'A PATENT ISSUED BY
THE UNITED STATES PATENT AND TRADEMARK OFFICE.

**\*44 \*\*2677** SECTION 156(G)

DEFINITION OF REGULATORY REVIEW PERIOD

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

THE 'REGULATORY REVIEW PERIOD' DIFFERS FOR EACH PRODUCT THAT CAN BE THE SUBJECT OF PATENT EXTENSION, BUT IN ALL CASES IT IS CONSIDERED TO HAVE A TESTING PHASE AND AN AGENCY APPROVAL PHASE.

IN SECTIONS 156(G)(1)-(3) OF THE TERM 'INITIALLY SUBMITTED' IS USED TO DESCRIBE THE POINT IN TIME WHEN THE TESTING PHASE IS CONSIDERED TO BE COMPLETED AND THE AGENCY APPROVAL PHASE TO HAVE BEGUN. THIS TERM IS USED INSTEAD OF THE TERM 'FILED,' BECAUSE AN APPLICATION IS OFTEN NOT CONSIDERED TO BE FILED, EVEN THOUGH AGENCY REVIEW HAS BEGUN, UNTIL THE AGENCY HAS DETERMINED THAT NO OTHER INFORMATION IS NEEDED AND A DECISION ON THE APPLICATION CAN BE MADE. FOR PURPOSES OF DETERM-INING THE REGULATORY REVIEW PERIOD AND ITS COMPONENT PERIODS, AN APPLICATION FOR AGENCY REVIEW IS CONSIDERED TO BE 'INITIALLY SUBMITTED' IF THE APPLICANT HAS MADE A DELIBERATE EFFORT TO SUBMIT AN APPLICATION CONTAINING ALL INFORMATION NECESSARY FOR AGENCY REVIEW TO BEGIN. THE COMMITTEE RECOGNIZES THAT THE AGENCY RECEIVING THE APPLICATION MIGHT DECIDE IT NEEDS ADDITIONAL INFORMATION OR OTHER CHANGES IN THE APPLICATION. AS LONG AS THE APPLICATION WAS COMPLETE ENOUGH SO THAT AGENCY ACTION COULD BE COMMENCED, IT WOULD BE CONSIDERED TO BE 'INITIALLY SUBMITTED'.

### DRUG PRODUCTS (SECTION 156(G)(1)

THE REGULATORY REVIEW PERIOD FOR DRUG PRODUCTS IS THE SUM OF THE PERIODS: (1) BEGINNING WHEN AN EXEMPTION UNDER 505(I), 507(D), OR 512(J) WAS GRANTED OR AUTHOR-ITY TO PREPARE AN EXPERIMENTAL DRUG PRODUCT UNDER THE VIRUS-SERUM-TOXIN ACT WAS GRANTED AND ENDING WHEN WITH THE INITIAL SUBMISSION OF AN APPLICATION FOR APPROVAL UNDER SECTION 351 OF THE PUBLIC HEALTH SERVICE ACT, 505, 507, OR 512 OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT, OR THE VIRUS-SERUM-TOXIN ACT; AND (2) BEGINNING WHEN AN APPLICATION FOR APPROVAL WAS INITIALLY SUBMITTED UNDER SECTION 351 OF THE PHS, 505, 507, 512 OF THE FFDCA OR THE VIRUS-SERUM-TOXIN ACT AND ENDING WHEN THE AP-PLICATION WAS APPROVED.

### FOOD AND COLOR ADDITIVES (SECTION 156(G)(2))

THE REGULATORY REVIEW PERIOD FOR FOOD AND COLOR ADDITIVES IS THE SUM OF THE PERIODS: (1) BEGINNING WHEN A MAJOR HEALTH OR ENVIRONMENTAL EFFECTS TEST FOR A FOOD OR COLOR ADDITIVE WAS INITIATED AND ENDING WHEN A PETITION REQUESTING THE IS-SUANCE OF A REGULATION FOR USE OF THE ADDITIVE WAS INITIALLY SUBMITTED; AND (2) BEGINNING WHEN A PETITION FOR THE ISSUANCE OF A REGULATION WAS INITIALLY SUBMITTED AND ENDING WHEN THE REGULATION BECAME EFFECTIVE.

IF PERMISSION FOR COMMERCIAL MARKETING WAS DELAYED BECAUSE OBJECTIONS WERE FILED TO THE REGULATION, OR IF SUCH PERMISSION WAS INITIALLY GRANTED AND LATER REVOKED BEFORE ACTUAL MARKETING BEGAN BECAUSE OBJECTIONS WERE FILED TO THE REGULATION, THEN THE PERIOD DESCRIBED IN (2) ABOVE WOULD END WHEN THE OBJECTIONS WERE RESOLVED AND COMMERCIAL MARKETING WAS PERMITTED.

### MEDICAL DEVICES (SECTION 156(G)(3))

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

    THE REGULATORY REVIEW PERIOD FOR MEDICAL DEVICES IS THE SUM OF THE PERIODS:
(1) BEGINNING WHEN HUMAN CLINICAL INVESTIGATIONS ARE **\*45 \*\*2678** COMMENCED AND END-
ING WHEN AN APPLICATION FOR APPROVAL WAS INITIALLY SUBMITTED; AND (2) BEGINNING
WHEN AN APPLICATION FOR APPROVAL WAS INITIALLY SUBMITTED AND ENDING WHEN THE AP-
PLICATION WAS APPROVED, OR BEGINNING WHEN A NOTICE OF COMPLETION OF A PRODUCT DE-
VELOPMENT PROTOCOL WAS INITIALLY SUBMITTED AND ENDING WHEN THE PROTOCOL WAS DE-
CLARED COMPLETED.

        LIMITATIONS ON THE REGULATORY REVIEW PERIOD (SECTION 156(G)(4))

    A DISCUSSION OF THIS SECTION IS CONTAINED IN THE EARLIER SECTION 156(C) ENTITLED
'PERIOD OF EXTENSION'.

                SECTION 156(H)

              FEES FOR APPLICATIONS

    THE COMMISSIONER OF PATENTS AND TRADEMARKS IS AUTHORIZED TO ESTABLISH SUCH FEES
AS HE DETERMINES APPROPRIATE TO COVER THE ENTIRE COST OF THE PATENTS AND TRADE-
MARKS OFFICE OF RECEIVING AND ACTING UPON APPLICATIONS FOR PATENT EXTENSIONS.

              SECTION 202 OF THE BILL

    SECTION 202 CREATES A NEW SECTION 271(E) IN TITLE 35 OF THE U.S.C. THE PATENT
LAW.

           PATENT INFRINGEMENT (SECTION 271(E))

    SECTION 271(E)(1) PROVIDES THAT IT SHALL NOT BE AN ACT OF INFRINGEMENT TO MAKE,
USE, OR SELL A PATENTED INVENTION SOLELY FOR USES REASONABLY RELATED TO THE DEVEL-
OPMENT AND SUBMISSION OF INFORMATION UNDER A FEDERAL LAW WHICH REGULATES THE AP-
PROVAL OF DRUGS.  THIS SECTION DOES NOT PERMIT THE COMMERCIAL SALE OF A PATENTED
DRUG BY THE PARTY USING THE DRUG TO DEVELOP SUCH INFORMATION, BUT IT DOES PERMIT
THE COMMERCIAL SALE OF RESEARCH QUANTITIES OF ACTIVE INGREDIENTS TO SUCH PARTY.
THE INFORMATION WHICH CAN BE DEVELOPED UNDER THIS PROVISION IS THE TYPE WHICH IS
REQUIRED TO OBTAIN APPROVAL OF THE DRUG.  A PARTY WHICH DEVELOPS SUCH INFORMATION,
BUT DECIDES NOT TO SUBMIT AN APPLICATION FOR APPROVAL, IS PROTECTED AS LONG AS THE
DEVELOPMENT WAS DONE TO DETERMINE WHETHER OR NOT AN APPLICATION FOR APPROVAL WOULD
BE SOUGHT.
    SECTION 271(E)(2) PROVIDES THAT IT SHALL BE AN ACT OF PATENT INFRINGEMENT TO
SUBMIT AN ANDA FOR A DRUG (1) WHICH IS CLAIMED IN A VALID PRODUCT PATENT, OR (2) A
USE OF WHICH IS CLAIMED IN A VALID USE PATENT, IF THE PURPOSE OF SUBMITTING THE
ANDA IS TO GET APPROVAL OF THE ANDA WITH AN EFFECTIVE DATE PRIOR TO THE EXPIRATION
OF SUCH PATENTS.
    THE PURPOSE OF SECTIONS 271(E)(1) AND (2) IS TO ESTABLISH THAT EXPERIMENTATION
WITH A PATENTED DRUG PRODUCT, WHEN THE PURPOSE IS TO PREPARE FOR COMMERCIAL ACTIV-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

ITY WHICH WILL BEGIN AFTER A VALID PATENT EXPIRES, IS NOT A PATENT INFRINGEMENT.
SINCE THE COMMITTEE'S SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT BEGAN CONSIDERA-
TION OF THIS BILL, THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT HELD THAT THIS
TYPE OF EXPERIMENTATION IS INFRINGEMENT.

   IN ROCHE PRODUCTS, INC. V. BOLAR PHARMACEUTICAL CO., INC.-- F.2D-- (FED. CIR.,
APRIL 23, 1984), THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT HELD THAT THE EXPER-
IMENTAL USE OF A DRUG PRODUCT PRIOR TO THE **46 **2679 EXPIRATION DATE OF A PATENT
CLAIMING THAT DRUG PRODUCT CONSTITUTES PATENT INFRINGEMENT, EVEN THOUGH THE ONLY
PURPOSE OF THE EXPERIMENTS IS TO SEEK FDA APPROVAL FOR THE COMMERCIAL SALE OF THE
DRUG AFTER THE PATENT EXPIRES.  IT IS THE COMMITTEE'S VIEW THAT EXPERIMENTAL
ACTIVITY DOES NOT HAVE ANY ADVERSE ECONOMIC IMPACT ON THE PATENT OWNER'S EXCLUSIV-
ITY DURING THE LIFE OF A PATENT, BUT PREVENTION OF SUCH ACTIVITY WOULD EXTEND THE
PATENT OWNER'S COMMERCIAL EXCLUSIVITY BEYOND THE PATENT EXPIRATION DATE.

   ARTICLE 1, SECTION 8, CLAUSE 8 OF THE CONSTITUTION EMPOWERS CONGRESS TO GRANT
EXCLUSIVE RIGHTS TO AN INVENTOR FOR A LIMITED TIME. THAT LIMITED TIME SHOULD BE A
DEFINITE TIME AND, THEREAFTER, IMMEDIATE COMPETITION SHOULD BE ENCOURAGED.  FOR
THAT REASON, TITLE I OF THE BILL PERMITS THE FILING OF ABBREVIATED NEW DRUG AP-
PLICATIONS BEFORE A PATENT EXPIRES AND CONTEMPLATES THAT THE EFFECTIVE APPROVAL
DATE WILL BE THE EXPIRATION DATE OF THE VALID PATENT COVERING THE ORIGINAL
PRODUCT. OTHER SECTIONS OF TITLE II PERMIT THE EXTENSION OF THE TERM OF A PATENT
FOR A DEFINITE TIME PROVIDED CERTAIN CONDITIONS ARE MET.  THERE SHOULD BE NO OTHER
DIRECT OR INDIRECT METHOD OF EXTENDING PATENT TERM.

          REMEDIES FOR PATENT INFRINGEMENT (SECTION 271(C)(3)-(4))

   IN AN INFRINGEMENT ACTION PURSUANT TO THIS SECTION, NO INJUNCTIVE OR OTHER RE-
LIEF COULD BE GRANTED TO PROHIBIT THE ACTIVITY WHICH IS PERMITTED BY SECTION
271(E)(1).

   THE COMMITTEE EXPECTS THAT INFRINGEMENT ACTIONS PURSUANT TO THIS SECTION WILL
ONLY BE BROUGHT IN THE INSTANCE DESCRIBED IN SECTION 271(E)(2), WHERE A PARTY SUB-
MITTING AN ABBREVIATED NEW DRUG APPLICATION UNDER TITLE I OF THIS BILL CERTIFIES
THAT A PATENT IS INVALID OR NON-INFRINGED AND GIVES THE REQUIRED NOTICE OF THAT
CERTIFICATION TO THE PATENT OWNER.  IN THE EVENT THE PATENT IS FOUND TO BE VALID
AND INFRINGED, SO THAT THE ACT OF INFRINGEMENT DESCRIBED IN SECTION 271(E)(2) HAS
OCCURRED, THE REMEDIES AVAILABLE TO THE COURT ARE THREE-FOLD.

   IF THE INFRINGING PARTY HAS NOT BEGUN COMMERCIAL MARKETING OF THE DRUG, INJUNCT-
IVE RELIEF MAY BE GRANTED TO PREVENT ANY COMMERCIAL ACTIVITY WITH THE DRUG AND THE
FDA WOULD BE MANDATED TO MAKE THE EFFECTIVE DATE OF ANY APPROVED ANDA NOT EARLIER
THAN THE EXPIRATION DATE OF THE INFRINGED PATENT.  THE INJUNCTION COULD NOT PRO-
HIBIT THE INFRINGING PARTY FROM USING THEIR INFORMATION CONTAINED IN THE APPLICA-
TION TO SUPPORT THE APPROVAL OF THE APPLICATION AT THE LATER EFFECTIVE DATE.  IN
THE CASE WHERE THE ANDA HAD NOT BEEN APPROVED, THE ORDER WOULD MANDATE THE EFFECT-
IVE DATE OF ANY APPROVAL TO BE NOT EARLIER THAN THE EXPIRATION DATE OF THE IN-
FRINGED PATENT.  IN THE CASE WHERE AN ANDA HAD BEEN APPROVED, THE ORDER WOULD MAN-
DATE A CHANGE IN THE EFFECTIVE DATE.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL 37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

IF THE INFRINGING PARTY HAS BEGUN COMMERCIAL MARKETING OF THE DRUG, DAMAGES AND OTHER MONETARY RELIEF AND INJUNCTIVE RELIEF MAY BE AWARDED FOR THE INFRINGEMENT AND TO PREVENT FURTHER INFRINGEMENT.  IN ADDITION, THE FDA WOULD BE MANDATED TO CHANGE THE EFFECTIVE DATE OF THE APPROVED ANDA TO THE EXPIRATION DATE OF THE IN-FRINGED PATENT.

**\*47 \*\*2680** SECTION 203 OF THE BILL

SECTION 203 ADDS A NEW PROVISIONS TO SECTION 282 OF TITLE 35, UNITED STATES CODE.

DEFENSES TO PATENT INFRINGEMENT (SECTION 282)

THE NEW PROVISION IN SECTION 282 PROVIDES THAT AN IMPROPER GRANT OF PATENT EX-TENSION, OR ANY PORTION THEREOF, BECAUSE OF A MATERIAL FAILURE BY THE APPLICANT OR BY THE COMMISSIONER OF PATENTS AND TRADEMARKS TO COMPLY WITH THE REQUIREMENTS OF SECTION 156, IS A DEFENSE IN ANY ACTION INVOLVING THE INFRINGEMENT OF THE PATENT DURING THE PATENT EXTENSION. ANY FAILURE BY THE APPLICANT TO COMPLY WITH THE RE-QUIREMENTS OF SECTION 156 WOULD BE CONSIDERED MATERIAL ONLY IF THE FAILURE WOULD HAVE CHANGES THE DECISION TO GRANT THE EXTENSION OR THE LENGTH OF THE EXTENSION. ANY FAILURE BY THE COMMISSIONER TO COMPLY WITH THE REQUIREMENTS OF SECTION 156 WOULD BE CONSIDERED MATERIAL UNLESS THE COMMISSIONER FAILED TO MEET A TIME DEAD-LINE.

UNDER THIS PROVISION, A COURT WHICH FOUND SOME PORTION OF THE EXTENSION TO BE IMPROPERLY GRANTED WOULD NOT INVALIDATE THE ENTIRE PATENT EXTENSION.  FOR EXAMPLE, IF THE COMMISSIONER MADE A MATHEMATICAL ERROR THAT RESULTED IN A FIVE YEAR EXTEN-SION INSTEAD OF THE FOUR YEAR EXTENSION TO WHICH THE APPLICANT WAS ENTITLED, THE COURT WOULD INVALIDATE ONLY THAT PORTION OF THE PATENT EXTENSION IMPROPERLY GRAN-TED.

IMPLICIT IN SECTION 156 IS A DIRECTIVE TO THE COMMISSIONER TO CORRECT ANY FAIL-URE ON HIS PART THAT RESULTED IN THE FUNDING OF INVALIDITY OF A PATENT EXTENSION OR ANY PORTION OF IT.  THE NEW PROVISION DOES NOT CREATE ANY CAUSE OF ACTION UNDER THE TORT CLAIMS ACT AGAINST THAT COMMISSIONER OR ANY PATENTS AND TRADEMARKS OFFICE EMPLOYEE INVOLVED WITH THE EXTENSION.

IN AN ACTION INVOLVING THIS NEW PROVISION, THE DETERMINATION REGARDING DUE DILI-GENCE MADE UNDER SECTION 156(D)(2) IS NOT SUBJECT TO REVIEW.

AGENCY VIEWS

AGENCY COMMENTS WERE SUBMITTED BY THE FOOD AND DRUG ADMINISTRATION DURING THE JULY 15, 1983, HEARING OF THE SUBCOMMITTEE ON HEALTH AND THE ENVIRONMENT.

\*        \*        \*        \*

**\*71 \*\*2681** MINORITY VIEWS OF MR. BLILEY

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


INTRODUCTION

   H.R. 3605, AS REPORTED BY THE COMMITTEE, IS A BILL DESCRIBED BY ITS PROPONENTS
AS HAVING SOMETHING FOR EVERYONE-- RESTORATION OF PATENT TERMS FOR PRODUCTS SUB-
JECT TO ELABORATE PREMARKET APPROVAL REQUIREMENTS TO PROVIDE INCENTIVES FOR PHAR-
MACEUTICAL RESEARCH AND FACILITATION OF APPROVAL OF GENERIC DRUGS BY THE FOOD AND
DRUG ADMINISTRATION UNDER ABBREVIATED APPLICATION PROCEDURES TO INCREASE DRUG
PRICE COMPETITION. THE OBJECTIVES OF THIS LEGISLATION ARE SALUTARY AND HAVE THE
SUPPORT OF ALL INTERESTED PARTIES.  IN MY VIEW, HOWEVER, THE LEGISLATION FAILS TO
ACHIEVE A PROPER BALANCE BETWEEN THESE TWO OBJECTIVES.
   INSTEAD OF PROVIDING AN APPROPRIATE PATENT TERM FOR PHARMACEUTICALS BY RESTORING
THE TIME DEVOTED TO PERIODS OF 'REGULATORY REVIEW,' THE BILL STRICTLY LIMITS THE
TYPES OF PATENTS ELIGIBLE FOR TERM RESTORATION AND THE CONDITIONS AND LENGTH OF
THE RESTORATION PERIOD.  IN SHORT, THE PATENT TERM RESTORATION PROVISIONS OF THIS
BILL ARE LARGELY ILLUSORY. MOREOVER, THE BILL WOULD OVERRULE A DECISION OF THE
HIGHEST PATENT COURT IN THIS COUNTRY AND THEREBY ALLOW GENERIC DRUG COMPANIES TO
USE A PATENTED PRODUCT DURING THE TERM OF THE PATENT.  THIS IS A SUBSTANTIAL DI-
MINUTION OF THE RIGHTS CURRENTLY HELD BY THE OWNER OF THE PATENT AND HAS SERIOUS
CONSTITUTIONAL AND POLICY IMPLICATIONS WHICH HAVE NOT BEEN CONSIDERED BY THE COM-
MITTEE.  THE PATENT PROVISIONS OF THIS BILL ALSO ENCOURAGE PATENT 'JUMPING' AND
LITIGATION OVER THE VALIDITY OF PATENTS.
   THE ABBREVIATED NEW DRUG APPLICATION (ANDA) PROVISIONS OF THIS BILL ARE EQUALLY
TROUBLESOME.  FOR EXAMPLE, THE BILL HAS SUBSTANTIAL ADVERSE EFFECTS ON THE RE-
SOURCES AND LEGAL AUTHORITY OF THE FOOD AND DRUG ADMINISTRATION, WHICH HAS EX-
PRESSED SOME OF ITS CONCERNS ABOUT THE BILL IN A DOCUMENT ENTITLED 'TECHNICAL COM-
MENTS ON JUNE 2 DISCUSSION DRAFT ANDA/PATENT TERM RESTORATION LEGISLATION,'
LARGELY TO NO AVAIL.  MANY MEMBERS OF THE CONGRESS AND VARIOUS PRESTIGIOUS ACADEM-
IC AND STUDY GROUPS HAVE EXPLORED RECENTLY THE NEED FOR FASTER APPROVALS OF INNOV-
ATIVE AND MEDICALLY NECESSARY NEW DRUGS.  THE NEED TO ACCELERATE THE APPROVAL OF
NEW DRUGS HAS BEEN ACKNOWLEDGED BY NEARLY EVERYONE, INCLUDING THE FDA.  IT IS AS-
TONISHING, IN LIGHT OF THE WIDELY HELD VIEW THAT THE NEW DRUG APPROVAL PROCESS
TAKES TOO LONG, THAT THE COMMITTEE REPORTED H.R. 3605, WHICH IMPOSES SUBSTANTIAL
NEW ADMINISTRATIVE AND RESOURCE BURDENS ON THE FDA WHICH WILL ALMOST CERTAINLY
HAVE THE EFFECT OF FORCING FDA TO DIVERT RESOURCES FROM THE REVIEW AND APPROVAL OF
NEW THEREPEUTIC ENTITIES TO THE REVIEW AND APPROVAL OF COPIES OF ALREADY-AVAILABLE
DRUGS.
   I AM DEEPLY CONCERNED THAT IN ITS HASTE TO REPORT THIS LENGTHY AND COMPLEX BILL,
THE COMMITTEE HAS FAILED TO CONSIDER FULLY AND ADEQUATELY ITS EFFECTS-- INTENDED
AND UNINTENDED, DESIRABLE AND UNDESIRABLE-- IN **72 EITHER HEARINGS OR MARKUP.
H.R. 3605 IS A SIGNIFICANT PIECE OF LEGISLATION WITH IMPORTANT IMPLICATIONS FOR
CONSUMERS, RESEARCH-**2682 BASED PHARMACEUTICAL COMPANIES, GENERIC DRUG COMPANIES
AND FOR THE FDA.  IN POINT OF FACT, HOWEVER, THE COMMITTEE HAS REPORTED A HIGHLY
SIGNIFICANT AND LENGTHY BILL WITHOUT ANY HEARINGS HAVING BEEN HELD ON IT IN EITHER
THE HEALTH SUBCOMMITTEE OR IN THE FULL COMMITTEE. IT IS NO ANSWER TO SAY THAT THE
BILL IS THE RESULT OF LENGTHY NEGOTIATIONS BETWEEN THE BRANDNAME AND GENERIC DRUG

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

INDUSTRY TRADE ASSOCIATIONS. MANY SIGNIFICANT INTERESTS, INCLUDING THE HIGHLY IN-
NOVATIVE AND RESEARCH-ORIENTED PHARMACEUTICAL FIRMS HAVE SERIOUS RESERVATIONS
ABOUT THE BILL AS REPORTED AS APPARENTLY, DOES THE FDA.

H.R. 3605 IS AN ADMIRABLE BEGINNING TO THE PROCESS OF STRIKING AN APPROPRIATE
BALANCE AMONG A VARIETY OF COMPETING AND IMPORTANT POLICY OBJECTIVES. THERE IS
AMPLE TIME FOR, AND A COMPELLING NEED TO, CONSIDER, REVISE AND IMPROVE UPON THE
BILL. IN MY VIEW, THE BILL SHOULD BE RETURNED TO THE HEALTH SUBCOMMITTEE FOR FUR-
THER HEARINGS AND AMENDMENT, RATHER THAN BEING REPORTED IN HASTE BY THIS COMMIT-
TEE. FURTHER, BECAUSE THIS COMMITTEE LACKS EXPERTISE IN PATENT MATTERS, THE COM-
MITTEE IS NOT QUALIFIED TO EVALUATE THE PATENT PROVISIONS OF H.R. 3605. WE DO
THIS INSTITUTION A DISSERVICE BY HASTILY REPORTING ON THE VERY DAY OF INTRODUC-
TION, A COMPLEX BILL OUTSIDE THE EXPERTISE OF THE COMMITTEE AFTER A 'MARKUP' THAT
LASTED BARELY THIRTY MINUTES.

IN THE NEXT SECTIONS OF MY VIEWS, I DESCRIBE IN GREATER DETAIL THE SIGNIFICANT
AREAS IN WHICH THIS BILL IS DEFICIENT.

### I. TITLE I-- ABBREVIATED NEW DRUG APPLICATIONS

#### A. LIMITS ON FDA AUTHORITY

BOTH THE RESEARCH-BASED PHARMACEUTICAL COMPANIES WHICH FAVOR AMENDMENTS TO  H.R.
3605 AND THE FDA ITSELF HAVE IDENTIFIED WAYS IN WHICH THE BILL UNWISELY RESTRICTS
FDA'S AUTHORITY TO ENSURE THAT ALL DRUGS ARE DEMONSTRATED TO BE SAFE AND EFFECT-
IVE.

FIRST, THE BILL EXPRESSLY PROHIBITS FDA FROM REQUESTING DATA ON THE SAFETY OR
EFFICACY OF CERTAIN GENERIC DRUGS, EVEN WHERE SUCH DATA ARE NEEDED TO FULFILL THE
FDA'S PUBLIC HEALTH RESPONSIBILITIES. ALTHOUGH ONE WOULD NOT ANTICIPATE THAT FDA
WOULD NEED TO RESORT TO THIS AUTHORITY VERY OFTEN, I BELIEVE IT IS A FUNDAMENTAL
MISTAKE TO DEPRIVE THE FDA OF THE AUTHORITY SIMPLY BECAUSE IT IS ASSUMED THAT IT
WILL NEED TO EXERCISE IT ONLY RARELY.

SECOND, IT HAS BEEN THE LONGSTANDING POLICY OF FDA TO REQUIRE THAT PERSONS SEEK-
ING TO MARKET DRUGS COMBINING TWO OR MORE ACTIVE INGREDIENTS DEMONSTRATE THAT THE
COMBINATION ITSELF, AS OPPOSED TO THE ACTIVE INGREDIENTS INDIVIDUALLY, BE SHOWN TO
BE SAFE AND EFFECTIVE. FDA'S AUTHORITY TO REQUIRE THIS PROOF HAS BEEN UPHELD BY
THE COURTS. WITHOUT EXPLANATION OR HEARING, H.R. 3605 WOULD OVERRULE THIS POLICY
AND LIMIT FDA'S CONSIDERATION OF SAFETY AND EFFICACY TO THE INDIVIDUAL ACTIVE IN-
GREDIENTS OF COMBINATION DRUGS. I DO NOT BELIEVE THAT THE CONGRESS SHOULD PROVIDE
FOR THE APPROVAL OF NEW COMBINATIONS OF DRUGS WITHOUT REQUIRING THE APPLICANT TO
DEMONSTRATE THAT THE COMBINATION IS SAFE AND EFFECTIVE. THE PUBLIC HEALTH SHOULD
NOT BE COMPROMISED IN THIS FASHION.

#### *73 **2683 B. RESOURCE IMPLICATIONS

THE REVIEW AND APPROVAL BY FDA OF NEW PHARMACEUTICALS-- OFTEN INNOVATIVE AND
HIGHLY DESIRABLE DEVELOPMENTS ESSENTIAL TO THE HEALTH OF OUR CITIZENS-- IS PERHAPS

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

THE MOST IMPORTANT FUNCTION THAT THE CONGRESS HAS GIVEN TO THE FDA. THE AMERICAN
PEOPLE AND THE MEMBERS OF THE CONGRESS RIGHTLY EXPECT THAT THIS FUNCTION BE PER-
FORMED COMPETENTLY AND EXPEDITIOUSLY. NEW DRUGS ARE OFTEN INEXPENSIVE WAYS TO
CURE LIFE-THREATENING OR DEBILITATING DISEASES. UNNECESSARY DELAY IN MAKING THESE
DRUGS AVAILABLE TO PHYSICIANS HAS BEEN A CONTINUING CONCERN TO ME, MANY OTHER MEM-
BERS OF THE CONGRESS, TO THE FDA, TO THE MEDICAL COMMUNITY AND OTHERS. THE SO-
CALLED 'DRUG LAG' AND THE NEED TO EXPEDITE DRUG APPROVALS HAS BEEN WIDELY STUDIED
AND RECOMMENDATIONS FOR IMPROVEMENTS ABOUND. INDEED, FDA IS IN THE MIDST OF RE-
VISING ITS REGULATIONS AND PROCEDURES FOR NEW DRUG APPROVALS.

   ASTONISHINGLY, THEN, THE COMMITTEE HAS REPORTED A BILL WHICH IS LIKELY TO REDUCE
FDA'S ABILITY TO IMPROVE ITS NEW DRUG APPROVAL PROCEDURES AND ITS TIMELINESS IN
ACTING ON NEW DRUG APPLICATIONS. FDA HAS EXPRESSED CONCERN IN ITS 'TECHNICAL COM-
MENTS' THAT THE BILL REPORTED BY THE COMMITTEE WILL RESULT IN A 'SUBSTANTIAL IN-
CREASE IN WORK LOAD DURING THE FIRST FEW YEARS IMMEDIATELY FOLLOWING ENACTMENT.'
IT IS OBVIOUS THAT THIS INCREASE IN WORKLOAD WILL OBLIGATE FDA TO REALLOCATE PER-
SONNEL FROM NEW DRUG REVIEW TO ANDA REVIEW. BECAUSE THE BILL ALSO CONTAINS TIME
LIMITS ON FDA'S ACTIONS ON ANDAS WHICH ARE FAR MORE RESTRICTIVE THAN THOSE FOR
NDAS, [FN21] THIS PROBLEM WILL BE FURTHER EXACERBATED. IT IS APPARENTLY THE COM-
MITTEE'S VIEW THAT REVIEW OF ANDAS IS A MORE IMPORTANT PRIORITY FOR FDA THAN NDAS.
I TAKE STRONG EXCEPTION TO THAT JUDGMENT.

   AS FDA HAS SUGGESTED, A PHASE-IN OF ELIGIBILITY OF ANDAS WOULD AMELIORATE MUCH
OF ITS WORKLOAD BURDEN WHILE SIMULTANEOUSLY MAKING AVAILABLE IMMEDIATELY FOR ANDA
TREATMENT SIX OF THE DRUGS THAT ARE AMONG THE TOP SELLING PRESCRIPTION DRUG
PRODUCTS. I URGE THE MEMBERS OF THE HOUSE TO CONSIDER THIS IDEA AMONG OTHERS AS A
WAY TO GREATLY IMPROVE UPON THIS BILL.

                      C. DISCLOSURE OF PROPRIETARY DATA

   THE BILL REPORTED BY THE COMMITTEE PROVIDES FOR THE PUBLIC DISCLOSURE OF ALL OF
THE EXTENSIVE AND COSTLY RESEARCH DATA GENERATED BY RESEARCH-ORIENTED PHARMACEUT-
ICAL COMPANIES, EVEN THOUGH THOSE SAFETY AND EFFECTIVENESS DATA MAY BE OF SIGNI-
FICANT VALUE TO FOREIGN COMPETITORS OR MAY RETAIN PROPRIETARY VALUE IN THE UNITED
STATES. THESE DATA MAY WELL RETAIN COMMERCIAL VALUE, EVEN WHEN FDA NO LONGER RE-
QUIRES AN APPLICANT TO SUBMIT THEM FOR APPROVAL OF A DRUG (I.E., WHEN AN ANDA MAY
BE FILED WITH FDA, THE FULL DATA ARE NOT NEEDED). THE DATA MAY STILL BE VALUABLE,
FOR EXAMPLE, BECAUSE IN MANY FOREIGN COUNTRIES ALL OR A PORTION OF THESE DATA ARE
NEEDED TO OBTAIN APPROVAL. THESE DATA WILL BE VALUABLE PARTICULARLY IN THOSE
COUNTRIES WHICH DO NOT RECOGNIZE U.S. PATENTS. BY PROVIDING FOR THE **\*74 \*\*2684** RE-
LEASE OF THESE DATA, THE BILL HANDS TO FOREIGN COMPETITORS OF U.S. DRUG FIRMS, FOR
THE MERE PRICE OF PHOTOCOPYING CHARGES, DATA WHICH COST MANY MILLIONS OF DOLLARS
TO OBTAIN AND WHICH CAN BE USED TO OBTAIN APPROVAL TO MARKET DRUGS IN COMPETITION
WITH THE OWNER AND GENERATOR OF THE DATA. THIS PROVISION OF H.R. 3605 IS HARDLY
THE WAY TO PROTECT AND IMPROVE THE COMPETITIVENESS OF AMERICA'S PHARMACEUTICAL IN-
DUSTRY.

   IT SHOULD ALSO BE NOTED THAT THIS PROVISION OF H.R. 3605 HAS SIGNIFICANT RE-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)
Case 1:08-cv-00290-SLR    Document 11-3    Filed 08/29/2008    Page 85 of 98
Page 98
H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

SOURCE IMPLICATIONS FOR FDA. UNDER THE FREEDOM OF INFORMATION ACT, FDA IS OBLIG-
ATED TO RESPOND TO REQUESTS FOR DOCUMENTS IN ITS FILES, INCLUDING THE VOLUMINOUS
SAFETY AND EFFECTIVENESS DATA MADE AVAILABLE BY THE BILL, ORDINARILY WITHIN TEN
DAYS. SINCE THE ENACTMENT OF THE FOI ACT, FDA HAS CONSISTENTLY RECEIVED MORE RE-
QUESTS FOR DOCUMENTS THAN VIRTUALLY ANY OTHER FEDERAL AGENCY. IN 1983, FDA RE-
CEIVED OVER 39,000 FOI REQUESTS. ONE HUNDRED TWENTY-FIVE 'FULL TIME EQUIVALENTS,'
MANY HIGHLY TRAINED SCIENTISTS AND DOCTORS, WERE REQUIRED TO PROCESS THESE RE-
QUESTS. UNDER H.R. 3605, OVER TWENTY YEARS OF SAFETY AND EFFECTIVENESS DATA AND
INFORMATION WILL, IMMEDIATELY UPON ENACTMENT, BE AVAILABLE FOR DISCLOSURE. IF FDA
WERE TO RECEIVE REQUESTS FOR EVEN A MODEST PART OF THOSE DATA, THE WORKLOAD AND
RESOURCE BURDENS WOULD BE STAGGERING. I FAIL TO SEE HOW THE PUBLIC BENEFITS BY
HAVING FDA BE FORCED TO DIVERT SCARCE TECHNICAL PERSONNEL AND RESOURCES TO PRO-
CESSING FDA REQUESTS AND ANDAS, AT THE EXPENSE OF NEW DRUG APPLICATIONS AND OTHER
IMPORTANT PUBLIC HEALTH FUNCTIONS.

## II.  TITLE II-- PATENT TERM RESTORATION

H.R. 3605 CONTAINS MANY SIGNIFICANT REVISIONS TO OUR PATENT LAWS. RATHER THAN
RESTORING PATENT TERMS LOST DURING EXTENSIVE REGULATORY REVIEW PERIODS, THESE RE-
VISIONS ELIMINATE MANY OF THE SIGNIFICANT RIGHTS WHICH CURRENTLY ACCRUE TO THE
PATENT OWNER. MOREOVER, THE PATENT TERM RESTORATION PROVISIONS ARE SO RESTRICTIVE
THAT THEIR EFFECT MAY WELL BE LARGELY ILLUSORY. INNOVATION IS NOT ENCOURAGED BY
THESE PATENT PROVISIONS.

### A. LOSS OF PATENT RIGHTS

I AM ADVISED THAT IT HAS LONG BEEN ACCEPTED THAT TO USE, SELL OR MAKE A PATENTED
PRODUCT DURING THE LIFE OF THE PATENT CONSTITUTES PATENT INFRINGEMENT. THIS AS-
PECT OF THE RIGHTS ACCRUING TO THE PATENT OWNER WAS RECENTLY REAFFIRMED IN THE
CONTEXT OF GENERIC DRUGS IN THE SO-CALLED BOLAR CASE. THE UNITED STATES COURT OF
APPEALS FOR THE FEDERAL CIRCUIT HELD, CONSISTENT WITH PRIOR LAW, THAT A GENERIC
DRUG COMPANY MAY NOT FORMULATE AND TEST ITS VERSION OF ANOTHER COMPANY'S PATENTED
DRUG UNTIL THE PATENT TERM EXPIRES. THE BOLAR DECISION IS SOUND LAW AND SHOULD BE
RETAINED.
H.R. 3605, HOWEVER, WOULD OVERRULE BOLAR AND THEREBY PERMIT A GENERIC DRUG COM-
PANY TO ENGAGE IN ACTS WHICH HERETOFORE WOULD HAVE CONSTITUTED PATENT INFRINGE-
MENT. IT IS EXTREMELY DOUBTFUL THAT IT IS SOUND POLICY IN A BILL DESIGNED TO RE-
STORE PATENT LIFE, TO DRAMATICALLY CUT BACK ON EXISTING PATENT RIGHTS.
I AM ALSO CONCERNED THAT THE CONSTITUTIONAL IMPLICATIONS OF THIS PROVISION OF
H.R. 3605 HAVE NOT BEEN CONSIDERED. BY OVERRULING BOLAR, THE BILL RETROSPECTIVELY
DEPRIVES THE PATENT HOLDER OF VALUABLE **\*75 \*\*2685** RIGHTS. PATENT RIGHTS REPRESENT
BOTH A CONTRACTUAL RIGHT BETWEEN THE PATENT HOLDER AND THE U.S. GOVERNMENT AND A
RECOGNIZED PROPERTY RIGHT. THE CONSTITUTION PREVENTS THE GOVERNMENT FROM IMPAIR-
ING THE RIGHTS OF CONTRACT AND FROM 'TAKING' OR DEPRIVING ONE OF A PROPERTY RIGHT
WITHOUT JUST COMPENSATION. BY OVERRULING BOLAR FOR PATENTS ALREADY ISSUED, H.R.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


3605 VIOLATES THESE IMPORTANT PROTECTIONS FOUND IN OUR CONSTITUTION.

                    B. RESTRICTIONS ON PATENT TERM RESTORATION

   UNDER H.R. 3605, MOST PATENTS WILL NOT BE ELIGIBLE FOR RESTORATION, EVEN THOUGH
THEY MAY COVER PRODUCTS OR METHODS OF USE, FORMULATION OR ADMINISTRATION, OF IN-
NOVATIVE DRUGS WHICH REQUIRED MANY YEARS AND GREAT EXPENSE TO RESEARCH AND DEVELOP
AND EVEN THOUGH MANY YEARS MAY HAVE BEEN DEVOTED TO SECURING AN APPROVAL TO MARKET
FROM THE FDA.  THE BILL THUS FAILS TO ACHIEVE ONE OF ITS PRINCIPAL PURPOSES:  TO
ENSURE THAT SUFFICIENT INCENTIVES EXIST FOR INNOVATION.

   A FEW EXAMPLES OF THE RESTRICTIVE APPROACH TO PATENT TERM RESTORATION WILL
DEMONSTRATE THE INADEQUACIES OF H.R. 3605.

   UNDER PRESENT LAW, A PATENT CAN BE OBTAINED CONTAINING A BROAD CLAIM (GENUS)
COVERING MANY COMPOUNDS.  IT IS DIFFICULT AND REQUIRES A LARGE INVESTMENT BY THE
INNOVATOR, BUT IS STILL POSSIBLE SUBSEQUENTLY TO OBTAIN A PATENT FOR SPECIFIC
CLAIMS (SPECIES) ON A FEW SPECIFIC COMPOUNDS ENCOMPASSED WITHIN THE GENUS.  UNDER
THE BILL, SHOULD A PATENT HOLDER OBTAIN A PATENT WITH SPECIES CLAIMS COVERED BY A
PREVIOUSLY-ISSUED GENUS PATENT, THE PATENT HOLDER COULD NOT OBTAIN RESTORATION OF
THE TERM OF THE SPECIES PATENT.

   IN ADDITION, UNDER PRESENT LAW, THE PATENT OFFICE CAN REQUIRE THAT THE CLAIMS IN
A PATENT APPLICATION BE DIVIDED AND PROSECUTED IN SEPARATE PATENTS.  UNDER THE
BILL, THE FIRST ISSUED PATENT OF THE SERIES WOULD BE THE ONLY PATENT TERM ENTITLED
TO RESTORATION, AND SUBSEQUENTLY ISSUED PATENTS OF THE SERIES WOULD BE PRECLUDED
FROM RESTORATION.  ACCORDINGLY, UNLESS AN FDA APPROVED PRODUCT IS CLAIMED WITHIN
THE FIRST ISSUED PATENT OF THE SERIES, RESTORATION OF A PATENT TERM COVERING THE
PRODUCT WOULD NOT BE AVAILABLE.  DURING THE PATENT APPLICATION PROCESS, IT IS IM-
POSSIBLE TO KNOW WHICH DRUG OR DRUGS WILL ULTIMATELY BE SUCCESSFULLY TESTED AND
MARKETED.  THEREFORE, A PATENT HOLDER IS BEING DENIED THE BENEFIT OF PATENT TERM
RESTORATION DUE TO CIRCUMSTANCES BEYOND ITS CONTROL.

   ANOTHER EXCEPTION TO PATENT TERM RESTORATION ENCOMPASSED BY H.R. 3605 WOULD OC-
CUR WHERE ONE PATENT COVERS TWO FDA APPROVED DRUGS.  ANY CLAIMS IN THE PATENT COV-
ERING THE SECOND FDA APPROVED DRUG COULD NOT BE RESTORED. ACCORDINGLY, ONLY ONE
RESTORATION IS AVAILABLE PER PATENT EVEN THOUGH A COMPANY MAY HAVE EXPENDED CON-
SIDERABLE RESOURCES IN DEVELOPING EACH FDA APPROVED PRODUCT.

   THE BILL ALSO LIMITS AVAILABILITY OF PATENT TERM RESTORATION FOR METHOD OF MANU-
FACTURING PATENTS (NOT USING DNA TECHNOLOGY), INCLUDING THE LIMITATION THAT NO
OTHER TYPE OF PATENT HAS BEEN OR 'MAY BE ISSUED FOR ANY KNOWN THERAPEUTIC PUR-
POSES' CLAIMING THE METHOD OF USING THE PRODUCT.

   BY EXCLUDING SO MANY PATENTS FROM ELIGIBILITY FOR TERM RESTORATION AND BY MAKING
THE ELIGIBILITY FOR RESTORATION OF SOME PATENTS TURN ON CIRCUMSTANCES BEYOND THE
CONTROL OF THE INNOVATOR, THE BILL FALLS WELL SHORT OF PROVIDING THE INCENTIVES
FOR INNOVATION THAT IT **\*76 \*\*2686** PURPORTS TO ACHIEVE.  IT IS NOT NECESSARY, OR
COURSE, THAT EVERY PATENT BE ELIGIBLE FOR EXTENSION IN ORDER FOR REASONABLE IN-
CENTIVES TO INNOVATE TO EXIST.  RATHER, THE BILL SHOULD PROVIDE FOR PATENT TERM
RESTORATION FOR ALL SIGNIFICANT INNOVATIONS, BE THEY IN DISCOVERING NEW CHEMICAL

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**

ENTITIES, NEW DOSAGE FORMS, NEW USES OR SPECIES OF SUBSTANCES PREVIOUSLY COVERED
BY BROAD GENUS PATENTS.  THE RESTRICTIVE ELIGIBILITY PROVISIONS OF H.R. 3605 MAKE
PATENT TERM RESTORATION A HAPHAZARD AND INFREQUENT EVENT.  INNOVATION IS NOT EN-
COURAGED WHEN THE PROSPECT OF MEANINGFUL PATENT LIFE IS LEFT TO CHANCE AND HAPPEN-
STANCE AND WHEN MOST INNOVATIONS COVERED BY PATENTS WILL NOT BE ELIGIBLE FOR TERM
RESTORATION.

  H.R. 3605 ALSO MAKES OTHER SIGNIFICANT CHANGES TO OUR PATENT LAWS WHICH NEITHER
I NOR THIS COMMITTEE HAVE HAD TIME TO LEARN ABOUT OR CONSIDER.

                    III.   CONCLUSION

  IT IS DISTRESSING AND REGRETTABLE THAT THIS COMMITTEE HAS REPORTED A COMPLEX,
LENGTHY AND HIGHLY SIGNIFICANT PIECE OF LEGISLATION WITHOUT HOLDING HEARINGS IN
EITHER THE HEALTH SUBCOMMITTEE OR IN THE FULL COMMITTEE AND AFTER WHAT CAN ONLY BE
DESCRIBED AS A PRO FORMA MARKUP. IT IS EQUALLY DISTRESSING THAT THIS COMMITTEE RE-
PORTED A CONTROVERSIAL BILL WHICH CHANGES SIGNIFICANTLY OUR PATENT LAWS, AN AREA
WHICH ESCAPES EVEN THE BROAD JURISDICTION OF THIS COMMITTEE.

  I SHARE WITH OTHER MEMBERS THE DESIRE TO RESTORE PATENT LIFE LOST DURING PERIODS
OF REGULATORY REVIEW AND THE DESIRE TO FACILITATE THE APPROVAL OF GENERIC DRUGS.
I OBJECT, HOWEVER, TO THE PRECIPITOUS AND SUPERFICIAL CONSIDERATION OF THE BILL BY
THE COMMITTEE AND TO ITS FAILURE TO PROVIDE FOR AND CONSIDER, THE VIEWS OF ALL
PARTIES AFFECTED BY THE LEGISLATION.

  THOMAS J. BLILEY, JR.

  FN1   21 U.S.C. 355.

  FN2   THE TERM 'LISTED DRUG' IS EXPLAINED IN PARAGRAPH (6) OF NEW SECTION 505(J)
OF THE FFDCA.  GENERALLY, A LISTED DRUG INCLUDES ANY DRUG THAT HAS BEEN APPROVED
FOR SAFETY AND EFFECTIVENESS OR THAT HAS BEEN APPROVED UNDER NEW SUBSECTION (J).

  FN3   48 FED.REG. 2751(1983).

  FN4   ID. AT 2753.

  FN5   ID. AT 2755.  21 C.F.R. 314.2(C) PROVIDES IN PART: 'A PROSPECTIVE APPLICANT
MAY SEEK A DETERMINATION OF THE SUITABILITY OF AN ABBREVIATED NEW DRUG APPLICATION
FOR A PRODUCT THAT THE APPLICANT BELIEVES SIMILAR OR RELATED TO A DRUG PRODUCT
THAT HAS BEEN DECLARED TO BE SUITABLE FOR AN ABBREVIATED NEW DRUG APPLICATION . .
. . '

  FN6   ID. AT 2756.  SEE 21 CFR 314.2(F)(4), (5), (6), (7), AND (8).

  FN7   ID. AT 2755.  SEE 21 CFR 314.2(C).

  FN8   ID. AT 2752.

  FN9   ID.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)

**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


FN10    21 U.S.C. 321(P).  FOR EXAMPLE, A DRUG MARKETED PRIOR TO 1938 AND UN-
CHANGED IS A 'GRANDFATHERED DRUG' AND THUS NOT WITHIN THE SCOPE OF THE DEFINITION
OF 'NEW DRUG' SET FORTH IN SECTION 201(P) OF THE FFDCA.  ANOTHER EXAMPLE OF A DRUG
OUTSIDE THE SCOPE OF SECTION 201(P) IS A PRODUCT THAT IS GENERALLY RECOGNIZED AS
SAFE AND EFFECTIVE AND THAT HAS BEEN USED TO A MATERIAL EXTENT OR FOR A MATERIAL
TIME.

FN11    21 U.S.C. 352(E)(1)-(4).

FN12    SEE UNTRUE STATEMENTS IN APPLICATION, 21 C.F.R. 314.12(1982).

FN13    THE COMMITTEE RECOGNIZES THAT, IN CERTAIN INSTANCES, THE PATENT OWNER MAY
AGREE WITH THE CERTIFICATION OF THE APPLICANT.  FOR EXAMPLE, WHEN THE APPLICANT
CERTIFIES THAT PATENT NO. 1 IS INVALID AND PATENT NO. 2 IS NOT INFRINGED, THE PAT-
ENT OWNER MAY AGREE WITH THE CERTIFICATION REGARDING PATENT NO. 2.  THEN AN ACTION
FOR PATENT INFRINGEMENT NEED ONLY BE BROUGHT WITH RESPECT TO PATENT NO. 1.

FN14    28 U.S.C. 1407.

FN15    SEE DEFINITION OF BIOAVAILABILITY, 21 C.F.R. 320.1(A)(1982).

FN16    SEE DEFINITION OF BIOEQUIVALENT DRUG PRODUCTS, 21 C.F.R. 320.1(E)(1982).

FN17    THE COMMITTEE RECOGNIZES THAT IN CERTAIN INSTANCES, THE PATENT OWNER MAY
AGREE WITH THE CERTIFICATION OF THE APPLICANT.  FOR EXAMPLE, WHEN THE APPLICANT
CERTIFIES THAT PATENT NO. 1 IS INVALID AND PATENT NO. 2 IS NOT INFRINGED, THE PAT-
ENT OWNER MAY AGREE WITH THE CERTIFICATION REGARDING PATENT NO. 2.  THEN AN ACTION
FOR PATENT INFRINGEMENT NEED ONLY BE BROUGHT WITH RESPECT TO PATENT NO. 1.

FN18    SEE CONFIDENTIALITY OF DATA AND INFORMATION IN A NEW DRUG APPLICA-
TION  (NDA) FILE, 21 C.F.R. 314.14(F)(1)-(4)(1982).

FN19    21 C.F.R. 314.14(F)(5) PROVIDES: '(5) A FINAL DETERMINATION HAS BEEN MADE
THAT THE DRUG MAY BE MARKETED WITHOUT SUBMISSION OF SUCH SAFETY AND/OR EFFECTIVE-
NESS DATA AND INFORMATION.' THE COMMITTEE WAS CONCERNED THAT THIS PROVISION OF THE
REGULATION MIGHT BE INTERPRETED AS PERMITTING THE DISCLOSURE OF SUCH INFORMATION
AND DATA UPON ENACTMENT OF THIS BILL.  THIS IS BECAUSE ALL DRUGS APPROVED FOR
SAFETY AND EFFECTIVENESS PRIOR TO ENACTMENT OF THIS BILL ARE DEEMED LISTED AND
THUS ELIGIBLE FOR CONSIDERATION IN AN ANDA UPON ENACTMENT OF THE BILL. THE COMMIT-
TEE WISHED TO AVOID ANY POSSIBILITY THAT LISTING OF A DRUG UNDER THIS BILL WOULD
BE DEEMED A FINAL DETERMINATION THAT THE DRUG COULD BE APPROVED WITHOUT THE SUB-
MISSION OF SAFETY AND EFFECTIVENESS INFORMATION.

FN20    THE PHRASE 'IDENTICALLY DISCLOSED OR DESCRIBED' IS USED IN 35 U.S.C. 103
TO SET FORTH THE CONDITIONS OF 35 U.S.C. 102.

FN21    UNDER CURRENT LAW, THE 180-DAY TIME PERIOD FOR ACTING ON AN NDA DOES NOT
BEGIN UNTIL THE NDA IS 'FILED,' I.E., IS NEARLY READY TO BE APPROVED BY

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

H.R. REP. 98-857(I)                                                          Page 42
H.R. REP. 98-857(I), H.R. Rep. No. 857(I), 98TH Cong., 2ND Sess. 1984, 1984 U.S.C.C.A.N. 2647, 1984 WL
37416 (Leg.Hist.)
**(Cite as: H.R. REP. 98-857(I), 1984 U.S.C.C.A.N. 2647)**


FDA.  UNDER H.R. 3605 THE 180-DAY TIME PERIOD FOR ACTING ON AN ANDA BEGINS WHEN
THE ANDA IS SUBMITTED.  A SUBSTANTIAL TIME MAY PASS BETWEEN 'SUBMISSION' AND 'FIL-
ING' WHILE THE APPLICATION IS BROUGHT INTO CONFORMITY WITH FDA'S CRITERIA FOR AP-
PROVAL.

(Note:  1.  PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE
DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS,
ARE OMITTED.  OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS:  *****.
        2.  TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH
USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NORTHEASTERN UNIVERSITY and<br>JARG CORPORATION | § <br> § <br> § | |
| Plaintiffs, | § <br> § | CASE NO. 2:07-CV-486 |
| v. | § <br> § | DEMAND FOR JURY TRIAL |
| GOOGLE, INC. | § <br> § <br> § | |
| Defendant. | § | |

**DOCKET CONTROL ORDER**

In accordance with the case status conference held herein on the 29th day of July, 2008, it

is hereby

**ORDERED** that the following schedule of deadlines is in effect until further order of this

court:

| | |
|---|---|
| April 4, 2011 | Jury Selection - 9:00 a.m. in **Marshall, Texas** |
| March 29, 2011 | Pretrial Conference – 9:00 a.m. in **Marshall, Texas** |
| March 25, 2011 | Joint Pretrial Order, Joint Proposed Jury Instructions and Form of the Verdict. |
| March 21, 2011 | **Responses to Motions *in Limine* Due** |
| | Responses to motions *in limine* filed prior to the motions *in limine* deadline shall be filed within 3 weeks after the motion *in limine* is filed. The parties are ordered to **meet and confer** on their respective motions *in limine* and **advise the court of any agreements in this regard by 3:00 p.m. the business day before** the pretrial conference. |

The parties shall limit their motions *in limine* to those issues which, if improperly introduced into the trial of the case would be so prejudicial that the court could not alleviate the prejudice with appropriate instruction(s).

| February 25, 2011 | **Motions in *Limine* Due** |
| --- | --- |
| March 7, 2011 | **Notice of Request for daily Transcript or Real Time Reporting of Court Proceedings.** If a daily trancript or real time reporting of court proceedings is requested for trial, the party or parties making said request shall file a notice with the Court and e-mail the Court Reporter, Susan Simmons, at lssimmons@yahoo.com |
| March 29, 2011 | Response to Dispositive Motions (including *Daubert* motions)[1] **Responses to dispositive motions filed prior to the dispositive motion deadline, including *Daubert* Motions, shall be filed within 3 weeks after the dispositive motion is filed.  Motions for Summary Judgment shall comply with Local Rule CV-56.** |
| March 7, 2011 | Deadline for filing Dispositive Motions and any other motions that may require a hearing (including *Daubert* motions) |
| March 7, 2011 | Mediation to be completed |
| February 18, 2011 | Parties to identify trial witnesses, exchange deposition designations, and exchange exhibit lists under Fed. R. Civ. P. 26(3)(A) |
| February 4, 2011 | Discovery Deadline |

---

[1] The parties are directed to Local Rule CV-7(d), which provides in part that "[i]n the event a party fails to oppose a motion in the manner prescribed herein the court will assume that the party has no opposition."

_____    **30** Days after claim construction ruling
Designate Rebuttal Expert Witnesses other than claims
construction
Expert witness report due
Refer to Discovery Order for required information.

_____    **15** Days after claim construction ruling
Comply with P.R. 3-7.

_____    **15** Days after claim construction ruling
Party with the burden of proof to designate Expert
Witnesses other than claim construction
Expert witness report due
Refer to Discovery Order for required information.

October 6, 2010        Claim construction hearing at 9:00 a.m., **Marshall, Texas.**

July 9, 2010           Respond to Amended Pleadings

June 25, 2010          Amend Pleadings
**(It is not necessary to file a Motion for Leave to Amend
before the deadline to amend pleadings except to the
extent the amendment seeks to add a new patent in suit.
It is necessary to file a Motion for Leave to Amend after
the amended pleadings date set forth herein.)**

May 7, 2010            Update of Privilege Logs to be exchanged by parties
(or a letter to the Court stating that there are no disputes as
to claims of privileged documents).

November 6, 2009       Join Additional Parties

October 26, 2009       Comply with P.R. 4-5(c).

3

| October 2, 2009 | Comply with P.R. 4-5(b). |
| September 4, 2009 | Comply with P.R. 4-5(a). |
| August 14, 2009 | Discovery deadline-claims construction issues. |
| July 10, 2009 | Comply with P.R. 4-3. |
| June 12, 2009 | Comply with P.R. 4-2. |
| May 22, 2009 | Comply with P.R. 4-1. |
| May 8, 2009 | Privilege Logs to be exchanged by parties (or a letter to the Court stating that there are no disputes as to claims of privileged documents). |
| November 7, 2008 | Comply with P.R. 3-3 and P.R. 3-4. |

## OTHER LIMITATIONS

1.    All depositions to be read into evidence as part of the parties' case-in-chief shall be **EDITED** so as to exclude all unnecessary, repetitious, and irrelevant testimony; **ONLY** those portions which are relevant to the issues in controversy shall be read into evidence.

2.    The Court will refuse to entertain any motion to compel discovery filed after the date of this Order unless the movant advises the Court within the body of the motion that counsel for the parties have first conferred in a good faith attempt to resolve the matter. See Eastern District of Texas Local Rule CV-7(h).

3.    The following excuses will not warrant a continuance nor justify a failure to comply with the discovery deadline:

   (a)    The fact that there are motions for summary judgment or motions to dismiss pending;

4

(b)     The fact that one or more of the attorneys is set for trial in another court on the same day, unless the other setting was made prior to the date of this order or was made as a special provision for the parties in the other case;

(c)     The failure to complete discovery prior to trial, unless the parties can demonstrate that it was impossible to complete discovery despite their good faith effort to do so.

SIGNED this 21st day of August, 2008.

CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GENETICS INSTITUTE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 08-290 (SLR) |
| | ) | |
| NOVARTIS VACCINES AND DIAGNOSTICS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

### DECLARATION OF BRADFORD A. LEWIN IN SUPPORT OF PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE TRANSFER

I, Bradford A. Lewin, hereby declare:

1.      I am Corporate Counsel in the Corporate, Mergers and Acquisitions, and Securities section of the Law Department at Wyeth.  I have been employed by Wyeth (formerly known as American Home Products Corporation) since 1980.  The term "Wyeth" as used in this declaration includes American Home Products Corporation.

2.      I have been made aware that Novartis has alleged that either Genetics Institute, LLC or its predecessor Genetics Institute, Inc. transferred all of its assets, including U.S. Patent No. 4,868,112, to Wyeth.

3.      I have searched Wyeth's Law Department corporate files relating to GI Inc. and GI LLC for documents reflecting any transfer of assets from Genetics Institute, Inc. or Genetics Institute, LLC to Wyeth.  Those files generally include corporate agreements relating to Wyeth and any existing or former subsidiaries of Wyeth (such as Genetics Institute, LLC and Genetics

Institute, Inc.) and include agreements involving transfers of assets.  Upon a search of those files, I found no transfer of any intellectual property assets from Genetics Institute, Inc. or Genetics Institute, LLC to Wyeth.  Based on my search of those files, I conclude that at no time did Genetics Institute, Inc. or Genetics Institute, LLC transfer any of its intellectual property assets, which includes U.S. Patent No. 4,868,112, to Wyeth.

4.    I have also searched the minutes of the Board of Directors of Genetics Institute, Inc. and Genetics Institute, LLC, and I found no authorization for a transfer of U.S. Patent No. 4,868,112 or any patent to Wyeth.  The only authorization by the Board of Directors of Genetics Institute, Inc. or Genetics Institute, LLC for a transfer of assets to Wyeth that I found expressly excluded patents.  (*See* Ex. 7.)

I declare under penalty of perjury that the foregoing is true and correct.

August 29, 2008

Bradford A. Lewin